Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 1 of 298   PageID 4862

**CDC** Centers for Disease
Control and Prevention

# Weekly U.S. Influenza Surveillance Report



A Weekly Influenza Surveillance Report Prepared by the Influenza Division

**Note:** CDC is tracking the COVID-19 pandemic in a weekly publication called COVID Data Tracker Weekly Review.
(https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/)

## Key Updates for Week 44, ending November 6, 2021

Seasonal influenza activity in the United States remains low, but the number of influenza virus detections reported by public health laboratories has increased in recent weeks.

## Viruses

| Clinical Lab | Public Health Lab | Virus Characterization |
|---|---|---|
| **0.3%** positive for influenza this week | A small but increasing number of specimens have tested positive. | Influenza virus characterization information will be reported later this season. (/flu/weekly/#VirusCharacterization) |

## Illness

### Outpatient Illness: ILINet

**2.1%**
of visits to a health care provider for ILI this week
(below baseline)

### Outpatient Illness: ILINet Activity Map

Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 2 of 298    PageID 4863

## Long-term Care Facilities

**0.1%**

of facilities reported
≥ 1 influenza-positive test
among residents this week

## Severe Disease

### FluSurv-NET

Hospitalization rates will be updated starting later this
season.

### HHS Protect Hospitalizations

**295**

patients admitted to hospitals with influenza
this week

### NCHS Mortality

**14.1%**

of deaths attributed to pneumonia, influenza, or COVID-
19 this week (above threshold)

### Pediatric Deaths

**0**

influenza-associated deaths occurring
this season

*All data are preliminary and may change as more reports are received.*

*A description of the CDC influenza surveillance system, including methodology and detailed descriptions of each data component is available on the* surveillance methods *(http://www.cdc.gov/flu/weekly/overview.htm)* *page.*

*Additional information on the current and previous influenza seasons for each surveillance component are available on* FluView Interactive *(https://www.cdc.gov/flu/weekly/fluviewinteractive.htm).*

### Key Points

- While influenza activity is low nationally, the number of influenza viruses detected by public health labs has increased in recent weeks.
- The majority of viruses detected are A(H3N2). More than 90% are among children and young adults aged 5-24 years.
- An annual flu vaccine is the best way to protect against flu and its potentially serious complications. CDC recommends everyone 6 months and older get a flu vaccine.
- As of October 29, 2021, 158.7M doses of flu vaccine have been distributed in the US.
- Flu vaccines are available at many different locations including pharmacies and health departments.
- Visit www.vaccines.gov to find a flu vaccine near you. There also are flu antiviral drugs that can be used to treat flu illness.

# U.S. Virologic Surveillance

**(https://www.cdc.gov/flu/weekly/overview.htm#anchor_1633697372803)**

AR-04322

# Clinical Laboratories

The results of tests performed by clinical laboratories nationwide are summarized below. Data from clinical laboratories (the percentage of specimens tested that are positive for influenza) are used to monitor whether influenza activity is increasing or decreasing.

|  | Week 44 | Data Cumulative since October 3, 2021 (Week 40) |
|---|---|---|
| No. of specimens tested | 34,828 | 201,409 |
| No. of positive specimens (%) | 101 (0.3%) | 320 (0.2%) |
| *Positive specimens by type* |  |  |
| Influenza A | 78 (77.2%) | 188 (58.8%) |
| Influenza B | 23 (22.8%) | 132 (41.3%) |

(http://gis.cdc.gov/grasp/fluview/fluportaldashboard.html)

View Chart Data (/flu/weekly/weeklyarchives2021-2022/data/whoAllregt_cl44.html) | View Full Screen (/flu/weekly/weeklyarchives2021-2022/WhoNPHL44.html)

# Public Health Laboratories

AR-04323

Case 2:21-cv-00229-Z Document 30-8 Filed 11/28/21 Page 4 of 298 PageID 4865

The _____ by public health laboratories worldwide. Data summarized below from public health laboratories are used to monitor the proportion of circulating viruses that belong to each influenza subtype/lineage.

|  | Week 44 | Data Cumulative since October 3, 2021 (Week 40) |
|---|---|---|
| No. of specimens tested | 21,450 | 107,933 |
| No. of positive specimens | 110 | 429 |
| *Positive specimens by type/subtype* |  |  |
| Influenza A | 107 (97.3%) | 401 (93.5%) |
| (H1N1)pdm09 | 0 | 1 (0.3%) |
| H3N2 | 102 (100%) | 383 (99.5%) |
| H3N2v | 0 | 1 (0.3%) |
| Subtyping not performed | 5 | 16 |
| Influenza B | 3 (2.7%) | 28 (6.5%) |
| Yamagata lineage | 0 | 2 (15.4 %) |
| Victoria lineage | 3 (100%) | 11 (84.6%) |
| Lineage not performed | 0 | 15 |

Overall influenza activity is still low; however, an increasing number of an influenza A(H3N2) viruses have been reported by public health laboratories in the most recent weeks. During the most recent three weeks, influenza A(H3N2) viruses have been reported by public health laboratories in seven of the 10 HHS regions (Regions 1, 3, 4, 5, 7, 8, and 9). Among 102 A(H3N2) viruses reported for week 44, 68 (66.7%) were reported by Michigan. The majority of influenza positives reported from Michigan can be linked to a single outbreak among young adults. Additionally, during week 44, a large backfill of data from previous weeks was received from Region 3. For regional and state level data about circulating influenza viruses, please visit FluView Interactive (https://gis.cdc.gov/grasp/fluview/fluportaldashboard.html).

AR-04324

(http://gis.cdc.gov/grasp/fluview/fluportaldashboard.html)

View Chart Data (/flu/weekly/weeklyarchives2021-2022/data/whoAllregt_phl44.html) | View Full Screen (/flu/weekly/weeklyarchives2021-2022/WhoPHL44.html)

Additional virologic surveillance information for current and past seasons:

Surveillance Methods (https://wcms-wp.cdc.gov/flu/weekly/overview.htm#anchor_1633697372803) | FluView Interactive: National, Regional, and State Data (http://gis.cdc.gov/grasp/fluview/fluportaldashboard.html) or Age Data (https://gis.cdc.gov/grasp/fluview/flu_by_age_virus.html)

# Influenza Virus Characterization (/flu/weekly/overview.htm#anchor_1633697390939)

CDC performs genetic (https://www.cdc.gov/flu/professionals/laboratory/genetic-characterization.htm) and antigenic (https://www.cdc.gov/flu/professionals/laboratory/antigenic.htm) characterization of U.S. viruses submitted from state and local health laboratories using Right Size Roadmap submission guidance. These data are used to compare how similar the currently circulating influenza viruses are to the reference viruses representing viruses contained in the current influenza vaccines and to monitor evolutionary changes that continually occur in influenza viruses circulating in humans. CDC also tests susceptibility of influenza viruses to antiviral medications including the neuraminidase inhibitors (oseltamivir, zanamivir, and peramivir) and the PA endonuclease inhibitor baloxavir.

Virus characterization data will be updated later this season when a sufficient number of specimens have been tested.

# Outpatient Illness Surveillance (https://www.cdc.gov/flu/weekly/overview.htm#anchor_1539281266932)

The U.S. Outpatient Influenza-like Illness Surveillance Network (ILINet) monitors outpatient visits for influenza-like illness [(ILI) fever plus cough or sore throat], not laboratory-confirmed influenza, and will capture visits due to other respiratory pathogens, such as SARS-CoV-2, that present with similar symptoms. Due to the COVID-19 pandemic, health care-seeking

Case 2:21-cv-00229-Z Document 30-8 Filed 11/28/21 Page 6 of 298 PageID 4867

behaviors have changed, people might be seeking care at the health care facilities that are part of ILINet or at a different point in their illness than they might have before the pandemic. Therefore, it is important to evaluate syndromic surveillance data, including that from ILINet, in the context of other sources of surveillance data to obtain a complete and accurate picture of influenza, COVID-19, and other respiratory virus activity. CDC is tracking the COVID-19 pandemic in a weekly publication called COVID Data Tracker Weekly Review (https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html). Information about other respiratory virus activity can be found on CDC's National Respiratory and Enteric Virus Surveillance System (NREVSS) website (https://www.cdc.gov/surveillance/nrevss/index.html).

## ILINet

Nationwide during week 44, 2.1% of patient visits reported through ILINet were due to ILI. This percentage is below the national baseline of 2.5%. Region 7 is above their region-specific baseline, and all other regions are below their baselines. Multiple respiratory viruses are co-circulating; therefore, the relative contribution of influenza virus infection to ILI varies by location.

(http://gis.cdc.gov/grasp/fluview/fluportaldashboard.html)

* Effective October 3, 2021 (week 40), the ILI definition (fever plus cough or sore throat) no longer includes "without a known cause other than influenza."

View Chart Data (current season only) (/flu/weekly/weeklyarchives2021-2022/data/senAllregt44.html) | View Full Screen (/flu/weekly/weeklyarchives2021-2022/ILI44.html)

## ILI Visits by Age Group

More than 70% of ILINet participants provide both the number of patient visits for ILI and the total number of patient visits for the week broken out by age group. Data from this subset of providers are used to calculate the percentages of patient visits for ILI by age group.

The percentages of visits for ILI reported in ILINet in week 44 increased for two age groups (0–4 years, 5–24 years) and remained stable for three age groups (25–49 years, 50–64 years, and 65+ years) compared to week 43. All age groups are showing a small increase or stable trend over the past four weeks.

(http://gis.cdc.gov/grasp/fluview/fluportaldashboard.html)

* Effective October 3, 2021 (week 40), the ILI definition (fever plus cough or sore throat) no longer includes "without a known cause other than influenza."

View Chart Data (/flu/weekly/weeklyarchives2021-2022/data/iliage44.html) | View Full Screen (/flu/weekly/weeklyarchives2021-2022/ILIAge44.html)

## ILI Activity Map

Data collected in ILINet are used to produce a measure of ILI activity*
(https://www.cdc.gov/flu/weekly/overview.htm#anchor_1633697504110) by state/jurisdiction and Core Based Statistical Areas (CBSA).

| Activity Level | Number of Jurisdictions | | Number of CBSAs | |
|---|---|---|---|---|
| | Week 44 (Week ending Nov. 6, 2021) | Week 43 (Week ending Oct. 30, 2021) | Week 44 (Week ending Nov. 6, 2021) | Week 43 (Week ending Oct. 30, 2021) |
| Very High | 0 | 0 | 2 | 0 |
| High | 1 | 0 | 9 | 9 |
| Moderate | 1 | 3 | 28 | 18 |
| Low | 10 | 2 | 81 | 79 |
| Minimal | 40 | 50 | 517 | 552 |
| Insufficient Data | 3 | 0 | 292 | 271 |

*Data collected in ILINet may disproportionally represent certain populations within a jurisdiction or CBSA, and therefore, may not accurately depict the full picture of influenza activity for the entire jurisdiction or CBSA. Differences in the data presented here by CDC and independently by some health departments likely represent differing levels of data completeness with data presented by the health department likely being the more complete.

Additional information about medically attended visits for ILI for current and past seasons:

Surveillance Methods (https://wcms-wp.cdc.gov/flu/weekly/overview.htm#anchor_1539281266932) | FluView Interactive: National, Regional, and State Data (http://gis.cdc.gov/grasp/fluview/fluportaldashboard.html) or ILI Activity Map (https://gis.cdc.gov/grasp/fluview/main.html)

# Long-term Care Facility (LTCF) Surveillance (https://www.cdc.gov/flu/weekly/overview.htm#anchor_1633698386507)

LTCFs (e.g., nursing homes/skilled nursing, long-term care for the developmentally disabled, and assisted living facilities) from all 50 states and U.S. territories report data on influenza infections among residents through the National Healthcare Safety Network (NHSN) Long-term Care Facility Component (https://www.cdc.gov/nhsn/ltc/index.html). During week 44, 18 (0.1%) of 14,228 reporting LTCFs reported at least one influenza positive test among their residents.

(/flu/weekly/weeklyarchives2021-2022/LTCF44.html)View Chart Data 🟢 (/flu/weekly/weeklyarchives2021-2022/data/LTCFData44.csv) | View Full Screen (/flu/weekly/weeklyarchives2021-2022/LTCF44.html)

Additional information about long-term care facility surveillance:
Surveillance Methods (https://www.cdc.gov/flu/weekly/overview.htm#anchor_1633698386507) | Additional Data ⧉ (https://data.cms.gov/covid-19/covid-19-nursing-home-data)

# Hospitalization Surveillance (http://www.cdc.gov/flu/weekly/overview.htm#anchor_1634240269291)

## FluSurv-NET

The Influenza Hospitalization Surveillance Network (FluSurv-NET) conducts population-based surveillance for laboratory-confirmed influenza-related hospitalizations in select counties in 14 states and represents approximately 9% of the U.S. population. FluSurv-NET estimated hospitalization rates will be updated weekly starting later this season.

Additional FluSurv-NET hospitalization surveillance information for current and past seasons and additional age groups:
Surveillance Methods (https://www.cdc.gov/flu/weekly/overview.htm#anchor_1633698456778) | FluView Interactive (http://gis.cdc.gov/GRASP/Fluview/FluHospRates.html)

## HHS-Protect Hospitalization Surveillance

Hospitals report to HHS-Protect the number of patients admitted with laboratory-confirmed influenza. During week 44, 295 patients with laboratory-confirmed influenza were admitted to the hospital.

(/flu/weekly/weeklyarchives2021-2022/Protect44.html)View Chart Data 📗 (/flu/weekly/weeklyarchives2021-2022/data/ProtectData44.csv) | View Full Screen (/flu/weekly/weeklyarchives2021-2022/Protect44.html)

**Additional HHS Protect hospitalization surveillance information:**
Surveillance Methods (https://www.cdc.gov/flu/weekly/overview.htm#anchor_1633698474047) | Additional Data 🔗 (https://healthdata.gov/Hospital/COVID-19-Reported-Patient-Impact-and-Hospital-Capa/anag-cw7u)

# Mortality Surveillance (https://www.cdc.gov/flu/weekly/overview.htm#anchor_1634311686144)

## National Center for Health Statistics (NCHS) Mortality Surveillance

Based on NCHS mortality surveillance data available on November 10, 2021, 14.1% of the deaths that occurred during the week ending November 6, 2021 (week 44), were due to pneumonia, influenza, and/or COVID-19 (PIC). This percentage is above the epidemic threshold of 6.1% for this week. Among the 2,230 PIC deaths reported for this week, 1,551 had COVID-19 listed as an underlying or contributing cause of death on the death certificate, and none listed influenza, indicating that current PIC mortality is due primarily to COVID-19 and not influenza. The data presented are preliminary and may change as more data are received and processed.

(https://gis.cdc.gov/grasp/fluview/mortality.html)View Chart Data (/flu/weekly/weeklyarchives2021-2022/data/NCHSData44.csv) | View Full Screen (/flu/weekly/weeklyarchives2021-2022/NCHS44.html)

---

**Additional pneumonia, influenza and COVID-19 mortality surveillance information for current and past seasons:**
Surveillance Methods (https://www.cdc.gov/flu/weekly/overview.htm#anchor_1633698570680) | FluView Interactive
(https://gis.cdc.gov/grasp/fluview/mortality.html)

## Influenza–Associated Pediatric Mortality

No influenza-associated pediatric deaths occurring during the 2021-2022 season have been reported to CDC.

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 12 of 298   PageID 4873

(http://gis.cdc.gov/GRASP/Fluview/PedFluDeath.html)

View Full Screen (/flu/weekly/weeklyarchives2021-2022/PedFlu44.html)

**Additional pediatric mortality surveillance information for current and past seasons:**
Surveillance Methods (https://www.cdc.gov/flu/weekly/overview.htm#anchor_1633698596803) | FluView Interactive
(https://gis.cdc.gov/GRASP/Fluview/PedFluDeath.html)

# Additional National and International Influenza Surveillance Information

**FluView Interactive:** FluView includes enhanced web-based interactive applications that can provide dynamic visuals of the influenza data collected and analyzed by CDC. These FluView Interactive applications (http://www.cdc.gov/flu/weekly/fluviewinteractive.htm) allow people to create customized, visual interpretations of influenza data, as well as make comparisons across flu seasons, regions, age groups and a variety of other demographics.

**National Institute for Occupational Safety and Health:** Monthly surveillance data on the prevalence of health-related workplace absenteeism among full-time workers in the United States are available from NIOSH (https://www.cdc.gov/niosh/topics/absences/default.html).

**U.S. State and local influenza surveillance:** Select a jurisdiction below to access the latest local influenza information.

Alabama (http://adph.org/influenza/)                    Alaska (http://dhss.alaska.gov/dph/Epi/id/Pages/influenza/flui

Colorado (https://www.colorado.gov/pacific/cdphe/influenza)   Connecticut (https://portal.ct.gov/DPH/Epidemiology-and-En

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 13 of 298   PageID 4874

Georgia (https://dph.georgia.gov/epidemiology/influenza/flu-activity-georgia)        Hawaii (http://health.hawaii.gov/docd/resources/reports/influ

Iowa (http://idph.iowa.gov/influenza/surveillance)        Kansas (http://www.kdheks.gov/flu/surveillance.htm)

Maryland (https://phpa.health.maryland.gov/influenza/fluwatch/)        Massachusetts (https://www.mass.gov/influenza)

Missouri (http://health.mo.gov/living/healthcondiseases/communicable/influenza/reports.php)        Montana (https://dphhs.mt.gov/publichealth/cdepi/diseases/

New Jersey (http://www.nj.gov/health/cd/topics/flu.shtml)        New Mexico (https://nmhealth.org/about/erd/ideb/isp/)

Ohio (http://www.flu.ohio.gov)        Oklahoma (https://www.ok.gov/health/Prevention_and_Preparedness/Acu

South Carolina (http://www.scdhec.gov/Health/DiseasesandConditions/InfectiousDiseases/Flu/FluData/)        South Dakota (https://doh.sd.gov/diseases/infectious/flu/su

Vermont (http://www.healthvermont.gov/immunizations-infectious-disease/influenza/flu-activity-and-surveillance)        Virginia (http://www.vdh.virginia.gov/epidemiology/influenza-

Wyoming (https://health.wyo.gov/publichealth/infectious-disease-epidemiology-unit/disease/influenza/)        New York City (http://www1.nyc.gov/site/doh/providers/hea

**World Health Organization:**
Additional influenza surveillance information from participating WHO member nations is available through
FluNet ☑ (https://www.who.int/tools/flunet) and the Global Epidemiology Reports. ☑ (https://www.who.int/teams/global-influenza-programme/surveillance-and-monitoring/influenza-surveillance-outputs)

**WHO Collaborating Centers for Influenza:**
Australia ☑ (http://www.influenzacentre.org/Surveillance_Samples_Received.html), China ☑ (http://www.chinaivdc.cn/cnic/), Japan ☑ (http://idsc.nih.go.jp/index.html), the United Kingdom ☑ (https://www.crick.ac.uk/research/worldwide-influenza-centre), and the United States (http://www.cdc.gov/flu/) (CDC in Atlanta, Georgia)

**Europe:**
The most up-to-date influenza information from Europe is available from WHO/Europe and the European Centre for Disease Prevention and Control ☑ (http://www.flunewseurope.org/).

**Public Health Agency of Canada:**
The most up-to-date influenza information from Canada is available in Canada's weekly FluWatch report ☑ (http://www.phac-aspc.gc.ca/fluwatch/).

**Public Health England:**
The most up-to-date influenza information from the United Kingdom is available from Public Health England ☑ (http://www.hpa.org.uk/Topics/InfectiousDiseases/InfectionsAZ/SeasonalInfluenza/).

**Any links provided to non-Federal organizations are provided solely as a service to our users. These links do not constitute an endorsement of these organizations or their programs by CDC or the Federal Government, and none should be inferred. CDC is not responsible for the content of the individual organization web pages found at these links.**

A description of the CDC influenza surveillance system, including methodology and detailed descriptions of each data component is available on the surveillance methods (http://www.cdc.gov/flu/weekly/overview.htm) page.

Page last reviewed: November 5, 2021, 11:00 AM



CDC Centers for Disease Control and Prevention

## COVID-19

# What to Do if You Had an Allergic Reaction After Getting a COVID-19 Vaccine

Updated Oct. 7, 2021      Print

> If you get a COVID-19 vaccine and you think you might be having a severe allergic reaction after leaving the vaccination provider site, seek immediate medical care by calling 911.

## If You Had a Severe Allergic Reaction to a COVID-19 Vaccine

If you had a severe allergic reaction—also known as anaphylaxis—after getting a shot of an mRNA COVID-19 vaccine (either Pfizer-BioNTech or Moderna), CDC recommends that you not get another shot of that vaccine. Learn which COVID-19 vaccines need a second shot.

A severe allergic reaction can cause a rapid heartbeat, difficulty breathing, swelling of the throat, or a generalized rash or hives. A person with a severe allergic reaction needs to be treated with epinephrine or EpiPen© or they must go to the hospital. Learn about common side effects of COVID-19 vaccines and when to call a doctor.

## If You Had a Non-severe Allergic Reaction to a COVID-19 Vaccine

If you had an immediate allergic reaction after getting a shot of an mRNA COVID-19 vaccine (either Pfizer-BioNTech or Moderna) COVID-19 vaccine, **you should not get another shot of that vaccine**, even if your allergic reaction was not severe enough to require emergency care.

An immediate allergic reaction happens within 4 hours of getting vaccinated and may include symptoms such as hives, swelling, and wheezing (respiratory distress). Your doctor may refer you to a specialist in allergies and immunology to provide more care or advice.

Learn about getting a different type of vaccine after an allergic reaction.

## If You Got a Rash Where You Got a COVID-19 Shot

If you had a red, itchy, swollen, or painful rash where you got a COVID-19 shot, **you should still get another shot** at the recommended interval if a second, additional, or booster shot is recommended. These rashes can start a few days to more than a week after the first shot and are sometimes quite large. These rashes are also known as "COVID arm." Tell your vaccination provider that you experienced a rash or "COVID arm" after the first shot. Your vaccination provider may recommend that you get the second shot in the opposite arm.

If the rash is itchy, you can take an antihistamine. If it is painful, you can take a pain medication like acetaminophen or a non-steroidal anti-inflammatory drug (NSAID).

## Safeguards Are in Place

CDC has provided recommendations for COVID-19 vaccination providers about how to prepare for the possibility of a severe allergic reaction:

- All people who get a COVID-19 vaccine should be monitored on site. People who have had severe allergic reactions or who have had any type of immediate allergic reaction to a vaccine or injectable therapy should be monitored for at least 30 minutes after getting the vaccine. All other people should be monitored for at least 15 minutes after getting the vaccine.
- Vaccination providers should have appropriate personnel, medications, and equipment—such as epinephrine, antihistamines, blood pressure monitor, and timing devices to check your pulse—at all COVID-19 vaccination provider sites.
- If you experience a severe allergic reaction after getting a COVID-19 vaccine, vaccination providers can provide care rapidly and call for emergency medical services. You should continue to be monitored in a medical facility for at least several hours.

Learn more about what to expect after getting vaccinated for COVID-19, including normal side effects and tips to reduce pain or discomfort.

## CDC Is Monitoring Reports of Severe Allergic Reactions

If someone has a severe allergic reaction after getting vaccinated, their vaccination provider will send a report to the Vaccine Adverse Event Reporting System (VAERS).  VAERS is a national system that collects reports from healthcare professionals, vaccine manufacturers, and the public about adverse events that happen after vaccination. Reports of adverse events that are unexpected, appear to happen more often than expected, or have unusual patterns are followed up with specific studies.

Learn more about how federal partners are monitoring the safety of COVID-19 vaccines in the United States.

## Related Pages

› Information about COVID-19 Vaccines for People with Allergies

› Possible Side Effects

› Ensuring the Safety of COVID-19 Vaccines



### For Healthcare Professionals

- Interim Considerations: Preparing for the Potential Management of Anaphylaxis at COVID-19 Vaccination Sites
- Interim Clinical Considerations for Use of mRNA COVID-19 Vaccines Currently Authorized in the United States
- COVID-19 Clinical Resources

## More Information

**Research**

Allergic Reactions Including Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine — United States, December 14–23, 2020

Allergic Reactions Including Anaphylaxis After Receipt of the First Dose of Moderna COVID-19 Vaccine — United States, December 21, 2020–January 10, 2021

**More Information**

AR-04335

Last Updated Oct. 7, 2021

AR-04336

 **U.S. Equal Employment Opportunity Commission**

# What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws

## INTRODUCTION

*Technical Assistance Questions and Answers - Updated on October 28, 2021.*

- *All EEOC materials related to COVID-19 are collected at* **www.eeoc.gov/coronavirus (https://www.eeoc.gov/coronavirus)** .

- The EEOC enforces workplace anti-discrimination laws, including the Americans with Disabilities Act (ADA) and the Rehabilitation Act (which include the requirement for reasonable accommodation and non-discrimination based on disability, and rules about employer medical examinations and inquiries), Title VII of the Civil Rights Act (which prohibits discrimination based on race, color, national origin, religion, and sex, including pregnancy), the Age Discrimination in Employment Act (which prohibits discrimination based on age, 40 or older), and the Genetic Information Nondiscrimination Act. Note: Other federal laws, as well as state or local laws, may provide employees with additional protections.

- Title I of the ADA applies to private employers with 15 or more employees. It also applies to state and local government employers, employment agencies, and labor unions. All nondiscrimination standards under Title I of the ADA also apply to federal agencies under Section 501 of the Rehabilitation Act. Basic background information about the ADA and the Rehabilitation Act is available

on EEOC's **disability page (https://www.eeoc.gov/disability-discrimination)** .

- The EEO laws, including the ADA and Rehabilitation Act, continue to apply during the time of the COVID-19 pandemic, but they do not interfere with or prevent employers from following the **guidelines and suggestions made by the CDC or state/local public health authorities (https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html)** about steps employers should take regarding COVID-19. **Employers should remember that guidance from public health authorities is likely to change as the COVID-19 pandemic evolves. Therefore, employers should continue to follow the most current information on maintaining workplace safety.** This includes evolving guidance found in the CDC publication, "**Interim Public Health Recommendations for Fully Vaccinated People (https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html)** ." Many common workplace inquiries about the COVID-19 pandemic are addressed in the CDC publication "**General Business Frequently Asked Questions (https://www.cdc.gov/coronavirus/2019-ncov/community/general-business-faq.html)** ."

- The EEOC has provided guidance (a publication entitled **Pandemic Preparedness in the Workplace and the Americans With Disabilities Act (https://www.eeoc.gov/laws/guidance/pandemic-preparedness-workplace-and-americans-disabilities-act)** [**PDF version (https://www.eeoc.gov/sites/default/files/2020-04/pandemic_flu.pdf)** ]) ("Pandemic Preparedness"), consistent with these workplace protections and rules, that can help employers implement strategies to navigate the impact of COVID-19 in the workplace. This pandemic publication, which was written during the prior H1N1 outbreak, is still relevant today and identifies established ADA and Rehabilitation Act principles to answer questions frequently asked about the workplace during a pandemic. It has been updated as of March 19, 2020 to address examples and information regarding COVID-19; **the new 2020 information appears in bold and is marked with an asterisk**.

- On March 27, 2020 the EEOC provided a webinar ("3/27/20 Webinar") which was recorded and transcribed and is available at **www.eeoc.gov/coronavirus (https://www.eeoc.gov/coronavirus)** . The World Health Organization (WHO) has declared COVID-19 to be an international pandemic. The EEOC pandemic

AR-04338

11/15/21, 8:59 AM    What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 19 of 298   PageID 4880

publication includes a **separate section (https://www.eeoc.gov/laws/guidance/pandemic-preparedness-workplace-and-americans-disabilities-act#secB)** that answers common employer questions about what to do after a pandemic has been declared. Applying these principles to the COVID-19 pandemic, the following may be useful:

# A. Disability–Related Inquiries and Medical Exams

*The ADA has restrictions on when and how much medical information an employer may obtain from any applicant or employee. Prior to making a conditional job offer to an applicant, disability-related inquiries and medical exams are generally prohibited. They are permitted between the time of the offer and when the applicant begins work, provided they are required for everyone in the same job category. Once an employee begins work, any disability-related inquiries or medical exams must be job related and consistent with business necessity. See CDC guidance, including the CDC's "**Interim Public Health Recommendations for Fully Vaccinated People. (https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html)** " The EEOC monitors CDC publications.*

**A.1. How much information may an employer request from an employee who calls in sick, in order to protect the rest of its workforce during the COVID-19 pandemic?** *(3/17/20)*

During a pandemic, ADA-covered employers may ask such employees if they are experiencing symptoms of the pandemic virus. For COVID-19, these include symptoms such as fever, chills, cough, shortness of breath, or sore throat. Employers must maintain all information about employee illness as a confidential medical record in compliance with the ADA.

**A.2. When screening employees entering the workplace during this time, may an employer only ask employees about the COVID-19 symptoms EEOC has identified as examples (https://www.eeoc.gov/transcript-march-27-2020-outreach-webinar#q1) , or may it ask about any symptoms identified by public health authorities as associated with COVID-19?** *(4/9/20)*

11/15/21, 8:59 AM          What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 20 of 298   PageID 4881

As public health authorities and doctors learn more about COVID-19, they may expand the list of associated symptoms. Employers should rely on the CDC, other public health authorities, and reputable medical sources for guidance on emerging symptoms associated with the disease. These sources may guide employers when choosing questions to ask employees to determine whether they would pose a direct threat to health in the workplace. For example, additional symptoms beyond fever or cough may include new loss of smell or taste as well as gastrointestinal problems, such as nausea, diarrhea, and vomiting.

### A.3. When may an ADA-covered employer take the body temperature of employees during the COVID-19 pandemic? *(3/17/20)*

Generally, measuring an employee's body temperature is a medical examination. Because the CDC and state/local health authorities have acknowledged community spread of COVID-19 and issued attendant precautions, employers may measure employees' body temperature. However, employers should be aware that some people with COVID-19 do not have a fever.

### A.4. Does the ADA allow employers to require employees to stay home if they have symptoms of the COVID-19? *(3/17/20)*

Yes. The CDC states that employees who become ill with symptoms of COVID-19 should leave the workplace. The ADA does not interfere with employers following this advice.

### A.5. >When employees return to work, does the ADA allow employers to require a doctor's note certifying fitness for duty? *(3/17/20)*

Yes. Such inquiries are permitted under the ADA either because they would not be disability-related or, if the pandemic were truly severe, they would be justified under the ADA standards for disability-related inquiries of employees. As a practical matter, however, doctors and other health care professionals may be too busy during and immediately after a pandemic outbreak to provide fitness-for-duty documentation. Therefore, new approaches may be necessary, such as reliance on local clinics to provide a form, a stamp, or an e-mail to certify that an individual does not have the pandemic virus.

### A.6. May an employer administer a COVID-19 test (a test to detect the presence of the COVID-19 virus) when evaluating an employee's initial or continued

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 21 of 298   PageID 4882

**presence in the workplace?** *(4/23/20; updated 9/8/20 to address stakeholder questions about updates to CDC guidance)*

The ADA requires that any mandatory medical test of employees be "job related and consistent with business necessity." Applying this standard to the current circumstances of the COVID-19 pandemic, employers may take screening steps to determine if **employees entering the workplace have COVID-19 (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#A.2)** because **an individual with the virus will pose a direct threat (https://www.eeoc.gov/transcript-march-27-2020-outreach-webinar#q1)** to the health of others. Therefore an employer may choose to administer COVID-19 testing to employees before initially permitting them to enter the workplace and/or periodically to determine if their presence in the workplace poses a direct threat to others. The ADA does not interfere with employers following **recommendations by the CDC (https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/testing-non-healthcare-workplaces.html)** or other public health authorities regarding whether, when, and for whom testing or other screening is appropriate. Testing administered by employers consistent with current CDC guidance will meet the ADA's "business necessity" standard.

Consistent with the ADA standard, employers should ensure that the tests are considered accurate and reliable. For example, employers may review **information (https://www.fda.gov/medical-devices/emergency-situations-medical-devices/faqs-diagnostic-testing-sars-cov-2)** from the U.S. Food and Drug Administration about what may or may not be considered safe and accurate testing, as well as guidance from CDC or other public health authorities. Because the CDC and FDA may revise their recommendations based on new information, it may be helpful to check these agency websites for updates. Employers may wish to consider the incidence of false-positives or false-negatives associated with a particular test. Note that a positive test result reveals that an individual most likely has a current infection and may be able to transmit the virus to others. A negative test result means that the individual did not have detectable COVID-19 at the time of testing.

A negative test does not mean the employee will not acquire the virus later. Based on guidance from medical and public health authorities, employers should still require–to the greatest extent possible–that employees observe infection control

AR-04341

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 22 of 298   PageID 4883

practices (such as social distancing, regular handwashing, and other measures) in the workplace to prevent transmission of COVID-19.

*Note: Question A.6 and A.8 address screening of employees generally. See Question A.9 regarding decisions to screen individual employees.*

**A.7. CDC said in its Interim Guidelines (https://www.cdc.gov/coronavirus/2019-ncov/lab/resources/antibody-tests-guidelines.html) that antibody test results "should not be used to make decisions about returning persons to the workplace." In light of this CDC guidance, under the ADA may an employer require antibody testing before permitting employees to re-enter the workplace?** *(6/17/20)*

No. An antibody test constitutes a medical examination under the ADA. In light of CDC's **Interim Guidelines (https://www.cdc.gov/coronavirus/2019-ncov/lab/resources/antibody-tests-guidelines.html)** that antibody test results "should not be used to make decisions about returning persons to the workplace," an antibody test at this time does not meet the ADA's "job related and consistent with business necessity" standard for medical examinations or inquiries for current employees. Therefore, requiring antibody testing before allowing employees to re-enter the workplace is not allowed under the ADA. Please note that an antibody test is different from a test to determine if someone has an active case of COVID-19 (i.e., a viral test). The EEOC has already stated that COVID-19 viral tests are **permissible under the ADA (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#A.6)** .

The EEOC will continue to closely monitor CDC's recommendations, and could update this discussion in response to changes in CDC's recommendations.

**A.8. May employers ask all employees physically entering the workplace if they have been diagnosed with or tested for COVID-19?** *(9/8/20; adapted from 3/27/20 Webinar Question 1)*

Yes. Employers may ask all employees who will be physically entering the workplace if they have COVID-19 or symptoms associated with COVID-19, and ask if they have been tested for COVID-19. Symptoms associated with COVID-19 include, for example, fever, chills, cough, and shortness of breath. The CDC has identified a **current list of symptoms (https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html)** .

AR-04342

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 23 of 298   PageID 4884

An employer may exclude those with COVID-19, or symptoms associated with COVID-19, from the workplace because, as EEOC has stated, their presence would pose a direct threat to the health or safety of others. However, for those employees who are teleworking and are not physically interacting with coworkers or others (for example, customers), the employer would generally not be permitted to ask these questions.

**A.9. May a manager ask only one employee—as opposed to asking all employees—questions designed to determine if she has COVID-19, or require that this employee alone have her temperature taken or undergo other screening or testing?** *(9/8/20; adapted from 3/27/20 Webinar Question 3)*

If an employer wishes to ask only a particular employee to answer such questions, or to have her temperature taken or undergo other screening or testing, the ADA requires the employer to have a reasonable belief based on objective evidence that this person might have the disease. So, it is important for the employer to consider why it wishes to take these actions regarding this particular employee, such as a display of COVID-19 symptoms. In addition, the ADA does not interfere with employers following **recommendations by the CDC (https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/testing-non-healthcare-workplaces.html)** or other public health authorities regarding whether, when, and for whom testing or other screening is appropriate.

**A.10. May an employer ask an employee who is physically coming into the workplace whether they have family members who have COVID-19 or symptoms associated with COVID-19?** *(9/8/20; adapted from 3/27/20 Webinar Question 4)*

No. The Genetic Information Nondiscrimination Act (GINA) prohibits employers from asking employees medical questions about family members. GINA, however, does not prohibit an employer from asking employees whether they have had contact with anyone diagnosed with COVID-19 or who may have symptoms associated with the disease. Moreover, from a public health perspective, only asking an employee about his contact with family members would unnecessarily limit the information obtained about an employee's potential exposure to COVID-19.

**A.11. What may an employer do under the ADA if an employee refuses to permit the employer to take his temperature or refuses to answer questions about**

AR-04343

**whether he has COVID-19, has symptoms associated with COVID-19, or has been tested for COVID-19?** *(9/8/20; adapted from 3/27/20 Webinar Question 2)*

Under the circumstances existing currently, the ADA allows an employer to bar an employee from physical presence in the workplace if he refuses to have his temperature taken or refuses to answer questions about whether he has COVID-19, has symptoms associated with COVID-19, or has been tested for COVID-19. To gain the cooperation of employees, however, employers may wish to ask the reasons for the employee's refusal. The employer may be able to provide information or reassurance that they are taking these steps to ensure the safety of everyone in the workplace, and that these steps are consistent with health screening recommendations from CDC. Sometimes, employees are reluctant to provide medical information because they fear an employer may widely spread such personal medical information throughout the workplace. The ADA prohibits such broad disclosures. Alternatively, if an employee requests reasonable accommodation with respect to screening, the usual accommodation process should be followed; this is discussed in Question G.7.

**A.12. During the COVID-19 pandemic, may an employer request information from employees who work on-site, whether regularly or occasionally, who report feeling ill or who call in sick?** *(9/8/20; adapted from Pandemic Preparedness Question 6)*

Due to the COVID-19 pandemic, at this time employers may ask employees who work on-site, whether regularly or occasionally, and report feeling ill or who call in sick, questions about their symptoms as part of workplace screening for COVID-19.

**A.13. May an employer ask an employee why he or she has been absent from work?** *(9/8/20; adapted from Pandemic Preparedness Question 15)*

Yes. Asking why an individual did not report to work is not a disability-related inquiry. An employer is always entitled to know why an employee has not reported for work.

**A.14. When an employee returns from travel during a pandemic, must an employer wait until the employee develops COVID-19 symptoms to ask questions about where the person has traveled?** *(9/8/20; adapted from Pandemic Preparedness Question 8)*

No. Questions about where a person traveled would not be disability-related inquiries. If the CDC or state or local public health officials recommend that people who visit specified locations remain at home for a certain period of time, an employer may ask whether employees are returning from these locations, even if the travel was personal.

# B. Confidentiality of Medical Information

*With limited exceptions, the ADA requires employers to keep confidential any medical information they learn about any applicant or employee. Medical information includes not only a diagnosis or treatments, but also the fact that an individual has requested or is receiving a reasonable accommodation.*

**B.1. May an employer store in existing medical files information it obtains related to COVID-19, including the results of taking an employee's temperature or the employee's self-identification as having this disease, or must the employer create a new medical file system solely for this information?** *(4/9/20)*

The ADA requires that all medical information about a particular employee be stored separately from the employee's personnel file, thus limiting access to this **confidential information (https://www.eeoc.gov/transcript-march-27-2020-outreach-webinar#q9)** . An employer may store all medical information related to COVID-19 in existing medical files. This includes an employee's statement that he has the disease or suspects he has the disease, or the employer's notes or other documentation from questioning an employee about symptoms.

**B.2. If an employer requires all employees to have a daily temperature check before entering the workplace, may the employer maintain a log of the results?** *(4/9/20)*

Yes. The employer needs to maintain the confidentiality of this information.

**B.3. May an employer disclose the name of an employee to a public health agency when it learns that the employee has COVID-19?** *(4/9/20)*

**Yes (https://www.cdc.gov/coronavirus/2019-ncov/community/contact-tracing-nonhealthcare-workplaces.html)** .

11/15/21, 8:59 AM        What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O...

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 26 of 298   PageID 4887

**B.4. May a temporary staffing agency or a contractor that places an employee in an employer's workplace notify the employer if it learns the employee has COVID-19?** *(4/9/20)*

Yes. The staffing agency or contractor may notify the employer and disclose the name of the employee, because the employer may need to determine if this employee had contact with anyone in the workplace.

**B.5. Suppose a manager learns that an employee has COVID-19, or has symptoms associated with the disease. The manager knows she must report it but is worried about violating ADA confidentiality. What should she do?** *(9/8/20; adapted from 3/27/20 Webinar Question 5)*

The ADA requires that an employer keep all medical information about employees confidential, even if that information is not about a disability. Clearly, the information that an employee has symptoms of, or a diagnosis of, COVID-19, is medical information. But the fact that this is medical information does not prevent the manager from reporting to appropriate employer officials so that they can take actions consistent with guidance from the CDC and other public health authorities.

The question is really what information to report: is it the fact that an employee—unnamed—has symptoms of COVID-19 or a diagnosis, or is it the identity of that employee? Who in the organization needs to know the identity of the employee will depend on each workplace and why a specific official needs this information. Employers should make every effort to limit the number of people who get to know the name of the employee.

The ADA does not interfere with a designated representative of the employer interviewing the employee to get a list of people with whom the employee possibly had contact through the workplace, so that the employer can then take action to notify those who may have come into contact with the employee, without revealing the employee's identity. For example, using a generic descriptor, such as telling employees that "someone at this location" or "someone on the fourth floor" has COVID-19, provides notice and does not violate the ADA's prohibition of disclosure of confidential medical information. For small employers, coworkers might be able to figure out who the employee is, but employers in that situation are still prohibited from confirming or revealing the employee's identity. Also, all employer officials who are designated as needing to know the identity of an employee should be specifically instructed that they must maintain the confidentiality of this information. Employers may want to plan in advance what supervisors and



11/15/21, 8:59 AM          What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 27 of 298   PageID 4888

managers should do if this situation arises and determine who will be responsible for receiving information and taking next steps.

**B.6. An employee who must report to the workplace knows that a coworker who reports to the same workplace has symptoms associated with COVID-19. Does ADA confidentiality prevent the first employee from disclosing the coworker's symptoms to a supervisor?** *(9/8/20; adapted from 3/27/20 Webinar Question 6)*

No. ADA confidentiality does not prevent this employee from communicating to his supervisor about a coworker's symptoms. In other words, it is not an ADA confidentiality violation for this employee to inform his supervisor about a coworker's symptoms. After learning about this situation, the supervisor should contact appropriate management officials to report this information and discuss next steps.

**B.7. An employer knows that an employee is teleworking because the person has COVID-19 or symptoms associated with the disease, and that he is in self-quarantine. May the employer tell staff that this particular employee is teleworking without saying why?** *(9/8/20; adapted from 3/27/20 Webinar Question 7)*

Yes. If staff need to know how to contact the employee, and that the employee is working even if not present in the workplace, then disclosure that the employee is teleworking without saying why is permissible. Also, if the employee was on leave rather than teleworking because he has COVID-19 or symptoms associated with the disease, or any other medical condition, then an employer cannot disclose the reason for the leave, just the fact that the individual is on leave.

**B.8. Many employees, including managers and supervisors, are now teleworking as a result of COVID-19. How are they supposed to keep medical information of employees confidential while working remotely?** *(9/8/20; adapted from 3/27/20 Webinar Question 9)*

The ADA requirement that medical information be kept confidential includes a requirement that it be stored separately from regular personnel files. If a manager or supervisor receives medical information involving COVID-19, or any other medical information, while teleworking, and is able to follow an employer's existing confidentiality protocols while working remotely, the supervisor has to do so. But to the extent that is not feasible, the supervisor still must safeguard this information to

the greatest extent possible until the supervisor can properly store it. This means that paper notepads, laptops, or other devices should not be left where others can access the protected information.

Similarly, documentation must not be stored electronically where others would have access. A manager may even wish to use initials or another code to further ensure confidentiality of the name of an employee.

# C. Hiring and Onboarding

*Under the ADA, prior to making a conditional job offer to an applicant, disability-related inquiries and medical exams are generally prohibited. They are permitted between the time of the offer and when the applicant begins work, provided they are required for everyone in the same job category.*

### C.1. If an employer is hiring, may it screen applicants for symptoms of COVID-19? *(3/18/20)*

Yes. An employer may screen job applicants for symptoms of COVID-19 after making a conditional job offer, as long as it does so for all entering employees in the same type of job. This ADA rule applies whether or not the applicant has a disability.

### C.2. May an employer take an applicant's temperature as part of a post-offer, pre-employment medical exam? *(3/18/20)*

Yes. Any medical exams are permitted after an employer has made a conditional offer of employment. However, employers should be aware that some people with COVID-19 do not have a fever.

### C.3. May an employer delay the start date of an applicant who has COVID-19 or symptoms associated with it? *(3/18/20)*

Yes. According to current CDC guidance, an individual who has COVID-19 or symptoms associated with it should not be in the workplace.

### C.4. May an employer withdraw a job offer when it needs the applicant to start immediately but the individual has COVID-19 or symptoms of it? *(3/18/20)*

Based on current CDC guidance, this individual cannot safely enter the workplace, and therefore the employer may withdraw the job offer.

11/15/21, 8:59 AM     What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 29 of 298   PageID 4890

**C.5. May an employer postpone the start date or withdraw a job offer because the individual is 65 years old or pregnant, both of which place them at higher risk from COVID-19?** *(4/9/20)*

No. The fact that the CDC has identified those who are 65 or older, or pregnant women, as being at greater risk does not justify unilaterally postponing the start date or withdrawing a job offer. However, an employer may choose to allow telework or to discuss with these individuals if they would like to postpone the start date.

# D. Reasonable Accommodation

*Under the ADA, reasonable accommodations are adjustments or modifications provided by an employer to enable people with disabilities to enjoy equal employment opportunities. If a reasonable accommodation is needed and requested by an individual with a disability to apply for a job, perform a job, or enjoy benefits and privileges of employment, the employer must provide it unless it would pose an undue hardship, meaning significant difficulty or expense. An employer has the discretion to choose among effective accommodations. Where a requested accommodation would result in undue hardship, the employer must offer an alternative accommodation if one is available absent undue hardship. In discussing accommodation requests, employers and employees may find it helpful to consult the Job Accommodation Network (JAN) website for types of accommodations,* **www.askjan.org (http://www.askjan.org/)** *. JAN's materials specific to COVID-19 are at* **https://askjan.org/topics/COVID-19.cfm (https://askjan.org/topics/COVID-19.cfm)** *.*

**D.1. If a job may only be performed at the workplace, are there reasonable accommodations (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#general) for individuals with disabilities, absent undue hardship (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#undue) , that could offer protection to an employee who, due to a preexisting disability, is at higher risk from COVID-19?** *(4/9/20)*

There may be reasonable accommodations that **could offer protection to an individual whose disability puts him at greater risk from COVID-19**

**(https://www.eeoc.gov/transcript-march-27-2020-outreach-webinar#q17)** and who therefore requests such actions to eliminate possible exposure. Even with the constraints imposed by a pandemic, some accommodations may meet an employee's needs on a temporary basis without causing undue hardship on the employer.

Low-cost solutions achieved with materials already on hand or easily obtained may be effective. If not already implemented for all employees, accommodations for those who request reduced contact with others due to a disability may include changes to the work environment such as designating one-way aisles; using plexiglass, tables, or other barriers to ensure minimum distances between customers and coworkers whenever feasible per **CDC guidance (https://www.cdc.gov/coronavirus/2019-ncov/community/index.html)** or other accommodations that reduce chances of exposure.

Flexibility by employers and employees is important in determining if some accommodation is possible in the circumstances. Temporary job restructuring of marginal job duties, temporary transfers to a different position, or modifying a work schedule or shift assignment may also permit an individual with a disability to perform safely the essential functions of the job while reducing exposure to others in the workplace or while commuting.

**D.2. If an employee has a preexisting mental illness or disorder that has been exacerbated by the COVID-19 pandemic, may he now be entitled to a reasonable accommodation (absent undue hardship)?** *(4/9/20)*

Although many people feel significant stress due to the COVID-19 pandemic, employees with certain preexisting mental health conditions, for example, anxiety disorder, obsessive-compulsive disorder, or post-traumatic stress disorder, may have more difficulty handling the disruption to daily life that has accompanied the COVID-19 pandemic.

As with any accommodation request, employers may: ask questions to determine whether the condition is a disability; discuss with the employee how the requested accommodation would assist him and enable him to keep working; explore alternative accommodations that may effectively meet his needs; and request medical documentation if needed.

**D.3. In a workplace where all employees are required to telework during this time, should an employer postpone discussing a request from an employee**

AR-04350

11/15/21, 8:59 AM          What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 31 of 298   PageID 4892

**with a disability for an accommodation that will not be needed until he returns to the workplace when mandatory telework ends?** *(4/9/20)*

Not necessarily. An employer may give higher priority to discussing requests for reasonable accommodations that are needed while teleworking, but the employer may begin discussing this request now. The employer may be able to acquire all the information it needs to make a decision. If a reasonable accommodation is granted, the employer also may be able to make some arrangements for the accommodation in advance.

**D.4. What if an employee was already receiving a reasonable accommodation prior to the COVID-19 pandemic and now requests an additional or altered accommodation?** *(4/9/20)*

An employee who was already receiving a reasonable accommodation prior to the COVID-19 pandemic may be entitled to an additional or altered accommodation, absent undue hardship. For example, an employee who is teleworking because of the pandemic may need a different type of accommodation than what he **uses in the workplace (https://www.eeoc.gov/transcript-march-27-2020-outreach-webinar#q20)** . The employer **may discuss (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#requesting)** with the employee whether the same or a different disability is the basis for this new request and why an additional or altered accommodation is needed.

**D.5. During the pandemic, if an employee requests an accommodation for a medical condition either at home or in the workplace, may an employer still request information to determine if the condition is a disability?** *(4/17/20)*

Yes, if it is not obvious or already known, an employer may ask questions or request medical documentation to determine whether the employee has a "disability" as defined by the ADA (a physical or mental impairment that substantially limits a major life activity, or a history of a substantially limiting impairment).

**D.6. During the pandemic, may an employer still engage in the interactive process and request information from an employee about why an accommodation is needed?** *(4/17/20)*

Yes, if it is not obvious or already known, an employer may ask questions or request **medical documentation (https://www.eeoc.gov/transcript-march-27-2020-**

11/15/21, 8:59 AM        What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 32 of 298   PageID 4893

**outreach-webinar#q17)** to determine whether the employee's disability necessitates an accommodation, either the one he requested or any other. **Possible questions (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#requesting)** for the employee may include: (1) how the disability creates a limitation, (2) how the requested accommodation will effectively address the limitation, (3) whether another form of accommodation could effectively address the issue, and (4) how a proposed accommodation will enable the employee to continue performing the "essential functions" of his position (that is, the fundamental job duties).

### D.7. If there is some urgency to providing an accommodation, or the employer has limited time available to discuss the request during the pandemic, may an employer provide a temporary accommodation? *(4/17/20)*

Yes. Given the pandemic, some employers may choose to forgo or shorten the exchange of information between an employer and employee known as the "interactive process" (discussed in D.5 and D.6., above) and grant the request. In addition, when government restrictions change, or are partially or fully lifted, the need for accommodations may also change. This may result in more requests for short-term accommodations. Employers may wish to adapt the interactive process—and devise end dates for the accommodation—to suit changing circumstances based on public health directives.

Whatever the reason for shortening or adapting the interactive process, an employer may also choose to place an end date on the accommodation (for example, either a specific date such as May 30, or when the employee returns to the workplace part- or full-time due to changes in government restrictions limiting the number of people who may congregate). Employers may also opt to provide a requested accommodation on an interim or trial basis, with an end date, while awaiting receipt of medical documentation. Choosing one of these alternatives may be particularly helpful where the requested accommodation would provide protection that an employee may need because of a pre-existing disability that puts her at greater risk during this pandemic. This **could also apply (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D.2)** to employees who have disabilities exacerbated by the pandemic.

Employees may request an extension that an employer must consider, particularly if current government restrictions are extended or new ones adopted.


AR-04352

11/15/21, 8:59 AM          What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 33 of 298   PageID 4894

**D.8. May an employer invite employees now to ask for reasonable accommodations they may need in the future when they are permitted to return to the workplace?** *(4/17/20; updated 9/8/20 to address stakeholder questions)*

Yes. Employers may inform the workforce that employees with disabilities may request accommodations in advance that they believe they may need when the workplace re-opens. This is discussed in greater detail in Question G.6. If advance requests are received, employers may begin the "interactive process" – the discussion between the employer and employee focused on whether the impairment is a disability and the reasons that an accommodation is needed. If an employee chooses not to request accommodation in advance, and instead requests it at a later time, the employer must still consider the request at that time.

**D.9. Are the circumstances of the pandemic relevant to whether a requested accommodation can be denied because it poses an undue hardship?** *(4/17/20)*

Yes. An employer does not have to provide a particular reasonable accommodation if it poses an "**undue hardship (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#undue)** ," which means "significant difficulty or expense." As described in the two questions that follow, in some instances, an accommodation that would not have posed an undue hardship prior to the pandemic may pose one now.

**D.10. What types of undue hardship considerations may be relevant to determine if a requested accommodation poses "significant difficulty" during the COVID-19 pandemic?** *(4/17/20)*

An employer may consider whether current circumstances create "significant difficulty" in acquiring or providing certain accommodations, considering the facts of the particular job and workplace. For example, it may be significantly more difficult in this pandemic to conduct a needs assessment or to acquire certain items, and delivery may be impacted, particularly for employees who may be teleworking. Or, it may be significantly more difficult to provide employees with temporary assignments, to remove marginal functions, or to readily hire temporary workers for specialized positions. If a particular accommodation poses an undue hardship, employers and employees should work together to determine if there may be an alternative that could be provided that does not pose such problems.


AR-04353

11/15/21, 8:59 AM    What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 34 of 298    PageID 4895

**D.11. What types of undue hardship considerations may be relevant to determine if a requested accommodation poses "significant expense" during the COVID-19 pandemic?** *(4/17/20)*

Prior to the COVID-19 pandemic, most accommodations did not pose a significant expense when considered against an employer's overall budget and resources (always considering the budget/resources of the entire entity and not just its components). But, the sudden loss of some or all of an employer's income stream because of this pandemic is a relevant consideration. Also relevant is the amount of discretionary funds available at this time—when considering other expenses—and whether there is an expected date that current restrictions on an employer's operations will be lifted (or new restrictions will be added or substituted). These considerations do not mean that an employer can reject any accommodation that costs money; an employer must weigh the cost of an accommodation against its current budget while taking into account constraints created by this pandemic. For example, even under current circumstances, there may be many no-cost or very low-cost accommodations.

**D.12. Do the ADA and the Rehabilitation Act apply to applicants or employees who are classified as "critical infrastructure workers (https://www.cdc.gov/coronavirus/2019-ncov/downloads/Essential-Critical-Workers_Dos-and-Donts.pdf) " or "essential critical workers (https://www.cdc.gov/coronavirus/2019-ncov/community/critical-workers/implementing-safety-practices.html) " by the CDC?** *(4/23/20)*

Yes. These CDC designations, or any other designations of certain employees, do not eliminate coverage under the ADA or the Rehabilitation Act, or any other equal employment opportunity law. Therefore, employers receiving requests for reasonable accommodation under the ADA or the Rehabilitation Act from employees falling in these categories of jobs must accept and process the requests as they would for any other employee. Whether the request is granted will depend on whether the worker is an individual with a disability, and whether there is a reasonable accommodation that can be provided absent undue hardship.

**D.13. Is an employee entitled to an accommodation under the ADA in order to avoid exposing a family member who is at higher risk of severe illness from COVID-19 due to an underlying medical condition?** *(6/11/20)*

No. Although the ADA prohibits discrimination based on association with an individual with a disability, that protection is limited to disparate treatment or


AR-04354

11/15/21, 8:59 AM    What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 35 of 298   PageID 4896

harassment. The ADA does not require that an employer accommodate an employee without a disability based on the disability-related needs of a family member or other person with whom she is associated.

For example, an employee without a disability is not entitled under the ADA to telework as an accommodation in order to protect a family member with a disability from potential COVID-19 exposure.

Of course, an employer is free to provide such flexibilities if it chooses to do so. An employer choosing to offer additional flexibilities beyond what the law requires should be careful not to engage in disparate treatment on a protected EEO basis.

**D.14. When an employer requires some or all of its employees to telework because of COVID-19 or government officials require employers to shut down their facilities and have workers telework, is the employer required to provide a teleworking employee with the same reasonable accommodations for disability under the ADA or the Rehabilitation Act that it provides to this individual in the workplace?** *(9/8/20; adapted from 3/27/20 Webinar Question 20)*

If such a request is made, the employer and employee should discuss what the employee needs and why, and whether the same or a different accommodation could suffice in the home setting. For example, an employee may already have certain things in their home to enable them to do their job so that they do not need to have all of the accommodations that are provided in the workplace.

Also, the undue hardship considerations might be different when evaluating a request for accommodation when teleworking rather than working in the workplace. A reasonable accommodation that is feasible and does not pose an undue hardship in the workplace might pose one when considering circumstances, such as the place where it is needed and the reason for telework. For example, the fact that the period of telework may be of a temporary or unknown duration may render certain accommodations either not feasible or an undue hardship. There may also be constraints on the normal availability of items or on the ability of an employer to conduct a necessary assessment.

As a practical matter, and in light of the circumstances that led to the need for telework, employers and employees should both be creative and flexible about what can be done when an employee needs a reasonable accommodation for telework at home. If possible, providing interim accommodations might be


AR-04355

appropriate while an employer discusses a request with the employee or is waiting for additional information.

**D.15. Assume that an employer grants telework to employees for the purpose of slowing or stopping the spread of COVID-19. When an employer reopens the workplace and recalls employees to the worksite, does the employer automatically have to grant telework as a reasonable accommodation to every employee with a disability who requests to continue this arrangement as an ADA/Rehabilitation Act accommodation?** *(9/8/20; adapted from 3/27/20 Webinar Question 21)*

No. Any time an employee requests a reasonable accommodation, the employer is entitled to understand the disability-related limitation that necessitates an accommodation. If there is no disability-related limitation that requires teleworking, then the employer does not have to provide telework as an accommodation. Or, if there is a disability-related limitation but the employer can effectively address the need with another form of reasonable accommodation at the workplace, then the employer can choose that alternative to telework.

To the extent that an employer is permitting telework to employees because of COVID-19 and is choosing to excuse an employee from performing one or more essential functions, then a request—after the workplace reopens—to continue telework as a reasonable accommodation does not have to be granted if it requires continuing to excuse the employee from performing an essential function. The ADA never requires an employer to eliminate an essential function as an accommodation for an individual with a disability.

The fact that an employer temporarily excused performance of one or more essential functions when it closed the workplace and enabled employees to telework for the purpose of protecting their safety from COVID-19, or otherwise chose to permit telework, does not mean that the employer permanently changed a job's essential functions, that telework is always a feasible accommodation, or that it does not pose an undue hardship. These are fact-specific determinations. The employer has no obligation under the ADA to refrain from restoring all of an employee's essential duties at such time as it chooses to restore the prior work arrangement, and then evaluating any requests for continued or new accommodations under the usual ADA rules.

**D.16. Assume that prior to the emergence of the COVID-19 pandemic, an employee with a disability had requested telework as a reasonable**


AR-04356

11/15/21, 8:59 AM	What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 37 of 298   PageID 4898

**accommodation. The employee had shown a disability-related need for this accommodation, but the employer denied it because of concerns that the employee would not be able to perform the essential functions remotely. In the past, the employee therefore continued to come to the workplace. However, after the COVID-19 crisis has subsided and temporary telework ends, the employee renews her request for telework as a reasonable accommodation. Can the employer again refuse the request?** *(9/8/20; adapted from 3/27/20 Webinar Question 22)*

Assuming all the requirements for such a reasonable accommodation are satisfied, the temporary telework experience could be relevant to considering the renewed request. In this situation, for example, the period of providing telework because of the COVID-19 pandemic could serve as a trial period that showed whether or not this employee with a disability could satisfactorily perform all essential functions while working remotely, and the employer should consider any new requests in light of this information. As with all accommodation requests, the employee and the employer should engage in a flexible, cooperative interactive process going forward if this issue does arise.

**D.17. Might the pandemic result in excusable delays during the interactive process?** *(9/8/20; adapted from 3/27/20 Webinar Question 19)*

Yes. The rapid spread of COVID-19 has disrupted normal work routines and may have resulted in unexpected or increased requests for reasonable accommodation. Although employers and employees should address these requests as soon as possible, the extraordinary circumstances of the COVID-19 pandemic may result in delay in discussing requests and in providing accommodation where warranted. Employers and employees are encouraged to use interim solutions to enable employees to keep working as much as possible.

**D.18. Federal agencies are required to have timelines in their written reasonable accommodation procedures governing how quickly they will process requests and provide reasonable accommodations. What happens if circumstances created by the pandemic prevent an agency from meeting this timeline?** *(9/8/20; adapted from 3/27/20 Webinar Question 19)*

Situations created by the current COVID-19 crisis may constitute an "extenuating circumstance"—something beyond a Federal agency's control—that may justify exceeding the normal timeline that an agency has adopted in its internal reasonable accommodation procedures.

AR-04357

11/15/21, 8:59 AM    What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 38 of 298   PageID 4899

# E. Pandemic–Related Harassment Due to National Origin, Race, or Other Protected Characteristics

**E.1. What practical tools are available to employers to reduce and address workplace harassment that may arise as a result of the COVID-19 pandemic?** *(4/9/20)*

Employers can help reduce the chance of harassment by explicitly communicating to the workforce that fear of the COVID-19 pandemic should not be misdirected against individuals because of a protected characteristic, including their **national origin, race (https://www.eeoc.gov/wysk/message-eeoc-chair-janet-dhillon-national-origin-and-race-discrimination-during-covid-19)** , or other prohibited bases.

Practical anti-harassment tools provided by the EEOC for small businesses can be found here:

- Anti-harassment **policy tips (https://www.eeoc.gov/employers/small-business/harassment-policy-tips)** for small businesses

- Select Task Force on the Study of Harassment in the Workplace (includes detailed recommendations and tools to aid in designing effective anti-harassment policies; developing training curricula; implementing complaint, reporting, and investigation procedures; creating an organizational culture in which harassment is not tolerated):

    - **report (https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686319)** ;

    - **checklists (https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686319)** for employers who want to reduce and address harassment in the workplace; and

    - **chart (https://www.eeoc.gov/chart-risk-factors-harassment-and-responsive-strategies)** of risk factors that lead to harassment and appropriate responses.

**E.2. Are there steps an employer should take to address possible harassment and discrimination against coworkers when it re-opens the workplace?** *(4/17/20)*

AR-04358

11/15/21, 8:59 AM    What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 39 of 298   PageID 4900

Yes. An employer may remind all employees that it is against the federal EEO laws to harass or otherwise discriminate against coworkers based on race, national origin, color, sex, religion, age (40 or over), disability, or genetic information. It may be particularly helpful for employers to advise supervisors and managers of their roles in watching for, stopping, and reporting any harassment or other discrimination. An employer may also make clear that it will immediately review any allegations of harassment or discrimination and take appropriate action.

### E.3. How may employers respond to pandemic-related harassment, in particular against employees who are or are perceived to be Asian? *(6/11/20)*

Managers should be alert to demeaning, derogatory, or hostile remarks directed to employees who are or are perceived to be of Chinese or other Asian national origin, including about the coronavirus or its origins.

All employers covered by Title VII should ensure that management understands in advance how to recognize such harassment. Harassment may occur using electronic communication tools—regardless of whether employees are in the workplace, teleworking, or on leave—and also in person between employees at the worksite. Harassment of employees at the worksite may also originate with contractors, customers or clients, or, for example, with patients or their family members at health care facilities, assisted living facilities, and nursing homes. Managers should know their legal obligations and be **instructed (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#E.2)** to quickly identify and resolve potential problems, before they rise to the level of unlawful discrimination.

Employers may choose to send a reminder to the entire workforce noting Title VII's prohibitions on harassment, reminding employees that harassment will not be tolerated, and inviting anyone who experiences or witnesses workplace harassment to report it to management. Employers may remind employees that harassment can result in disciplinary action up to and including termination.

### E.4. An employer learns that an employee who is teleworking due to the pandemic is sending harassing emails to another worker. What actions should the employer take? *(6/11/20)*

The employer should take the same actions it would take if the employee was in the workplace. Employees may not harass other employees through, for example, emails, calls, or platforms for video or chat communication and collaboration.



11/15/21, 8:59 AM     What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 40 of 298   PageID 4901

# F. Furloughs and Layoffs

**F.1. Under the EEOC's laws, what waiver responsibilities apply when an employer is conducting layoffs?** *(4/9/20)*

Special rules apply when an employer is offering employees severance packages in exchange for a general release of all discrimination claims against the employer. More information is available in EEOC's **technical assistance document on severance agreements (https://www.eeoc.gov/laws/guidance/qa-understanding-waivers-discrimination-claims-employee-severance-agreements)** .

**F.2. What are additional EEO considerations in planning furloughs or layoffs?** *(9/8/20; adapted from 3/27/20 Webinar Question 13)*

The laws enforced by the EEOC prohibit covered employers from selecting people for furlough or layoff because of that individual's race, color, religion, national origin, sex, age, disability, protected genetic information, or in retaliation for protected EEO activity.

# G. Return to Work

**G.1. As government stay-at-home orders and other restrictions are modified or lifted in your area, how will employers know what steps they can take consistent with the ADA to screen employees for COVID-19 when entering the workplace?** *(4/17/20)*

The ADA permits employers to make disability-related inquiries and conduct medical exams if job-related and consistent with business necessity. Inquiries and reliable medical exams meet this standard if it is necessary to exclude employees with a medical condition that would pose a direct threat to health or safety.

Direct threat is to be determined based on the best available objective medical evidence. The guidance from CDC or other public health authorities is such evidence. Therefore, employers will be acting consistent with the ADA as long as any screening implemented is consistent with advice from the CDC and public health authorities for that type of workplace at that time.

11/15/21, 8:59 AM                 What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 41 of 298   PageID 4902

For example, this may include continuing to take temperatures and asking questions about symptoms (or require self-reporting) **of all those entering the workplace**. Similarly, the CDC recently posted **information (https://www.cdc.gov/coronavirus/2019-ncov/community/critical-workers/implementing-safety-practices.html)** on return by certain types of critical workers.

Employers should make sure not to engage in unlawful disparate treatment based on protected characteristics in decisions related to screening and exclusion.

**G.2. An employer requires returning workers to wear personal protective gear and engage in infection control practices. Some employees ask for accommodations due to a need for modified protective gear. Must an employer grant these requests?** *(4/17/20)*

An employer may require employees to wear protective gear (for example, masks and gloves) and observe infection control practices (for example, regular hand washing and social distancing protocols).

However, where an employee with a disability needs a related reasonable accommodation under the ADA (e.g., non-latex gloves, modified face masks for interpreters or others who communicate with an employee who uses lip reading, or gowns designed for individuals who use wheelchairs), or a religious accommodation under Title VII (such as modified equipment due to religious garb), the employer should discuss the request and provide the modification or an alternative if feasible and not an undue hardship on the operation of the employer's business under the ADA or Title VII.

**G.3. What does an employee need to do in order to request reasonable accommodation from her employer because she has one of the medical conditions (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html) that CDC says may put her at higher risk for severe illness from COVID-19?** *(5/5/20)*

An employee—or a third party, such as an employee's doctor—must **let the employer know (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#requesting)** that she needs a change for a reason related to a medical condition (here, the underlying condition). Individuals may request accommodation in conversation or in writing.

AR-04361 

11/15/21, 8:59 AM                 What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 42 of 298   PageID 4903

While the employee (or third party) does not need to use the term "reasonable accommodation" or reference the ADA, she may do so.

The employee or her representative should communicate that she has a medical condition that necessitates a change to meet a medical need. After receiving a request, the employer may **ask questions or seek medical documentation (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D.6)** to help decide if the individual has a disability and if there is a reasonable accommodation, barring **undue hardship (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D)** , that can be provided.

**G.4. The CDC identifies a number of medical conditions that might place individuals at "higher risk for severe illness" (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html) if they get COVID-19. An employer knows that an employee has one of these conditions and is concerned that his health will be jeopardized upon returning to the workplace, but the employee has not requested accommodation. How does the ADA apply to this situation?** *(5/7/20)*

First, if the employee does not request a reasonable accommodation, the ADA does not mandate that the employer take action.

If the employer is concerned about the employee's health being jeopardized upon returning to the workplace, the ADA does not allow the employer to exclude the employee—or take any other adverse action—*solely* because the employee has a disability that the CDC identifies as potentially placing him at "higher risk for severe illness" if he gets COVID-19. Under the ADA, such action is not allowed unless the employee's disability poses a "direct threat" to his health that cannot be eliminated or reduced by reasonable accommodation.

The ADA direct threat requirement is a high standard. As an affirmative defense, direct threat requires an employer to show that the individual has a disability that poses a "significant risk of substantial harm" to his own health under **29 C.F.R. section 1630.2(r) (https://www.ecfr.gov/cgi-bin/text-idx?SID=28cadc4b7b37847fd37f41f8574b5921&mc=true&node=pt29.4.1630&rgn=div5#se29.4.1630_12)** (regulation addressing direct threat to health or safety of self or others). A direct threat assessment cannot be based solely on the condition being on the CDC's list; the determination must be an individualized assessment based on a reasonable medical judgment about this employee's disability—not the disability



in general—using the most current medical knowledge and/or on the best available objective evidence. The ADA regulation requires an employer to consider the duration of the risk, the nature and severity of the potential harm, the likelihood that the potential harm will occur, and the imminence of the potential harm. Analysis of these factors will likely include considerations based on the severity of the pandemic in a particular area and the employee's own health (for example, is the employee's disability well-controlled), and his particular job duties. A determination of direct threat also would include the likelihood that an individual will be exposed to the virus at the worksite. Measures that an employer may be taking in general to protect all workers, such as mandatory social distancing, also would be relevant.

Even if an employer determines that an employee's disability poses a direct threat to his own health, the employer still cannot exclude the employee from the workplace—or take any other adverse action—unless there is no way to provide a reasonable accommodation (absent undue hardship). The ADA regulations require an employer to consider whether there are reasonable accommodations that would eliminate or reduce the risk so that it would be safe for the employee to return to the workplace while still permitting performance of essential functions. This can involve an interactive process with the employee. If there are not accommodations that permit this, then an employer must consider accommodations such as telework, leave, or reassignment (perhaps to a different job in a place where it may be safer for the employee to work or that permits telework). An employer may only bar an employee from the workplace if, after going through all these steps, the facts support the conclusion that the employee poses a significant risk of substantial harm to himself that cannot be reduced or eliminated by reasonable accommodation.

**G.5. What are examples of accommodation that, absent undue hardship, may eliminate (or reduce to an acceptable level) a direct threat to self?** *(5/5/20)*

**Accommodations (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D.1)** may include additional or enhanced protective gowns, masks, gloves, or other gear beyond what the employer may generally provide to employees returning to its workplace. Accommodations also may include additional or enhanced protective measures, for example, erecting a barrier that provides separation between an employee with a disability and coworkers/the public or increasing the space between an employee with a disability and others. Another possible reasonable accommodation may be

AR-04363

11/15/21, 8:59 AM            What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 44 of 298   PageID 4905

elimination or substitution of particular "marginal" functions (less critical or incidental job duties as distinguished from the "essential" functions of a particular position). In addition, accommodations may include temporary modification of work schedules (if that decreases contact with coworkers and/or the public when on duty or commuting) or moving the location of where one performs work (for example, moving a person to the end of a production line rather than in the middle of it if that provides more social distancing).

These are only a few ideas. Identifying an effective accommodation depends, among other things, on an employee's job duties and the design of the workspace. An employer and employee should discuss possible ideas; the Job Accommodation Network (**www.askjan.org (http://www.askjan.org/)** ) also may be able to assist in helping identify possible accommodations. As with all discussions of reasonable accommodation during this pandemic, employers and employees are encouraged to be creative and flexible.

**G.6. As a best practice, and in advance of having some or all employees return to the workplace, are there ways for an employer to invite employees to request flexibility in work arrangements?** *(6/11/20)*

Yes. The ADA and the Rehabilitation Act permit employers to make information available in advance to **all** employees about who to contact—if they wish—to request accommodation for a disability that they may need upon return to the workplace, even if no date has been announced for their return. If requests are received in advance, the employer may begin the **interactive process (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D.8)** . An employer may choose to include in such a notice all the CDC-listed medical conditions that may place people at higher risk of serious illness if they contract COVID-19, provide instructions about who to contact, and explain that the employer is willing to consider on a case-by-case basis any requests from employees who have these or other medical conditions.

An employer also may send a general notice to all employees who are designated for returning to the workplace, noting that the employer is willing to consider requests for accommodation or flexibilities on an individualized basis. The employer should specify if the contacts differ depending on the reason for the request – for example, if the office or person to contact is different for employees



with disabilities or pregnant workers than for employees whose request is based on age or child-care responsibilities.

Either approach is consistent with the ADEA, the ADA, and the May 29, 2020 **CDC guidance (https://www.cdc.gov/coronavirus/2019-ncov/community/high-risk-workers.html?deliveryName=USCDC_2067-DM29601)** that emphasizes the importance of employers providing accommodations or flexibilities to employees who, due to age or certain medical conditions, are at higher risk for severe illness.

Regardless of the approach, however, employers should ensure that whoever receives inquiries knows how to handle them consistent with the different federal employment nondiscrimination laws that may apply, for instance, with respect to accommodations due to a medical condition, a religious belief, or pregnancy.

### G.7. What should an employer do if an employee entering the worksite requests an alternative method of screening due to a medical condition? *(6/11/20)*

This is a request for reasonable accommodation, and an employer should proceed as it would for any other request for accommodation under the ADA or the Rehabilitation Act. If the requested change is easy to provide and inexpensive, the employer might voluntarily choose to make it available to anyone who asks, without going through an interactive process. Alternatively, if the disability is not obvious or already known, an employer may ask the employee for information to establish that the condition is a **disability (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D.5)** and what specific limitations require an accommodation. If necessary, an employer also may request medical documentation to support the employee's request, and then determine if that accommodation or an alternative effective accommodation can be provided, absent undue hardship.

Similarly, if an employee requested an alternative method of screening as a religious accommodation, the employer should determine if accommodation is **available under Title VII (https://www.eeoc.gov/laws/guidance/questions-and-answers-religious-discrimination-workplace)** .

# H. Age

AR-04365

11/15/21, 8:59 AM                 What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 46 of 298    PageID 4907

**H.1. The CDC has explained (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html) that individuals age 65 and over are at higher risk for a severe case of COVID-19 if they contract the virus and therefore has encouraged employers to offer maximum flexibilities to this group. Do employees age 65 and over have protections under the federal employment discrimination laws?** *(6/11/20)*

The Age Discrimination in Employment Act (ADEA) prohibits employment discrimination against individuals age 40 and older. The ADEA would prohibit a covered employer from involuntarily excluding an individual from the workplace based on his or her being 65 or older, even if the employer acted for benevolent reasons such as protecting the employee due to higher risk of severe illness from COVID-19.

Unlike the ADA, the ADEA does not include a right to reasonable accommodation for older workers due to age. However, employers are free to provide flexibility to workers age 65 and older; the ADEA does not prohibit this, even if it results in younger workers ages 40-64 being treated less favorably based on age in comparison.

Workers age 65 and older also may have medical conditions that bring them under the protection of the ADA as individuals with disabilities. As such, they may request reasonable **accommodation for their disability (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D.1)** as opposed to their age.

**H.2. If an employer is choosing to offer flexibilities to other workers, may older comparable workers be treated less favorably based on age?** *(9/8/20; adapted from 3/27/20 Webinar Question 12)*

No. If an employer is allowing other comparable workers to telework, it should make sure it is not treating older workers less favorably based on their age.

# I. Caregivers/Family Responsibilities

**I.1. If an employer provides telework, modified schedules, or other benefits to employees with school-age children due to school closures or distance learning during the pandemic, are there sex discrimination considerations?** *(6/11/20)*



11/15/21, 8:59 AM        What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 47 of 298   PageID 4908

Employers may provide any flexibilities as long as they are not treating employees differently based on sex or other EEO-protected characteristics. For example, under Title VII, female employees cannot be given more favorable treatment than male employees because of a gender-based assumption about who may have **caretaking responsibilities (https://www.eeoc.gov/laws/guidance/enforcement-guidance-unlawful-disparate-treatment-workers-caregiving-responsibilities)** for children.

# J. Pregnancy

**J.1. Due to the pandemic, may an employer exclude an employee from the workplace involuntarily due to pregnancy (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/pregnancy-breastfeeding.html) ?** *(6/11/20)*

No. Sex discrimination under Title VII of the Civil Rights Act includes discrimination based on pregnancy. Even if motivated by benevolent concern, an employer is not permitted to single out workers on the basis of pregnancy for adverse employment actions, including involuntary leave, layoff, or furlough.

**J.2. Is there a right to accommodation based on pregnancy during the pandemic?** *(6/11/20)*

There are two federal employment discrimination laws that may trigger **accommodation for employees based on pregnancy (https://www.eeoc.gov/laws/guidance/legal-rights-pregnant-workers-under-federal-law)** .

First, pregnancy-related medical conditions may themselves be disabilities under the ADA, even though pregnancy itself is not an ADA disability. If an employee makes a request for reasonable accommodation due to a pregnancy-related medical condition, the employer must consider it under the usual ADA rules.

Second, Title VII as amended by the Pregnancy Discrimination Act specifically requires that women affected by pregnancy, childbirth, and related medical conditions be treated the same as others who are similar in their ability or inability to work. This means that a pregnant employee may be entitled to job modifications, including telework, changes to work schedules or assignments, and leave to the extent provided for other employees who are similar in their ability or inability to

AR-04367

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 48 of 298   PageID 4909

work. Employers should ensure that supervisors, managers, and human resources personnel know how to handle such requests to avoid disparate treatment in violation of Title VII.

# K. Vaccinations – Overview, ADA, Title VII, and GINA

*The availability of COVID-19 vaccinations raises questions under the federal equal employment opportunity (EEO) laws, including the Americans with Disabilities Act (ADA), the Rehabilitation Act, the Genetic Information Nondiscrimination Act (GINA), and Title VII of the Civil Rights Act, as amended, inter alia, by the Pregnancy Discrimination Act (Title VII) (see also **Section J, EEO rights relating to pregnancy** and **Section L, Vaccinations – Title VII and Religious Objections to COVID-19 Vaccine Mandates**.)*

*This section was originally issued on December 16, 2020, and was updated on October 25, 2021.  Note that the Centers for Disease Control and Prevention (CDC) has **issued guidance (https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html)** for fully vaccinated individuals that addresses, among other things, when they need to wear a mask indoors.*

*The EEOC has received many inquiries from employers and employees about the type of authorization granted by the U.S. Department of Health and Human Services (HHS) Food and Drug Administration (FDA) for the administration of COVID-19 vaccines.  On August 23, 2021, the FDA approved the Biologics License Application for the Pfizer-BioNTech COVID-19 vaccine for use in individuals 16 years of age and older.  Previously, the FDA granted Emergency Use Authorizations (EUAs) for the two other vaccines—one made by Moderna and the other by Janssen/Johnson & Johnson—authorizing them for use in the United States for individuals 18 years of age and older.  The Pfizer-BioNTech vaccine is authorized under an EUA for individuals 12 years of age and older and for the administration of a **third dose (https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html)** in certain immunocompromised individuals.   For the current status of vaccines authorized or approved by the FDA, please visit:  **https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html)**

AR-04368

11/15/21, 8:59 AM          What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 49 of 298   PageID 4910

*Also of note, on July 6, 2021, the U.S. Department of Justice's Office of Legal Counsel issued a Memorandum Opinion concluding that section 564 of the Federal Food, Drug, and Cosmetic Act does not prohibit public or private entities from imposing vaccination requirements for a vaccine that is subject to an EUA.*

*Other federal, state, and local laws and regulations govern COVID-19 vaccination of employees, including requirements for the federal government as an employer.  The federal government as an employer is subject to the EEO laws.  Federal departments and agencies should consult the website of the **Safer Federal Workforce Task Force** (**https://www.saferfederalworkforce.gov/**) for the latest guidance on federal agency operations during the COVID-19 pandemic.*

*This technical assistance on vaccinations was written to help employees and employers better understand how federal laws related to workplace discrimination apply during the COVID-19 pandemic. The EEOC questions and answers provided here set forth applicable EEO legal standards consistent with the federal civil rights laws enforced by the EEOC and with EEOC regulations, guidance, and technical assistance, unless another source is expressly cited.  In addition, whether an employer meets the EEO standards will depend on the application of these standards to particular factual situations.*

## COVID-19 Vaccinations:  EEO Overview

**K.1.  Under the ADA, Title VII, and other federal employment nondiscrimination laws, may an employer require all employees physically entering the workplace to be vaccinated against COVID-19?** *(Updated 10/13/21)*

The federal EEO laws do not prevent an employer from requiring all employees physically entering the workplace to be fully vaccinated against COVID-19, subject to the **reasonable accommodation provisions of Title VII and the ADA and other EEO considerations discussed below**. (See **Section L, Vaccinations – Title VII and Religious Objections to COVID-19 Vaccine Mandates**).

In some circumstances, Title VII and the ADA require an employer to provide reasonable accommodations for employees who, because of a disability or a sincerely held religious belief, practice, or observance, do not get vaccinated against COVID-19, unless providing an accommodation would pose an undue hardship on the operation of the employer's business.  The analysis for undue hardship depends


AR-04369

11/15/21, 8:59 AM      What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 50 of 298   PageID 4911

on whether the accommodation is for a disability (including pregnancy-related conditions that constitute a disability) (see K.6) or for religion (see K.12).

As with any employment policy, employers that have a vaccination requirement may need to respond to allegations that the requirement has a disparate impact on —or disproportionately excludes—employees based on their race, color, religion, sex, or national origin under Title VII (or age under the Age Discrimination in Employment Act [40+]). Employers should keep in mind that because some individuals or demographic groups may face barriers to receiving a COVID-19 vaccination, some employees may be more likely to be negatively impacted by a vaccination requirement.

It would also be unlawful to apply a vaccination requirement to employees in a way that treats employees differently based on disability, race, color, religion, sex (including pregnancy, sexual orientation, and gender identity), national origin, age, or genetic information, unless there is a legitimate non-discriminatory reason.

### K.2.   What are some examples of reasonable accommodations or modifications that employers may have to provide to employees who do not get vaccinated due to disability; religious beliefs, practices, or observance; or pregnancy?
*(5/28/21)*

An employee who does not get vaccinated due to a disability (covered by the ADA) or a sincerely held religious belief, practice, or observance (covered by Title VII) may be entitled to a reasonable accommodation that does not pose an undue hardship on the operation of the employer's business.  For example, as a reasonable accommodation, an unvaccinated employee entering the workplace might wear a face mask, work at a social distance from coworkers or non-employees, work a modified shift, get periodic tests for COVID-19, be given the opportunity to telework, or finally, accept a reassignment.

Employees who are not vaccinated because of pregnancy may be entitled (under Title VII) to adjustments to keep working, if the employer makes modifications or exceptions for other employees.  These modifications may be the same as the accommodations made for an employee based on disability or religion.

### K.3.  How can employers encourage employees and their family members to be vaccinated against COVID-19 without violating the EEO laws, especially the ADA and GINA?  *(Updated 10/13/21)*

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 51 of 298   PageID 4912

Employers may provide employees and their family members with information to educate them about COVID-19 vaccines, raise awareness about the benefits of vaccination, and address common questions and concerns. Employers also may work with local public health authorities, medical providers, or pharmacies to make vaccinations available for unvaccinated workers in the workplace.  Also, under certain circumstances employers may offer incentives to employees who receive COVID-19 vaccinations, as discussed in K.16 - K.21. The federal government is providing COVID-19 vaccines at no cost to everyone 12 years of age and older.

There are many resources available to employees seeking more information about how to get vaccinated against COVID-19:

- The federal government's online **vaccines.gov (https://www.vaccines.gov/)** site can identify vaccination sites anywhere in the country (or **https://www.vacunas.gov (https://www.vacunas.gov)** for Spanish).  Individuals also can text their ZIP  code to "GETVAX" (438829)–or "VACUNA" (822862) for Spanish–to find three vaccination locations near them.

- Employees with disabilities (or employees' family members with disabilities) may need extra support to obtain a vaccination, such as transportation or in-home vaccinations.  The HHS/Administration for Community Living has launched the Disability Information and Assistance Line (DIAL) to assist individuals with disabilities in obtaining such help.   DIAL can be reached at: 888-677-1199 from 9 am to 8 pm (Eastern Standard Time) Mondays through Fridays or by emailing **DIAL@n4a.org**.

- CDC's website offers a link to a listing of **local health departments (https://www.cdc.gov/publichealthgateway/healthdirectories/index.html)**, which can provide more information about local vaccination efforts.

- In addition, CDC provides a complete communication "tool kit" for employers to use with their workforce to educate people about getting a COVID-19 vaccine.  Although originally written for essential workers and employers, it is useful for all workers and employers.  *See* **Workplace Vaccination Program | CDC (https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/essentialworker/workplace-vaccination-program.html)** .

- Some employees may not have reliable access to the internet to identify nearby vaccination locations or may speak no English or have limited English proficiency and find it difficult to make an appointment for a vaccination over

AR-04371

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 52 of 298   PageID 4913

the phone. CDC operates a toll-free telephone line that can provide assistance in many languages for individuals seeking more information about vaccinations: 800-232-4636; TTY 888-232-6348.

- Some employees also may require assistance with transportation to vaccination sites. Employers may gather and disseminate information to their employees on low-cost and no-cost transportation resources serving vaccination sites available in their community and offer paid time-off for vaccination, particularly if transportation is not readily available outside regular work hours.

- Employers should provide the contact information of a management representative for employees who need to request a reasonable accommodation for a disability or religious belief, practice, or observance, or to ensure nondiscrimination for an employee who is pregnant.

## The ADA and COVID-19 Vaccinations

### K.4.  Is information about an employee's COVID-19 vaccination confidential medical information under the ADA? *(Updated 10/13/21)*

Yes.  The ADA requires an employer to maintain the confidentiality of employee medical information. Although the EEO laws do not prevent employers from requiring employees to provide documentation or other confirmation of vaccination, this information, like all medical information, must be kept confidential and stored separately from the employee's personnel files under the ADA.

*Mandatory Employer Vaccination Programs*

### K.5.  Under the ADA, may an employer require a COVID-19 vaccination for all employees entering the workplace, even though it knows that some employees may not get a vaccine because of a disability? *(Updated 5/28/21)*

Yes, provided certain requirements are met.  Under the ADA, an employer may require an individual with a disability to meet a qualification standard applied to all employees, such as a safety-related standard requiring COVID-19 vaccination, if the standard is job-related and consistent with business necessity.  If a particular employee cannot meet such a safety-related qualification standard because of a disability, the employer may not require compliance for that employee unless it can demonstrate that the individual would pose a "direct threat" to the health or safety

AR-04372 

11/15/21, 8:59 AM      What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 53 of 298    PageID 4914

of the employee or others in the workplace. A "direct threat" is a "significant risk of substantial harm" that cannot be eliminated or reduced by reasonable accommodation. **29 C.F.R. 1630.2(r) (https://www.govinfo.gov/content/pkg/CFR-2012-title29-vol4/xml/CFR-2012-title29-vol4-sec1630-2.xml)** . This determination can be broken down into two steps: determining if there is a direct threat and, if there is, assessing whether a reasonable accommodation would reduce or eliminate the threat.

To determine if an employee who is not vaccinated due to a disability poses a "direct threat" in the workplace, an employer first must make an individualized assessment of the employee's present ability to safely perform the essential functions of the job. The factors that make up this assessment are: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. The determination that a particular employee poses a direct threat should be based on a reasonable medical judgment that relies on the most current medical knowledge about COVID-19. Such medical knowledge may include, for example, the level of community spread at the time of the assessment. Statements from the CDC provide an important source of current medical knowledge about COVID-19, and the employee's health care provider, with the employee's consent, also may provide useful information about the employee. Additionally, the assessment of direct threat should take account of the type of work environment, such as: whether the employee works alone or with others or works inside or outside; the available ventilation; the frequency and duration of direct interaction the employee typically will have with other employees and/or non-employees; the number of partially or fully vaccinated individuals already in the workplace; whether other employees are wearing masks or undergoing routine screening testing; and the space available for social distancing.

If the assessment demonstrates that an employee with a disability who is not vaccinated would pose a direct threat to self or others, the employer must consider whether providing a reasonable accommodation, absent undue hardship, would reduce or eliminate that threat. Potential reasonable accommodations could include requiring the employee to wear a mask, work a staggered shift, making changes in the work environment (such as improving ventilation systems or limiting contact with other employees and non-employees ), permitting telework if feasible, or reassigning the employee to a vacant position in a different workspace.

11/15/21, 8:59 AM        What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 54 of 298   PageID 4915

As a best practice, an employer introducing a COVID-19 vaccination policy and requiring documentation or other confirmation of vaccination should notify all employees that the employer will consider requests for reasonable accommodation based on disability on an individualized basis.  (See also **K.12** recommending the same best practice for religious accommodations.)

**K.6. Under the ADA, if an employer requires COVID-19 vaccinations for employees physically entering the workplace, how should an employee who does not get a COVID-19 vaccination because of a disability inform the employer, and what should the employer do?** *(Updated 5/28/21)*

An employee with a disability who does not get vaccinated for COVID-19 because of a disability must let the employer know that he or she needs an exemption from the requirement or a change at work, known as a reasonable accommodation.  To request an accommodation, an individual does not need to mention the ADA or use the phrase "reasonable accommodation."

Managers and supervisors responsible for communicating with employees about compliance with the employer's vaccination requirement should know **how to recognize an accommodation request from an employee with a disability (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#requesting)** and know to whom to refer the request for full consideration. As a best practice, before instituting a mandatory vaccination policy, employers should provide managers, supervisors, and those responsible for implementing the policy with clear information about how to handle accommodation requests related to the policy.

Employers and employees typically engage in a flexible, interactive process to identify workplace accommodation options that do not impose an undue hardship (significant difficulty or expense) on the employer.  This process may include determining whether it is necessary to obtain supporting medical documentation about the employee's disability.

In discussing accommodation requests, employers and employees may find it helpful to consult the **Job Accommodation Network (JAN) website (https://www.askjan.org)** as a resource for different types of accommodations.  JAN's materials about COVID-19 are available at **https://askjan.org/topics/COVID-19.cfm (https://askjan.org/topics/COVID-19.cfm)**.  Employers also may consult applicable **Occupational Safety and Health Administration (OSHA) COVID-specific resources (https://www.osha.gov/SLTC/covid-19/)**.  Even if there is no

11/15/21, 8:59 AM          What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 55 of 298   PageID 4916

reasonable accommodation that will allow the unvaccinated employee to be physically present to perform his or her current job without posing a direct threat, the employer must consider if telework is an option for that particular job as an accommodation and, as a last resort, whether reassignment to another position is possible.

The ADA requires that employers offer an available accommodation if one exists that does not pose an undue hardship, meaning a significant difficulty or expense. See 29 C.F.R. 1630.2(p). Employers are advised to consider all the options before denying an accommodation request. The proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with non-employees, who may be ineligible for a vaccination or whose vaccination status may be unknown, can impact the ADA undue hardship consideration. Employers may rely on **CDC recommendations (https://www.cdc.gov/coronavirus/2019-ncov/)** when deciding whether an effective accommodation is available that would not pose an undue hardship.

Under the ADA, it is unlawful for an employer **to disclose that an employee is receiving a reasonable accommodation (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#li42)** or **to retaliate against an employee for requesting an accommodation (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#li19)** .

**K.7. If an employer requires employees to get a COVID-19 vaccination from the employer or its agent, do the ADA's restrictions on an employer making disability-related inquiries or medical examinations of its employees apply to any part of the vaccination process?** *(Updated 5/28/21)*

Yes. The ADA's restrictions apply to the screening questions that must be asked immediately prior to administering the vaccine if the vaccine is administered by the employer or its agent. An **employer's agent (https://www.eeoc.gov/laws/guidance/section-2-threshold-issues#2-III-B-2)** is an individual or entity having the authority to act on behalf of, or at the direction of, the employer.

The ADA generally restricts when employers may require medical examinations (procedures or tests that seek information about an individual's physical or mental impairments or health) or make disability-related inquiries (questions that are likely

AR-04375

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 56 of 298   PageID 4917

to elicit information about an individual's disability).  The act of administering the vaccine is not a "medical examination" under the ADA because it does not seek information about the employee's physical or mental health.

However, because the pre-vaccination screening questions are likely to elicit information about a disability, the ADA requires that they must be "job related and consistent with business necessity" when an employer or its agent administers the COVID-19 vaccine.  To meet this standard, an employer would need to have a reasonable belief, based on objective evidence, that an employee who does not answer the questions and, therefore, cannot be vaccinated, will pose a direct threat to the employee's own health or safety or to the health and safety of others in the workplace.  (See general discussion in **Question K.5**.)  Therefore, when an employer requires that employees be vaccinated by the employer or its agent, the employer should be aware that an employee may challenge the mandatory pre-vaccination inquiries, and an employer would have to justify them under the ADA.

The ADA also requires employers to keep any employee medical information obtained in the course of an employer vaccination program confidential.

*Voluntary Employer Vaccination Programs*

**K.8.  Under the ADA, are there circumstances in which an employer or its agent may ask disability-related screening questions before administering a COVID-19 vaccine *without* needing to satisfy the "job-related and consistent with business necessity" standard?** *(Updated 5/28/21)*

Yes.  If the employer offers to vaccinate its employees on a voluntary basis, meaning that employees can choose whether or not to get the COVID-19 vaccine from the employer or its agent, the employer does not have to show that the pre-vaccination screening questions are job-related and consistent with business necessity.  However, the employee's decision to answer the questions must be voluntary.  (See also Questions **K.16 – 17**.)  The ADA prohibits taking an adverse action against an employee, including harassing the employee, for refusing to participate in a voluntary employer-administered vaccination program.  An employer also must keep any medical information it obtains from any voluntary vaccination program confidential.

**K.9.  Does the ADA prevent an employer from inquiring about or requesting documentation or other confirmation that an employee obtained a COVID-19 vaccination?** *(Updated 10/13/21)*

AR-04376

No.  When an employer asks employees whether they obtained a COVID-19 vaccination, the employer is not asking the employee a question that is likely to disclose the existence of a disability; there are many reasons an employee may not show documentation or other confirmation of vaccination besides having a disability.  Therefore, requesting documentation or other confirmation of vaccination is not a disability-related inquiry under the ADA, and the ADA's rules about making such inquiries do not apply.

However, documentation or other confirmation of vaccination provided by the employee to the employer is medical information about the employee and must be kept confidential, as discussed in K.4.

### K.10.  May an employer offer voluntary vaccinations only to certain groups of employees? *(5/28/21)*

If an employer or its agent offers voluntary vaccinations to employees, the employer must comply with federal employment nondiscrimination laws.  For example, not offering voluntary vaccinations to certain employees based on national origin or another protected basis under the EEO laws would not be permissible.

### K.11. What should an employer do if an employee who is fully vaccinated for COVID-19 requests accommodation for an underlying disability because of a continuing concern that he or she faces a heightened risk of severe illness from a COVID-19 infection, despite being vaccinated? *(5/28/21)*

Employers who receive a reasonable accommodation request from an employee should process the request in accordance with applicable ADA standards.

When an employee asks for a reasonable accommodation, whether the employee is fully vaccinated or not, the employer should engage in an interactive process to determine if there is a disability-related need for reasonable accommodation.  This process typically includes seeking information from the employee's health care provider with the employee's consent explaining why an accommodation is needed.

For example, some individuals who are immunocompromised might still need reasonable accommodations because their conditions may mean that the vaccines may not offer them the same measure of protection as other vaccinated individuals. If there is a disability-related need for accommodation, an employer must explore

AR-04377

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 58 of 298   PageID 4919

potential reasonable accommodations that may be provided absent undue hardship.

# Title VII and COVID–19 Vaccinations

**K.12.  Under Title VII, how should an employer respond to an employee who communicates that he or she is unable to be vaccinated for COVID-19 (or provide documentation or other confirmation of vaccination) because of a sincerely held religious belief, practice, or observance?** *(Updated 5/28/21)*

Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting a COVID-19 vaccine, the employer must provide a reasonable accommodation unless it would pose an undue hardship.  Employers also may receive religious accommodation requests from individuals who wish to wait until an alternative version or specific brand of COVID-19 vaccine is available to the employee.  Such requests should be processed according to the same standards that apply to other accommodation requests. For more information on requests for religious accommodations related to COVID-19 vaccination requirements, see **Section L,  Vaccinations – Title VII and Religious Objections to COVID-19 Vaccine Mandates**.

EEOC guidance explains that the definition of religion is broad and protects beliefs, practices, and observances with which the employer may be unfamiliar.  Therefore, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance.  However, if an employee requests a religious accommodation, and an employer is aware of facts that provide an objective basis for questioning either the religious nature or the sincerity of a particular belief, practice, or observance, the employer would be justified in requesting additional supporting information. See also 29 CFR 1605.

Under Title VII, an employer should thoroughly consider all possible reasonable accommodations, including telework and reassignment.  For suggestions about types of reasonable accommodation for unvaccinated employees, see **question and answer K.6.,** above.  In many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices, or observances.

AR-04378

11/15/21, 8:59 AM    What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 59 of 298   PageID 4920

Under Title VII, courts define "undue hardship" as having more than minimal cost or burden on the employer.  This is an easier standard for employers to meet than the ADA's undue hardship standard, which applies to requests for accommodations due to a disability.  Considerations relevant to undue hardship can include, among other things, the proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with non-employees, whose vaccination status could be unknown or who may be ineligible for the vaccine.  Ultimately, if an employee cannot be accommodated, employers should determine if any other rights apply under the EEO laws or other federal, state, and local authorities before taking adverse employment action against an unvaccinated employee

**K.13.  Under Title VII, what should an employer do if an employee chooses not to receive a COVID-19 vaccination due to pregnancy?**  *(Updated 10/13/21)*

**CDC recommends (https://emergency.cdc.gov/han/2021/han00453.asp)** COVID-19 vaccinations for everyone aged 12 years and older, including people who are pregnant, breastfeeding, trying to get pregnant now, or planning to become pregnant in the future.  Despite these recommendations, some pregnant employees may seek job adjustments or may request exemption from a COVID-19 vaccination requirement.

If an employee seeks an exemption from a vaccination requirement due to pregnancy, the employer must ensure that the employee is not being discriminated against compared to other employees similar in their ability or inability to work.  This means that a pregnant employee may be entitled to job modifications, including telework, changes to work schedules or assignments, and leave to the extent such modifications are provided for other employees who are similar in their ability or inability to work.  Employers should ensure that supervisors, managers, and human resources personnel know how to handle such requests to avoid **disparate treatment in violation of Title VII**.

# GINA And COVID-19 Vaccinations

*Title II of GINA prohibits covered employers from using the genetic information of employees to make employment decisions.  It also restricts employers from requesting, requiring, purchasing, or disclosing genetic information of employees.  Under Title II of GINA, genetic information includes information about the manifestation of disease or disorder in a family member (which is referred to as*

11/15/21, 8:59 AM          What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 60 of 298   PageID 4921

*"family medical history"*) and information from genetic tests of the individual *employee or a family member, among other things.*

### K.14.  Is Title II of GINA implicated if an employer requires an employee to receive a COVID-19 vaccine administered by the employer or its agent? *(Updated 5/28/21)*

No.  Requiring an employee to receive a COVID-19 vaccination administered by the employer or its agent would not implicate Title II of GINA unless the pre-vaccination medical screening questions include questions about the employee's genetic information, such as asking about the employee's family medical history.   As of May 27, 2021, the pre-vaccination medical screening questions for the first three COVID-19 vaccines to receive Emergency Use Authorization (EUA) from the FDA do not seek family medical history or any other type of genetic information.  See **CDC's Pre-vaccination Checklist (https://www.cdc.gov/vaccines/covid-19/downloads/pre-vaccination-screening-form.pdf)** (last visited May 27, 2021).  Therefore, an employer or its agent may ask these questions without violating Title II of GINA.

The act of administering a COVID-19 vaccine does not involve the use of the employee's genetic information to make employment decisions or the acquisition or disclosure of genetic information and, therefore, does not implicate Title II of GINA.

### K.15.  Is Title II of GINA implicated when an employer requires employees to provide documentation or other confirmation that they received a vaccination from a health care provider *that is not affiliated with their employer* (such as from the employee's personal physician or other health care provider, a pharmacy, or a public health department)? *(Updated 10/13/21)*

No.  An employer requiring an employee to show documentation or other confirmation of vaccination from a health care provider unaffiliated with the employer, such as the employee's personal physician or other health care provider, a pharmacy, or a public health department, is not using, acquiring, or disclosing genetic information and, therefore, is not implicating Title II of GINA.  This is the case even if the medical screening questions that must be asked before vaccination include questions about genetic information, because documentation or other confirmation of vaccination would not reveal genetic information.  Title II of GINA does not prohibit an employee's *own* health care provider from asking questions about genetic information.  This GINA Title II prohibition only applies to the employer or its agent.

11/15/21, 8:59 AM          What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 61 of 298   PageID 4922

# Employer Incentives For COVID-19 Voluntary Vaccinations Under ADA and GINA

*ADA: Employer Incentives for Voluntary COVID-19 Vaccinations*

**K.16.  Does the ADA limit the value of the incentive employers may offer to employees for voluntarily receiving a COVID-19 vaccination from a health care provider *that is not affiliated with their employer* (such as the employee's personal physician or other health care provider, a pharmacy, or a public health department)?**  *(Updated 10/13/21)*

No.  The ADA does not limit the incentives an employer may offer to encourage employees to voluntarily receive a COVID-19 vaccination, or to provide confirmation of vaccination, if the health care provider administering a COVID-19 vaccine *is not the employer or its agent*.  By contrast, if an employer offers an incentive to employees to voluntarily receive a vaccination *administered by the employer or its agent*, the ADA's rules on disability-related inquiries apply and the value of the incentive may not be so substantial as to be coercive.  See K.17.

As noted in K 4., the employer is required to keep vaccination information confidential under the ADA.

**K.17.  Under the ADA, are there limits on the value of the incentive employers may offer to employees for voluntarily receiving a COVID-19 vaccination *administered by the employer or its agent*?**  *(Updated 10/13/21)*

Yes.  When the employer or its agent administers a COVID-19 vaccine, the value of the incentive (which includes both rewards and penalties) may not be so substantial as to be coercive.  Because vaccinations require employees to answer pre-vaccination disability-related screening questions, a very large incentive could make employees feel pressured to disclose protected medical information to their employers or their agents. As explained in K.16., however, this incentive limit does not apply if an employer offers an incentive to encourage employees to be voluntarily vaccinated by a health care provider that is not their employer or an agent of their employer.

*GINA: Employer Incentives for Voluntary COVID-19 Vaccinations*

**K.18.  Does GINA limit the value of the incentive employers may offer employees if employees or their family members get a COVID-19 vaccination from a health care provider *that is not affiliated with the employer* (such as the**



11/15/21, 8:59 AM    What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 62 of 298    PageID 4923

**employee's personal physician or other health care provider, a pharmacy, or a public health department)?**  (*Updated 10/13/21*)

No.  GINA does not limit the incentives an employer may offer to employees to encourage them or their family members to get a COVID-19 vaccine or provide confirmation of vaccination if the health care provider administering the vaccine is not the employer or its agent.  If an employer asks an employee to show documentation or other confirmation that the employee or a family member has been vaccinated, it is not an unlawful request for genetic information under GINA because the fact that someone received a vaccination is not information about the manifestation of a disease or disorder in a family member (known as "family medical history" under GINA), nor is it any other form of genetic information. GINA's restrictions on employers acquiring genetic information (including those prohibiting incentives in exchange for genetic information), therefore, do not apply.

**K.19.  Under GINA, may an employer offer an incentive to employees in exchange for the employee getting vaccinated by the employer or its agent?** (*5/28/21*)

Yes.  Under GINA, as long as an employer does not acquire genetic information while administering the vaccines, employers may offer incentives to employees for getting vaccinated.  Because the pre-vaccination medical screening questions for the three COVID-19 vaccines now available do not inquire about genetic information, employers may offer incentives to their employees for getting vaccinated.  See **K.14** for more about GINA and pre-vaccination medical screening questions.

**K.20. Under GINA, may an employer offer an incentive to an employee in return for an employee's *family member* getting vaccinated by the employer or its agent?** (*5/28/21*)

No.  Under GINA's Title II health and genetic services provision, an employer may not offer any incentives to an employee in exchange for a family member's receipt of a vaccination from an employer or its agent.   Providing such an incentive to an employee because a family member was vaccinated by the employer or its agent would require the vaccinator to ask the family member the pre-vaccination medical screening questions, which include medical questions about the family member. Asking these medical questions would lead to the employer's receipt of genetic information in the form of family medical history *of the employee*.  The regulations implementing Title II of GINA prohibit employers from providing incentives in exchange for genetic information.  Therefore, the employer may not offer incentives



11/15/21, 8:59 AM    What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 63 of 298   PageID 4924

in exchange for the family member getting vaccinated.  However, employers may still offer an employee's family member the opportunity to be vaccinated by the employer or its agent, if they take certain steps to ensure GINA compliance.

**K.21. Under GINA, may an employer offer an employee's family member an opportunity to be vaccinated *without* offering the employee an incentive?**
*(5/28/21)*

Yes.  GINA permits an employer to offer vaccinations to an employee's family members if it takes certain steps to comply with GINA.  Employers must not require employees to have their family members get vaccinated and must not penalize employees if their family members decide not to get vaccinated.  Employers must also ensure that all medical information obtained from family members during the screening process is only used for the purpose of providing the vaccination, is kept confidential, and is not provided to any managers, supervisors, or others who make employment decisions for the employees.  In addition, employers need to ensure that they obtain prior, knowing, voluntary, and written authorization from the family member before the family member is asked any questions about his or her medical conditions.  If these requirements are met, GINA permits the collection of genetic information.

# L. Vaccinations – Title VII and Religious Objections to COVID-19 Vaccine Mandates

*The EEOC enforces Title VII of the Civil Rights Act of 1964 (Title VII), which prohibits employment discrimination based on religion. This includes a right for job applicants and employees to request an exception, called a religious or reasonable accommodation, from an employer requirement that conflicts with their sincerely held religious beliefs, practices, or observances.  If an employer shows that it cannot reasonably accommodate an employee's religious beliefs, practices, or observances without undue hardship on its operations, the employer is not required to grant the accommodation.  See generally **Section 12: Religious Discrimination (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_718485799340516107498304 52)** ; EEOC **Guidelines on Discrimination Because of Religion (https://www.govinfo.gov/content/pkg/CFR-2016-title29-vol4/xml/CFR-2016-title29-vol4-part1605.xml)** . Although other*

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 64 of 298   PageID 4925

*laws, such as the Religious Freedom Restoration Act (RFRA), may also protect religious freedom in some circumstances, this technical assistance only describes employment rights and obligations under Title VII.*

**L.1. Do employees who have a religious objection to receiving a COVID-19 vaccination need to tell their employer?  If so, is there specific language that must be used under Title VII?** *(10/28/21)*

Employees must tell their employer if they are requesting an exception to a COVID-19 vaccination requirement because of a conflict between that requirement and their sincerely held religious beliefs, practices, or observances (hereafter called "religious beliefs").  Under Title VII, this is called a request for a "religious accommodation" or a "reasonable accommodation."

When making the request, employees do not need to use any "magic words," such as "religious accommodation" or "Title VII."  However, they need to notify the employer that there is a conflict between their sincerely held religious beliefs and the employer's COVID-19 vaccination requirement.

The same principles apply if employees have a religious conflict with getting a particular vaccine and wish to wait until an alternative version or specific brand of COVID-19 vaccine is available.

As a best practice, an employer should provide employees and applicants with information about whom to contact, and the procedures (if any) to use, to request a religious accommodation.

*As an example, here is how **EEOC designed its own form for its own workplace (https://www.eeoc.gov/sites/default/files/2021-10/EEOC%20Religious%20Accommodation%20Request%20Form%20-%20for%20web.pdf)** . Although the EEOC's internal forms typically are not made public, it is included here given the extraordinary circumstances facing employers and employees due to the COVID-19 pandemic. (Note: Persons not employed by the EEOC should not submit this form to the EEOC to request a religious accommodation.)*

**L.2. Does an employer have to accept an employee's assertion of a religious objection to a COVID-19 vaccination at face value?  May the employer ask for additional information?** *(10/25/21)*

AR-04384


11/15/21, 8:59 AM          What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 65 of 298   PageID 4926

Generally, under Title VII, an employer should assume that a request for religious accommodation is based on sincerely held religious beliefs.  However, if an employer has an objective basis for questioning either the religious nature or the sincerity of a particular belief, the employer would be justified in making a limited factual inquiry and seeking additional supporting information.  An employee who fails to cooperate with an employer's reasonable request for verification of the sincerity or religious nature of a professed belief risks losing any subsequent claim that the employer improperly denied an accommodation.  *See generally* **Section 12-IV.A.2: Religious Discrimination (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_790763467358216107498601 35)** .

The definition of "religion" under Title VII protects nontraditional religious beliefs that may be unfamiliar to employers.  While the employer should not assume that a request is invalid simply because it is based on unfamiliar religious beliefs, employees may be asked to explain the religious nature of their belief and should not assume that the employer already knows or understands it.  By contrast, Title VII does not protect social, political, or economic views, or personal preferences.  **Section 12-I.A.1: Religious Discrimination (definition of religion) (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_ftnref18)** .  Thus, objections to COVID-19 vaccination that are based on social, political, or personal preferences, or on nonreligious concerns about the possible effects of the vaccine, do not qualify as "religious beliefs" under Title VII.

The sincerity of an employee's stated religious beliefs also is not usually in dispute.  The employee's sincerity in holding a religious belief is "largely a matter of individual credibility."  **Section 12-I.A.2: Religious Discrimination (credibility and sincerity) (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_ftnref42)** .  Factors that – either alone or in combination – might undermine an employee's credibility include:  whether the employee has acted in a manner inconsistent with the professed belief (although employees need not be scrupulous in their observance); whether the accommodation sought is a particularly desirable benefit that is likely to be sought for nonreligious reasons; whether the timing of the request renders it suspect (e.g., it follows an earlier request by the employee for the same benefit for secular reasons); and whether the employer otherwise has reason to believe the accommodation is not sought for religious reasons.



11/15/21, 8:59 AM          What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 66 of 298   PageID 4927

The employer may ask for an explanation of how the employee's religious belief conflicts with the employer's COVID-19 vaccination requirement. Although prior inconsistent conduct is relevant to the question of sincerity, an individual's beliefs – or degree of adherence – may change over time and, therefore, an employee's newly adopted or inconsistently observed practices may nevertheless be sincerely held. An employer should not assume that an employee is insincere simply because some of the employee's practices deviate from the commonly followed tenets of the employee's religion, or because the employee adheres to some common practices but not others. No one factor or consideration is determinative, and employers should evaluate religious objections on an individual basis.

When an employee's objection to a COVID-19 vaccination requirement is not religious in nature, or is not sincerely held, Title VII does not require the employer to provide an exception to the vaccination requirement as a religious accommodation.

### L.3. How does an employer show that it would be an "undue hardship" to accommodate an employee's request for religious accommodation? *(10/25/21)*

Under Title VII, an employer should thoroughly consider all possible reasonable accommodations, including telework and reassignment. For suggestions about types of reasonable accommodations for unvaccinated employees, *see* K.6, above. In many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices, or observances without imposing an undue hardship.

If an employer demonstrates that it is unable to reasonably accommodate an employee's religious belief without an "undue hardship" on its operations, then Title VII does not require the employer to provide the accommodation. 42 U.S.C. § 2000e(j). The Supreme Court has held that requiring an employer to bear more than a "de minimis," or a minimal, cost to accommodate an employee's religious belief is an undue hardship. Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business – including, in this instance, the risk of the spread of COVID-19 to other employees or to the public.

Courts have found Title VII undue hardship where, for example, the religious accommodation would impair workplace safety, diminish efficiency in other jobs, or cause coworkers to carry the accommodated employee's share of potentially hazardous or burdensome work. For a more detailed discussion, *see* **Section 12-IV.B: Religious Discrimination (discussing undue hardship)**

AR-04386


11/15/21, 8:59 AM    What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 67 of 298   PageID 4928

**(https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_12929403436951610749878556)** .

An employer will need to assess undue hardship by considering the particular facts of each situation and will need to demonstrate how much cost or disruption the employee's proposed accommodation would involve.  An employer cannot rely on speculative hardships when faced with an employee's religious objection but, rather, should rely on objective information. Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals).  Another relevant consideration is the number of employees who are seeking a similar accommodation (i.e., the cumulative cost or burden on the employer).

**L.4. If an employer grants some employees a religious accommodation from a COVID-19 vaccination requirement because of sincerely held religious beliefs, does it have to grant the requests of all employees who seek an accommodation because of sincerely held religious beliefs?** *(10/25/21)*

No.  The determination of whether a particular proposed accommodation imposes an undue hardship on the conduct of the employer's business depends on its specific factual context. When an employer is assessing whether exempting an employee from getting a vaccination would impair workplace safety, it may consider, for example, the type of workplace, the nature of the employee's duties, the number of employees who are fully vaccinated, how many employees and nonemployees physically enter the workplace, and the number of employees who will in fact need a particular accommodation.  A mere assumption that many more employees might seek a religious accommodation to the vaccination requirement in the future is not evidence of undue hardship, but the employer may take into account the cumulative cost or burden of granting accommodations to other employees.

**L.5. Must an employer provide the religious accommodation preferred by an employee if there are other possible accommodations that also are effective in eliminating the religious conflict and do not cause an undue hardship under Title VII?** *(10/25/21)*

No.  If there is more than one reasonable accommodation that would resolve the conflict between the vaccination requirement and the sincerely held religious belief without causing an undue hardship under Title VII, the employer may choose which accommodation to offer.  If more than one accommodation would be effective in eliminating the religious conflict, the employer should consider the employee's preference but is not obligated to provide the reasonable accommodation preferred by the employee.  If the employer denies the employee's proposed accommodation, the employer should explain to the employee why the preferred accommodation is not being granted.

An employer should consider all possible alternatives to determine whether exempting an employee from a vaccination requirement would impose an undue hardship.  *See, e.g.*, K.2. Employers may rely on **CDC recommendations (https://www.cdc.gov/coronavirus/2019-ncov/)** when deciding whether an effective accommodation is available that would not pose an undue hardship.

### L.6. If an employer grants a religious accommodation to an employee, can the employer later reconsider it? *(10/25/21)*

The obligation to provide religious accommodations absent undue hardship is a continuing obligation that takes into account changing circumstances.  Employees' religious beliefs and practices may evolve or change over time and may result in requests for additional or different religious accommodations.  Similarly, an employer has the right to discontinue a previously granted accommodation if it is no longer utilized for religious purposes, or if a provided accommodation subsequently poses an undue hardship on the employer's operations due to changed circumstances.  As a best practice, an employer should discuss with the employee any concerns it has about continuing a religious accommodation before revoking it and consider whether there are alternative accommodations that would not impose an undue hardship.

# Table of Contents

**Introduction**

**A. Disability-Related Inquiries and Medical Exams**

**B. Confidentiality of Medical Information**

11/15/21, 8:59 AM       What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws | U.S. Equal Employment O…

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 69 of 298   PageID 4930

**C. Hiring and Onboarding**

**D. Reasonable Accommodation**

**E. Pandemic-Related Harassment Due to National Origin, Race, or Other Protected Characteristics**

**F. Furloughs and Layoffs**

**G. Return to Work**

**H. Age**

**I. Caregivers/Family Responsibilities**

**J. Pregnancy**

**K. Vaccinations – Overview, ADA, Title VII, and GINA**

**L. Vaccinations – Title VII and Religious Objections to COVID-19 Vaccine Mandates**



**CDC** Centers for Disease
Control and Prevention

---

# COVID-19

## When You've Been Fully Vaccinated

How to Protect Yourself and Others

Updated Oct. 15, 2021        Print

COVID-19 vaccines are effective at protecting you from getting sick. Based on what we know about COVID-19 vaccines, people who have been fully vaccinated can do things that they had stopped doing because of the pandemic.

These recommendations can help you make decisions about daily activities after you are fully vaccinated. They are *not* intended for healthcare settings.

In general, people are considered fully vaccinated: [±]



**COVID-19 County Check**

Find community transmission levels by county.

Select a Location

State

County

- 2 weeks after their second dose in a 2-dose series, such as the Pfizer or Moderna vaccines, or
- 2 weeks after a single-dose vaccine, such as Johnson & Johnson's Janssen vaccine

If you don't meet these requirements, regardless of your age, you are NOT fully vaccinated. Keep taking all precautions until you are fully vaccinated.

> If you have a condition or are taking medications that weaken your immune system, you may not be fully protected even if you are fully vaccinated and have received an additional dose. You should continue to take all precautions recommended for unvaccinated people until advised otherwise by your healthcare provider.

## What You Can Do

  

If you've been fully vaccinated:

- You can resume activities that you did prior to the pandemic.
  - To reduce the risk of being infected with the Delta variant and possibly spreading it to others, wear a mask indoors in public if you are in an area of substantial or high transmission.
  - You might choose to wear a mask regardless of the level of transmission if you have a weakened immune system or if, because of your age or an underlying medical condition, you are at increased risk for severe disease, or if a

member of your household has a weakened immune system, is at increased risk for severe disease, or is unvaccinated.

- You can travel.

  – If you travel in the United States, you do not need to get tested before or after travel or self-quarantine after travel.

  – You need to pay close attention to the situation at your international destination before traveling outside the United States.

    • You do NOT need to get tested **before** leaving the United States unless your destination requires it.

    • You still need to show a negative test result or documentation of recovery from COVID-19 **before** boarding an international flight to the United States.

    • You should still get tested 3-5 days **after** international travel.

    • You do NOT need to self-quarantine **after** arriving in the United States.

  – Wearing a mask over your nose and mouth is required on planes, buses, trains, and other forms of public transportation traveling into, within, or out of the United States and while indoors at U.S. transportation hubs such as airports and stations. Travelers are not required to wear a mask in outdoor areas of a conveyance (like on open deck areas of a ferry or the uncovered top deck of a bus).

- You should still get tested if you've had close contact with someone who has COVID-19 or if you have symptoms of COVID-19.

  – If you've had close contact with someone who has COVID-19, you should get tested 5-7 days after your exposure, even if you don't have symptoms. You should also wear a mask indoors in public for 14 days following exposure or until your test result is negative.

  – If you have symptoms of COVID-19, you should get tested and stay home and away from others.

  – If your test result is positive, isolate at home for 10 days.

- You will still need to follow guidance at your workplace and local businesses.

 **About the Delta Variant:** Vaccines continue to reduce a person's risk of contracting the virus that cause COVID-19, including this variant. Vaccines are highly effective against severe illness, but the Delta variant causes more infections and spreads faster than earlier forms of the virus that causes COVID-19. Learn more about variants in the US.

## What We Know

- COVID-19 vaccines are safe and effective at preventing COVID-19, including severe illness and death.

- COVID-19 vaccines are effective against severe disease and death from variants of the virus that causes COVID-19 currently circulating in the United States, including the Delta variant.

- Infections happen in only a small proportion of people who are fully vaccinated, even with the Delta variant. When these infections occur among vaccinated people, they tend to be mild.

- If you are fully vaccinated and become infected with the Delta variant, you can spread the virus to others.

- People with weakened immune systems, including people who take immunosuppressive medications, may not be protected even if fully vaccinated.

## What We're Still Learning

- How long COVID-19 vaccines can protect people.

Want to learn more about these recommendations? Read our expanded Interim Public Health Recommendations for Fully Vaccinated People.

± This guidance applies to COVID-19 vaccines currently approved or authorized for emergency use by the U.S. Food and Drug Administration (Pfizer-BioNTech, Moderna, and Johnson & Johnson [J&J]/Janssen COVID-19 vaccines), and can be applied to COVID-19 vaccines that have been listed for emergency use by the World Health Organization (such as AstraZeneca/Oxford). Additionally, this guidance can be applied to clinical trial participants from U.S. sites who received all recommended doses of

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 72 of 298   PageID 4933

a COVID-19 vaccine that is neither approved nor authorized for use by FDA but is listed for emergency use by WHO, or who have received the full series of an "active" (not placebo) COVID-19 vaccine candidate for which vaccine efficacy has been independently confirmed (e.g., by a data and safety monitoring board). Currently, participants in the U.S.-based AstraZeneca and Novavax COVID-19 vaccine trials meet these criteria. These U.S. participants in COVID-19 vaccine trials can be considered fully vaccinated 2 weeks after they complete the vaccine series, if it has been confirmed that they received "active" vaccine, and not placebo. More information is available at Interim Clinical Considerations for Use of COVID-19 Vaccines | CDC.

## Related Pages

› Interim Public Health Recommendations for Fully Vaccinated People

› Science Brief: Background Rationale and Evidence for Public Health Recommendations

› Infection Control after Vaccination for Healthcare Workers

Last Updated Oct. 15, 2021

**CDC** Centers for Disease
Control and Prevention



## COVID-19

# When You've Been Fully Vaccinated
How to Protect Yourself and Others

Updated Sept. 16, 2021      Print

COVID-19 vaccines are effective at protecting you from getting sick. Based on what we know about COVID-19 vaccines, people who have been fully vaccinated can do things that they had stopped doing because of the pandemic.

These recommendations can help you make decisions about daily activities after you are fully vaccinated. They are *not* intended for healthcare settings.

> Learn more about who is eligible for a COVID-19 booster shot.

In general, people are considered fully vaccinated: ‡

- 2 weeks after their second dose in a 2-dose series, such as the Pfizer or Moderna vaccines, or
- 2 weeks after a single-dose vaccine, such as Johnson & Johnson's Janssen vaccine

If you don't meet these requirements, regardless of your age, you are NOT fully vaccinated. Keep taking all precautions until you are fully vaccinated.

> If you have a condition or are taking medications that weaken your immune system, you may not be fully protected even if you are fully vaccinated. You should continue to take all precautions recommended for unvaccinated people until advised otherwise by your healthcare provider.
>
> People with moderately to severely compromised immune systems should receive an additional dose of mRNA COVID-19 vaccine after the initial 2 doses.



### COVID-19 County Check

Find community transmission levels by county.

Select a Location

State

County

# What You Can Do





If you've been fully vaccinated:

- You can resume activities that you did prior to the pandemic.

- To reduce the risk of being infected with the Delta variant and possibly spreading it to others, wear a mask indoors in public if you are in an area of substantial or high transmission.

- You might choose to wear a mask regardless of the level of transmission if you have a weakened immune system or if, because of your age or an underlying medical condition, you are at increased risk for severe disease, or if a member of your household has a weakened immune system, is at increased risk for severe disease, or is unvaccinated.

- If you travel in the United States, you do not need to get tested before or after travel or self-quarantine after travel.

- You need to pay close attention to the situation at your international destination before traveling outside the United States.

  - You do NOT need to get tested **before** leaving the United States unless your destination requires it.

  - You still need to show a negative test result or documentation of recovery from COVID-19 **before** boarding an international flight to the United States.

  - You should still get tested 3-5 days **after** international travel.

  - You do NOT need to self-quarantine **after** arriving in the United States.

- If you've had close contact with someone who has COVID-19, you should get tested 3-5 days after your exposure, even if you don't have symptoms. You should also wear a mask indoors in public for 14 days following exposure or until your test result is negative. You should isolate for 10 days if your test result is positive.

 **About the Delta Variant:** Vaccines continue to reduce a person's risk of contracting the virus that cause COVID-19, including this variant. Vaccines are highly effective against severe illness, but the Delta variant causes more infections and spreads faster than earlier forms of the virus that causes COVID-19. Learn more about variants in the US.

# What You Should Keep Doing

  

For now, if you've been fully vaccinated:

- You will still need to follow guidance at your workplace and local businesses.

- If you travel, you should still take steps to protect yourself and others.

- Wearing a mask over your nose and mouth is required on planes, buses, trains, and other forms of public transportation traveling into, within, or out of the United States and while indoors at U.S. transportation hubs such as airports and stations. Travelers are not required to wear a mask in outdoor areas of a conveyance (like on open deck areas of a ferry or the uncovered top deck of a bus).

- Fully vaccinated international travelers arriving in the United States are still required to get tested 3 days before travel by air into the United States (or show documentation of recovery from COVID-19 in the past 3 months) and should still get tested 3-5 days after their trip.

- You should still watch out for symptoms of COVID-19, especially if you've been around someone who is sick. If you have symptoms of COVID-19, you should get tested and stay home and away from others. If your test is positive, isolate at home for 10 days.

- People who have a condition or are taking medications that weaken the immune system, should continue to take all precautions recommended for unvaccinated people until advised otherwise by their healthcare provider.

# What We Know

AR-04394

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 75 of 298   PageID 4936

- COVID-19 vaccines are safe and effective at preventing COVID-19, including severe illness and death.

- COVID-19 vaccines are effective against severe disease and death from variants of the virus that causes COVID-19 currently circulating in the United States, including the Delta variant.

- Infections happen in only a small proportion of people who are fully vaccinated, even with the Delta variant. When these infections occur among vaccinated people, they tend to be mild.

- If you are fully vaccinated and become infected with the Delta variant, you can spread the virus to others.

- People with weakened immune systems, including people who take immunosuppressive medications, may not be protected even if fully vaccinated.

# What We're Still Learning

- How long COVID-19 vaccines can protect people.

Want to learn more about these recommendations? Read our expanded Interim Public Health Recommendations for Fully Vaccinated People.

± This guidance applies to COVID-19 vaccines currently approved or authorized for emergency use by the U.S. Food and Drug Administration (Pfizer-BioNTech, Moderna, and Johnson & Johnson [J&J]/Janssen COVID-19 vaccines) and some vaccines used for U.S. participants in COVID-19 vaccine trials (such as Novavax). This guidance can also be applied to COVID-19 vaccines that have been listed for emergency use by the World Health Organization (such as AstraZeneca/Oxford). More information is available at Interim Clinical Considerations for Use of COVID-19 Vaccines | CDC.

## Related Pages

› Interim Public Health Recommendations for Fully Vaccinated People

› Science Brief: Background Rationale and Evidence for Public Health Recommendations

› Infection Control after Vaccination for Healthcare Workers

Last Updated Sept. 16, 2021

(Slip Opinion)

# Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization

Section 564(e)(1)(A)(ii)(III) of the Food, Drug, and Cosmetic Act concerns only the provision of information to potential vaccine recipients and does not prohibit public or private entities from imposing vaccination requirements for a vaccine that is subject to an emergency use authorization.

July 6, 2021

MEMORANDUM OPINION FOR THE
DEPUTY COUNSEL TO THE PRESIDENT

Section 564 of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3,[1] authorizes the Food and Drug Administration ("FDA") to issue an "emergency use authorization" ("EUA") for a medical product, such as a vaccine, under certain emergency circumstances. This authorization permits the product to be introduced into interstate commerce and administered to individuals even when FDA has not approved the product for more general distribution pursuant to its standard review process. Section 564 directs FDA—"to the extent practicable" given the emergency circumstances and "as the [agency] finds necessary or appropriate to protect the public health"—to impose "[a]ppropriate" conditions on each EUA. FDCA § 564(e)(1)(A). Some of these conditions are designed to ensure that recipients of the product "are informed" of certain things, including "the option to accept or refuse administration of the product." *Id.* § 564(e)(1)(A)(ii)(III).

Since December 2020, FDA has granted EUAs for three vaccines to prevent coronavirus disease 2019 ("COVID-19"). In each of these authorizations, FDA imposed the "option to accept or refuse" condition by requiring the distribution to potential vaccine recipients of a Fact Sheet that states: "It is your choice to receive or not receive [the vaccine]. Should you decide not to receive it, it will not change your standard medical care." *E.g.*, FDA, Fact Sheet for Recipients and Caregivers at 5 (revised June 25, 2021), https://www.fda.gov/media/144414/download

---

[1] Because it is commonly referred to by its FDCA section number, and for the sake of simplicity, we will refer to this provision as section 564, rather than by its United States Code citation.

1

AR-04396

45 Op. O.L.C. __ (July 6, 2021)

("Pfizer Fact Sheet"). In recent months, many public and private entities have announced that they will require individuals to be vaccinated against COVID-19—for instance, in order to attend school or events in person, or to return to work or be hired into a new job. We will refer to such policies as "vaccination requirements," though we note that these policies typically are conditions on employment, education, receipt of services, and the like rather than more direct legal requirements.[2]

In light of these developments, you have asked whether the "option to accept or refuse" condition in section 564 prohibits entities from imposing such vaccination requirements while the only available vaccines for COVID-19 remain subject to EUAs. We conclude, consistent with FDA's interpretation, that it does not. This language in section 564 specifies only that certain information be provided to potential vaccine recipients and does not prohibit entities from imposing vaccination requirements.[3]

## I.

### A.

Federal law generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug" or "biological product" unless and until FDA has approved the drug or product as safe and effective for its intended uses. *See, e.g.*, FDCA §§ 301(a), 505(a), 21 U.S.C. §§ 331(a), 355(a); 42 U.S.C § 262(a). A vaccine is both a drug and a biological product. *See* FDCA § 201(g), 21 U.S.C § 321(g); 42 U.S.C. § 262(i)(1). Consistent with section 564, we will generally refer to it here as a "product." *See* FDCA § 564(a)(4)(C) (defining "product" to mean "a drug, device, or biological product").

---

[2] For an example of the latter, see our discussion in Part II.B of a hypothetical military order to service members.

[3] We do not address whether other federal, state, or local laws or regulations, such as the Americans with Disabilities Act ("ADA"), might restrict the ability of public or private entities to adopt particular vaccination policies. *See, e.g.*, Equal Employment Opportunity Commission, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (updated June 28, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (discussing the ADA).

2

AR-04397

*Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*

In 2003, Congress addressed a problem raised in emergency situations where "the American people may be placed at risk of exposure to biological, chemical, radiological, or nuclear agents, and the diseases caused by such agents," but where, "[u]nfortunately, there may not be approved or available countermeasures to treat diseases or conditions caused by such agents," even though "a drug, biologic, or device is highly promising in treating [such] a disease or condition." H.R. Rep. No. 108-147, pt. 1, at 2 (2003). President George W. Bush had flagged this problem in his 2003 State of the Union Address, in which he proposed Project BioShield, a legislative initiative "to quickly make available effective vaccines and treatments against agents like anthrax, botulinum toxin, Ebola, and plague." *Address Before a Joint Session of the Congress on the State of the Union* (Jan. 28, 2003), 1 Pub. Papers of Pres. George W. Bush 82, 86 (2003). Among the principal components of the proposed Project BioShield legislation were provisions to enable FDA to authorize medical products for use during emergencies even before they are proven to be safe and effective under ordinary FDA review. *See, e.g.*, H.R. 2122, 108th Cong. § 4 (2003). At that time, the only alternative to ordinary FDA approval was 21 U.S.C. § 355(i), which authorizes FDA to exempt drugs from the ordinary approval requirements where the drug is "intended solely for investigational use by experts qualified by scientific training and experience to investigate the safety and effectiveness of drugs." Such a cabined investigational new drug ("IND") exemption does not, however, allow the widespread dissemination of a drug for general public use in response to an emergency. *See* H.R. Rep. No. 108-147, pt. 1, at 2.

Congress enacted a version of the Project BioShield legislation's EUA provision in the National Defense Authorization Act for Fiscal Year 2004 as section 564 of the FDCA. *See* Pub. L. No. 108-136, § 1603(a), 117 Stat. 1392, 1684 (2003) (codified at 21 U.S.C. § 360bbb-3).[4] Section 564 authorizes the Secretary of Health and Human Services ("HHS")—who has delegated to FDA the authorities under the statute at issue here—to authorize the introduction into interstate commerce of a drug, device, or biological product intended for use in an actual or potential emergency even though the product has not yet been generally approved as safe and

---

[4] The statute has been amended since, including when Congress enacted the Project BioShield Act the following year. *See* Pub. L. No. 108-276, § 4(a), 118 Stat. 835, 853 (2004).

AR-04398

45 Op. O.L.C. __ (July 6, 2021)

effective for its intended use. FDCA § 564(a)(1)–(2); *see also* FDA, *Emergency Use Authorization of Medical Products and Related Authorities: Guidance for Industry and Other Stakeholders* at 3 n.6 (Jan. 2017) ("EUA Guidance") (noting delegation of most of the Secretary's authorities under section 564 to FDA).[5]

The most pertinent part of section 564 for purposes of your question has remained materially the same since Congress first enacted the statute in 2003. Subsection (e)(1)(A),[6] titled "Required conditions," provides:

> With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable [emergency] circumstances . . . , shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including [certain specified conditions].

---

[5] The current version of section 564(a)(1) provides in full:

> Notwithstanding any provision of this chapter and section 351 of the Public Health Service Act, and subject to the provisions of this section, the Secretary may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an "emergency use").

The "declaration under subsection (b)" refers to a declaration by the Secretary "that the circumstances exist justifying" an EUA, which must be made "on the basis" of one or more types of emergencies or threats. FDCA § 564(b)(1). FDA can grant an EUA where, "based on the totality of scientific evidence available to the Secretary, including data from adequate and well-controlled clinical trials, if available," FDA finds that "it is reasonable to believe," among other things, that "the product may be effective in diagnosing, treating, or preventing" a "serious or life-threatening disease or condition" caused by a "biological, chemical, radiological, or nuclear agent or agents" (a standard less onerous than for final approval of the product); that "the known and potential benefits of the product, when used to diagnose, prevent, or treat such disease or condition, outweigh the known and potential risks of the product"; and that "there is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition." FDCA § 564(c).

[6] Subsection (e)(1) applies to a product that FDA has not approved as safe and effective for any intended use, whereas subsection (e)(2) applies to an unapproved use of an otherwise approved product. The COVID-19 vaccines fall under the former category, but the statute applies the condition at issue here to the latter category as well. *See* FDCA § 564(e)(2)(A).

4

*Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*

The statute then lists a number of such conditions, including "[a]p-propriate conditions designed to ensure that individuals to whom the product is administered are informed" of certain information. FDCA § 564(e)(1)(A)(ii). This information includes the fact that FDA "has authorized the emergency use of the product," "the significant known and potential benefits and risks of such use," and "the extent to which such benefits and risks are unknown." *Id.* § 564(e)(1)(A)(ii)(I)–(II). Most relevant here, section 564(e)(1)(A)(ii)(III) directs FDA to impose conditions on an EUA "designed to ensure that individuals to whom the product is administered are informed . . . of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks."

In the same section of the 2004 National Defense Authorization Act, Congress also enacted another provision, codified as 10 U.S.C. § 1107a, which is specific to the U.S. military and which expressly refers to the "option to accept or refuse" condition described in section 564(e)(1)(A)(ii)(III). Pub. L. No. 108-136, sec. 1603(b)(1), § 1107a, 117 Stat. at 1690. Subsection (a) of this law provides that when an EUA product is administered to members of the armed forces, "the condition described in section 564(e)(1)(A)(ii)(III) . . . and required under paragraph (1)(A) or (2)(A) of such section 564(e), designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President" and "only if the President determines, in writing, that complying with such requirement is not in the interests of national security." 10 U.S.C. § 1107a(a)(1).

**B.**

In the years after Congress enacted section 564, FDA issued dozens of EUAs in response to various public-health emergencies. *See, e.g.*, Authorization of Emergency Use of the Antiviral Product Peramivir Accompanied by Emergency Use Information; Availability, 74 Fed. Reg. 56,644 (Nov. 2, 2009) (antiviral drug to treat swine flu). The agency's use of EUAs increased dramatically with the onset of the COVID-19 pandemic in 2020. As of January 2021, the agency had issued more than 600 EUAs for products to combat COVID-19, including drugs, tests, personal protective equipment, and ventilators. *See* FDA, *FDA COVID-19 Pandemic*

5

45 Op. O.L.C. __ (July 6, 2021)

*Recovery and Preparedness Plan (PREPP) Initiative: Summary Report* at 6 (Jan. 2021); *cf. id.* at 24 (noting that FDA issued 65 EUAs prior to COVID-19). More importantly for present purposes, the agency has granted EUAs for three COVID-19 vaccines manufactured by Pfizer, Moderna, and Janssen, respectively. *See* Authorizations of Emergency Use of Certain Biological Products During the COVID-19 Pandemic; Availability, 86 Fed. Reg. 28,608 (May 27, 2021) (Janssen); Authorizations of Emergency Use of Two Biological Products During the COVID-19 Pandemic; Availability, 86 Fed. Reg. 5200 (Jan. 19, 2021) (Pfizer and Moderna).

As we have explained, section 564 of the FDCA contemplates that each EUA will be subject to various conditions. For the three COVID-19 vaccines, FDA implemented the "option to accept or refuse" condition described in section 564(e)(1)(A)(ii)(III) in the following manner: In each letter granting the EUA, FDA established as a "condition[] of authorization" that FDA's "Fact Sheet for Recipients and Caregivers" be made available to potential vaccine recipients. *See, e.g.*, Letter for Pfizer Inc. from RADM Denise M. Hinton, Chief Scientist, FDA at 6, 9 (updated June 25, 2021), https://www.fda.gov/media/150386/download ("Pfizer EUA Letter"). The Fact Sheet in question states (to take the Pfizer vaccine as an example): "It is your choice to receive or not receive the Pfizer-BioNTech COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care." Pfizer Fact Sheet at 5. We understand that this approach is consistent with FDA's general practice for EUAs. *See* EUA Guidance at 24–25 (discussing the use of fact sheets to inform recipients of EUA products "[t]hat they have the option to accept or refuse the EUA product and of any consequences of refusing administration of the product").

As access to the COVID-19 vaccines has become widespread, numerous educational institutions, employers, and other entities across the United States have announced that they will require individuals to be vaccinated against COVID-19 as a condition of employment, enrollment, participation, or some other benefit, service, relationship, or access.[7] For

---

[7] *See, e.g.*, Rukmini Callimachi, *For Colleges, Vaccine Mandates Often Depend on Which Party Is in Power*, N.Y. Times (May 22, 2021), https://www.nytimes.com/2021/05/22/us/college-vaccine-universities.html; Tracy Rucinski, *Delta will require COVID-19*

6

AR-04401

*Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*

instance, certain schools will require vaccination in order for students to attend class in person, and certain employers will require vaccination as a condition of employment.

Some have questioned whether such entities can lawfully impose such requirements in light of the fact that section 564 instructs that potential vaccine recipients are to be informed that they have the "option to accept or refuse" receipt of the vaccine.[8] In the past few months, several lawsuits have also been filed challenging various entities' vaccination requirements on the same theory.[9] The only judicial decision to have addressed this issue so far summarily rejected the challenge. *See Bridges v. Houston Methodist Hosp.*, No. 4:21-cv-01774, 2021 WL 2399994, at *1–2 (S.D. Tex. June 12, 2021), *appeal docketed*, No. 21-20311 (5th Cir. June 14, 2021).

## II.

### A.

We conclude that section 564(e)(1)(A)(ii)(III) concerns only the provision of information to potential vaccine recipients and does not prohibit public or private entities from imposing vaccination requirements for vaccines that are subject to EUAs. By its terms, the provision directs only that potential vaccine recipients be "informed" of certain information, including "the option to accept or refuse administration of the product."

---

*vaccine for new employees*, Reuters (May 14, 2021, 9:16 AM), https://www.reuters.com/world/us/delta-will-require-covid-19-vaccine-new-employees-2021-05-14/.

[8] *See, e.g.*, Letter for Thomas C. Galligan Jr., Interim President, Louisiana State University, from Jeff Landry, Attorney General of Louisiana (May 28, 2021); *see also* Advisory Committee on Immunization Practices, Summary Report at 56 (Aug. 26, 2020), https://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/min-2020-08-508.pdf (reporting a CDC official as saying that EUA vaccines are not allowed to be mandatory).

[9] *See, e.g.*, Defendant's Notice of Removal, *Bridges v. Methodist Hosp.*, No. 4:21-cv-01774 (S.D. Tex. June 1, 2021), 2021 WL 2221293 (referencing complaint); Complaint, *Neve v. Birkhead*, No. 1:21-cv-00308 (M.D.N.C. Apr. 16, 2021), 2021 WL 1902937; Complaint, *Cal. Educators for Med. Freedom v. L.A. Unified Sch. Dist.*, No. 21-cv-2388 (C.D. Cal. Mar. 17, 2021), 2021 WL 1034618; Complaint, *Legaretta v. Macias*, No. 2:21-cv-00179 (D.N.M. Feb. 28, 2021), 2021 WL 909707; *see also* Complaint, *Health Freedom Defense Fund v. City of Hailey*, No. 1:21-cv-00212-DCN (D. Idaho May 14, 2021), 2021 WL 1944543 (making a similar argument about a face-mask requirement).

7

45 Op. O.L.C. __ (July 6, 2021)

FDCA § 564(e)(1)(A)(ii)(III). In the sense used here, the word "inform" simply means to "give (someone) facts or information; tell." *New Oxford American Dictionary* 891 (3d ed. 2010); *see also, e.g.*, *Webster's Third New International Dictionary* 1160 (2002) (similar). Consistent with this understanding, the conditions of authorization that FDA imposed for the COVID-19 vaccines require that potential vaccine recipients receive FDA's Fact Sheet, *see, e.g.*, Pfizer EUA Letter at 6, 9, which states that recipients have a "choice to receive or not receive" the vaccine, *see, e.g.*, Pfizer Fact Sheet at 5. Neither the statutory conditions of authorization nor the Fact Sheet itself purports to restrict public or private entities from insisting upon vaccination in any context. *Cf. Bridges*, 2021 WL 2399994, at *2 (explaining that section 564 "confers certain powers and responsibilities to the Secretary of [HHS] in an emergency" but that it "neither expands nor restricts the responsibilities of private employers").[10]

The language of another provision of section 564 reflects the limited scope of operation of section 564(e)(1)(A)(ii)(III). Section 564(*l*) provides that "this section [i.e., section 564] only has legal effect on a person who carries out an activity for which an authorization under this section is issued." This provision expressly forecloses any limitation on the activities of the vast majority of entities who would insist upon vaccination requirements, because most do not carry out any activity for which an EUA is issued.

To be sure, the EUA conditions effectively require parties administering the products to do so in particular ways—including that they only administer the products to individuals after providing them the informational Fact Sheets that FDA prescribes—and some of those entities,

---

[10] Earlier-introduced versions of section 564(e)(1)(A)(ii)(III) in 2003 referred to "*any* option to accept or refuse administration of the product" (as opposed to "the" option), a formulation that might have even more clearly conveyed the informational nature of the condition. *See, e.g.*, S. 15, 108th Cong. § 204 (Mar. 11, 2003) (emphasis added). We have not found any explanation for why Congress revised the provision to refer to "the option," so we ascribe little significance to the change—either for or against our reading of the statute. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989); *Trainmobile Co. v. Whirls*, 331 U.S. 40, 61 (1947) ("The interpretation of statutes cannot safely be made to rest upon mute intermediate legislative maneuvers."). In 10 U.S.C. § 1107a(a), moreover, Congress used the alternative formulation "*an* option to accept or refuse" in referring to the condition in section 564(e)(1)(A)(ii)(III) as it relates to the armed forces. (Emphasis added.) This discrepancy counsels further against assigning interpretive weight to the change from "any" to "the" in the legislative development of section 564.

8

AR-04403

*Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*

such as universities, might also impose vaccination requirements (e.g., on their students and employees). There is no indication, however, that Congress intended to regulate such entities except with respect to the circumstances of their administration of the product itself. *See, e.g.*, FDCA § 564(e)(1)(B)(ii) (authorizing FDA to establish "[a]ppropriate conditions on who may administer the product with respect to the emergency use of the product, and on the categories of individuals to whom, *and the circumstances under which, the product may be administered with respect to such use*" (emphasis added)). And it would have been odd for Congress to have done so, for in that case the entities choosing to administer EUA products would be limited in their relations with third parties (e.g., students, employees) in ways that analogous entities that did not administer the products were not.

This reading of the "option to accept or refuse" condition to be informational follows not only from the plain text of the provision, but also from the surrounding requirements in section 564(e)(1)(A)(ii). *See, e.g.*, *Lagos v. United States*, 138 S. Ct. 1684, 1688–89 (2018) (relying on the canon of "*noscitur a sociis*, the well-worn Latin phrase that tells us that statutory words are often known by the company they keep"). In addition to requiring that potential recipients be informed of "the option to accept or refuse administration of the product," the statute also requires that they be informed of "the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." FDCA § 564(e)(1)(A)(ii)(III). Similarly, the two other provisions in subsection (e)(1)(A)(ii) require that individuals be informed of the fact that FDA "has authorized the emergency use of the product" and of "the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown." *Id.* § 564(e)(1)(A)(ii)(I)–(II). These provisions all appear to require only that certain factual information be conveyed to those who might use the product.

Indeed, if Congress had intended to restrict entities from imposing EUA vaccination requirements, it chose a strangely oblique way to do so, embedding the restriction in a provision that on its face requires only that individuals be provided with certain information (and grouping that requirement with other conditions that are likewise informational in nature). Congress could have created such a restriction by simply stating that persons (or certain categories of persons) may not require others to

9

45 Op. O.L.C. __ (July 6, 2021)

use an EUA product. *See Kloeckner v. Solis*, 568 U.S. 41, 52 (2012) (rejecting a statutory interpretation positing that Congress took a "roundabout way" and an "obscure path" to reach "a simple result"); *cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

Our reading of section 564(e)(1)(A)(ii)(III) does not fully explain why Congress created a scheme in which potential users of the product would be informed that they have "the option to accept or refuse" the product. The legislative history of the 2003 statute does not appear to offer any clear explanation. Perhaps Congress viewed section 564(e)(1)(A)(ii)(III) as a variation on the "informed consent" requirement that applies to human subjects in "investigational drug" settings,[11] the only other context in which FDA may (in a limited fashion) authorize the introduction of unapproved drugs into interstate commerce. Or perhaps Congress included this condition to ensure that potential users of an EUA product would not misunderstand what the likely impact of declining to use that product would be.

The information conveyed pursuant to the "option" clause continues to be a true statement about a material fact of importance to potential vac-

---

[11] Section 355(i)(4) of title 21 provides that an IND exemption to the premarket approval requirement may only apply if the manufacturer or sponsor of an expert investigation requires the experts in question to certify

> that they will inform any human beings to whom such drugs, or any controls used in connection therewith, are being administered, or their representatives, that such drugs are being used for investigational purposes and will obtain the consent of such human beings or their representatives, except where it is not feasible, it is contrary to the best interests of such human beings, or the proposed clinical testing poses no more than minimal risk to such human beings and includes appropriate safeguards.

Congress did not include this same "informed consent" requirement as part of the EUA provision in 2003, perhaps out of concern that it would not be practicable in emergency situations. *See Project BioShield: Contracting for the Health and Security of the American Public: Hearing Before the H. Comm. on Gov't Reform*, 108th Cong. 33 (Apr. 4, 2003) (statement of Mark B. McClellan, Commissioner, FDA, and Anthony S. Fauci, Director, National Institute of Allergy and Infectious Diseases) ("Because urgent situations may require mass inoculations and/or drug treatments, such informed consent requirements may prove impossible to implement within the necessary time frame when trying to achieve the public health goal of protecting Americans from the imminent danger."); *see also infra* note 15 (explaining that the informed consent requirements contained in 21 U.S.C. § 355(i)(4) do not apply to EUA products).

10

*Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*

cine recipients—virtually all such persons continue to have the "option" of refusing the vaccine in the sense that there is no direct legal requirement that they receive it. *See Bridges*, 2021 WL 2399994, at *2 (noting that an employer's vaccination policy was not "coercive" because an employee "can freely choose to accept or refuse a COVID-19 vaccine; however, if she refuses, she will simply need to work somewhere else"); Wen W. Shen, Cong. Research Serv., R46745, *State and Federal Authority to Mandate COVID-19 Vaccination* at 4 (Apr. 2, 2021) ("[E]xisting vaccination mandates—as they are typically structured—generally do not interfere with . . . an individual's right to refuse in that context. Rather, they impose secondary consequences—often in the form of exclusion from certain desirable activities, such as schools or employment—in the event of refusal." (footnote omitted)); *Black's Law Dictionary* 1121 (7th ed. 1999) (defining "option" as relevant here as "[t]he right or power to choose; something that may be chosen"); *The American Heritage Dictionary of the English Language* 1235 (4th ed. 2000) (similar); *cf.* FDCA § 564(e)(1)(A)(ii)(III) (directing that potential vaccine recipients be informed not only of "the option to accept or refuse administration of the product" but also of "the *consequences*, if any, of refusing administration of the product" (emphasis added)).

Importantly, however, and consistent with FDA's views, we also read section 564 as giving FDA some discretion to modify or omit "the option to accept or refuse" notification, or to supplement it with additional information, if and when circumstances change. As noted above, the statute directs FDA to establish the section 564(e)(1)(A) conditions "to the extent practicable given the applicable [emergency] circumstances" and "as the [agency] finds necessary or appropriate to protect the public health." FDCA § 564(e)(1)(A). Both of these phrases—"to the extent practicable" and "as the [agency] finds necessary or appropriate"—are generally understood to confer discretion on an agency. *See, e.g.*, *Gallegos-Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012) (per curiam) ("to the extent practicable"); *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1128 (6th Cir. 1996) (collecting cases on "necessary" and "appropriate"). Moreover, the portion of section 564 that deals specifically with informational conditions provides that FDA should establish "[a]ppropriate" conditions designed to ensure that potential vaccine recipients are informed of the "option to accept or refuse" an EUA product. FDCA § 564(e)(1)(A)(ii). These qualifiers indicate that FDA's responsibility to

11

45 Op. O.L.C. __ (July 6, 2021)

impose the "option to accept or refuse" condition is not absolute and that the agency has some discretion to modify or omit the condition when the agency finds the notification would not be "practicable" given the emergency circumstances, or to determine that changes to the notification are "necessary or appropriate to protect the public health." *See* EUA Guidance at 24 n.46 (noting circumstances in which the "option to accept or refuse" notification might not be practicable).[12] In addition, section 564 gives FDA the authority to supplement the information that is conveyed to potential vaccine recipients, including information about "the consequences, if any, of refusing administration of the product." FDCA § 564(e)(1)(A)(ii)(III); *see also id.* § 564(e)(1)(B) (noting that FDA has the authority to impose additional conditions as the agency "finds necessary or appropriate to protect the public health"); EUA Guidance at 22 n.40, 26–27 (noting this point). Together, then, these provisions of section 564 give FDA the authority to adapt to changing circumstances and to ensure that the information conveyed to potential users of EUA products is accurate.[13]

Although many entities' vaccination requirements preserve an individual's ultimate "option" to refuse an EUA vaccine, they nevertheless impose sometimes-severe adverse consequences for exercising that option (such as not being able to enroll at a university). Under such circumstances, FDA could theoretically choose to supplement the conditions of authorization to notify potential vaccine recipients of the possibility of such consequences (or to make it even clearer that the consequences described

---

[12] Indeed, FDA has recently exercised its discretion not to require certain of the statutorily specified conditions with respect to the current COVID-19 pandemic. We understand that FDA has amended or plans to amend the EUAs for the COVID-19 vaccines so as not to require compliance with several of the conditions—including the "option to accept or refuse" notification—when the vaccines are exported to other countries. *See, e.g.*, Pfizer EUA Letter at 10.

[13] Congress's use of the phrase "Required conditions" in the title of subsection (e)(1)(A) and its specification of certain conditions in the statute suggest that Congress may have presumed that FDA would generally find that the specified conditions are "necessary or appropriate" and thus impose them. As we discuss above, however, the operative text of section 564 indicates that FDA has some discretion to modify, omit, or supplement the conditions in some circumstances. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021) ("[A] title or heading should never be allowed to override the plain words of a text." (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 222 (2012)) (alteration in original)).

12

*Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*

in the Fact Sheets are limited to consequences related to medical care). As we have noted, however, section 564 does not limit the ability of entities to impose vaccination requirements, and FDA would not be required to change the Fact Sheets in order to allow them to impose such requirements.[14]

\* \* \* \* \*

As noted above, FDA agrees with our interpretation of section 564. On a few occasions, however, FDA has made statements that could be understood as saying that the condition described in section 564(e)(1)(A)(ii)(III) prohibits entities (particularly the U.S. military) from requiring the use of EUA products. In 2005, for instance, FDA issued an EUA that permitted the use of a vaccine for the prevention of inhalation anthrax by individuals between 18 and 65 years of age who were deemed by the Department of Defense ("DOD") to be at heightened risk of exposure due to an attack with anthrax. As a condition of that authorization, the agency required DOD to inform potential vaccine recipients "of the option to accept or refuse administration of [the vaccine]." Authorization of Emergency Use of Anthrax Vaccine Adsorbed for Prevention of Inhalation Anthrax by Individuals at Heightened Risk of Exposure Due to Attack With Anthrax; Availability, 70 Fed. Reg. 5452, 5455 (Feb. 2, 2005). That EUA continued:

> With respect to [the] condition . . . relating to the option to accept or refuse administration of [the vaccine], the [immunization program] will be revised to give personnel the option to refuse vaccination. Individuals who refuse anthrax vaccination will not be punished. Refusal may not be grounds for any disciplinary action under the Uniform Code of Military Justice. Refusal may not be grounds for any adverse personnel action. Nor would either military or civilian personnel be considered non-deployable or processed for separation

_____

[14] FDA further informs us that, wholly apart from FDA's own authority to change the Fact Sheet, nothing in the FDCA would prohibit an administrator of the vaccine who also has a relationship with the individuals to whom the vaccine is offered (e.g., students in a university that offers the vaccine) from supplementing the FDA Fact Sheet at the point of administration with factually accurate information about the possible nonmedical consequences of the person choosing not to use the product (e.g., that she might not be permitted to enroll).

13

AR-04408

45 Op. O.L.C. __ (July 6, 2021)

> based on refusal of anthrax vaccination. There may be no penalty or loss of entitlement for refusing anthrax vaccination.

*Id.*; *see also id.* (allowing DOD to inform recipients that "military and civilian leaders strongly recommend anthrax vaccination, but . . . individuals [subject to the vaccination program] may not be forced to be vaccinated" and that "the issue of mandatory vaccination will be reconsidered by [DOD] after FDA completes its administrative process."). FDA included the same information in its later extension of that EUA. *See* Authorization of Emergency Use of Anthrax Vaccine Adsorbed for Prevention of Inhalation Anthrax by Individuals at Heightened Risk of Exposure Due to Attack With Anthrax; Extension; Availability, 70 Fed. Reg. 44,657, 44,659–60 (Aug. 3, 2005).

In addition, although it is less than clear, certain FDA guidance could be read as saying that section 564 confers an affirmative "option" or "opportunity" to refuse EUA products. *See* EUA Guidance at 24 n.46 (implying that the condition in section 564(e)(1)(A)(ii)(III)—which is subject to waiver for the armed forces under 10 U.S.C. § 1107a—protects "the option for members of the armed forces to accept or refuse administration of an EUA product"); *Guidance Emergency Use Authorization of Medical Products*, 2007 WL 2319112, at *15 (July 1, 2007) (stating that "[r]ecipients must have an opportunity to accept or refuse the EUA product").

These statements do not affect our conclusion. Neither the 2005 anthrax vaccine EUA nor the later FDA guidance articulated a legal interpretation of section 564(e)(1)(A)(ii)(III)'s text. And FDA appears to have insisted upon the voluntariness requirement for DOD in the anthrax vaccine EUA because of then-recent litigation in which a court enjoined DOD from implementing a mandatory vaccination program based upon a different statutory provision that is inapplicable to EUAs. *See Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004) (relying on 10 U.S.C. § 1107); *Doe v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003) (same); *see also* 70 Fed. Reg. at 44,660 (requiring DOD to tell vaccine recipients the following: "On October 27, 2004, the U.S. District Court for the District of Columbia issued an Order declaring unlawful and prohibiting mandatory anthrax vaccinations to protect against inhalation anthrax, pending further FDA action. The *Court's injunction* means you have the right to refuse to take the vaccine without fear of retaliation." (emphasis added)); 70 Fed. Reg.

14

AR-04409

*Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*

at 5454 (discussing litigation); *see also infra* note 15 (explaining that 10 U.S.C. § 1107(f) is inapplicable to EUAs).

**B.**

Section 564(e)(1)(A)(ii)(III) also raises a question about how to understand its cognate provision regarding the use of EUA products by the armed forces. As we noted above, in the same 2003 legislation that first created section 564, Congress also added the following provision to title 10 of the United States Code:

> In the case of the administration of [an EUA] product . . . to members of the armed forces, the condition described in section 564(e)(1)(A)(ii)(III) . . . and required under paragraph (1)(A) or (2)(A) of such section 564(e), designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security.

10 U.S.C. § 1107a(a)(1).[15] On its own terms, this provision appears to be consistent with—and even to support—our reading of section 564, as it likewise describes the "option to accept or refuse" condition in purely informational terms. The language refers to the President's authority to

---

[15] Section 1107(f) of title 10—an earlier-enacted provision—contains a similar, but importantly different, waiver authority. Specifically, that provision authorizes the President, "[i]n the case of the administration of an [IND] or a drug unapproved for its applied use to a member of the armed forces in connection with the member's participation in a particular military operation," to waive "the prior consent requirement imposed under [21 U.S.C. § 355(i)(4)]." 10 U.S.C. § 1107(f)(1). That "prior consent requirement," which is imposed for purposes of the human clinical trials for which FDA authorizes "investigational" use of unapproved drugs, *see* 21 U.S.C. § 355(i)(4), does not apply to EUA products, which typically are more widely available, *see* FDCA § 564(k); EUA Guidance at 24 ("informed consent as generally required under FDA regulations is not required for administration or use of an EUA product" (footnote omitted)). Thus, the waiver provision in section 1107(f) is inapplicable to EUA products. *See* 10 U.S.C. § 1107(f)(2) (explaining that this waiver authority applies only in cases in which "prior consent for administration of a particular drug is required" because the Secretary of HHS determines that the drug "is subject to the [IND] requirements of [21 U.S.C. § 355(i)]"); *see also id.* § 1107(f)(4) (defining the relevant consent requirements as those in 21 U.S.C. § 355(i)).

15

45 Op. O.L.C. __ (July 6, 2021)

waive a requirement to provide certain information, not to waive any right or affirmative "option" to refuse administration of the product itself.

On the other hand, the conference report on the legislation that created both section 564 of the FDCA and section 1107a of title 10 described the latter provision in the following way:

> [This provision] would authorize the President to waive *the right of service members to refuse administration of a product* if the President determines, in writing, that affording service members the right to refuse the product is not feasible, is contrary to the best interests of the members affected, or is not in the interests of national security.

H.R. Rep. No. 108-354, at 782 (2003) (Conf. Rep.) (emphasis added). This language indicates that the conferees may have believed that section 1107a concerns some "right" of members of the armed forces to refuse the use of EUA products. And that belief may help to explain why section 1107a allows only the President to exercise the waiver authority.

Consistent with this legislative history and the vesting of the waiver authority in the President, DOD informs us that it has understood section 1107a to mean that DOD may not require service members to take an EUA product that is subject to the condition regarding the option to refuse, unless the President exercises the waiver authority contained in section 1107a. *See* DOD Instruction 6200.02, § E3.4 (Feb. 27, 2008) ("In the event that an EUA granted by the Commissioner of Food and Drugs includes a condition that potential recipients *are provided an option* to refuse administration of the product, the President may . . . waive *the option* to refuse for administration of the medical product to members of the armed forces." (emphasis added)). Moreover, we understand that DOD's position reflects the concern that service members, unlike civilian employees, could face serious criminal penalties if they refused a superior officer's order to take an EUA product. *See* 10 U.S.C. § 890; *see also United States v. Kisala,* 64 M.J. 50 (C.A.A.F. 2006) (upholding a soldier's punishment for refusing to take a vaccine). In this way, service members do not have the same "option" to refuse to comply with a vaccination requirement as other members of the public.

As noted above, it does appear that certain members of Congress thought that section 1107a concerned a prohibition against requiring service members to take an EUA product—perhaps on the view that the

16

*Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*

waiver authority in section 1107a paralleled the one in 10 U.S.C. § 1107(f), which does effectively prohibit the administration of an IND product in a clinical trial without first obtaining the individual's affirmative, informed *consent*. *See supra* note 15 (distinguishing these waiver authorities).[16] As explained, however, that intent or expectation is not realized in the text of section 564(e)(1)(A)(ii)(III), which section 1107a expressly cross-references. *Cf. Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1164 n.11 (9th Cir. 2019) ("[T]he plain and unambiguous statutory text simply does not accomplish what the Conference Report says it was designed to accomplish."); *Goldring v. Dist. of Columbia*, 416 F.3d 70, 75 (D.C. Cir. 2005) ("A sentence in a conference report cannot rewrite unambiguous statutory text[.]").[17] We therefore conclude that section 1107a does not change our interpretation of section 564 of the FDCA.

As for DOD's concern about service members who would lack a meaningful option to refuse EUA products because of the prospect of sanction, including possibly prosecution, we note that any difference between our view and the assumption reflected in the conference report should have limited practical significance. Given that FDA has imposed the "option to accept or refuse" condition for the COVID-19 vaccines by requiring

---

[16] It is possible the conferees assumed that the new EUA legislation would, in effect, carry over from the earlier IND provision of the FDCA, *see supra* Part I.A and note 11, the condition that a covered product may not be administered to an individual without that person's express, informed consent—a condition that applies to the military when it undertakes the sort of clinical trial with an IND that 21 U.S.C. § 355(i) governs, *see supra* note 11. Congress did not include such a consent requirement in section 564, however, perhaps because EUA products are not limited, as INDs are, to use in human clinical trials, but are instead authorized for more widespread use in the case of a declared emergency. *See supra* Part I.A and notes 11 & 15.

[17] Moreover, the legislative history as a whole is not uniform on this point. The earlier House report, for instance, described the condition in purely informational terms. *See* H.R. Rep. No. 108-147, pt. 3, at 33 (2003) ("New section 564(k) [an earlier but similarly worded version of what became 10 U.S.C. § 1107a] pertains to members of the Armed Forces and, among other things, it specifies that the President may waive requirements designed to ensure that such members are *informed* of the option to accept or refuse administration of an emergency use product, upon certain findings[.]" (emphasis added)); *see also Milner v. Dep't of the Navy*, 562 U.S. 562, 574 (2011) (noting that "[l]egislative history, for those who take it into account, is meant to clear up ambiguity, not create it," and thus, "[w]hen presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language").

AR-04412

45 Op. O.L.C. __ (July 6, 2021)

distribution of its Fact Sheet containing the "[i]t is your choice to receive or not receive" language, DOD is required to provide service members with the specified notification unless the President waives the condition pursuant to 10 U.S.C. § 1107a. And because DOD has informed us that it understandably does not want to convey inaccurate or confusing information to service members—that is, telling them that they have the "option" to refuse the COVID-19 vaccine if they effectively lack such an option because of a military order—DOD should seek a presidential waiver before it imposes a vaccination requirement.

**III.**

For the reasons set forth above, we conclude that section 564 of the FDCA does not prohibit public or private entities from imposing vaccination requirements, even when the only vaccines available are those authorized under EUAs.

DAWN JOHNSEN
*Acting Assistant Attorney General*
*Office of Legal Counsel*

18



CONSIDERATIONS FOR EVALUATION OF COVID19 VACCINES


Points to consider for manufacturers of COVID19 vaccines


Version 25 November 2020


Vaccine and Immunization Devices Assessment Team (VAX)
Prequalification Unit (PQT)
Regulation and Prequalification Department (RPQ)
Access to Medicine and Health Products (MHP)
World Health Organization, Geneva,  Switzerland

AR-04414

## Table of Contents

1.   EXECUTIVE SUMMARY ................................................................................................. 4

2.   INTRODUCTION ........................................................................................................... 5

3.   SUBMISSION AND REVIEW PROCESS ......................................................................... 7

3.1.  GENERAL ..................................................................................................................... 7

3.1.1.   Format and content of an application ...................................................................... 7

3.1.2.   Screening of applications .......................................................................................... 7

3.2.  ADDITIONAL NON-CLINICAL INFORMATION ............................................................ 8

3.3.  CLINICAL ASSESSMENT .............................................................................................. 9

3.3.1.  Clinical development programme ............................................................................. 9

3.3.2.   Requirement for the protocols of clinical trials that support application .......................... 9

3.3.3.   Evidence of Ethics Committee approval of clinical trials ............................................. 9

3.3.4.   Evidence for Good Clinical Practices (GCP) conduct of each trial ................................. 9

3.3.5.   Evidence for registration of each clinical trial ........................................................... 9

3.3.6.   Clinical trial design ................................................................................................ 9

3.3.7.   Statistical Considerations ...................................................................................... 10

3.3.8.   Clinical trial end-point assays - relevance, validation and accreditation ....................... 11

3.3.9.   Vaccine lots used in clinical studies and lot-to-lot consistency studies ......................... 11

3.3.10.  Subject exposure to a new vaccine in clinical trials ................................................ 12

3.3.11.  Follow-up in clinical trials .................................................................................... 12

3.3.12.  Requirement for a risk management plan, or equivalent document as part of the CTD .. 12

3.3.13.  Specific data should be submitted to answer the following questions ........................... 13

3.3.14.  Minimum clinical criteria for EUL assessment ........................................................ 17

3.4.  MANUFACTURING AND QUALITY CONTROL ........................................................... 19

3.4.1.   Drug Substance .................................................................................................... 19

3.4.1.1.   Manufacturer(s) ................................................................................................ 19

3.4.1.2.   Description of Manufacturing Process and Process Controls ................................... 20

3.4.1.3.   Cell banking system, characterization and testing ................................................. 20

3.4.1.4.   Characterization of Master and Working seed ...................................................... 21

3.4.1.5.   Controls of Critical Steps and Intermediates ........................................................ 21

3.4.1.6.   Process Validation and/or Evaluation ................................................................. 21

3.4.1.7.   Analytical method validation ............................................................................. 22

3.4.1.8.   Manufacturing Process Development .................................................................. 22

3.4.1.9.   Control of Drug Substance ................................................................................ 22

3.4.1.10.  Reference standards or materials ....................................................................... 23

3.4.1.11.  Container Closure System ................................................................................. 23

3.4.1.12.  Stability .......................................................................................................... 23

3.4.2.   Drug product ...................................................................................................... 23

AR-04415

3.4.2.1.    Manufacture ................................................................................................. 23

3.4.2.2.    Pharmaceutical Development ....................................................................... 23

3.4.2.3.    Components of the Drug Product .................................................................. 24

3.4.2.4.    Formulation Development ............................................................................ 24

3.4.2.5.    Manufacturing Process Development ........................................................... 24

3.4.2.6.    Container Closure System ........................................................................... 24

3.4.2.7.    Compatibility of diluents ............................................................................ 25

3.4.2.8.    Batch Formula ........................................................................................... 25

3.4.2.9.    Description of Manufacturing Process and Process Controls ......................... 25

3.4.2.10.   Controls of Critical Steps and Intermediates ................................................ 25

3.4.2.11.   Process Validation and/or Evaluation ......................................................... 26

3.4.2.12.   Control of Drug Product .............................................................................. 26

3.4.2.13.   Control of excipients, stabilizers, adjuvants ................................................ 26

3.4.2.14.   Reference Standards or Materials ............................................................... 27

3.4.2.15.   Stability ..................................................................................................... 27

3.4.2.16.   Post-approval Stability Protocol and Stability Commitment ........................... 28

3.4.3.      Changes ...................................................................................................... 28

3.4.4.      Inspection reports ....................................................................................... 29

3.4.5.      Labelling ..................................................................................................... 29

3

# 1. EXECUTIVE SUMMARY

This document provides advice to manufacturers on both the process and the criteria that will be used by the World Health Organization (WHO) to evaluate COVID-19 vaccines that are submitted either for prequalification (PQ) or for Emergency Use Listing (EUL). The current status of development of a candidate Covid-19 vaccine, the extent of the available quality, safety and efficacy data and regulatory approvals by National Regulatory Authorities (NRAs)[1] of record[2] will guide WHO's decision on which pathway (PQ or EUL) to follow for each vaccine.

The document should not be read as a standalone document.;  other relevant documents, as cited, must also be consulted.

Only vaccines that have undergone phase IIb or phase III studies and have been submitted to the NRA of record should be submitted for consideration. WHO may review rolling submission, however, a decision on listing will not be made until the NRA of record has approved/authorized the vaccine.

As the data, at the moment of submission, will not be complete (i.e. clinical trials will be ongoing) this document outlines what information needs to be provided in the dossier (rolling submissions and complete dossier) for WHO to review and formulate a decision on listing.

The dossier should follow the format of the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use - Common Technical Document[3] (ICH CTD) as indicated in the EUL and PQ procedures. This means that Modules 2 to 5 should  include the same items, although not all of the information may be available at the time of submission. In the CTD dossier, the applicant should indicate in the sections for which no information is available at the time of the initial submission "data or information not available", "study ongoing" or "not applicable" as the case may be. Adequate justification must be provided for any unavailable data, and a plan must be presented to address the data gaps, when applicable.

This document provides a guidance on the level of expected completeness of information, taking into consideration that the development is still ongoing and the criteria that will be used to assess clinical trial design, endpoints, statistical criteria, as well as manufacturing, quality control and non-clinical data to address the potential for vaccine-associated enhanced disease. Post-authorization commitments will be part of the listing conditions, depending on existing information and a benefit-risk assessment.

---

[1] See Technical Report Series 1003 and 1010 for definition of types of NRAs
[2] NRA of record is the NRA that first approved the vaccine and is responsible for the oversight of such vaccine
[3] https://www.ich.org/page/ctd

WHO has published a call for Expression of Interest for those manufacturers with vaccine candidates in advanced stages of development (Phase IIb/III) that expect to have the vaccine approved by their NRA of record within the next six months. Those products that meet the criteria set in this document will be considered for submission after a pre-submission meeting to discuss specific issues related to available data, estimated timelines for submission of new data, submissions to NRA of record and timelines for their approval/authorization.

## 2. INTRODUCTION

The United Nations Children's Fund (UNICEF) and other United Nations (UN) agencies take into consideration advice provided by the World Health Organization (WHO), through its Department of Regulation and Prequalification (RPQ), on the acceptability, in principle, of vaccines considered for purchase by such agencies; this is known as vaccine prequalification (PQ). In addition WHO has developed a time limited Emergency Use Listing Procedure (EUL)[4] to expedite the availability of medical products needed in public health emergency situations, to assist interested UN procurement agencies and Member States on the acceptability for use of specific products in the context of a public health emergency, based on an essential set of available quality, safety, and efficacy/immunogenicity/performance data[5]. Both procedures include, for each product, the evaluation of data submitted contained in the CTD format.

The EUL is not equivalent or an alternative to WHO prequalification, and should not be thought of as such. The EUL is a special procedure for unlicensed vaccines, medicines and in vitro diagnostics in the event of a Public Health Emergency (PHE) when the community/public health authorities may be willing to tolerate less certainty about the efficacy and safety of products, given the morbidity and/or mortality of the disease and the lack or paucity of treatment, diagnosis/detection or prevention options. The procedure intends to provide a time-limited listing for unlicensed products in an emergency context when limited data are available and the products are not yet ready for application for prequalification[6]. As part of the EUL, the manufacturer is expected to complete the development of the product and submit for licensure and WHO prequalification.

The review of the quality, safety and efficacy/immunogenicity data is performed by WHO experts. Their recommendations are taken into account by WHO in the decision-making process for prequalification or EUL of each individual product.

The WHO evaluation of vaccines- either for EUL or PQ- considers the suitability for use in Low- and Middle-Income Countries (LMICs). In the reviews, WHO focuses on information that may

---

[4] https://www.who.int/teams/regulation-prequalification/eul/eul-vaccines
[5] https://www.who.int/immunization_standards/vaccine_quality/EUL/en/
[6] https://www.who.int/immunization_standards/vaccine_quality/pq_revision2010/en/

AR-04418

not be part of the NRA approval process, although in practice they also do at least a verification of what is expected to have been evaluated by the NRA. Any vaccine submitted for WHO assessment through the EUL or PQ procedure should have been submitted to the NRA of record (for emergency use approval or equivalent or standard licensure/marketing authorization). However, manufacturers may submit data packages (rolling submissions for non-clinical, CMC, clinical) to WHO when they submit to their NRA of record to advance the review.

The general principles described in the WHO Guidelines below apply to all Covid-19 vaccines and should be followed:

1.  "Procedure for assessing the acceptability, in principle, of vaccines for purchase by United Nations agencies", WHO Technical Report Series 978, Annex 6, 2013 [7]

2.  WHO EUL document [8]

3.  "Guidelines on clinical evaluation of vaccines: regulatory expectations", WHO Technical Report Series 1004, Annex 9, 2017 [9]

4.  COVAX SAGE Compendium of Covid-19 vaccine research questions [10]

5.  "Guidelines for assuring the quality, safety, and efficacy of plasmid DNA vaccines" adopted by the Seventy-first Meeting of the World Health Organization Expert Committee on Biological Standardization, 24–28August 2020.[11]

6.  "Points to Consider for assuring the quality, safety and efficacy of RNA vaccines"[12] (currently under development)[13]

7.  WHO guidelines on nonclinical evaluation of vaccines. TRS 927, Annex 1 [14]

8.  Guidelines on the nonclinical evaluation of vaccine adjuvants and adjuvanted vaccines. TRS 987, Annex 2 [15]

---

[7] http://www.who.int/immunization_standards/vaccine_quality/TRS_978_61st_report_Annex_6_PQ_vaccine_procedure.pdf?ua=1
[8] https://www.who.int/medicines/publications/EULprocedure.pdf?ua=1
[9] http://www.who.int/biologicals/expert_committee/WHO_TRS_1004_web_Annex_9.pdf
[10] https://www.who.int/docs/default-source/immunization/sage/2020/october/sage-wg-critical-questions-covid19-vaccine.pdf?Status=Temp&sfvrsn=6a98fce2_6&ua=1
[11] https://www.who.int/publications/m/item/DNA-post-ECBS-1-sept-2020
[12] Currently under development and to be published at https://www.who.int/biologicals
[13] https://www.who.int/publications/m/item/WHO-ECBS-aug-2020-executive_summary
[14] https://www.who.int/biologicals/publications/trs/areas/vaccines/nonclinical_evaluation/ANNEX%201Nonclinical.P31-63.pdf?ua=1
[15] https://www.who.int/biologicals/areas/vaccines/TRS_987_Annex2.pdf?ua=1

AR-04419

CONSIDERATIONS FOR EVALUATION OF COVID-19 VACCINES v25112020

9. Recommendations for the Evaluation of Animal Cell Cultures as Substrates for the Manufacture of Biological Medicinal Products and for the Characterization of Cell banks. TRS 978, Annex 3[16]

10. WHO good manufacturing practices for biological products. TRS 999, Annex 2 [17]

Based on the current status of development of Covid-19 vaccines candidate, the extent of the available quality, safety and efficacy data and regulatory approvals by relevant NRAs, WHO shall follow either EUL process or Prequalification. Once a product has been listed under the EUL procedure, the development of the product must continue to completion for marketing authorization and be submitted to WHO for prequalification.

The decision for listing will be based on a risk-benefit assessment, of existing evidence of quality, safety and efficacy and will include a set of post-listing commitments.

# 3. SUBMISSION AND REVIEW PROCESS

## 3.1. GENERAL

### 3.1.1. Format and content of an application

The format of the application should follow the ICH CTD format. Refer to "Vaccine Prequalification Dossier" [18]

### 3.1.2. Screening of applications

The CTD of a vaccine submitted for evaluation is expected to have adequate information to support the quality, efficacy, immunogenicity and safety of that product, and evidence that such information is supportive for a wide use of the vaccine if listed through the EUL or PQ procedures.

Queries may be sent to the applicant at this stage, and the acceptance of the application for review will be conditional to satisfactory answers. Rolling review of submissions may be acceptable. See specific data requirements below.

---

[16] https://www.who.int/biologicals/vaccines/TRS_978_Annex_3.pdf

[17] https://www.who.int/biologicals/expert_committee/WHO_TRS_999_FINAL.pdf?ua=1

[18] http://www.who.int/immunization_standards/vaccine_quality/VaccinePQ-dossier_Dec2017.pdf?ua=1

AR-04420

CONSIDERATIONS FOR EVALUATION OF COVID-19 VACCINES v25112020

### 3.2. ADDITIONAL NON-CLINICAL INFORMATION

The CTD requires the presentation of a summary table of non-clinical studies that would have been assessed by the NRA of reference. Additional information on non-clinical studies can be requested by the clinical reviewers whenever necessary, and if this is anticipated by the applicant such information may be included in the application. If novel adjuvants are used, relevant non-clinical data, as recommended in the WHO guidelines on the nonclinical evaluation of vaccine adjuvants, must be submitted.[19]

Data from studies in animal models of certain vaccine constructs against other coronaviruses (SARS-CoV and MERS-CoV) have raised concerns of a theoretical risk for COVID-19 vaccine-enhanced disease (VED). Current knowledge and understanding of the potential risk of COVID-19 vaccine-enhanced disease (VED) is limited, as is understanding of the value of available animal models in predicting the likelihood of such occurrence in humans. Nevertheless, studies in animal models (e.g., rodents or and non-human primates) are considered important to address the potential for vaccine-enhanced disease (VED). Bio/Immunological markers to be evaluated should include relative levels of neutralizing vs non-neutralizing antibodies, antibody affinity, T-cell response profile (Th1/Th2), characterization of lung histopathology,[20] and other potential complications.

Studies should include an evaluation of humoral, cellular, and functional immune responses, as appropriate to each of the included COVID-19 antigens, with consideration of the adjuvant effect. Use of isotype-specific enzyme linked immunosorbent assays (ELISA) should be considered to characterize the humoral response. Evaluation of cellular responses should include the examination of CD8+ and CD4+ T cell responses using sensitive and specific assays. The functional activity of immune responses should be evaluated in vitro in neutralization assays using either wild-type virus or pseudovirus microneutralization. Assays for vaccines with multiple components or adjuvants should be measured with either a multiplex assay or separate single assays. The assays used for immunogenicity evaluation should be validated for their intended purpose and calibrated against WHO international standards where available.

Detailed WHO guidelines on the design, conduct, analysis and evaluation of nonclinical studies of vaccines are available in WHO TRS 927.

---

[19] ttps://www.who.int/biologicals/areas/vaccines/ADJUVANTS_Post_ECBS_edited_clean_Guidelines_NCE_Adjuvant_Final_17122013_WEB.pdf

[20] Vaccine 2020, Lambert et al.doi: 10.1016/j.vaccine.2020.05.064

AR-04421

CONSIDERATIONS FOR EVALUATION OF COVID-19 VACCINES v25112020

### 3.3. CLINICAL ASSESSMENT

#### 3.3.1. Clinical development programme

The applicant should provide in the CTD a tabulated summary of the clinical development programme in one or more tables.

#### 3.3.2. Requirement for the protocols of clinical trials that support application

The applicant must provide the English version of the protocols of the clinical trials supporting the application. The protocols should be the final approved versions, incorporating all amendments.

#### 3.3.3. Evidence of Ethics Committee approval of clinical trials

Evidence of approval of the clinical trials by competent Ethics Committees, as well as information about their contact details, are expected to be included in the CTD.

#### 3.3.4. Evidence for Good Clinical Practices (GCP) conduct of each trial

In the absence of a certificate of GCP compliance from the responsible NRA, applicants should provide evidence of GCP compliance for each trial. This might include evidence of the independent monitoring of the trial conduct, audits by the sponsor, available NRA inspection reports or Data and Safety Monitoring Board (DSMB) reports. Manufacturers should consult WHO Guidelines for good clinical practice (GCP) for trials on pharmaceutical products should be consulted (TRS 850 Annex 3).

#### 3.3.5. Evidence for registration of each clinical trial

Each clinical trial that supports an application must have been registered in a registry that is included in the WHO International Clinical Trials Registry platform. The name of the registry and the registry number must be provided. If this is not possible the reason(s) should be provided.

#### 3.3.6. Clinical trial design[21] [22]

Phase IIB/III efficacy trials should be randomized, blinded, and placebo controlled or active-controlled (when a safe and effective COVID-19 vaccine is available). An individually randomized controlled trial with 1:1 or 2:1 randomization between vaccine and placebo groups is usually the most efficient study design for demonstrating vaccine efficacy.

---

[21] FDA Development and Licensure of Vaccines to Prevent COVID-19; Guidance for Industry June 2020.

[22] Guidelines on clinical evaluation of vaccines: regulatory expectations", WHO Technical Report Series 1004, Annex 9, 2017

9

AR-04422

CONSIDERATIONS FOR EVALUATION OF COVID-19 VACCINES v25112020

Other types of randomization, such as cluster randomization, may be acceptable if there is evidence that potential biases have been avoided.

Protocols for late stage (phase IIb/III) trials (including adaptive trials) should include pre-specified criteria for critical decisions. Protocols for early stage trials (phase I/IIa) should be designed to characterize optimal vaccine formulations, doses, and regimens efficiently and safely. Frequent interactions with NRAs may be needed to guide decision making in adaptive or seamless trials in their early stages.

Follow-up of study participants for COVID-19 outcomes (especially severe COVID-19 manifestations) should continue as long as feasible, and ideally at least one to two years. This is to allow for an adequate assessment on the duration of protection and potential for vaccine-associated Enhanced Disease (VAED) as immune responses to the vaccine wane.

Efficacy trials should include contingency plans for continued follow up and analysis of safety and effectiveness outcomes in the event that a safe and effective vaccine becomes available and the study is stopped (e.g., as demonstrated in a planned interim analysis or as demonstrated in another clinical trial). In that case, discussion with the NRA may be necessary to address ethical issue of breaking the blind and offering vaccine to placebo recipients.

A Data and Safety Monitoring Board should be established to provide periodic independent review of safety data at appropriate intervals, as well as to conduct a review of any interim efficacy data

### 3.3.7.   Statistical Considerations[23] [24] [25]

The primary efficacy endpoint in COVID-19 vaccine trials should be a clinically driven endpoint (e.g. laboratory confirmed first episode of COVID-19). If an immune correlate of protection becomes established, it could be used as the primary efficacy endpoint.

To ensure that a widely deployed COVID-19 vaccine is effective, the primary efficacy endpoint point estimate for a placebo-controlled efficacy trial should be at least 50%, and the statistical success criterion should be that the lower bound of the appropriately alpha-adjusted confidence interval around the primary efficacy endpoint point estimate is >30%.

A statistical success criterion for an interim analysis for early detection of efficacy should be at least as rigorous as the end of study success criterion.

---

[23] FDA Development and Licensure of Vaccines to Prevent COVID-19; Guidance for Industry June 2020

[24] WHO Target Product Profiles (TPP) for COVID-19 Vaccines (Version 3 - 29 April 2020)

[25] Guidelines on clinical evaluation of vaccines: regulatory expectations", WHO Technical Report Series 1004, Annex 9, 2017

AR-04423

A lower bound ≤30% but >0% may be acceptable as a statistical success criterion for a secondary efficacy endpoint, provided that secondary endpoint hypothesis testing is dependent on success on the primary endpoint.

For non-inferiority comparison based of efficacy to a COVID-19 vaccine already proven to be effective, the statistical success criterion should be that the lower bound of the appropriately alpha-adjusted confidence interval around the primary relative efficacy point estimate is >-10%.

For each vaccine candidate, appropriate statistical methods should be used to control type 1 error for hypothesis testing on multiple endpoints and/or interim efficacy analyses.

Phase IIb/III studies should include interim analyses to assess risk of vaccine-associated enhanced disease, or other adverse reactions and futility.

Study sample sizes and timing of interim analyses should be based on the statistical success criteria for primary and secondary (if applicable) efficacy analyses and realistic, data-driven estimates of vaccine efficacy and incidence of COVID-19 for the populations and locales in which the trial will be conducted.

### 3.3.8.   Clinical trial end-point assays - relevance, validation and accreditation

Any serological correlate of protection used in the analyses must be justified and supported with best scientific evidence available. Assays should consider the assessment of a functional antibody response along with immunoglobulin serum titre unless the immunoglobulin measured is clearly demonstrated as an immune correlate of protection. As immune responses can vary between gender, age groups or with other target groups, the clinical trial endpoints should as much as possible include adequate assessment of these populations. Evidence should be provided of end- point immunogenicity assay relevance and standardization. Assay results should be reported in international units wherever possible. The laboratory should be identified, and evidence of competence or accreditation to conduct these assays should be provided. The assays should be validated and run in a central laboratory, if possible.

### 3.3.9.   Vaccine lots used in clinical studies and lot-to-lot consistency studies

Consistency of manufacturing for the vaccine candidate lots used in clinical trials should be demonstrated and well documented. Ideally, at least three consecutive lots with the same formulation intended for marketing are used in the late stages of the clinical development

AR-04424

programme. If clinical lot to lot consistency data has not been demonstrated, CMC consistency data must be provided.

### 3.3.10. Subject exposure to a new vaccine in clinical trials

For assessment of safety and immunogenicity the results from an adequate number of subjects, exposed to the vaccine, and monitored during comparative clinical trials are expected to be provided for prequalification review. When considering the pre-licensure safety database the need for a sufficient sample size to estimate adverse events (AE) rates with precision is an important factor. For example, a total database of 3000 subjects across all trials and populations provides a 95% chance of observing one instance of an AE that occurs on average in 1 in 1000 subjects. (The number that would provide a 95% chance of observing one instance of an AE that occurs on average in 1 in 10 000 subjects is 30 000). The vaccine characteristics, the population under study and the study design should be considered to determine the number of the subjects evaluated in clinical trials. Trials may not be powered to demonstrate vaccine efficacy by subgroup, e.g., age. The safety database needs not be a single clinical trial but could represent cumulative exposure across all clinical studies provided that the vaccine used in these studies is similar to and representative of the final formulation to be marketed. In cases where vaccines had been authorized by NRAs based on small sample sizes and where there is insufficient supporting safety data, this needs to be discussed before submission.

### 3.3.11. Follow-up in clinical trials

The expectation is that the follow-up of study participants for COVID-19 outcomes (in particular, for severe COVID-19 disease manifestations) should continue as long as feasible, at least one to two years, to assess duration of protection and potential for vaccine-associated enhanced disease as immune responses to the vaccine wane. This follow up should be active and not reliant on spontaneous reports. A follow-up of at least one year may be expected for efficacy and immunogenicity assessment, depending on the clinical endpoint requirements.

### 3.3.12. Requirement for a risk management plan, or equivalent document as part of the CTD

Risk management plans (RMP), including pharmacovigilance plans, are part of modern risk management strategies required for vaccines. This is particularly relevant in COVID 19 where more knowledge is still being accumulated. A pharmacovigilance plan taking into consideration where the vaccine is likely to be used if listed/prequalified, is required as an essential part of the EUL/PQ submission. This plan should include actions designed to address all important identified and potential risks.

AR-04425

CONSIDERATIONS FOR EVALUATION OF COVID-19 VACCINES v25112020

### 3.3.13. Specific data should be submitted to answer the following questions

Sponsors should consider whether, and how, their submission to PQ addresses the following questions. These are posed with the intention of aiding the sponsor during their vaccine development program and assembly of their submission and do not necessarily represent the only questions that PQ would consider during their assessment. The questions may not apply to all vaccine types. Only vaccines that have undergone phase IIb or phase III studies and have received authorization from a functional NRA (or have been submitted for evaluation) should be submitted for consideration. Rolling review of submissions may be acceptable.

*Clinical efficacy*

   i.   What is the evidence of an effect of vaccination on efficacy against COVID-19 (regardless of severity); mild symptomatic, moderate, and severe disease; hospitalizations and death. How does efficacy vary by age-group (children, younger adults, older adults), by sex, in pregnant and lactating women, and in specific co-morbidity risk groups?
      • Measured as % vaccine efficacy and 95% confidence intervals

   ii.   What is the evidence of an effect of vaccination on efficacy against SARS-CoV-2 infection?
      ▪ Measured as percentage vaccine efficacy and 95% confidence intervals
      ▪ Measured difference in viral load (PCR Ct values) in upper respiratory tract samples
      ▪ Measured as seroconversion to viral antigens not contained in the vaccine

   iii.   What is the evidence of the efficacy of post-infection immunization?

The WHO Target Product Profile should serve as a guide.[26]

*Immunogenicity*

   i)   What is the evidence of induction and levels of neutralizing antibodies and of immunoassay-measured antibodies after partial or full primary vaccination in the different groups listed above (under clinical efficacy)?
      ▪ Measured as concentrations/titres of antibodies or seroconversion rates versus pre-vaccination values or, if a correlate is established, seroprotection rates.

---

[26] WHO Target Product Profile (TPP) for COVID-19 Vaccine (version-3 29 April 2020)

13

ii) What is the evidence that immunobridging can be used to estimate vaccine efficacy in specific groups for which clinical efficacy is not available from clinical trials? This is important as, based on the inclusion/exclusion criteria of the currently ongoing large phase III trials, certain population and age groups have in some instances been excluded from participation (e.g. infants, those with co-morbidities, pregnant and lactating women, etc.).

iii) What is the evidence of persistence of protective / neutralizing / immunoassay-measured antibodies over time (over an interval lasting as long as feasible after completion of partial or full primary vaccination in the different groups listed above?)

iv) For vaccines with regimens of two or more doses, what is the evidence for interchangeability of vaccines?

*Effectiveness*

i) What is the evidence from observational post-implementation studies on vaccine effectiveness (in different populations)?

ii) What is the evidence of effectiveness of the intervention in specific subpopulations?

iii) What is the evidence of vaccine effectiveness after a single dose of vaccination or after using an incomplete schedule?

*Duration of protection*

What is the evidence of continued efficacy/ effectiveness of vaccination (in different populations) after completion of 1 or 2 dose course of immunization in the different at-risk populations (e.g. elderly)? This can be measured as decay in antibody titers over time.

*Questions on indirect effects and biomarkers*

Transmission

i) What is the evidence of the relation of viral shedding post-vaccination and SARS-CoV-2 transmissibility?
   ▪ Measured as viral load among those infected
   ▪ Other measures of infectiousness (e.g., subgenomic viral RNA)

AR-04427

ii) What is the evidence of an effect of immunization on the duration of shedding of SARS-CoV-2?
- Measured as viral shedding through active surveillance of respiratory tract sampling in vaccinated and control individuals

iii) What is the evidence of reduction in new SARS-CoV-2 infections in contacts of vaccinated as compared to unvaccinated study subjects who become infected?

*(For example: this could be answered by adjunctive protocols to large randomized controlled trials (RCTs), comparing infection rates among contacts of vaccinated and control study subjects)*

iv) What is the evidence of reduced rates of infection in unvaccinated individuals in vaccinated populations?

*(For example: this could be answered by cluster randomized studies focusing on infection rates in un-vaccinated members of vaccinated clusters – if logistical and ethical challenges of undertaking such trials could be overcome)*

Biomarkers and correlates of protection

i) What is the evidence from functional antibody assays /neutralizing antibody assays? What is the evidence of their standardization and use in phase 1-3 clinical trials? What is the evidence that one or more of the described assays have been correlated to clinical protection?

ii) What is the evidence from immunoassays used to assess responses to vaccines? What is the evidence that these assays have been correlated to functional/neutralization assays or to clinical protection?

iii) What is the evidence concerning characterization of T cell responses, both to naturally acquired infection and to vaccination that are (expected to be) protective?

iv) What is the evidence that certain aspects of immune responses to vaccination (e.g. predominant development of certain types of CD4+ T cells, such as T helper cells (Th) type 1,overTh type 2 or Th type 17 and their distinct cytokine production patterns, elicited by the specific vaccine) are predictive of effective protection and/or absence of vaccine enhanced disease when exposed to SARS-CoV-2 following immunization?

15

AR-04428

*Target populations*

i) How to extrapolate to potential target populations (age, ethnicities, co-morbidities) for whom there may be insufficient data (effectiveness, safety). It is acknowledged that data for all target groups may not be available when vaccines is considered for EUL/PQ in the early stages of the response to COVID-19.

*Vaccine safety*

i) What is the evidence on rates of local and systemic reactogenicity signs and symptoms (e.g., pain at injection site, fever, headaches, malaise, etc.) using standardized definitions and ascertainment methods in the different target-populations and what is the impact on tolerability of the vaccine?

ii) What is the evidence of disease enhancement in either vaccine recipients subsequently exposed to the virus, in vaccine recipients with prior infection/pre-existing antibodies or those with incomplete immunization schedule?

iii) What is the evidence of any suspected unexpected serious adverse reactions (SUSARs), including but not limited to cases of (or absence of cases of) inflammatory disease or other manifestations following vaccination (e.g., mimicking pediatric multisystem inflammatory syndrome and toxic-shock - PIMS-TS)?

iv) What is the evidence of adverse events of special interest (AESI), related or possibly related serious adverse events (SAE) and medically attended adverse events (MAAE) after vaccination (in all vaccinees with a minimum of 3 months, preferably up to 12 months, of follow-up after completion of administration of all doses in the vaccination schedule; in line with regulatory requirements and the points to consider for manufacturers of COVID-19 vaccines3)?

v) What is the evidence of adverse maternal and neonatal outcomes after vaccination of pregnant women?

vi) What is the evidence on co-administration of COVID-19 vaccines with other vaccines included in routine immunization schedule leading to decreased immune response to either vaccine?

vii) What is the evidence that vaccinated persons are less likely to adopt other measures to reduce the risk of infection?

16

Manufacturers should provide safety data as indicated in the list of adverse events of special interest proposed by WHO GACVS.[27] The Brighton Collaboration standardized case definitions, whenever available, should be applied to assess level of diagnostic certainty.

*Benefit Risk Assessment Report.*

A detailed review of available data and objective Benefit and Risk assessment of the vaccine [e.g., via the appropriate Brighton Collaboration standardized templates for benefit–risk assessment of vaccines (by technology platforms)] should be provided at the time of submission.

### 3.3.14. Minimum clinical criteria for EUL assessment

For clarity, the following information must be part of the dossier for EUL application. However, the totality of the available scientific evidence relevant to the product (the preclinical and human clinical study data) will be considered.

Results from both final report and pre specified interim reports are acceptable.

Results for a given vaccine will be reported when the study reaches a monitoring boundary. Interim analyses should be timed considering the potential of such analyses to meet the criteria noted below.

After this report, study subjects will continue to be followed for additional endpoints as additional safety and efficacy data is required. Efficacy against the secondary endpoint of severe disease should be reported at the time that primary endpoint analyses are reported.

Efficacy should be evaluated by accumulating end points at least two weeks after full schedule administered after vaccination for a one dose regimen or at least one week after the last vaccination of a multidose regimen. Cases should be accumulated for at least 2 months to exclude that any effect is just only innate immunity or immediate post vaccination neutralization titers of short duration.

*Efficacy*

The primary efficacy endpoint point estimate should be at least 50%, and the statistical success criterion should be that the lower bound of the appropriately alpha-adjusted confidence interval around the primary efficacy endpoint point estimate is >30%. In order to evaluate the duration of protection by the vaccine, subjects should continue to be followed for a period to estimate this.

---

[27] WER 2020, 28, 95, 325-336

AR-04430

Subgroup analyses of efficacy endpoints stratified by prior infection status at trial enrolment should be done.

Efficacy data including a median follow-up duration of at least two months after completion of administration of all doses in the schedule

*Safety*

The general safety evaluation should be no different than for other preventive vaccines.

- o Solicited local and systemic adverse events for at least 7 days after each study vaccination in an adequate number of study participants to characterize reactogenicity (including at least a subset of participants in late phase efficacy trials).
- o Unsolicited adverse events in all study participants for at least 28 days after each study vaccination.
- o Serious adverse events in all study participants for at least 6 months after completion of all study vaccinations.
- o Longer safety monitoring may be needed for certain vaccine platforms (e.g., those that include novel adjuvants).

Specifically,

- ▪ Phase 1 and 2 trials: data on short and longer term follow up, including data on serious adverse events, adverse events of special interest, and cases of severe COVID-19 among study subjects.

- ▪ Phase 3 studies: safety data from a minimum number of vaccinees (see TRS 1004) including a median follow-up duration of at least two months after completion of administration of all doses in the schedule.

Reports should include:

- o adverse events; cases of severe COVID-19 disease among study subjects; and cases of COVID-19 occurring at least 14 days after the last dose is administered.
- o subgroup analyses of safety and efficacy endpoints stratified by prior infection status at trial enrolment.
- o Data on sufficient cases of COVID-19 among trial participants to investigate the low risk for Vaccine Associated Enhanced Disease (VAED).

18

*Follow up*

Blinded study follow-up, for COVID19 disease and for SAEs, should last for at least one year (and preferably longer). This will enable further analysis of duration of efficacy and potential for risk of vaccine-induced COVID-19 disease enhancement in the presence of waning immunity. In the event that there is evidence of waning efficacy of a successful vaccine over the period of observation, participants in this trial may be randomized to prospectively designed controlled study of a booster dose. Vaccinated subjects experiencing a respiratory infection in the follow up period should be tested for specific pathogen.

Active safety follow-up must also be implemented in all vaccinees to further document safety: Local and systemic solicited adverse reactions collected for the defined duration of follow-up in an adequate number of subjects to characterize reactogenicity in each protocol-defined age cohort participating in the trial;

Manufacturers should provide safety data as indicated in the list of adverse events of special interest proposed by WHO GACVS (WER 2020, 28, 95, 325-336).

*Benefit Risk assessment Report*

A detailed review of available data and objective Benefit and Risk assessment of the vaccine [e.g., via the appropriate Brighton Collaboration standardized templates for benefit–risk assessment of vaccines (by technology platforms)] should be provided at the time of submission.

*Risk Management Plan*

A detailed RMP including pharmacovigilance and risk minimization plans (or equivalent documents) should be provided.

### 3.4. MANUFACTURING AND QUALITY CONTROL

The following list indicates the key information in Module 3 of the CTD that should be complete in the submissions to consider the dossier for review.

3.4.1.   Drug Substance

3.4.1.1.   Manufacturer(s)

This should be the manufacturer and manufacturing sites that will be intended for EUL/PQ, which may not be the same as those included in the submission to the NRA of record for the Conditional Marketing Authorization, Emergency Use Approval or equivalent.

AR-04432

### 3.4.1.2.  Description of Manufacturing Process and Process Controls

A flow diagram that illustrates the manufacturing route from starting materials (Master and Working Cell Banks, Master and Working Seeds, starting materials of biological origin) to the Drug substance should be provided.

Relevant information for each stage of the upstream and downstream processes, should be included. Critical steps and critical intermediates for which specifications are established should be identified.

A description of each process step in the flow diagram should be provided, including major equipment and process controls, including in-process tests and operational parameters, with acceptance criteria.

Information on procedures used to transfer material between steps, equipment, areas, and buildings, as appropriate, and shipping and storage conditions should be provided.

If applicable, reprocessing procedures with criteria for reprocessing of any intermediate or the drug substance should be described.

A description of the filling procedure for the drug substance, process controls (including in process tests and operational parameters), and acceptance criteria should be provided.

### 3.4.1.3.  Cell banking system, characterization and testing

Full characterization of the cell banks according to relevant WHO guidelines should be provided and should include viral safety studies.

Information on the cell banking system, should include quality control activities, and cell line stability during production and storage (including procedures used to generate the Master and Working Cell Bank(s).

If applicable to the manufacturing platform, information on the source of the cell substrate and analysis of the expression construct used to genetically modify cells and incorporated in the initial cell clone used to develop the Master Cell Bank should be provided.

AR-04433

### 3.4.1.4.    Characterization of Master and Working seed

Full characterization of Master and Working Seed, complete history of the virus used to prepare the Virus Seed

For viral-vectored vaccines, the use of any viral vector should be based on a master and working seed lot system, analogous to the cell banking system used for production cells. The origin of all genetic components of the vaccine and their function should be specified to allow for a clear overall understanding of the functionality of the vaccine and of how it is attenuated or made replication incompetent by genetic engineering.

### 3.4.1.5.    Controls of Critical Steps and Intermediates

Tests and acceptance criteria for all critical steps (with justification including experimental data) should be provided for all critical steps of the manufacturing process to ensure that the process is controlled.

Information on the quality and control of intermediates isolated during the process should be provided.

### 3.4.1.6.    Process Validation and/or Evaluation

Process validation (based on quality risk-based approach) and demonstration of consistency of production at the production scale used for the lots to be distributed should be provided.

Sufficient information should be provided on validation and evaluation studies to demonstrate that the manufacturing process is suitable for its intended purpose and to substantiate selection of critical process controls (operational parameters and in-process tests) and their limits for critical manufacturing steps (e.g., cell culture, harvesting, purification, and modification).

Use of multiple sites for production of Drug Substance should be supported by demonstration of analytical comparability.

As an alternative to the traditional process validation, continuous process verification can be utilised in process validation protocols for the initial commercial production and also for manufacturing process changes for the continual improvement throughout the remainder of the product lifecycle.

21

### 3.4.1.7.    Analytical method validation

If novel test methods have been developed for potency tests and other critical assays, full description of the test development and qualification must be provided.

The analytical procedures and corresponding validation should be cross-referenced or provided as part of justifying the selection of critical process controls and acceptance criteria.
For manufacturing steps intended to remove or inactivate viral contaminants, the information from evaluation studies should be provided in detail.

### 3.4.1.8.    Manufacturing Process Development

A description and discussion should be provided of the significant changes made to the manufacturing process and/or manufacturing site of the drug substance used in producing nonclinical, clinical, scale-up, pilot, and, if available, production scale batches.

The developmental history of the manufacturing process, should be provided. The description of change(s) made to the manufacture of drug substance batches used in support of the submission (e.g., nonclinical or clinical studies) should include, for example, changes to the process or to critical equipment. The reason for the change should be explained. Relevant information on drug substance batches manufactured during development, such as the batch number, manufacturing scale, and use (e.g., stability, nonclinical, reference material) in relation to the change, should be provided. The significance of the change should be assessed by evaluating its potential to impact the quality of the drug substance (and/or intermediate, if appropriate).

A discussion of the data, including a justification for selection of the tests and assessment of results, should be included. Testing used to assess the impact of manufacturing changes on the drug substance(s) and the corresponding drug product(s) can also include nonclinical and clinical studies. Cross-reference to the location of these studies in other modules of the submission should be included.

### 3.4.1.9.    Control of Drug Substance

The specification for the drug substance should be provided and justified.

Analytical procedures for testing of the drug substance should be validated.

Description of batches and results of batch analyses should be provided to demonstrate lot consistency.

AR-04435

### 3.4.1.10.   Reference standards or materials

Information on Reference standards or reference materials should be provided.

### 3.4.1.11.   Container Closure System

A description of the container closure system(s) should be provided, including the identity of materials of construction of each primary packaging component, and their specifications. The specifications should include description and identification (and critical dimensions with drawings, where appropriate).

### 3.4.1.12.   Stability

This section should include a summary of the studies undertaken (conditions, batches, analytical procedures) and a brief discussion of the results and conclusions, the proposed storage conditions, retest date or shelf-life, where relevant. The post-approval stability protocol should be included.

## 3.4.2.   Drug product

### 3.4.2.1.   Manufacture

Manufacturer(s) of Drug Product, Filler/packagers must be indicated for the vaccine that will be submitted for EUL/PQ, which may be different from the one submitted to the NRA of record for Conditional Marketing Authorization, Emergency Use Approval or equivalent.

If the manufacturer of the Drug Substance is different from the manufacturer of the Drug Product it should be indicated.

Facilities and Equipment included in the dossier should be for those sites where the product intended for supply through COVAX facility is manufactured.

### 3.4.2.2.   Pharmaceutical Development

The Pharmaceutical Development section should contain information on the development studies conducted to establish that the dosage form, the formulation, manufacturing process, container closure system, microbiological attributes and usage instructions are appropriate for the purpose specified in the application. The studies described here are distinguished from routine control tests conducted according to specifications. Additionally, this section should

AR-04436

identify and describe the formulation and process attributes (critical parameters) that can influence batch reproducibility, product performance and drug product quality. Supportive data and results from specific studies or published literature can be included within or attached to the Pharmaceutical Development section. Additional supportive data can be referenced to the relevant nonclinical or clinical sections of the application.

### 3.4.2.3.    Components of the Drug Product

***Drug Substance***

The compatibility of the drug substance with excipients/ stabilizers/adjuvants listed should be discussed.

If the manufacturer of the Drug Substance is different from the manufacturer of the Drug Product it should be indicated.

***Excipients, stabilizers, adjuvants***

The choice of excipients/stabilizers/adjuvants listed, their concentration, their characteristics that can influence the drug product performance should be discussed relative to their respective functions.

### 3.4.2.4.    Formulation Development

A brief summary describing the development of the drug product should be provided, taking into consideration the proposed route of administration and usage. The differences between clinical formulations and the formulation in the finished product should be discussed. Results from comparative in vitro studies or comparative in vivo studies should be discussed when appropriate.

### 3.4.2.5.    Manufacturing Process Development

The selection and optimisation of the manufacturing process, in particular its critical aspects, should be explained. Differences between the manufacturing process(es) used to produce pivotal clinical batches and the process described in finished product that can influence the performance of the product should be discussed.

### 3.4.2.6.    Container Closure System

The suitability of the container closure system used for the storage, transportation (shipping) and use of the drug product should be discussed. This discussion should consider, e.g., choice of materials, protection from moisture and light, compatibility of the materials of construction with the dosage form (including sorption to container and leaching) safety of materials of construction, and performance (such as reproducibility of the dose delivery from the device when

24

presented as part of the drug product).

A description of the container closure systems should be provided, including the identity of materials of construction of each primary packaging component and its specification. The specifications should include description and identification (and critical dimensions, with drawings where appropriate). Non-compendial methods (with validation) should be included where appropriate. For non-functional secondary packaging components (e.g., those that neither provide additional protection nor serve to deliver the product), only a brief description should be provided. For functional secondary packaging components, additional information should be provided.

### 3.4.2.7.    Compatibility of diluents

If the vaccine is lyophilized, the compatibility of the drug product with reconstitution diluent(s) or dosage devices – if applicable- should be addressed to provide appropriate and supportive information for the labeling.

### 3.4.2.8.    Batch Formula

A batch formula should be provided that includes a list of all components of the dosage form to be used in the manufacturing process, their amounts on a per batch basis, including overages, and a reference to their quality standards.

### 3.4.2.9.    Description of Manufacturing Process and Process Controls

A flow diagram should be presented giving the steps of the process and showing where materials enter the process. The critical steps and points at which process controls, intermediate tests or final product controls are conducted should be identified. A narrative description of the manufacturing process, including packaging, that represents the sequence of steps undertaken and the scale of production should also be provided. Novel processes or technologies and packaging operations that directly affect product quality should be described with a greater level of detail.
Equipment should, at least, be identified by type and working capacity, where relevant.
Steps in the process should have the appropriate process parameters identified.

### 3.4.2.10.    Controls of Critical Steps and Intermediates

Tests and acceptance criteria should be provided (with justification, including experimental data) performed at the critical steps of the manufacturing process, to ensure that the process is controlled. Information on the quality and control of intermediates isolated during the process should be provided.

AR-04438

CONSIDERATIONS FOR EVALUATION OF COVID-19 VACCINES v25112020

### 3.4.2.11.   Process Validation and/or Evaluation

Process validation (based on quality risk-based approach) and demonstration of consistency of production at the production scale used for the lots to be distributed.

Use of multiple sites for production of Drug Product should be supported by demonstration of analytical comparability.

N.B., if full characterization is not possible at the time of submission, adequate justification must be submitted as to why not, and a plan must be presented to address the data gaps analysis

### 3.4.2.12.   Control of Drug Product

The specification(s) for the drug product and the analytical procedures used for testing the drug product should be provided.

Analytical validation information, including experimental data, for the analytical procedures used for testing the drug product, should be provided.

Justification for the proposed drug product specification(s) should be provided.

### 3.4.2.13.   Control of excipients, stabilizers, adjuvants

The specifications for excipients and the analytical procedures used for testing the excipients should be provided, where appropriate.

Analytical validation information, including experimental data, for the analytical procedures used for testing the excipients should be provided, where appropriate.

Justification for the proposed excipient specifications should be provided, where appropriate.

For excipient(s) and adjuvants used for the first time in a drug product or by a new route of administration, full details of manufacture, characterisation, and controls, with cross references to supporting safety data (nonclinical and/or clinical) should be provided according to the drug substance format

AR-04439

CONSIDERATIONS FOR EVALUATION OF COVID-19 VACCINES v25112020

### 3.4.2.14.   Reference Standards or Materials

Information on the reference standards or reference materials used for testing of the drug product should be provided.

### 3.4.2.15.   Stability

The types of studies conducted, protocols used, and the results of the studies should be summarized. The summary should include, for example, conclusions with respect to storage conditions and shelf-life, and, if applicable, in-use storage conditions and shelf-life.

Stability data for the vaccine produced at the scale produced for the lots at the scale intended for distribution should be supplied.

Generally, real-time stability from three full-scale production lots is preferred. With appropriate justification and discussion with the WHO, a scientific risk-based approach to determine the proposed vaccine shelf life in the absence of real time stability data on the commercial batches may be considered. For example, data generated from smaller lots, such as clinical or engineering lots, and/or data generated on a different vaccine using a similar process and/or manufacturing platform, may be appropriate for submission in support of the initial recommended shelf-life for the vaccine.

Consideration of platform stability data, prior knowledge from early clinical batches or statistical modelling may also be applied to forecast expiry of product.

The types of studies conducted, protocols used, and the results of the studies should be summarized. The summary should include results, for example, from forced degradation studies and stress conditions, as well as conclusions with respect to storage conditions and retest date or shelf-life, as appropriate.

Results of the stability studies should be presented in an appropriate format (e.g. tabular, graphical, narrative). Information on the analytical procedures used to generate the data and validation of these procedures should be included

Long term stability studies as part of post-listing commitments will be discussed.

WHO may consider candidate vaccines with characteristics that would not be accepted for prequalification (programmatic suitability criteria)[28].

a) Vaccines requiring storage at less than -20°C are generally not accepted for prequalification. However, under this emergency procedure, such vaccines can be

---

[28] https://www.who.int/immunization_standards/vaccine_quality/ps_pq/en/

AR-04440

considered. Upon receipt of such an application, WHO staff responsible for emergency response vaccine deployment will be informed by the WHO EUL/PQ Secretariat, and will be requested to evaluate and consider whether recipient countries will require assistance with regards to infrastructure for vaccine storage and distribution at required temperatures.

b)  Routinely, if a vaccine presented for prequalification requires storage below +2°C during its shelf-life period, a minimum period of storage between +2°C and +8°C of 6 months is required. Under this emergency procedure, vaccines with a shelf life at +2 to +8°C of less than 6 months may be considered. The application should include stability data at +2 to +8°C to determine the minimum acceptable storage period at +2 to +8°C. Upon receipt of such an application, WHO staff responsible for emergency response vaccine deployment will be informed by the WHO EUL/PQ Secretariat, and will be requested to evaluate and consider whether recipient countries will require assistance with regards to infrastructure for vaccine storage and distribution at required temperatures.

c)  Routinely, multi-dose vaccines for prequalification should contain adequate preservative, unless they are live-attenuated vaccines (where the preservative may have an adverse effect on the viability of the virus). However, if a multi-dose vaccine submitted under this emergency procedure does not contain a preservative, information/plans on how such a vaccine could be safely managed in the field should be submitted.

d)  The requirement for VVM may be waived while data is generated. Accelerated stability data must be included. This information is required to assess if the stability profile at different temperatures matches any existing VVM category.

### 3.4.2.16.   Post-approval Stability Protocol and Stability Commitment

The post-approval stability protocol and stability commitment should be provided. As data for real time stability will be limited at the time of submission, updated information will be part of the post listing commitments.

### 3.4.3.   Changes

If changes in the manufacturing process are introduced before the assessment is finalized or after the listing, these must be reported to WHO and all information provided for evaluation before the final report is prepared. Post listing changes must be reported according to the Guidance on reporting variations to a prequalified vaccine.

AR-04441

### 3.4.4.   Inspection reports

Inspection report(s) from the responsible NRA showing compliance with GMP requirements. Taking in consideration the current challenges due to the COVID-19 pandemic, the WHO PQT/INS is considering various measures of regulatory flexibility including waving an on-site inspection and as a temporary measure, carrying out a desk assessment to determine the compliance of the site with Good Manufacturing Practices (GMP) and Quality Management System (QMS) requirements.

In cases where an inspection was deemed not required, a valid GMP certificate for the facility should be provided.

### 3.4.5.   Labelling

Vial label, carton label and package insert should follow the models provided by WHO.

1. Summary of product characteristic (information for healthcare provider)

2. Patient information leaflet

3. Container labelling

4. Any other instructional materials provided to the user.

5. A plan to help assure that prospective recipients and healthcare providers are adequately informed about the uncertainties regarding both the potential benefits and risks.

29

# COVID-19 and mandatory vaccination:
# Ethical considerations and caveats

Policy brief

13 April 2021



## Background

Vaccines are one of the most effective tools for protecting people against COVID-19. Consequently, with COVID-19 vaccination under way or on the horizon in many countries, some may be considering whether to make COVID-19 vaccination mandatory in order to increase vaccination rates and achieve public health goals and, if so, under what conditions, for whom and in what contexts.

It is not uncommon for governments and institutions to mandate certain actions or types of behaviour in order to protect the well-being of individuals or communities. Such policies can be ethically justified, as they may be crucial to protect the health and well-being of the public. Nevertheless, because policies that mandate an action or behaviour interfere with individual liberty and autonomy, they should seek to balance communal well-being with individual liberties (1). While interfering with individual liberty does not in itself make a policy intervention unjustified, such policies raise a number of ethical considerations and concerns and should be justified by advancing another valuable social goal, like protecting public health.

This document does not provide a position that endorses or opposes mandatory COVID-19 vaccination. Rather, it identifies important ethical considerations and caveats that should be explicitly evaluated and discussed through ethical analysis by governments and/or institutional policy-makers who may be considering mandates for COVID-19 vaccination.

## What does "mandatory vaccination" entail?

**Sub-heading**

Contemporary forms of "mandatory vaccination" compel vaccination by direct or indirect threats of imposing restrictions in cases of non-compliance (2). Typically, mandatory vaccination policies permit a limited number of exceptions recognized by legitimate authorities (e.g., medical contraindications) (3). Despite its name, 'mandatory vaccination' is not truly compulsory, i.e., force or threat of criminal sanction are not used in cases of non-compliance. It is therefore the kind of mandatory vaccination described at the beginning of this paragraph to which we refer in this document. Still, "mandatory vaccination" policies limit individual choice in non-trivial ways by making vaccination a condition of, for example, attending school or working in particular industries or settings, like health care. Such policies are not uncommon (2), although it should be noted that the World Health Organization (WHO) does not presently support the direction of mandates for COVID-19 vaccination, having argued that it is better to work on information campaigns and making vaccines accessible (4). In addition, WHO recently issued a position statement that national authorities and conveyance operators should not require COVID-19 vaccination as a condition of international travel (5).

Laws and the legal justifications for mandatory vaccination differ by jurisdiction (6). A legal obligation to be vaccinated is distinct from an ethical obligation insofar as the latter is not enforced by threats of restrictions in the case of non-compliance. The focus of this document is ethical considerations and caveats for mandatory COVID-19 vaccination policies.

## Ethical considerations and caveats regarding mandatory COVID-19 vaccination

The following considerations and caveats should all be explicitly evaluated and discussed through an ethical analysis by governments and/or institutional policy-makers who may be considering mandates for COVID-19 vaccination. They should be considered alongside other relevant scientific, medical, legal, and practical considerations not described in this document.

**1. Necessity and proportionality**

Mandatory vaccination should be considered only if it is necessary for, and proportionate to, the achievement of an important public health goal (including socioeconomic goals) identified by a legitimate public health authority. If such a public health goal (e.g., herd immunity, protecting the most vulnerable, protecting the capacity of the acute health care system) can be achieved with less coercive

AR-04443

COVID-19 and mandatory vaccination: Ethical considerations and caveats: policy brief

or intrusive policy interventions (e.g., public education), a mandate would not be ethically justified, as achieving public health goals with less restriction of individual liberty and autonomy yields a more favourable risk-benefit ratio (1).

As mandates represent a policy option that interferes with individual liberty and autonomy, they should be considered only if they would increase the prevention of significant risks of morbidity and mortality and/or promote significant and unequivocal public health benefits. If important public health objectives cannot be achieved without a mandate – for instance, if a substantial portion of individuals are able but unwilling to be vaccinated and this is likely to result in significant risks of harm – their concerns should be addressed, proactively if possible. If addressing such concerns is ineffective and those concerns remain a barrier to achievement of public health objectives and/or if low vaccination rates in the absence of a mandate put others at significant risk of serious harm, a mandate may be considered "necessary" to achieve public health objectives. In this case, those proposing the mandate should communicate the reasons for the mandate to the affected communities through effective channels and find ways to implement the mandate such that it accommodates the reasonable concerns of communities. Individual liberties should not be challenged for longer than necessary. Policy-makers should therefore frequently re-evaluate the mandate to ensure it remains necessary and proportionate to achieve public health goals. In addition, the necessity of a mandate to achieve public health goals should be evaluated in the context of the possibility that repeated vaccinations may be required as the virus evolves, as this may challenge the possibility of a mandate to realistically achieve intended public health objectives.

## 2. Sufficient evidence of vaccine safety

Data should be available that demonstrate the vaccine being mandated has been found to be safe in the populations for whom the vaccine is to be made mandatory. When safety data are lacking or when they suggest the risks associated with vaccination outweigh the risks of harm without the vaccine, the mandate would not be ethically justified, particularly without allowing for reasonable exceptions (e.g., medical contraindications). Policy-makers should consider specifically whether vaccines authorized for emergency or conditional use meet an evidentiary threshold for safety sufficient for a mandate (7). In the absence of sufficient evidence of safety, there would be no guarantee that mandating vaccination would achieve the goal of protecting public health. Furthermore, coercive exposure of populations to a potentially harmful product would violate the ethical obligation to protect the public from unnecessary harm when the harm the product might cause outweighs the degree of harm that might exist without the product.

Even when the vaccine is considered sufficiently safe, mandatory vaccination should be implemented with no-fault compensation schemes to address any vaccine-related harm that might occur. This is important, as it would be unfair to require people who experience vaccine-related harm to seek legal remedy from harm resulting from a mandatory intervention (8). Such compensation would depend on countries' health systems, including the extent of universal health coverage and how they address harm from vaccines that are not fully licensed (e.g., vaccines authorized for emergency or conditional use).

## 3. Sufficient evidence of vaccine efficacy and effectiveness

Data on efficacy and effectiveness should be available that show the vaccine is efficacious in the population for whom vaccination is to be mandated and that the vaccine is an effective means of achieving an important public health goal. For instance, if mandatory vaccination is considered necessary to interrupt transmission chains and prevent harm to others, there should be sufficient evidence that the vaccine is efficacious in preventing serious infection and/or transmission. Alternatively, if a mandate is considered necessary to prevent hospitalization and protect the capacity of the acute health care system, there should be sufficient evidence that the vaccine is efficacious in reducing hospitalization. Policy-makers should carefully consider whether vaccines authorized for emergency or conditional use meet evidentiary thresholds for efficacy and effectiveness sufficient for a mandate (7).

## 4. Sufficient supply

In order for a mandate to be considered, supply of the authorized vaccine should be sufficient and reliable, with reasonable, free access for those for whom it is to be made mandatory (i.e., there should be few barriers that make it difficult for populations affected by the mandate to access the vaccine). The absence of a sufficient supply and reasonable, free access would not only render a mandate ineffective in achieving vaccine uptake, but would create an unduly burdensome, unfair demand on those who are required to be vaccinated but are unable to access the vaccine. Such a mandate would threaten to exacerbate social inequity in access to health care.

## 5. Public trust

Policy-makers have a duty to carefully consider the effect that mandating vaccination could have on public confidence and public trust, and particularly on confidence in the scientific community and public trust in vaccination generally (9). If such a policy threatens to undermine confidence and public trust, it might affect both vaccine uptake and adherence to other important public health measures, which can have an enduring effect (10). In particular, the coercive power that governments or institutions display in a programme that undermines voluntariness could have unintended negative consequences for vulnerable or marginalized populations (11). High priority should therefore be given to threats to public trust and confidence amongst historically disadvantaged minority populations, ensuring that cultural considerations are taken into account. Vaccine hesitancy may be stronger in such populations and may not be restricted to concerns of safety and efficacy (12), as mistrust in authorities may be rooted in histories of unethical medical and public health policies and practices as well as structural inequity (9). Such populations may regard mandatory vaccination as another form of inequity or oppression, making it more difficult for them to access jobs and essential services (13).

AR-04444

COVID-19 and mandatory vaccination: Ethical considerations and caveats: policy brief

The extent to which mandatory vaccination policies accommodate conscientious objection may also affect public trust (14). There should, however, be strict scientific and prudential limits to appeals for accommodation or "conscientious objection", especially when such accommodation might be used by individuals to 'free ride' the public health good of herd immunity or if they threaten public health and others' right not to be infected with a virulent infectious disease (15, 16).

**6. Ethical processes of decision-making**

Transparency and stepwise decision-making by legitimate public health authorities should be fundamental elements of ethical analysis and decision-making about mandatory vaccination. Reasonable effort should be made to engage affected parties and relevant stakeholders, and particularly those who are vulnerable or marginalized, to elicit and understand their perspectives. Steps should be taken in good faith to respect human rights obligations not to discriminate or disproportionately disadvantage vulnerable populations. Legitimate public health authorities that are contemplating mandatory vaccination policies should use transparent, deliberative procedures to consider the ethical issues outlined in this document in an explicit ethical analysis, including the threshold of evidence necessary for vaccine safety and efficacy to justify a mandate. As in other contexts, mechanisms should be in place to monitor evidence constantly and to revise such decisions periodically.

## Mandatory COVID-19 vaccination in context

Authorized COVID-19 vaccines have been shown to be safe and efficacious in preventing severe disease and death, and it is clear that vaccine supply will continue to increase globally, albeit inequitably. That being said, the nature of the COVID-19 pandemic and evidence on vaccine safety, efficacy, and effectiveness continue to evolve (including with respect to variants of concern). Consequently, the six considerations identified above are described generally so that they can be applied at any point in time and in any context. For illustrative purposes, we now turn our attention to the application of these ethical considerations in three settings for which mandatory vaccination is commonly discussed: for the general public, in schools, and for health workers.

**The general public**

Vaccination mandates for general adult populations are rare (7). In the absence of a sufficient, reliable vaccine supply that would permit every eligible member of the general public to be vaccinated, a mandate for the general public would fail to address ethical consideration 4 regarding sufficient supply. Even if there is a sufficient, reliable vaccine supply, policy-makers should consider whether mandatory vaccination of the general population is necessary and proportionate to achieve intended public health goals (ethical consideration 1). More evidence may be required about vaccine uptake to determine whether a mandate is necessary, which will depend on local contexts and on the goals of the health system (e.g., achievement of herd immunity, protecting the most vulnerable). Similarly, the extent to which a mandate for the general public is proportional will depend to some extent on the local context given the variation in COVID-19 epidemiology in different jurisdictions. Even if there is a sufficient supply and a mandate for vaccination of the general public is considered necessary and proportionate, policy-makers should still consider whether a mandate for the general public would threaten public trust or exacerbate inequity for the most vulnerable or marginalized (ethical consideration 5).

**In schools**

Given the lack of data on the safety and efficacy of COVID-19 vaccines for children (ethical considerations 2 and 3), COVID-19 vaccines have not yet been authorized for this population. Consequently, vaccination is not currently ethically justified as a condition for attending school. Once such data are available and show favourable safety and efficacy in this population, policy-makers will have to consider whether mandating vaccination as a condition of attending school is necessary and proportional to achieve the public health objectives (ethical consideration 1) and whether this could undermine public trust (ethical consideration 5). In some jurisdictions, vaccination against the viruses that cause a number of diseases (e.g., polio, measles, mumps, rubella) is a condition for attending school or receiving state-sponsored entitlements (2); however, mandates for routine paediatric vaccines are distinct from vaccines authorized for emergency use in many respects, including the relatively limited and evolving evidence for COVID-19 vaccines in addition to uncertainty regarding herd immunity and new SARS-CoV-2 variants in the context of COVID-19.

**Health workers**

Mandatory vaccination is perhaps most often discussed in the context of health and social care, particularly where health workers have direct contact with populations at high risk of SARS-CoV-2 infection or severe illness or death resulting from COVID-19 (e.g., congregate settings in which care is provided to older adults), because of the unique settings in which health workers work and their ethical obligation not to harm their patients. Moreover, mandatory COVID-19 vaccination might appear to be particularly plausible for health workers given that vaccination of this population might be seen as necessary to protect health system capacity (ethical consideration 1) and because health workers are commonly identified as a priority group for vaccination, meaning there is more likely to be a sufficient supply to meet the needs of this population (ethical consideration 4). Whether a mandate for health workers is necessary and proportionate (ethical consideration 1) and would not undermine trust (ethical consideration 5) might depend on the local context and should be investigated empirically before a mandate is considered for this population.

AR-04445

COVID-19 and mandatory vaccination: Ethical considerations and caveats policy brief

Forms of mandatory vaccination are not uncommon in health care settings (17), including requirements that unvaccinated health workers stay at home during outbreaks, policies in which vaccination is required as a condition of employment, requirements that unvaccinated health workers be transferred to settings where the risk is lower, and so-called "vaccinate-or-mask" policies.

Given current rates (and concerns) of health worker "burn-out" as a result of the pandemic and the potential consequence of an inadequately resourced health workforce (18), mandatory vaccination policies that require unvaccinated health workers to stay at home or require vaccination as a condition of employment or hospital privileges might have significant negative consequences for already overburdened health systems. Policies that require unvaccinated health workers to be transferred to settings where the risk is lower might have similar consequences, as they might remove critical health workers from settings that badly need health human resources, such as congregate living settings where care is provided to older adults. Additionally, it may be difficult to distinguish high and low-risk settings where there is widespread community transmission of SARS-CoV-2.

Finally, some health institutions might wonder whether vaccinate-or-mask policies, which have not been proposed for COVID-19 but are sometimes used as a type of vaccine mandate for seasonal influenza (19, 20), should be similarly used to mandate COVID-19 vaccinations among health workers. As masks are likely to be a requirement in health care settings for the foreseeable future, the incentive for health workers to be vaccinated under vaccinate-or-mask policies – namely, that they will not have to wear a mask in all patient care settings while the virus is circulating if they are vaccinated – will simply lack the same force. Vaccinate-or-mask policies would retain this force if vaccination against COVID-19 meant that vaccinated health workers could refrain from wearing masks, but this is not scientifically or ethically justified given the importance of personal protective equipment for institutional infection prevention and control (21), particularly where there is uncertainty surrounding a vaccine's capacity for sterilizing immunity. In this case, vaccinate-or-mask policies risk placing too much emphasis on the protective effect of masks. Because no vaccine is 100% effective, standard infection prevention and control precautions, which includes masks but also a number of other standard precautions, should be used to minimize risk.

## Conclusions

Vaccines are effective for protecting people from COVID-19. Governments and/or institutional policy-makers should use arguments to encourage voluntary vaccination against COVID-19 before contemplating mandatory vaccination. Efforts should be made to demonstrate the benefit and safety of vaccines for the greatest possible acceptance of vaccination. Stricter regulatory measures should be considered only if these means are not successful. A number of ethical considerations and caveats should be explicitly discussed and addressed through ethical analysis when considering whether mandatory COVID-19 vaccination is an ethically justifiable policy option. Similar to other public health policies, decisions about mandatory vaccination should be supported by the best available evidence and should be made by legitimate public health authorities in a manner that is transparent, fair, non-discriminatory, and involves the input of affected parties.

## References

1. Nuffield Council on Bioethics. Public health: Ethical issues. London: Nuffield Council on Bioethics; 2007 (https://www.nuffieldbioethics.org/assets/pdfs/Public-health-ethical-issues.pdf).
2. Gravagna K, Becker A, Valeris-Chacin R, Mohammed I, Tambe S, Awan FA et al. Global assessment of national mandatory vaccination policies and consequences of non-compliance. Vaccine. 2020;38:7865–73.
3. Colgrove J, Bayer R. Manifold restraints: Liberty, public health, and the legacy of Jacobson v Massachusetts. Am J Public Health. 2005;95:571–6.
4. World Health Organization. COVID-19 virtual press conference 7 December 2020 (https://www.who.int/publications/m/item/covid-19-virtual-press-conference-transcript---7-december-2020).
5. World Health Organization. Interim position paper: Considerations regarding proof of COVID-19 vaccination for international travellers. Geneva: World Health Organization; 2021 (https://www.who.int/news-room/articles-detail/interim-position-paper-considerations-regarding-proof-of-covid-19-vaccination-for-international-travellers).
6. Walkinshaw E. Mandatory vaccinations: The international landscape. Can Med Assoc J. 2011;183:e1167–8.
7. Gostin LO, Salmon DA, Larson HJ. Mandating COVID-19 vaccines. JAMA. 2020;325:532–3.
8. Halabi S, Heinrich A, Omer S. No-fault compensation for vaccine injury – The other side of equitable access to Covid-19 vaccines. N Engl J Med. 2020;383:e125.
9. Schwartz JL. Evaluating and deploying Covid-19 vaccines – The importance of transparency, scientific integrity, and public trust. N Engl J Med. 2020;383:1703–5.
10. Shetty P. Experts concerned about vaccination backlash. Lancet. 2020;375:970–1.
11. Giubilini A. Chapter 3, Vaccination policies and the principle of least restrictive alternative: An intervention ladder. In Giubilini A, The ethics of vaccination. Cham (CH): Palgrave Pivot; 2019.
12. Goldenberg M. Vaccine hesitancy: Public trust, expertise, and the war on science. Pittsburgh, PA: University of Pittsburgh Press. 2021.
13. Opel DJ, Lo B, Peek ME. Addressing mistrust about COVID-19 vaccines among patients of color. Ann Intern Med. 2021;M21-0055. doi: 10.7326/M21-0055.
14. Colgrove J. Immunization and ethics: Beneficence, coercion, public health, and the state. In: Mastroianni AC, Kahn JP, Kass NE, editors. The Oxford handbook of public health ethics, New York City (NY): Oxford University Press; 2020:435–44.
15. Sutton EJ, Upshur REG. Are there different spheres of conscience? J Eval Clin Pract. 2010;16:338–43.

AR-04446

COVID-19 and mandatory vaccination: Ethical considerations and caveats: policy brief

16. Harris J, Holm S. Is there a moral obligation not to infect others? BMJ. 1995;311:1215–7.
17. Gruben V, Siemieniuk RA, McGeer A. Health care workers, mandatory influenza vaccination policies and the law. Can Med Assoc J. 2014;186:1076–80.
18. Krystal JH. Responding to the hidden pandemic for healthcare workers: Stress. Nat Med. 2020;26:639.
19. Van Buynder PG, Konrad S, Kersteins F, Preston E, Brown PD, Keen D, et al. Healthcare worker influenza immunization vaccinate or mask policy: Strategies for cost effective implementation and subsequent reductions in staff absenteeism due to illness. Vaccine. 2015;33:625–8.
20. Caplan A, Shah NR. Managing the human toll caused by seasonal influenza: New York State's mandate to vaccinate or mask. JAMA. 2013;310:1797–8.
21. World Health Organization. Mask use in the context of COVID-19 – Interim guidance. Geneva: World Health Organization; 2020. (https://www.who.int/publications/i/item/advice-on-the-use-of-masks-in-the-community-during-home-care-and-in-healthcare-settings-in-the-context-of-the-novel-coronavirus-(2019-ncov)-outbreak).

## Acknowledgements

This policy brief was prepared by the World Health Organization Ethics and COVID-19 Working Group. Drafting of the document was led by Maxwell J. Smith (Western University, Canada), with guidance from the Working Group's co-chairs Beatriz Thomé (Federal University of São Paulo, Brazil) and Ross Upshur (University of Toronto, Canada) and contributions by (ordered alphabetically by surname): Aasim Ahmad (National Bioethics Committee, Karachi, Pakistan), Thalia Arawi (American University, Beirut, Lebanon), Oumou Bah Sow (Comité National d'Ethique pour la Recherche en Santé, Guinea), Sally Bean (Sunnybrook Health Sciences Centre and University of Toronto, Canada), Ezekiel Emanuel (University of Pennsylvania, USA), Jean-François Delfraissy (French National Bioethics Committee, France), Tina Garanis-Papadatos (University of West Attica, Athens, Greece), Prakash Ghimire (National Ethics Review Board, Katmandu, Nepal), Zubairu Iliyasu (National Health Research Ethics Committee, Nigeria), Sharon Kaur (Centre for Law and Ethics in Science and Technology, University of Malaya, Malaysia), Ruipeng Lei (Wuhan Centre for Bioethics, China), Ignacio Mastroleo (Facultad Latinoamericana de Ciencias Sociales, Argentina), Roli Mathur (Indian Council of Medical Research Ethics Centre, India), Signe Mezinska (University of Latvia, Latvia), Keymanthri Moodley (Stellenbosch University, South Africa), Kaori Muto (University of Tokyo, Japan), Michael Parker (Ethox Centre, United Kingdom), Anthony Skelton (Western University, Canada), Voo Teck Chuan (National University, Singapore) and Xiaomei Zhai (Peking Union College, China). Katherine Littler and Andreas Reis (WHO Health Ethics and Governance Unit) provided support for the WHO Secretariat, with the assistance of Patrik Hummel, Liz Mumford and Lee-Anne Pascoe.

Contributions and feedback from Joachim Hombach (WHO Scientific Advisory Group on Emergencies Secretariat), Ana Maria Henao Restrepo (WHO R&D Blueprint), Nikki Shindo (WHO Global Infectious Hazard Preparedness), Giorgio Cometto and Onyema Ajuebor (WHO Health Workforce), Shalini Desai (WHO Essential Programme on Immunization), Ivan Ivanov (WHO Occupational and Workplace Health), April Baller, Carole Fry (WHO Health Care Readiness), Carmen Dolea, Thomas Hofmann, Helge Hollmeyer and Fernando Gonzalez (WHO International Health Regulations) are duly acknowledged. Additional input was provided by the WHO COVID-19 ACT-A Ethics and Governance Working Group.

## Declarations of interest

All authors and members of the World Health Organization Ethics and COVID-19 Working Group declared their interests according to WHO standard procedures. None of the interests declared were found to be significant.

## Funding source

Funding in support of the WHO Secretariat under the "WHO COVID-19 SPRP R&D" grant by the Ministry of Health of Germany is gratefully acknowledged.

WHO continues to monitor the situation closely for any changes that may affect this policy brief. Should any factors change, WHO will issue a further update. Otherwise, this policy brief document will expire 2 years after the date of publication.

© World Health Organization 2021. Some rights reserved. This work is available under the CC BY-NC-SA 3.0 IGO licence.

WHO reference number:  WHO/2019-nCoV/Policy_brief/Mandatory_vaccination/2021.1

AR-04447

AR-04448

**Vaccines**

**Guidance Document**
**29 September 2021**

## Status of COVID-19 Vaccines within WHO EUL/PQ evaluation process

| | Manufacturer / WHO EUL holder | Name of Vaccine | NRA of Record | Platform | EOI accepted | Pre-submission meeting held | Dossier accepted for review* | Status of assessment** | Decision date*** |
|---|---|---|---|---|---|---|---|---|---|
| 1. |  BioNTech Manufacturing GmbH | BNT162b2/COMIRNATY Tozinameran (INN) | EMA | Nucleoside modified mRNA | ✓ | ✓ | ✓ | Finalized: Additional sites: – Baxter Oncology GmbH Germany (DP) – Novartis Switzerland – Mibe (Dermapharm) Germany (DP) – Delpharm, Saint-Remy FRANCE (DP) – Shelf life extension: 09 months at -70 to -90°C | 31/12/2020 30/06/2021 08/07/2021 16/07/2021 17/09/2021 20/09/2021 |
| | | | USFDA | | | | | Diluent suppliers: – Pfizer Perth, Australia/Fresenius Kabi, USA | 18/062021 |
| | | | | | | | ✓ | Finalized: – Pharmacia & Upjohn, Kalamazoo (DP)/PGS McPherson (DP) | 16/07/2021 16/07/2021 |
| 2. | | AZD1222 Vaxzevria | EMA | Recombinant ChAdOx1 adenoviral vector encoding the Spike protein antigen of the SARS-CoV-2. | ✓ | ✓ | ✓ | Core data finalized | 16 April 2021 |
| | | | | | | | ✓ | Finalized Additional sites: – SK-Catalent – Wuxi (DS) – Chemo Spain – Amylin Ohio US (DP) | 16 April 2021 30 April 2021 04 June 2021 23 July 2021 |
| 3. | AstraZeneca, AB | AZD1222 Vaxzevria | MFDS KOREA | Recombinant ChAdOx1 adenoviral vector encoding the Spike protein antigen of the SARS-CoV-2. | ✓ | ✓ | ✓ | Finalized | 15 Feb 2021 |
| 4. | | AZD1222 Vaxzevria | Japan MHLW/PMDA | Recombinant ChAdOx1 adenoviral vector encoding the Spike protein antigen of the SARS-CoV-2. | ✓ | ✓ | ✓ | Finalized Additional site | 09 July 2021 TBC |
| 5. | | AZD1222 Vaxzevria | Australia TGA | Recombinant ChAdOx1 adenoviral vector encoding the Spike protein antigen of the SARS-CoV-2. | ✓ | ✓ | ✓ | Finalized Additional site: Thailand | 09 July 2021 TBC |
| 6. | Serum Institute of India Pvt. Ltd | Covishield (ChAdOx1_nCoV-19) | DCGI | Recombinant ChAdOx1 adenoviral vector encoding the Spike protein antigen of the SARS-CoV-2. | ✓ | ✓ | ✓ | Finalized | 15 Feb 2021 |
| 7. | Janssen–Cilag International NV | Ad26.COV2.S | EMA | Recombinant, replication-incompetent adenovirus type 26 (Ad26) vectored vaccine encoding the (SARS-CoV-2) Spike (S) protein | ✓ | ✓ | ✓ | Core data finalized (US +NL sites) | 12 March 2021 |
| | | | | | | | Additional sites: - Merck, Durham, UK (DS) - Merck, West Point/PA (DP) | Finalized – Aspen RSA (DP) – Catalent Agnani Italy (DP) - Future submission - Future submission | -25 June 2021 - 02 July 2021 - As submitted - As submitted |

AR-04449

**Guidance Document
29 September 2021**

## Vaccines

| No. | Manufacturer | Product name | NRA | Description | Additional information submitted | Meetings | Rolling data | Status | Anticipated date |
|---|---|---|---|---|---|---|---|---|---|
| 8. | moderna / Moderna Biotech | mRNA-1273 | EMA | mRNA-based vaccine encapsulated in lipid nanoparticle (LNP) | ✓ | ✓ | ✓ | Finalized | 30 April 2021 |
| | | | USFDA | mRNA-based vaccine encapsulated in lipid nanoparticle (LNP) | ✓ | ✓ | ✓ | Finalized ModernaTx, Norwood (DS) - Catalent Indiana, LLC (DP) - Lonza Biologics, Inc. Portsmouth, USA (DS) - Baxter, Bloomington, USA (DP) | 06 August 2021 |
| 9. | Sinopharm / BIBP[2] Beijing Institute of Biological Products Co., Ltd. (BIBP) | SARS-CoV-2 Vaccine (Vero Cell), Inactivated (InCoV) | NMPA | Inactivated, produced in Vero cells | ✓ | ✓ | ✓ | Finalized 2 and 5 dose presentation (new manufacturing site) | 07 May 2021 TBC |
| 10. | Sinovac Sinovac Life Sciences Co., Ltd. | COVID-19 Vaccine (Vero Cell), Inactivated/ Coronavac™ | NMPA | Inactivated, produced in Vero cells | ✓ | ✓ | ✓ | Finalized 2 dose presentation | 01 June 2021 30 September 2021 |
| 11. | | Sputnik V | Russian NRA | Human Adenovirus Vector-based Covid-19 vaccine | Additional information submitted | Several meetings have been and continue to be held. | "Rolling" submission incomplete. | On hold, awaiting completion of rolling submission | October 2021 |
| 12. | BHARAT BIOTECH Bharat Biotech, India | SARS-CoV-2 Vaccine, Inactivated (Vero Cell)/ COVAXIN | DCGI | Whole-Virion Inactivated Vero Cell | ✓ | ✓ | Rolling data started 06 July 2021 | Ongoing | October 2021 |
| 13. | Sinopharm / WIBP[2] | Inactivated SARS-CoV-2 Vaccine (Vero Cell) | NMPA | Inactivated, produced in Vero cells | ✓ | ✓ | Rolling data started 23 July 2021 | Ongoing | To be confirmed (TBC) |
| 14. | CanSinoBIO | Ad5-nCoV | NMPA | Recombinant Novel Coronavirus Vaccine (Adenovirus Type 5 Vector) | ✓ | ✓ | Rolling data started 09 August 2021 | Ongoing | TBC |
| 15. | NOVAVAX | NVX-CoV2373/Covovax | EMA | Recombinant nanoparticle prefusion spike protein formulated with Matrix-M™ adjuvant. | ✓ | ✓ | Rolling data starting in August 2021 | Ongoing | TBC |
| 16. | SANOFI | CoV2 preS dTM-AS03 vaccine | EMA | Recombinant, adjuvanted | ✓ | ✓ | Rolling data started 30 July 2021 | Ongoing | TBC |
| 17. | SERUM INSTITUTE OF INDIA PVT. LTD. | NVX-CoV2373/Covovax | DCGI | Recombinant nanoparticle prefusion spike protein formulated with Matrix-M™ adjuvant. | ✓ | 10 August 2021 | Rolling data starting in August 2021 | Ongoing | TBC |
| 18. | Clover Biopharmaceuticals | SCB-2019 | NMPA | Novel recombinant SARS-CoV-2 Spike (S)-Trimer fusion protein | ✓ | ✓ | Rolling data starting 20 September | Ongoing | TBC |
| 19. | CUREVAC | Zorecimeran (INN) concentrate and solvent for dispersion for injection; Company code: CVnCoV/CV07050101 | EMA | mRNA-based vaccine encapsulated in lipid nanoparticle (LNP) | ✓ | Planned for Q4 of 2021, at request of the applicant. | | | |
| 20. | Vector State Research Centre of Virology and Biotechnology | EpiVacCorona | Russian NRA | Peptide antigen | Letter received not EOI. Reply sent on 15/01/2021 | | | | |



WHO PREQUALIFICATION — World Health Organization

## Vaccines

| | | | | | |
|---|---|---|---|---|---|
| 21. | Zhifei Longcom, China | Recombinant Novel Coronavirus Vaccine (CHO Cell) | NMPA | Recombinant protein subunit | Response to 2nd EOI sent 29 Jan 2021. Additional information requested |
| 22. | IMBCAMS, China | SARS-CoV-2 Vaccine, Inactivated (Vero Cell) | NMPA | Inactivated | Not accepted, still under initial development |
| 23. | BioCubaFarma - Cuba | Soberana 01, Soberana 02, Soberana Plus Abdala | CECMED | SARS-CoV-2 spike protein conjugated chemically to meningococcal B or tetanus toxoid or Aluminum | Awaiting information on strategy and timelines for submission. |

1. Beijing Institute of Biological Products Co Ltd
2. Wuhan Institute of Biological Products Co Ltd

\* Dossier Submission dates: more than one date is possible because of the rolling submission approach. Dossier is accepted after screening of received submission.
\*\*Status of assessment: 1. Under screening; 2. Under assessment; 3. Waiting responses from the applicant; 4. Risk-benefit decision 5. Final decision made
\*\*\*\* Anticipated decision date: this is only an estimate because it depends on when all the data is submitted under rolling submission and when all the responses to the assessors' questions are submitted.

Please send any questions you may have to: WHOEUL@who.int


WHO PREQUALIFICATION World Health Organization

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 131 of 298   PageID 4992



# COVID-19 vaccines

Equitable access to safe and effective vaccines is critical to ending the COVID-19 pandemic, so it is hugely encouraging to see so many vaccines proving and going into development. WHO is working tirelessly with partners to develop, manufacture and deploy safe and effective vaccines.

Safe and effective vaccines are a game-changing tool: but for the foreseeable future we must continue wearing masks, cleaning our hands, ensuring good ventilation indoors, physically distancing and avoiding crowds.

Being vaccinated does not mean that we can throw caution to the wind and put ourselves and others at risk, particularly because research is still ongoing into how much vaccines protect not only against disease but also against infection and transmission.

AR-04451

See WHO's landscape of COVID-19 vaccine candidates for the latest information on vaccines in clinical and pre-clinical development, generally updated twice a week. WHO's COVID-19 dashboard, updated daily, also features the number of vaccine doses administered globally, with more detail provided on the dedicated COVID-19 vaccination dashboard. At a regional level, there is an AFRO COVID-19 vaccines dashboard and a PAHO COVID-19 vaccines deliveries dashboard.

But it's not vaccines that will stop the pandemic, it's vaccination. We must ensure fair and equitable access to vaccines, and ensure every country receives them and can roll them out to protect their people, starting with the most vulnerable.

***You can follow the status of COVID-19 Vaccines within WHO EUL/PQ evaluation process here.***

# Learn more

**Public advice**

**Country readiness and delivery**

**Guidance**

**COVAX**

**ACT-Accelerator**

**SAGE Recommendations**

**Emergency use listing**

**COVID-19**

**Vaccine equity**

# Public Advice

# "Vaccines Explained" series

# Science in 5: COVID-19 questions answered

# Public advice on getting vaccinated

Vaccines explained series

Science in 5

Getting vaccinated

# Q&As

## Coronavirus disease (COVID-19): Vaccines

## Coronavirus disease (COVID-19): Vaccines safety

## Coronavirus disease (COVID-19): Vaccine access and allocation

## Coronavirus disease (COVID-19): Vaccine research and development

## Coronavirus disease (COVID-19): Use of Emergency Use Listing procedure for vaccines...

## Vaccines and immunization: What is vaccination?

## Vaccines and immunization: Vaccine safety

# COVAX and vaccine introduction

## COVAX

COVAX aims to accelerate the development and manufacturing of COVID-19 vaccines, and guarantee fair and equitable access for every country. COVAX is co-led by the Coalition for Epidemic Preparedness Innovations (CEPI), Gavi and WHO, with UNICEF as a key delivery partner and PAHO as the procurement agent in the Americas.

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 137 of 298   PageID 4998

## Country readiness and delivery

WHO has worked with UNICEF, Gavi and partners to develop resources, such as guidance, trainings, tools and advocacy materials to help governments, health workers and partners to launch, refine, and optimise uptake of their COVID-19 vaccination programmes.

## COVAX No fault compensation program

The COVAX No-Fault Compensation Program for Advance Market Commitment (AMC) Eligible Economies is the world's first and only international vaccine injury compensation mechanism. The Program helps COVAX deliver safe and effective COVID-19 vaccines to the high-risk and vulnerable populations in 92 low- and middle-income countries and economies.

# Regulation and policy

### Emergency Use Listing (EUL)

WHO's EUL procedure is a risk-based procedure for assessing and listing unlicensed vaccines, therapeutics and in vitro diagnostics with the ultimate aim of expediting the availability of these products to people affected by a public health emergency.

## Strategic Advisory Group of Experts (SAGE) on Immunization

SAGE advises WHO on overall global policies and strategies, ranging from vaccines and technology, research and development, to delivery of immunization and its linkages with other health interventions.

**Draft landscape of COVID-19 vaccine candidates**

The draft landscape of COVID-19 vaccine candidates contains information on vaccine candidates collected through public information (e.g. clinical trial registries) and information that were directly provided by vaccine developers to WHO. The landscape is generally updated twice a week, based on the latest information, including those we receive from scientists and research

# COVID-19 vaccines: product-by-product information

2 September 2021

**The Pfizer BioNTech (BNT162b2) COVID-19 vaccine: What you need to know**

2 September 2021

**The Sinopharm COVID-19 vaccine: What you need to know**

2 September 2021

**The Sinovac-CoronaVac COVID-19 vaccine: What you need to know**

2 September 2021

**The Janssen Ad26.COV2.S COVID-19 vaccine: What you need to know**

2 September 2021

**The Oxford/AstraZeneca COVID-19 vaccine: what you need to know**

2 September 2021

**The Moderna COVID-19 (mRNA-1273) vaccine: what you need to know**

# Latest vaccine news

All →

7 October 2021 | News release

## WHO, UN set out steps to meet world COVID vaccination targets

4 October 2021 | Statement

## Interim statement on booster doses for COVID-19 vaccination

24 September 2021 | Statement

## Global commitments on COVID-19 offer way forward but success depends on action being taken now

23 September 2021 | Joint News Release

## Global leaders commit further support for global equitable access to COVID-19 vaccines and COVAX

# Multimedia                                                                    All →

11 October 2021

## PAHO Vaccine COVAX

23 September 2021

## COVID-19 vaccines: race against time

23 September 2021

## Half a Fire

13 July 2021

## The pandemic is not over

# Feature stories

All →

11 August 2021
## Pasig City: A COVID-19 Vaccination Success Story

18 June 2021
## PAHO paving the way for COVID-19 vaccination in the Americas

1 March 2021
## The effects of virus variants on COVID-19 vaccines

26 February 2021
## Inside the Mammoth Undertaking of Global Vaccine Distribution

## Other resources

**Responsible media reporting on COVID-19 Vaccines**

**Vaccine Equity**

## Criteria for COVID-19 vaccine prioritization

The proposed attributes and criteria provide considerations for the evaluation and prioritization of COVID-19 candidate vaccines to be considered for further development by WHO. The target audience includes vaccine scientists, product developers, manufacturers, regulators and funding agencies.

Read More

## Vaccine target product profile

WHO has published the target product profiles for COVID-19 vaccines, which describes the preferred and minimally acceptable profiles for human vaccines for long term protection of persons at high ongoing risk of COVID-19, and for reactive use in outbreak settings with rapid onset of immunity. We have also published the criteria for prioritization of vaccines for clinical trials.

Read More

# Related health topics

Prevention & Safety

## Vaccines and immunization

Disease & conditions

## Coronavirus disease (COVID-19)

# Publications

<u>All →</u>

12 October 2021

## COVID-19 vaccine tracker and landscape

10 December 2020

## Evidence to recommendations for COVID-19 vaccines: Evidence framework

19 November 2020

AR-04468

## Temperature-sensitive health products in the Expanded Programme on Immunization cold chain

15 October 2020

## Behavioural considerations for acceptance and uptake of COVID-19 vaccines

6 October 2020

## What we know about COVID-19 vaccine development

13 September 2020

## WHO SAGE values framework for the allocation and prioritization of COVID-19 vaccination

9 September 2020

## Fair allocation mechanism for COVID-19 vaccines through the COVAX Facility



 Play Live Radio

PLAYLIST



DONATE

---

## Shots

---

CORONAVIRUS IN AMERICA: FAMILIES IN CRISIS

# With hospitals crowded from COVID, 1 in 5 American families delays health care

October 14, 2021 · 5:13 AM ET
Heard on Morning Edition

JAMES DAWSON

FROM 

**3-Minute Listen**       PLAYLIST    Download

Transcript



Voting has changed. Subscribe to the NPR Politics newsletter to keep up with the trends and how they'll shape the 2022 midterms.

What's your email?       SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 151 of 298   PageID 5012

Hospitals in Idaho, like St. Luke's Boise Medical Center in Boise, remain full after the summer delta surge pushed many to their limits.

*Kyle Green/AP*

Last month, Chelsea Titus, a 40-year-old mother of one in Boise, Idaho, needed surgery to relieve severe pain from endometriosis. But hospitals there are so full of unvaccinated COVID-19 patients that doctors told her she'd have to wait.

Nearly 1 in 5 American households has had to delay care for serious illnesses in the past few months, according to a new poll from NPR, the Robert Wood Johnson Foundation and the Harvard T.H. Chan School of Public Health.

Titus, who works for a tech company from the home she shares with her husband, her daughter and a labradoodle named Winston, previously had surgery for endometriosis in which doctors removed her uterus and one ovary. When the condition flared again in September, the pain was severe.

"Sometimes it feels like I am in active labor," she says.

Endometriosis affects millions of women in the U.S. when tissue that typically grows inside the uterus also grows outside it.

When the initial medication that Titus received didn't help, she reached out to her on-call doctor.

---

**Article continues after sponsor message**

# Voting has changed. Subscribe to the NPR Politics newsletter to keep up with the trends and how they'll shape the 2022 midterms.

How Leah Bolden went from carpenter to cre...

How Leah from carp

For more stories
YouTube's new p

*The Rise of the C*

What's your email?          SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

AR-04471

Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 152 of 298    PageID 5013

"He said, 'If the hospitals weren't in the situation they were in, I would have you in for surgery today,' " she recalls.

## The safety net is gone

The situation in Idaho's hospitals has become dire. The facilities are so full of mostly unvaccinated COVID-19 patients that many can no longer operate normally. Several hospitals have had to ration care.



Voting has changed. Subscribe to the NPR Politics newsletter to keep up with the trends and how they'll shape the 2022 midterms.

What's your email?                                                    SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

AR-04472

Case 2:21-cv-00229-Z   Document 39-8   Filed 11/28/21   Page 153 of 298   PageID 5014

Chelsea Titus

*Chelsea Titus/Boise State Public Radio*

Jim Souza, chief physician executive at the largest of Boise's hospitals, St. Luke's, describes his institution's typical high standards of care as the net that allows doctors to perform high-wire medical acts every day.

But now, "the net is gone and the people will fall from the wire," Souza says.

Idaho has one of the lowest COVID-19 vaccination rates in the United States.

"As cancer clinicians, we're really frustrated," says Dr. Dan Zuckerman, medical director for St. Luke's Cancer Institute.

Zuckerman says his staff has delayed surgery for some breast cancers that can likely be kept at an early and treatable stage with hormones.

"There's just no guarantees with that," he says, "and there will still be some cancers that biologically may break through."

Zuckerman now spends half his day at the hospital to help his overloaded colleagues and says he can see only half as many patients at the clinic.

Across town at Saint Alphonsus, Boise's slightly smaller hospital, another oncologist, Scott Pierson, says they haven't had to postpone any surgeries — yet.

But standard cancer screenings, like colonoscopies, have been pushed back.

## Voting has changed. Subscribe to the NPR Politics newsletter to keep up with the trends and how they'll shape the 2022 midterms.

"We're really starting to see a lot of downstream trends in screening," Pierson says.

The pulmonologists who usually perform lung biopsies at Saint Alphonsus, for example, are swamped right now, he says, trying to treat severe cases of COVID-19 in the intensive care unit.

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

AR-04473

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 154 of 298   PageID 5015

## Strained health care systems mean delayed care

Lots of Americans face delays like the ones in Idaho, says Robert Blendon, a pollster at the Harvard Chan School of Public Health.

"The numbers were much greater than we expected," Blendon says, "and the delta variant changed what was going on."

The survey he helped run found that nearly 1 in 5 U.S. households reported not being able to get treatment for a serious illness in the past few months; most of them said they had negative health outcomes because of that.

"This is the United States," Blendon says. "You don't expect people with serious illnesses to say they cannot be seen for care."

This data, he says, shows that health care systems need to boost their capacity ahead of the next pandemic or serious natural disaster.

While Boise-area hospitals are bursting with COVID-19 patients, they've also had a surge in demand from people who've already delayed care during the pandemic.

Pierson and Zuckerman say they've seen more advanced cancers than usual that could have been caught earlier; catching the malignancies sooner would likely have given patients a much higher chance of survival, they say.

Pierson says he has suggested to patients they might take a less intense form of chemotherapy so they're less likely to need a hospital bed if complications arise.

Meanwhile, though the immense pain Titus felt from her endometriosis was overwhelming, she says she couldn't get surgery anywhere in Boise to remove her remaining ovary.

**Voting has changed. Subscribe to the NPR Politics newsletter to keep up with the trends and how they'll shape the 2022 midterms.**

Her brother took the extraordinary step of chartering a private plane to take her to the California Bay Area for treatment instead.

| What's your email? | SUBSCRIBE |

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. This site is protected by reCAPTCHA and the Google privacy policy and terms of service apply.

"I guess I could have flown commercially, but it would've been really hard and embarrassing because I was, like, screaming in pain," she says.

AR-04474

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 155 of 298   PageID 5016

After landing, Titus went to an emergency room and an urgent care clinic and talked to multiple doctors before finding a surgeon in her insurance network with an open calendar.

Hotel rooms, a rental car and her flight home added up to thousands of dollars out of pocket — all for a surgery she could have had at a hospital just a few minutes' drive from her home in normal times.

She recognizes she's privileged to have been able to afford all she did to get treatment.

"It breaks my heart that most in Idaho don't have the ability to do that," Titus says.

And even so, it was nearly two weeks after first experiencing the severe pain that she was able to find relief.

"It's amazing how much better I feel," she said two days after her surgery.

But the situation has left her questioning just how much her friends and neighbors who have refused to wear masks or get the COVID-19 vaccine really care about their community — and whether she has a place in the state any longer.

"My husband and I used to say, 'We're never leaving Idaho,' " Titus says. "We love it here. It's an amazing place to live, and we've been looking at real estate in other states — because this just isn't OK."

covid 19     triage     endometriosis     doctors and nurses     hospitals

Voting has changed. Subscribe to the NPR Politics
More stories From NPR R up with the trends and how
they'll shape the 2022 midterms.

HEALTH
After a concussion, the brain may no longer make sense of sounds

What's your email?                                              SUBSCRIBE

HEALTH
By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station.
There's more demand for boosters than first shots of the COVID vaccine

AR-04475

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 156 of 298   PageID 5017

HEALTH
## COVID is still crushing parts of the U.S. as the holiday season approaches

HEALTH
## As constituents clamor for ivermectin, Republican politicians embrace their cause

HEALTH
## A doctor spread COVID misinformation and renewed her license with a mouse click

HEALTH
## Some parents want to wait to vaccinate their kids. Here's why doctors say do it now

# Popular on NPR.org

BUSINESS
## Biden's vaccine rules for 100 million workers are here. These are the details

INVESTIGATIONS
## Active-duty police in major U.S. cities appear on purported Oath Keepers rosters

SPORTS
## NBA launches investigation into Phoenix Suns owner after explosive ESPN report

NATIONAL
## Daylight saving time ends soon. Here are 4 things you should know

LAW
## Hours after the White House issues its new vaccine mandate, GOP-led states sue

WORLD
## Here's how India is celebrating Diwali

# NPR Editors' Picks

NATIONAL
## Prosecutors say the McMichaels chased Ahmaud Arbery for 5 minutes before killing him

## Voting has changed. Subscribe to the NPR Politics newsletter to keep up with the trends and how they'll shape the 2022 midterms.

POLITICS
## What stays and what's gone from Biden's spending bill (so far)

What's your email?     SUBSCRIBE

EDUCATION
## COMIC: If history is a guide, schools will start requiring COVID vaccines

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station.
See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

ANIMALS

AR-04476

ANIMALS
**The flamingo is in the running to replace the mockingbird as Florida's state bird**

MOVIES
**Dwayne Johnson vows to stop using real guns in film projects after 'Rust' tragedy**

LAW
**University of Florida allows professors to testify in a voting rights case after all**

## Shots

READ & LISTEN

**Home**

**News**

**Arts & Life**

**Music**

**Podcasts**

**Programs**

CONNECT

**Newsletters**

**Facebook**

**Twitter**

**Instagram**

**Press**

**Contact & Help**

ABOUT NPR

**Overview**

**Diversity**

**Ethics**

**Finances**

**Public Editor**

**Corrections**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**NPR Shop**

**NPR Events**

**NPR Extra**

terms of use

privacy

your privacy choices

text only

© 2021 npr

# Voting has changed. Subscribe to the NPR Politics newsletter to keep up with the trends and how they'll shape the 2022 midterms.

What's your email?

SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

AR-04477

AAMC

HEALTH CARE (/TOPIC/HEALTH-CARE)  |  WORKFORCE (/TOPIC/WORKFORCE)

## "Worst surge we've seen": Some hospitals in delta hot spots close to breaking point

**Bridget Balch**, Staff Writer

August 24, 2021

Unvaccinated people are being hospitalized with COVID-19 at alarming rates, and hospitals are struggling to care for them.

In Houston, ambulances with patients in need of urgent care have been idling for hours ☑ (https://www.click2houston.com/news/local/2021/08/10/our-emergency-departments-are-overcrowded-ambulances-seeing-longer-wait-times-at-houston-hospitals-as-covid-cases-surge/) outside emergency departments. In New Orleans, COVID-19 hospitalizations have already eclipsed last winter's peak. And in Tampa, doctors who normally work in outpatient settings are making rounds as hospitalists.

Leaders at teaching hospitals in regions currently facing COVID-19 surges driven by the highly infectious delta variant describe the situation in their hospitals as the worst it's been during the pandemic, despite hopes earlier this summer that the vaccination of large portions of the elderly and most vulnerable populations would keep hospitalizations in check.

"Hospitals are approaching a breaking point," says James McDeavitt, MD, executive vice president and dean of clinical affairs at Baylor College of Medicine in Houston.

Despite more than 70% of adults in the country having received at least one COVID-19 vaccine dose and 81% of people 65 and older ☑ (https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-onedose-pop-pop18) being vaccinated, a dramatic spike in infections among unvaccinated younger people, coupled with staffing shortages, is testing the surge plans hospital systems developed for previous waves.

"This fourth surge is now becoming the worst surge we've seen," says Leonardo Seoane, MD, senior vice president and chief academic officer for Ochsner Health in New Orleans and associate vice chancellor of academics at LSU Health Shreveport. "The team is feeling like it's another Hurricane Katrina."

### Hospitalization rates spiking

In the United States, hospitalizations due to COVID-19 reached a rate of 3.43 per 100,000 people ☑ (https://covid.cdc.gov/covid-data-tracker/#new-hospital-admissions) as of Aug. 16, the highest it's been since January though still below the winter peak of almost 5 per 100,000 people.

But the hospitalizations are far from evenly distributed. The two U.S. Department of Health and Human Services-designated health regions that include the Southern and Southwestern states — including Florida, Louisiana, and Texas — are recording hospitalization rates at least twice as high as any other health region, according to data from the Centers for Disease Control and Prevention ☑ (https://covid.cdc.gov/covid-data-tracker/#new-hospital-admissions) .

Texas reached a hospitalization rate of nearly 6 per 100,000 people in mid-August, Louisiana had almost 8 per 100,000, and Florida reached a pandemic high of more than 10 per 100,000 people, nearly double the rate it experienced during last winter's surge.

"At Tampa General, we're busier than we've ever been," says Charles Lockwood, MD, senior vice president of USF Health in Tampa, Florida, and dean of the USF Health Morsani College of Medicine.

Although deaths from COVID-19 have stayed low compared with earlier in the pandemic — thanks in part to better treatment protocols and the vaccination of older, sicker people — those who are being hospitalized now are younger, and some did not have medical conditions that put them at higher risk.

"The average age of admission has dropped by more than a decade," McDeavitt says.

**"The new risk factor [for severe, life-threatening COVID-19] is, 'I'm not vaccinated.'"**

AR-04478

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 159 of 298   PageID 5020

Charles Fox, MD, chief medical officer for Ochsner/LSU Health System of North Louisiana

At Ochsner Health in New Orleans, the average age of patients admitted for COVID-19 is 50, and hospitals are seeing more people in their 20s, 30s, and 40s. In Shreveport last week, six patients were on extracorporeal membrane oxygenation (ECMO) machines, which bypass the heart and lungs of the sickest patients to give their bodies a chance to rest.

"It's the most we've ever had," says Charles Fox, MD, chief medical officer for Ochsner/LSU Health System of North Louisiana. "I don't think anyone is over 45, and four had no risk factors.

"The new risk factor is, 'I'm not vaccinated.'"

These COVID-19-related hospitalizations are on top of all the non-COVID-19 hospitalizations, which administrators say have also increased, in part because some people put off medical care earlier in the pandemic.

"I suspect a lot of people didn't get medical care during 2020," says Kencee Graves, MD, associate chief medical officer and associate professor of hospital medicine and palliative medicine at the University of Utah Health. "We need to be able to care for those that need us. COVID absolutely makes that harder."

Even in places that are not experiencing steep COVID-19 surges, like New Mexico and Utah, hospitals are strained.

"At UNM [University of New Mexico] hospitals, we are experiencing very high volumes of patients. We're well over capacity," says Irene Agostini, MD, chief medical officer of UNM Hospital in Albuquerque. "We've been seeing an enormous influx of patients from around the state. … We're surmising that these people can't be cared for at the more rural hospitals."

## Staffing challenges

"The main difference [between this surge and previous ones] is that we are very challenged because of staffing," says Roberto de la Cruz, MD, chief medical officer of Parkland Health and Hospital System in Dallas. On a recent weekend, the health system had to close more than two dozen beds because there weren't enough nurses to staff them all.

Across the United States, health care workers — particularly nurses and respiratory therapists — have been quitting their jobs due to burnout or trauma from watching so many patients die ⤢ (https://www.reuters.com/world/us/us-nurses-covid-19-grief-pours-out-online-i-just-dont-want-watch-anyone-else-die-2021-08-06/) or to pursue other opportunities.

Some nurses have quit their jobs ⤢ (https://www.texastribune.org/2021/08/05/texas-hospitals-nurses-covid/) to work in higher-paying markets or to sign up with traveling nursing agencies, which contract with hospitals and often offer higher compensation.

"Health care providers never got a break," McDeavitt says. "We've had nurses say, 'I quit; I'm going home; I can't do this anymore.' We're seeing people just resign because they've had enough."

Many nurses, particularly those with young children, have decided they don't want to go through another year of trying to arrange child care and are even more worried about infecting their kids as more children are getting sicker from the delta variant, says Fox.

And with vaccines now available that largely prevent hospitalization from COVID-19, many health care workers are feeling particularly frustrated by continually seeing unvaccinated people suffer with the disease.

**"Health care providers never got a break. We've had nurses say, 'I quit; I'm going home; I can't do this anymore.' We're seeing people just resign because they've had enough."**

James McDeavitt, MD, executive vice president and dean of clinical affairs at Baylor College of Medicine in Houston

"We're having to go through tremendous sacrifice — deal with death and dying, the emotional toll for a completely preventable disease," Seoane says.

Hospitals are now looking to state and federal governments to help call in reinforcements, in some cases by deploying military nurses ⤢ (https://www.militarytimes.com/news/your-military/2021/08/17/military-deploying-medical-assistance-teams-to-battle-covid-19-surges/) to overwhelmed regions or by providing funding for traveling nurse contracts. But in the meantime, they are having to stretch their resources.

AR-04479

Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 160 of 298    PageID 5021

This means in some areas, intensive care units that would normally have one nurse to every one or two patients will now have one nurse tending to three patients, McDeavitt says. In other places, medical residents are treating more COVID-19 patients than early in the pandemic, and medical students are helping with tasks such as communicating with the families of patients and staffing clinics to free up nursing staff for more critical care.

"[The students] really are more engaged than ever, and they are really helping us," Fox says.

But many health care leaders worry that as K-12 schools reconvene this month, potentially driving up case counts even more, the strain will only increase, putting those health care workers who remain on the front lines at even more risk of burning out.

"They leave their families every day, work long hours, they're dedicated in their work," Seoane says. "They seem indefatigable, [but] the truth is … [they] can only run on adrenaline for so long."

**A plea for solidarity**

As COVID-19 cases continue to rise, hospital administrators worry that even worse days are ahead for their hospital systems and are pleading with the public to change their behavior to control the spread of the virus.

They are forging ahead with efforts to vaccinate those who remain unvaccinated. At Parkland Health and Hospital System in Dallas, clinicians get an alert if the patient they are seeing is unvaccinated to remind them to talk with them about any concerns or questions they might have about the vaccines. In Shreveport, health officials enlisted the help of players from the New Orleans Saints NFL team to promote vaccination. And in Tampa, they are doubling down on community outreach programs to vaccinate people in communities that have low vaccination rates, particularly people living in rural areas and Black and Latino people.

The efforts are paying off. Louisiana and Florida have seen upticks in vaccinations over the past month. In Louisiana, the seven-day average of vaccine doses administered has more than doubled, from 7,741 on July 20 to 15,919 on Aug. 17. Florida increased its seven-day-average doses from 42,476 on July 20 to 68,239 on Aug. 16, although that number dropped again in recent days, <u>according to CDC data</u> ☑ (https://covid.cdc.gov/covid-data-tracker/#vaccination-trends_vacctrends-total-daily) .

But the relief the vaccines will provide may not come soon enough. Hospital leaders are urging the public to band together in solidarity, not only for their own health and the health of those around them, but for the health care workers being pushed to their limits.

"We need masks and social mitigation, and the public needs to change their behavior; that's the only thing that's going to decrease hospitalizations over the next three weeks," Seoane says. "We don't have four to five weeks [to wait for vaccines to take effect]. The hospitals would absolutely be overrun.

"The public seems to go about their day-to-day life without any concept of what a true crisis this is."



Association of
American Medical Colleges

655 K Street, NW, Suite 100 Washington, DC, 20001-2399

© 2021 AAMC

AR-04480

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 161 of 298   PageID 5022

 Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™



COVID-19

# Science Brief: SARS-CoV-2 Infection-induced and Vaccine-induced Immunity

Updated Oct. 29, 2021

This brief provides an overview of the current scientific evidence regarding infection-induced and vaccine-induced immunity, including both peer-reviewed and preprint publications, as well as unpublished CDC data. Although comprehensive, it is neither a formal systematic review nor meta-analysis. New data continue to emerge, and recommendations will be updated periodically, as needed.

Recovery from many viral infectious diseases is followed by a period of infection-induced immunologic protection against reinfection. This phenomenon is widely observed with many respiratory viral infections, including both influenza and the endemic coronaviruses, for which acquired immunity also wanes over time making individuals susceptible to reinfection.

CDC continues to recommend COVID-19 vaccination for all eligible persons, including those who have been previously infected with SARS-CoV-2.

## Executive Summary

Key findings and considerations for this brief are as follows:

- Available evidence shows that fully vaccinated individuals and those previously infected with SARS-CoV-2 each have a low risk of subsequent infection for at least 6 months. Data are presently insufficient to determine an antibody titer threshold that indicates when an individual is protected from infection. At this time, there is no FDA-authorized or approved test that providers or the public can use to reliably determine whether a person is protected from infection.
  - The immunity provided by vaccine and prior infection are both high but not complete (i.e., not 100%).
  - Multiple studies have shown that antibody titers correlate with protection at a population level, but protective titers at the individual level remain unknown.
  - Whereas there is a wide range in antibody titers in response to infection with SARS-CoV-2, completion of a primary vaccine series, especially with mRNA vaccines, typically leads to a more consistent and higher-titer initial antibody response.
  - For certain populations, such as the elderly and immunocompromised, the levels of protection may be decreased following both vaccination and infection.
  - Current evidence indicates that the level of protection may not be the same for all viral variants.
  - The body of evidence for infection-induced immunity is more limited than that for vaccine-induced immunity in terms of the quality of evidence (e.g., probable bias towards symptomatic or medically-attended infections) and types of studies (e.g., observational cohort studies, mostly retrospective versus a mix of randomized controlled trials, case-control studies, and cohort studies for vaccine-induced immunity). There are insufficient data to extend the findings related to infection-induced immunity at this time to persons with very mild or asymptomatic infection or children.

AR-04481

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 162 of 298   PageID 5023

- Substantial immunologic evidence and a growing body of epidemiologic evidence indicate that vaccination after infection significantly enhances protection and further reduces risk of reinfection, which lays the foundation for CDC recommendations.

# Background

CDC recommends COVID-19 vaccination for all eligible persons, including those who have been previously infected with SARS-CoV-2 [1]. As of October 28, 2021, more than 45 million COVID-19 cases and over 740,000 deaths have been reported in the United States (US) [2]. Data from a seroprevalence survey that assessed for presence of antibodies and history of vaccination among US blood donors from January to August 2021 suggest that approximately half of previously infected adults in the US have not been vaccinated [3].

Both SARS-CoV-2 infection and COVID-19 vaccination induce an immune response that initially confers high levels of protection against symptomatic COVID-19 illness. This brief contains a review of evidence regarding vaccine-induced immunity and infection-induced immunity, including the initial immune response, antibody decay kinetics, protection from subsequent infection, impact of new variants, and effect of vaccinating previously infected individuals.

Separate overviews have been written on the types of assays used to assess the serologic response to SARS-CoV-2 (Interim Guidelines for COVID-19 Antibody Testing | CDC) and detailed evidence of the immunity provided specifically by vaccines (Science Brief: COVID-19 Vaccines and Vaccination).

# Immune Response to Infection and Vaccination

## Initial Immune Response to Infection

SARS-CoV-2 enters cells by binding to angiotensin converting enzyme-2 (ACE-2) receptors on the cell surface via the viral spike protein. As described in the Antibody Testing Guidelines, currently available serologic assays measure both overall production of antibodies against SARS-CoV-2 antigenic targets (binding antibodies) and functional ability to neutralize the SARS-CoV-2 virus via virus neutralization or pseudovirus neutralization tests (neutralizing antibodies). The antigenic targets most frequently assessed include those to the spike (S) protein, receptor binding domain (RBD) of the spike protein and nucleocapsid (N) core. IgM, IgA, and IgG isotypes may be developed against any of these antigens. As discussed below, serum binding antibodies to S and RBD and neutralizing antibodies have all been shown to correlate with protection against symptomatic SARS-CoV-2 infection.

SARS-CoV-2 infection induces a robust humoral and cellular immune response [4-8]. SARS-CoV-2-specific IgA and IgG have been detected from both mucosal sites and the serum of infected individuals [8]. IgM, IgA, and IgG can be detected in the blood 5–15 days following symptom onset or a positive reverse transcriptase polymerase chain reaction (RT-PCR) test, with IgM typically appearing first [6, 9]. IgM antibodies peak within the first few weeks following symptom onset, then fall below detectable limits 2–3 months after infection [6, 9, 10]. IgA antibodies also decrease rapidly, with some studies noting a return to undetectable levels within the first 3 months following infection [9]. IgG antibodies are more durable, though waning is also noted as described below. SARS-CoV-2-specific memory B- and T-cells also begin to appear within the first month following infection [11].

The vast majority of persons with SARS-CoV-2 infection generate detectable anti-SARS-CoV-2 antibodies, with multiple studies reporting seroconversion rates of 90% or higher [10, 12]. One large population-based study reported a lower seroconversion rate of 76%, though, among those who did not seroconvert in this study, only 21% reported symptoms, and authors noted that only 34% had strong evidence of a true-positive PCR [13]. Among individuals who seroconvert following infection with SARS-CoV-2, substantial heterogeneity exists, with a 200-fold difference in peak antibody titers noted in some studies [11].

AR-04482

Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 163 of 298    PageID 5024

Multiple factors contribute to the degree of immune response mounted following infection. Both binding and neutralizing antibody titers rise faster and reach a higher peak in persons with more severe COVID-19 [9, 10, 14]. People with symptomatic SARS-CoV-2 infection tend to have higher antibody titers than people who are asymptomatic, and people who are hospitalized tend to have higher antibody titers than people managed as outpatients [9, 10, 15, 16]. Studies have also demonstrated a correlation between cycle threshold (Ct) value and antibody titer, with lower Ct values being associated with higher antibody titers at the population level [9, 13].

Most studies did not find a relationship between sex and level of peak binding or neutralizing antibody titer. Increasing age has been associated with decreased likelihood of seroconversion [13] but higher peak antibody titers among those who do seroconvert [10, 11, 13, 15]. Lower rates of seroconversion have also been reported in persons with hematologic malignancies or receiving certain immunosuppressive medications [17, 18]. Data on the impact of other medical conditions is more variable and often confounded by the increased risk of severe disease in persons with certain underlying medical conditions.

## Initial Immune Response to Vaccination

As of October 28, 2021, approximately 92% of people who have been vaccinated in the United States received one of two FDA-approved or authorized mRNA vaccines (Pfizer/BNT1272b2 and Moderna/mRNA-1273), and 8% received an adenovirus vector vaccine (Janssen/Ad26.COV2.S) [2]. Both vaccine types are designed to elicit an immune response against the spike protein that is required for SARS-CoV-2 binding, fusion, and cell entry. Consequently, vaccination induces the production of anti-S and anti-RBD binding and neutralizing antibodies in the blood, but not anti-N antibodies. Similar to infection, vaccines result in early production of serum IgA, IgM, and IgG antibodies [19, 20], and also induce long-lasting memory B- and T-cell responses [19, 21-23].

In immunogenicity analyses completed during phase I/II vaccine trials, 100% of participants developed both binding and neutralizing antibodies following vaccination with Pfizer-BioNTech and Moderna vaccines, and 90% of participants developed binding and neutralizing antibodies following vaccination with the Janssen vaccine [24-26]. Whereas there is a wide range in antibody titers in response to infection with SARS-CoV-2, completion of a primary vaccine series, especially with mRNA vaccines, typically leads to a more consistent, and higher-titer initial antibody response [24, 26-29]. However, similar to infection, this immune response may be decreased in older and immunosuppressed persons. Decreased rates of vaccine-induced seroconversion have been reported among persons with a variety of immune suppressing conditions, including those on certain immunosuppressive medications, post-solid organ transplant, and with hematologic cancers [30-34]. Studies have also found that persons aged 65-80 years and above have significantly lower peak anti-S and neutralizing antibody titers following vaccination than persons less than 65 years [35-40]. This is of particular concern given the increased risk of severe disease in older and immunosuppressed populations [41, 42].

## Correlation of Immune Response Metrics to Protection

Multiple correlate-of-protection studies have demonstrated that higher antibody titers are associated with decreased risk of subsequent symptomatic SARS-CoV-2 infection. Data from both the phase 3 AZD1222 and mRNA-1273 vaccine efficacy trials demonstrated that quantitative titers of anti-S IgG, anti-RBD IgG, and pseudovirus and SARS-CoV-2 neutralizing antibody tests all correlate with protection against symptomatic infection (though not asymptomatic infection), with neutralizing antibodies having the strongest correlation in both of these studies [43, 44].

Analysis of data across studies has been difficult due to a lack of standardization of serologic assays [45]. Two different studies used data from seven vaccine efficacy studies (standardized against mean convalescent plasma titers) and one convalescent plasma/reinfection study to model effectiveness as a function of antibody titer [46, 47]. These found a high degree of correlation between mean peak neutralizing antibody titers and anti-S IgG binding antibodies within a population, and overall decrease in risk of infection. One study estimated that neutralizing antibody titers amounting to only 20% of the mean convalescent plasma neutralizing antibody titer (54 international units/ml using the WHO standard) correlated with a 50% reduction in infection risk; this appeared robust in predicting the effectiveness of vaccines not included in the model [46, 48]. Of note, the level of antibody associated with protection against severe disease was much lower than the level required to provide protection against infection, with only 3% of the mean convalescent antibody titer level correlating with 50% protection against severe disease [46].

AR-04483

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 164 of 298   PageID 5025

Other immune mechanisms are also important in preventing SARS-CoV-2 infection and limiting COVID-19 illness severity, although their direct correlation with protection is less defined at this time. A study of rhesus macaques found that adaptive transfer of plasma with high titers of neutralizing antibodies was sufficient to protect from infection following a SARS-CoV-2 challenge. However, depleting CD8+ T cells compromised their ability to prevent infection once neutralizing antibodies had waned [49]. Analysis of antibody, B-cell and T-cell responses in acutely infected and convalescent humans has shown that protection depends on coordination of all three components of the immune response [50]. In the mRNA-1273 phase 3 clinical trial described above, investigators estimated that 68.5% (95% CI 58.5–78.4) of the protective effect of vaccination could be attributed to initial neutralization titers with some degree of protection occurring following vaccination, even when neutralization titers were not detected [43]. These, along with studies noted above, suggest that, while the magnitude of antibody response following infection or vaccination is correlated with protection and the absence of antibody with risk, antibody test results (particularly when not standardized nor quantitative) provide only a partial picture of an individual's immune response. At this time there is no specific antibody test or antibody threshold that can determine an individual's risk of subsequent infection.

# Immune Response Kinetics and Duration of Protection

## Immune Response Kinetics Following Infection

Antibody titers peak within 3-5 weeks following infection and then begin to wane in a manner that varies by individual, target antigen, antibody isotype, and assay used [6, 51]. Anti-N antibodies appear to wane fastest, followed by anti-RBD, then anti-S antibodies. Although at least 30% of persons may lose detectable anti-N antibodies within 10 months after infection, anti-S and overall SARS-CoV-2-specific IgG remain detectable in approximately 90% of persons who seroconvert up to 10 months to one year post-infection [16, 52]. Neutralizing antibodies appear to have a biphasic decline with an initial half-life of 2–3 months followed by a slower decline [11, 14, 15]. (**Table 1**)

For at least 2–3 months following infection, people with moderate-to-severe COVID-19 illness have higher titers of binding and neutralizing antibodies than people with mild illness [9, 14]; these differences may persist for 5–8 months following infection [11, 15].

B cells targeting SARS-CoV-2 increase in the first month and then remain at higher concentrations for at least 8 months post infection [11, 14, 53]. SARS-CoV-2-specific CD4+ T cells increase then decline with a half-life of approximately 3-7 months; CD8+ T cell measurements varied with at least one study reporting virtually no decline over the initial 4 months post-infection [11, 14]. (**Table 1**).

## Protection from Reinfection in Cohort Studies

Multiple studies have compared the incidence of reinfection and primary infection during a specific time period to evaluate the level and duration of protection provided by initial infection with SARS-CoV-2. **Table 2** summarizes data from seven observational cohort studies from six countries, each with >10,000 participants, assessing the risk of reinfection over time. Five studies used RT-PCR positivity to define initial infection. In these studies, primary RT-PCR-confirmed SARS-CoV-2 infection decreased risk of subsequent infection by 80–93% for at least 6–9 months [54-58]. Studies specifically assessing persons seropositive with anti-N and anti-S antibodies following infection [16, 45] found slightly higher protective effects (89–93%). Most studies had a mean or median follow-up period of approximately 7 months; the longest reported follow-up was 12 months post-infection [58]. Three studies included sub-analysis to assess if the protection waned over time; none of these found a decline in protection within the follow-up period [54, 55, 57].

It is important to note that all of these studies were observational and all but two were retrospective. Low availability of testing early in the pandemic may have biased these studies toward populations that were more likely to have had symptomatic or medically attended primary infection. Most were unable to control for any potential differences in test- or healthcare-seeking behaviors between previously infected and naïve persons, though a large proportion of the reinfections reported across the studies were asymptomatic infections (**Table 2**). In one of the prospective cohort studies, over 25,000 healthcare workers were

AR-04484

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 165 of 298   PageID 5026

tested using RT-PCR testing every 2 weeks, allowing a more comprehensive ascertainment of reinfections. This study found that a history of previous RT-PCR-confirmed infection provided 93% protection against a subsequent symptomatic infection, 52% protection against asymptomatic infection, and 84% protection against overall infection with SARS-CoV-2 [54].

Many of these studies were completed just as vaccination was being rolled out in their respective countries, which makes it challenging to follow up and determine when immunity after infection wanes and what markers best predict this waning. Based on the trajectory of antibody decline, researchers have predicted that the immune response following infection would continue to provide at least 50% protection against reinfection for 1–2 years following initial infection with SARS-CoV-2 or vaccination [13, 46]. This would be similar to what is observed with seasonal coronaviruses [59]. Further epidemiologic analyses are needed to confirm these hypotheses.

Of note, these studies occurred when the ancestral strain and Alpha variant were the predominantly circulating variants. There is evidence that protection may decrease in the setting of more transmissible variants of concern (VoC) and variants being monitored (VBM), as discussed below.

## Immune Response Kinetics Following Vaccination

Anti-S, anti-RBD and neutralizing antibodies remain detectable at least 6–8 months following vaccination [21, 22, 60]. Neutralizing titers following vaccination with the mRNA-1273 vaccine are estimated to decay with a half-life of 68–202 days, whereas binding anti-RBD antibodies decline with a half-life of 52–109 days [60]. These rates of antibody decay overlap with those reported for convalescent individuals (as shown in Table 1), though at least one preprint study reported less rapid decay among people recovered from infection compared with those vaccinated with BNT162b2 [28]. As with infection, the protective effect of vaccine-induced immunity is also supported by longer-term components of the humoral response, including memory B cells [21, 23, 61]; vaccine-induced CD4+ and CD8+ T cells continue to be relatively stable up to 6–8 months following vaccination [21, 61].

Although some studies have reported a faster decay of antibodies in persons 65 years or older, as compared to persons less than 65 years, lower anti-S and neutralizing antibodies at 2–6 months post vaccination appear to be at least partially attributable to lower peak antibody titers in this population [39, 40]. Nursing home residents are a unique population given age, co-morbidity, and congregate-setting associated risks. One study reported that detectable pseudovirus neutralization fell from 84% to 30% among nursing home residents (median age: 76 years, age range: 48–100 years) between 2 weeks and 6 months following vaccination; this was significantly faster than the rate of decline reported among staff-member controls (median age: 48 years, age range: 26 –76 years), 81% of whom continued to have detectable neutralization at 6 months post-vaccination [42].

## Duration of Immune Protection from Vaccination

Evidence is still accruing regarding the duration of protection following vaccination. Using antibody kinetics, one model predicted that an initial vaccine effectiveness of 90% would likely decline to approximately 70% around 250 days post-vaccination [46], not accounting for other factors such as non-serologic components of the immune response or the impact of new circulating variants.

Both Pfizer-BioNTech and Moderna released data from their phase 3 trials reporting overall high efficacy of mRNA vaccines against laboratory confirmed SARS-CoV-2 infection 5-6 months following vaccination. Pfizer-BioNTech reported an overall vaccine efficacy of 91% against infection and 97% against severe disease 6 months after vaccination with BNT162b2, though also reported a gradual decline in efficacy against infection from 96% at 7 days–2 months to 84% at 4–6months [62]. Moderna reported 93% efficacy at a median of 5 months after vaccination with mRNA-1273, without further details on the rate of decline in efficacy over time [63].

As described in greater detail in CDC's COVID-19 Vaccine and Vaccination Science Brief and in a October 2021 Advisory Committee on Immunization Practices presentation    , recent studies have demonstrated waning of both antibody titers and vaccine effectiveness against infection over time, especially among older populations [42, 64]. Decreased vaccine effectiveness may

AR-04485

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 166 of 298   PageID 5027

reflect a combination of waning antibody titers and decreased neutralizing capacity in the setting of widespread circulation of variants with partial immune escape. Notably, multiple studies have found that vaccine effectiveness against hospitalization and/or severe disease continues to be high, ranging from 84–96%, up to 6 months following vaccination [65-68].

# Impact of Variants on Infection- and Vaccine-induced Immunity

Variants of SARS-CoV-2 have emerged with multiple mutations in the spike protein that can result in decreased neutralization by antibodies, including those induced by either prior infection or vaccination [19, 69].

There is laboratory evidence that persons previously infected with the original lineage of SARS-CoV-2 have reduced neutralizing antibody titers against certain variants (i.e., Beta, Gamma, and Delta variants) [70-73]. One study found that among 367 unvaccinated persons assessed 12 months after infection, 98% had detectable anti-S IgG and 91% had neutralizing antibodies against wild-type virus. By comparison, among a subset of 78 persons assessed for neutralizing antibodies against particular variants, these were detectable in 84%, 68%, and 55% for Alpha, Delta, and Beta variants respectively [72]. Of note, absence of neutralization activity was higher among people reporting mild infection versus those with severe disease [72].

In studies examining neutralization from convalescent sera and vaccinated individuals together, the relative reduction in neutralization appears to be similar across both groups. A number of studies reported a 2- to 4-fold reduction in neutralization against Delta and a 6-fold (or higher) reduction in neutralization against Beta but minimal decreased neutralization against Alpha, as compared to the original SARS-CoV-2 lineage, for both convalescent and vaccinated individuals [70, 74, 75].

Decreased neutralization against Delta parallels reduced vaccine effectiveness against infection, but effectiveness remains high against hospitalization or severe disease [65, 66]. As highlighted in the COVID-19 Vaccine and Vaccination Science Brief, recent studies from the United States, United Kingdom, and Qatar have reported vaccine effectiveness of 54–85% against SARS-CoV-2 infection compared with 90–100% against hospitalization/severe disease during periods of widespread circulation of Delta [65, 76-78]

# Comparison of Infection- and Vaccine-induced Immune Responses

A systematic review and meta-analysis including data from three vaccine efficacy trials and four observational studies from the US, Israel, and the United Kingdom, found no significant difference in the overall level of protection provided by infection as compared with protection provided by vaccination; this included studies from both prior to and during the period in which Delta was the predominant variant [79]. In this review, the randomized controlled trials appeared to show higher protection from mRNA vaccines whereas the observational studies appeared to show protection to be higher following infection.

A more recent analysis of data from a network of 187 hospitals in the United States found that, among more than 7,000 COVID-19–like illness hospitalizations whose prior infection or vaccination occurred 90–179 days beforehand, there was a 5.5 times higher odds of laboratory-confirmed COVID-19 among previously infected patients than among fully vaccinated patients [80]. This study included data on persons more recently infected and/or vaccinated than the studies in the systematic review, though the authors noted one limitation of the design was the potential of missing testing that may have occurred outside of the healthcare network.

The Office of National Statistics in the United Kingdom used data from a large-scale longitudinal community survey of COVID-19 to compare the risk of infection among fully vaccinated, partially vaccinated, unvaccinated/previously infected, and unvaccinated/uninfected persons during two different periods 1) when Alpha was the predominant variant (December 2020–May 2021) and 2) when Delta was the predominant variant (May–August 2021) [81]. Based on results that included over 26,000 RT-PCR positive tests, they found full vaccination to provide the greatest protection during the Alpha predominant period (79% vs. 65% reduction in risk), but equivalent protection from full vaccination and infection during the Delta predominant period (67% vs. 71% reduction in risk).

AR-04486

Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 167 of 298    PageID 5028

# Vaccine-induced Immune Responses after Previous Infection

Although there appears to be varying evidence regarding the relative protection that occurs after surviving COVID-19 as compared with completing vaccination, there is substantial immunologic and increasing epidemiologic evidence that vaccination following infection further increases protection against subsequent illness among those who have been previously infected.

## Immunologic Data on Vaccination Following Infection

There is clear evidence that neutralizing antibody and memory B cell response elicited by a single dose of mRNA vaccine following previous infection with SARS-CoV-2 results in an increased antibody titer that is approximately equivalent to a two-dose vaccine regimen in individuals who were not previously infected (**Table 3**) [22, 23, 82-89]. In one study of healthcare workers vaccinated 7–11 months after infection with SARS-CoV-2, antibody titers measured 6 days following their first vaccination dose were twice as high as the antibody titers measured the month after their initial infection, and were able to neutralize wild-type, Alpha, and Beta variants, irrespective of vaccine type, number of doses, or pre-vaccination antibody titers [90].

## Risk of Reinfection in Unvaccinated vs. Vaccinated Individuals with a History of Infection

In studies directly comparing risk of reinfection among previously infected individuals who were never vaccinated versus individuals who were vaccinated after infection, most, but not all, studies show a benefit of vaccination. One retrospective cohort study described risk of reinfection from December 2020–May 2021 among 2,579 US-based healthcare users previously infected with SARS-CoV-2, about 47% of whom were vaccinated over the course of the study. Investigators did not detect any cases of reinfection, regardless of vaccination status during 5 months of observation and so could not detect a benefit of vaccination [91]. In contrast, a case-control study conducted among 738 residents of Kentucky with reported infection during March–December 2020 found that previously infected persons who were unvaccinated had 2.3 times greater odds of reinfection during May–June 2021 than previously infected but vaccinated individuals [92]. Both studies occurred before Delta became the dominant variant in the United States.

More recent observational cohort studies including over 700,000 health system users in Israel and over 11,000 healthcare workers in India reported that history of prior infection provided greater protection from subsequent infection than vaccination alone, but overall risk of infection was lowest among those that were vaccinated following infection during periods of Delta predominance [93, 94]. In the systematic review described above, a pooled analysis across seven studies showed a modest but significant increase in protection from infection when previously infected individuals were vaccinated [79].

# Limitations

This review summarizes characteristics of infection- and vaccine-induced immune responses, evidence regarding duration of immunity, and the potential impact of circulating variants. The approach was limited in scope focusing primarily on articles that were published in high-impact journals or novel in their findings; therefore, this does not represent a systematic review of all the scientific literature on SARS-CoV-2 infection-induced immunity. Particular biases related to observational study designs have been discussed above. The majority of studies included in this review came from a small number of countries, often with limited diversity in participants. Many of the immunologic studies did not include detailed demographic data. More consistent inclusion of descriptive data about demographics of participating populations (e.g., race/ethnicity, socioeconomic status, educational attainment) and conscious efforts to improve the racial, ethnic, and social diversity of participants in studies would be of great benefit in ensuring that related policies address the needs of all populations.

# Conclusions

AR-04487

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 168 of 298   PageID 5029

Multiple studies in different settings have consistently shown that infection with SARS-CoV-2 and vaccination each result in a low risk of subsequent infection with antigenically similar variants for at least 6 months. Numerous immunologic studies and a growing number of epidemiologic studies have shown that vaccinating previously infected individuals significantly enhances their immune response and effectively reduces the risk of subsequent infection, including in the setting of increased circulation of more infectious variants.

Although the Delta variant and some other variants have shown increased resistance to neutralization by both post-infection and post-vaccination sera in laboratory studies, observed reduction in effectiveness has been modest, with continued strong protection against hospitalization, severe disease, and death.

Multiple studies have shown that antibody titers correlate with protection at a population level; however, data are presently insufficient to determine an antibody titer threshold that indicates if an individual is protected from infection. At this time, there is no FDA-authorized or approved test that providers or the public can use to reliably determine whether a person is protected from infection.

CDC will continue to follow and evaluate evolving scientific evidence in these areas and update recommendations accordingly.

Table 1: Duration of various immune markers after infection, multiple studies

| Immune marker | Half-life/Duration | Citation |
|---|---|---|
| Anti-nucleocapsid IgG | 63–85 days | [11, 14, 15, 53] |
| Anti-spike IgG | 126–229 days | [11, 13-15, 52, 53] |
| Anti-receptor binding domain | 83–126 days | [11, 14, 53] |
| Neutralizing Abs | 55 days (at <70 days post infection), then 519 days 150 days (at >42 days), then 254 days (at>120 days post symptom onset) | [14] [53] |
| Pseudovirus neutralization | 90–114 days | [11] |
| Memory B Cells | Increased over initial 4 months, then sustained | [11] [53] |
| CD4+ T Cells | Increased over first month then declined with half-life of 94–207 days | [11, 14, 53] |
| CD8+ T-Cells | Increased over first month then declined with half-life of 125–690 days | [11, 14, 53] |

TTable 2: Summary of cohort studies with N>10,000 and population-level observational studies on reinfection, multiple locations

| Study Design/ Location | Population/Sample Size | Definition of initial infection | Follow-up period | Definition of reinfection | Key Findings | Citation |
|---|---|---|---|---|---|---|

AR-04488

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 169 of 298   PageID 5030

| Study Design/ Location | Population/Sample Size | Definition of initial infection | Follow-up period | Definition of reinfection | Key Findings | Citation |
|---|---|---|---|---|---|---|
| Multicenter prospective cohort (SIREN) with routine RT-PCR and antibody testing every 2-4 weeks United Kingdom | Healthcare workers (HCWs) Median age: 46 yrs (Range: 18–84yrs) (N = 25,661) | RT-PCR or antibody positive (n = 8278) | Enrolled: Jun–Dec 2020 Data extracted Feb 2021 | RT-PCR positive >90 days following previous positive RT-PCR or >4 weeks following prior positive antibody test (further classified as confirmed, probable, or possible from clinical review) | Incidence of reinfections: 7.6 per 100,000 person-days compared to 57.3 for per 100,000 person-days for primary infections SARS-CoV-2 infection offered 84% protection against infection (93% against symptomatic infection) at 7-months following primary infection Mean interval to reinfection was 200 days 50% of cases were symptomatic | [54] |
| National-level observational study Denmark | Individuals tested nationally during 1st wave (N = 525,339) | RT-PCR positive during the 1st wave (Mar–May 2020) (n = 11,068) | Assessed for reinfections during 2nd wave (Sep –Dec 2020 | RT-PCR positive during the 1st and 2nd wave (or subsequent positive >90 days later in alternative analysis) | Protection against repeat infection was 80.5% overall; 47.1% in persons >65years (in alternate analysis) No difference found when comparing 3-6 months to >7 months of follow-up | [55] |

AR-04489

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 170 of 298   PageID 5031

| Study Design/ Location | Population/Sample Size | Definition of initial infection | Follow-up period | Definition of reinfection | Key Findings | Citation |
|---|---|---|---|---|---|---|
| Retrospective observational study (national reporting system) Austria | Compared "COVID-19 survivors" from first wave to general population (N~8.9 million) | Positive RT-PCR during 1st wave (Feb to April 2020) excluding deaths (n = 14,840) | Assessed for reinfections during 2nd wave (Sep –Nov 2020) | RT-PCR positive during 1st and 2nd wave (did not track infections that occurred from May to Aug 2020) | Odds ratio (OR) for reinfection amongst COVID-19 survivors compared to general population was .09 Mean time to reinfection was 212 days Noted 5 hospitalizations and one death amongst 40 "tentative" reinfections, though death was thought to be unrelated | [56] |
| Retrospective cohort study (health system) United States | Healthcare users tested for COVID-19 from Mar to Aug 2020 Mean age: 51 years (SD: 22 years) (N = 150,325) | RT-PCR positive prior to Aug 30, 2020 (n=8,845) | Initial testing: Mar –Aug 2020 Follow-up through Feb 2021 | RT-PCR positive ≥90 days after initial positive test | Protection against repeat infection was 81.8% overall and 84.5% against symptomatic infection Average time to reinfection was 139 days; protection increased over time 50% of possible reinfections were symptomatic | [57] |

AR-04490

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 171 of 298   PageID 5032

| Study Design/ Location | Population/Sample Size | Definition of initial infection | Follow-up period | Definition of reinfection | Key Findings | Citation |
|---|---|---|---|---|---|---|
| Population-level observational study (using laboratory-system) Italy | Healthcare users Median age: 59 years (Range: 0-108 years) (N = 15,078) | RT-PCR positive during 1st wave (Feb –Jul 2020) (n = 1579) | Mean follow-up: 280 days | RT-PCR positive test >90 days after resolution of first infection (with at least 2 consecutive negative tests in-between) | Incidence of reinfections: 1.0 per 100,000 person days compared to 15.1 per 100,000 person days for primary infections Incidence rate ratio (IRR) 0.07 (93% reduction in risk) Mean interval between primary infection and reinfection was >230 days Of 5 reinfections, 1 required hospitalization | [58] |

AR-04491

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 172 of 298   PageID 5033

| Study Design/ Location | Population/Sample Size | Definition of initial infection | Follow-up period | Definition of reinfection | Key Findings | Citation |
|---|---|---|---|---|---|---|
| National-level observational study (using national laboratory) Qatar | Individuals with testing data in centralized national database, from April to Dec 2020 Median age: 35-38 years (N = 192,967) | Antibody positive from Apr –Dec 2020 (n = 43,044) | Median follow-up: 16.3 weeks (range: 0–34 weeks) | RT-PCR-positive >14 days after infection, assessed clinically for evidence of reinfection and then adjusted for proportion that were able to be confirmed as genetically distinct in paired genomic sequencing | Calculated incidence rate of reinfection as 0.66 per 10,000 person-weeks compared to 13.69 per 10,000 person weeks for primary infection Amongst antibody-positive individuals, protection was estimated at 95.2% for up to 7 months of follow-up Incidence of reinfections did not increase with time Reinfections were less severe than primary infections (none were critical or fatal) | [95] |
| Prospective Cohort United Kingdom | HCWs at four Oxford University teaching hospitals Median age: 38 years (Range: 18-86 years) (N = 12,541) | Anti-S IgG positive (n = 1265) | Initial testing: Mar 2020 Follow-up until Nov 2020 (31 weeks) | RT-PCR positive 60 days or more after their first positive antibody test or RT-PCR test | Incidence of reinfection: 0.13 per 10,000 days at risk compared to 1.09 per 10,000 days at risk for seronegative participants aIRR of 0.11 (89% reduction in risk) All reinfections were asymptomatic | [96] |

Table 3: Selected studies evaluating the immune response to a 1st and 2nd dose of mRNA vaccine following previous infection

AR-04492

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 173 of 298   PageID 5034

| Participants | Effect of 1st dose if previously infected vs. 2nd dose if SARS-CoV-2 naïve | Effect of if previously infected, 2nd dose vs. 1st dose | Notes | Citation |
|---|---|---|---|---|
| SARS-CoV-2 naïve (n=33) or previously infected (n=11; 65–275d prior); similar age and sex distribution who received two doses of Pfizer-BioNTech or Moderna vaccine | Antibody and memory B cell responses 2 weeks after 1st dose similar to SARS-CoV-2 naïve participants 1 week after 2nd dose | No increase in overall or neutralizing antibodies, or spike-specific memory B cells | Included assessment of response to B.1.351 variant | [22] |
| Study within cohort of participants who were SARS-CoV-2 naïve (n=490 post dose 1, n=228 post dose 2) or previously infected (n=35 post dose 1, n=11 post dose 2) | Anti-RBD IgG no difference ≤21d post 1st dose than for SARS-CoV-2 naïve participants ≤21d after 2nd dose (10.0 [9.2–10.4] vs. 9.9 [9.4-10.3) | No difference in Anti-RBD IgG (10.2[8.4−10.5] vs. 9.9 [9.4−10.3]) | Sensitivity analysis including participants with data at all time points found similar results. Timing of previous infections not specified. | [86] |
| Study within cohort of participants who were SARS-CoV-2 naïve (n=67 post dose 1, n=36 post dose 2) with previously infected (n=43 post dose 1, n=19 post dose 2) | Median anti-spike IgG 6-fold higher after 2nd dose than SARS-CoV-2 naïve participants after 1st dose | No increase in antibody titers after 2nd dose | Assay measured by area under the curve; antibody levels 10–45 times higher at baseline if previous infection. Timing was soon after 2nd dose but was unspecified; timing of prior infection is also unknown. | [88] |
| Group receiving 2 doses of Pfizer-BioNTech vaccine, either previously infected (n=6, 2–7 months post-infection) or SARS-CoV-2 naïve (n=9) | Neutralizing anti-RBD IgG at day 7 post 1st vaccine dose in previously infected group no different to day 7 post 2nd dose in uninfected group (GMT, 95% CI: 906, 552–1348 vs. 670, 364–1228, p = NS) | Results chart indicates no difference between antibody titers after 1st vs. 2nd dose (numbers not provided) | | [87] |
| Healthcare workers infected a median of 2 months previously (n=18), 9 months previously (n=19) or SARS-CoV-2 naïve (n=73) who received 2 doses of Pfizer-BioNTech vaccine. | (not assessed) | No substantial difference in binding assay (0.92-fold) or neutralizing titers (1.17-fold) between 21d after 1st dose and 28 days after 2nd dose | Similar antibody responses after vaccine by whether previous infection was ~2 months or ~9 months previously | [82] |

AR-04493

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 174 of 298   PageID 5035

| | | | | |
|---|---|---|---|---|
| Cohort of recipients of Pfizer-BioNTech vaccine previously infected (n=51; 25 in 1st wave, 26 in 2nd wave) or SARS-CoV-2 naïve (n=50) | Irrespective of time since infection, previously infected recipients had higher spike-specific IgG and pseudovirus neutralization than previously uninfected after 2nd dose. | Neutralization did not increase between 1st and 2nd doses. | This study noted similar trends for IgA, IgM, and IgG. There is limited information on timing of tests after vaccine doses. | [85] |
| Group of recipients of Pfizer-BioNTech vaccine previously infected (n=23; 1–9 months after infection) or uninfected (n=23) | Higher IFN-gamma 20 d after 1st dose if previous infection than 20d after 2nd if no previous infection | IFN-gamma declines after 2nd dose (but boosted after 1st dose) | IFN-gamma from CD4+ T cells assessed to SARS-CoV-2 spike and peptide pools. Note that a separate analysis indicates natural infection drives IFN-gamma responses more than vaccine-induced immunity. | [84] |
| Recipients of Pfizer-BioNTech vaccine, 1 dose if previously infected (n=43; 17 with severe illness 12 months prior; 17 with mild illness 12 months prior; 9 with mild illness 6 months prior); or 2 doses if SARS-CoV-2 naïve * (n=25) | Two months after 2nd dose without previous infection, similar antibody levels but lower neutralization against variants, lower proportion of anti-spike B cells that were anti-RBD, and less diverse responses. Neutralizing B-cell clones were present but less common without infection. | (Not assessed) | Stable IgG and memory B-cells 6 to 12 months after infection. | [23] |
| Recipients of Pfizer-BioNTech or Moderna vaccine, anti-nucleocapsid negative (n=148) or positive (n=20; mostly by RT-PCR) | Similar titers of anti-spike antibody if previously infected ~21 days post dose 1 compared with ~66 days after dose 2 if SARS-CoV-2 naïve. | No increase in median anti-spike or anti-RBD titers. However, no. post infection with neutralizing antibodies increased from 10/15 to 12/15 and varied by individual. | Timing of RT-PCR positive tests is unclear. | [89] |

# References

1. CDC. *Preparing for Your COVID-19 Vaccination*. 2021 [cited 2021 September 29]; Available from: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/prepare-for-vaccination.html.

2. CDC. *COVID Data Tracker*. 2021 [cited 2021 Sept 12, 2021]; Available from: https://covid.cdc.gov/covid-data-tracker/#datatracker-home. [accessed October 29, 2021]

3. Jones, J., *Percent population with antibodies due to vaccination only, vaccination and infection, or infection only (unpublished)*. 2021, Centers for Disease Control and Prevention.

4. Cromer, D., et al., *Prospects for durable immune control of SARS-CoV-2 and prevention of reinfection*. Nature Reviews Immunology, 2021. **21**(6): p. 395-404.

AR-04494

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 175 of 298   PageID 5036

5.  Grigoryan, L. and B. Pulendran, *The immunology of SARS-CoV-2 infections and vaccines.* Semin Immunol, 2020. **50**: p. 101422.

6.  Post, N., et al., *Antibody response to SARS-CoV-2 infection in humans: A systematic review.* PLoS One, 2020. **15**(12): p. e0244126.

7.  Shrotri, M., et al., *T cell response to SARS-CoV-2 infection in humans: A systematic review.* PLoS One, 2021. **16**(1): p. e0245532.

8.  Cervia, C., et al., *Systemic and mucosal antibody responses specific to SARS-CoV-2 during mild versus severe COVID-19.* J Allergy Clin Immunol, 2021. **147**(2): p. 545-557 e9.

9.  Roltgen, K., et al., *Defining the features and duration of antibody responses to SARS-CoV-2 infection associated with disease severity and outcome.* Sci Immunol, 2020. **5**(54).

10. Gudbjartsson, D.F., et al., *Humoral Immune Response to SARS-CoV-2 in Iceland.* N Engl J Med, 2020. **383**(18): p. 1724-1734.

11. Dan, J.M., et al., *Immunological memory to SARS-CoV-2 assessed for up to 8 months after infection.* Science, 2021. **371**(6529).

12. Wang, H., et al., *Dynamics of the SARS-CoV-2 antibody response up to 10 months after infection.* Cell Mol Immunol, 2021. **18** (7): p. 1832-1834.

13. Wei, J., et al., *Anti-spike antibody response to natural SARS-CoV-2 infection in the general population.* medRxiv, 2021: p. 2021.07.02.21259897.

14. Wheatley, A.K., et al., *Evolution of immune responses to SARS-CoV-2 in mild-moderate COVID-19.* Nat Commun, 2021. **12**(1): p. 1162.

15. Lumley, S.F., et al., *The Duration, Dynamics, and Determinants of Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Antibody Responses in Individual Healthcare Workers.* Clin Infect Dis, 2021. **73**(3): p. e699-e709.

16. He, Z., et al., *Seroprevalence and humoral immune durability of anti-SARS-CoV-2 antibodies in Wuhan, China: a longitudinal, population-level, cross-sectional study.* Lancet, 2021. **397**(10279): p. 1075-1084.

17. Roeker, L.E., et al., *Anti-SARS-CoV-2 antibody response in patients with chronic lymphocytic leukemia.* Leukemia, 2020. **34**(11): p. 3047-3049.

18. Cattaneo, C., et al., *Production and persistence of specific antibodies in COVID-19 patients with hematologic malignancies: role of rituximab.* Blood Cancer Journal, 2021. **11**(9): p. 151.

19. Wang, Z., et al., *mRNA vaccine-elicited antibodies to SARS-CoV-2 and circulating variants.* Nature, 2021. **592**(7855): p. 616-622.

20. Campillo-Luna, J., A.V. Wisnewski, and C.A. Redlich, *Human IgG and IgA responses to COVID-19 mRNA vaccines.* medRxiv, 2021: p. 2021.03.23.21254060.

21. Barouch, D.H., et al., *Durable Humoral and Cellular Immune Responses Following Ad26.COV2.S Vaccination for COVID-19.* medRxiv, 2021: p. 2021.07.05.21259918.

22. Goel, R.R., et al., *Distinct antibody and memory B cell responses in SARS-CoV-2 naïve and recovered individuals after mRNA vaccination.* Science Immunology, 2021. **6**(58).

23. Sokal, A., et al., *Memory B cells control SARS-CoV-2 variants upon mRNA vaccination of naive and COVID-19 recovered individuals.* bioRxiv, 2021: p. 2021.06.17.448459.

24. Jackson, L.A., et al., *An mRNA Vaccine against SARS-CoV-2 — Preliminary Report.* New England Journal of Medicine, 2020. **383**(20): p. 1920-1931.

25. Sadoff, J., et al., *Interim Results of a Phase 1–2a Trial of Ad26.COV2.S Covid-19 Vaccine.* New England Journal of Medicine, 2021. **384**(19): p. 1824-1835.

26. Walsh, E.E., et al., *Safety and Immunogenicity of Two RNA-Based Covid-19 Vaccine Candidates.* New England Journal of Medicine, 2020. **383**(25): p. 2439-2450.

27. Thornburg, N., *Unpublished Data.* 2021, CDC.

28. Israel, A., et al., *Large-scale study of antibody titer decay following BNT162b2 mRNA vaccine or SARS-CoV-2 infection.* medRxiv, 2021: p. 2021.08.19.21262111.

AR-04495

29. Lombardi, A., et al., *Mini Review Immunological Consequences of Immunization With COVID-19 mRNA Vaccines: Preliminary Results.* Frontiers in Immunology, 2021. **12**(677).

30. Thakkar, A., et al., *Seroconversion rates following COVID-19 vaccination among patients with cancer.* Cancer Cell, 2021. **39**(8): p. 1081-1090.e2.

31. Aslam, S., et al., *Clinical effectiveness of COVID-19 vaccination in solid organ transplant recipients.* Transpl Infect Dis, 2021: p. e13705.

32. Lee, A.R.Y.B., et al., *Efficacy of COVID-19 vaccines in immunocompromised patients: A systematic review and meta-analysis.* medRxiv, 2021: p. 2021.09.28.21264126.

33. Schietzel, S., et al., *Humoral and cellular immune responses upon SARS-CoV-2 vaccines in patients with anti-CD20 therapies: A systematic review and meta-analysis of 1342 patients.* medRxiv, 2021: p. 2021.09.30.21264335.

34. Negahdaripour, M., et al., *Administration of COVID-19 vaccines in immunocompromised patients.* Int Immunopharmacol, 2021. **99**: p. 108021.

35. Jabal, K.A., et al., *Impact of age, ethnicity, sex and prior infection status on immunogenicity following a single dose of the BNT162b2 mRNA COVID-19 vaccine: real-world evidence from healthcare workers, Israel, December 2020 to January 2021.* Eurosurveillance, 2021. **26**(6): p. 2100096.

36. Wall, E.C., et al., *Neutralising antibody activity against SARS-CoV-2 VOCs B.1.617.2 and B.1.351 by BNT162b2 vaccination.* The Lancet, 2021. **397**(10292): p. 2331-2333.

37. Canaday, D.H., et al., *Reduced BNT162b2 mRNA vaccine response in SARS-CoV-2-naive nursing home residents.* Clin Infect Dis, 2021.

38. Müller, L., et al., *Age-dependent Immune Response to the Biontech/Pfizer BNT162b2 Coronavirus Disease 2019 Vaccination.* Clinical Infectious Diseases, 2021.

39. Shrotri, M., et al., *Spike-antibody waning after second dose of BNT162b2 or ChAdOx1.* The Lancet, 2021. **398**(10298): p. 385-387.

40. Levin, E.G., et al., *Waning Immune Humoral Response to BNT162b2 Covid-19 Vaccine over 6 Months.* New England Journal of Medicine, 2021.

41. Brodin, P., *Immune determinants of COVID-19 disease presentation and severity.* Nature Medicine, 2021. **27**(1): p. 28-33.

42. Canaday, D.H., et al., *Significant reduction in humoral immunity among healthcare workers and nursing home residents 6 months after COVID-19 BNT162b2 mRNA vaccination.* medRxiv, 2021: p. 2021.08.15.21262067.

43. Gilbert, P.B., et al., *Immune Correlates Analysis of the mRNA-1273 COVID-19 Vaccine Efficacy Trial.* medRxiv, 2021: p. 2021.08.09.21261290.

44. Frenck, R.W., et al., *Safety, Immunogenicity, and Efficacy of the BNT162b2 Covid-19 Vaccine in Adolescents.* New England Journal of Medicine, 2021. **0**(0): p. null.

45. Gundlapalli, A.V., et al., *SARS-CoV-2 Serologic Assay Needs for the Next Phase of the US COVID-19 Pandemic Response.* Open Forum Infectious Diseases, 2020. **8**(1).

46. Khoury, D.S., et al., *Neutralizing antibody levels are highly predictive of immune protection from symptomatic SARS-CoV-2 infection.* Nature Medicine, 2021: p. 1-7.

47. Earle, K.A., et al., *Evidence for antibody as a protective correlate for COVID-19 vaccines.* Vaccine, 2021. **39**(32): p. 4423-4428.

48. Kristiansen, P.A., et al., *WHO International Standard for anti-SARS-CoV-2 immunoglobulin.* Lancet, 2021. **397**(10282): p. 1347-1348.

49. McMahan, K., et al., *Correlates of protection against SARS-CoV-2 in rhesus macaques.* Nature, 2021. **590**(7847): p. 630-634.

50. Rydyznski Moderbacher, C., et al., *Antigen-Specific Adaptive Immunity to SARS-CoV-2 in Acute COVID-19 and Associations with Age and Disease Severity.* Cell, 2020. **183**(4): p. 996-1012.e19.

51. Peluso, M.J., et al., *SARS-CoV-2 antibody magnitude and detectability are driven by disease severity, timing, and assay.* Sci Adv, 2021. **7**(31).

52. Alfego, D., et al., *A population-based analysis of the longevity of SARS-CoV-2 antibody seropositivity in the United States.* EClinicalMedicine, 2021. **36**: p. 100902.

AR-04496

53. Cohen, K.W., et al., *Longitudinal analysis shows durable and broad immune memory after SARS-CoV-2 infection with persisting antibody responses and memory B and T cells.* Cell Rep Med, 2021. **2**(7): p. 100354.

54. Hall, V.J., et al., *SARS-CoV-2 infection rates of antibody-positive compared with antibody-negative health-care workers in England: a large, multicentre, prospective cohort study (SIREN).* Lancet, 2021. **397**(10283): p. 1459-1469.

55. Hansen, C.H., et al., *Assessment of protection against reinfection with SARS-CoV-2 among 4 million PCR-tested individuals in Denmark in 2020: a population-level observational study.* Lancet, 2021. **397**(10280): p. 1204-1212.

56. Pilz, S., et al., *SARS-CoV-2 re-infection risk in Austria.* Eur J Clin Invest, 2021. **51**(4): p. e13520.

57. Sheehan, M.M., A.J. Reddy, and M.B. Rothberg, *Reinfection Rates among Patients who Previously Tested Positive for COVID-19: a Retrospective Cohort Study.* Clin Infect Dis, 2021.

58. Vitale, J., et al., *Assessment of SARS-CoV-2 Reinfection 1 Year After Primary Infection in a Population in Lombardy, Italy.* JAMA Intern Med, 2021.

59. Edridge, A.W.D., et al., *Seasonal coronavirus protective immunity is short-lasting.* Nature Medicine, 2020. **26**(11): p. 1691-1693.

60. Doria-Rose, N., et al., *Antibody Persistence through 6 Months after the Second Dose of mRNA-1273 Vaccine for Covid-19.* New England Journal of Medicine, 2021. **384**(23): p. 2259-2261.

61. Goel, R.R., et al., *mRNA Vaccination Induces Durable Immune Memory to SARS-CoV-2 with Continued Evolution to Variants of Concern.* bioRxiv, 2021: p. 2021.08.23.457229.

62. Thomas, S.J., et al., *Six Month Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine.* medRxiv, 2021: p. 2021.07.28.21261159.

63. Moderna, I., *Moderna Reports Second Quarter Fiscal Year 2021 Financial Results and Provides Business Updates.* 2021.

64. Nanduri, S., et al., *Effectiveness of Pfizer-BioNTech and Moderna Vaccines in Preventing SARS-CoV-2 Infection Among Nursing Home Residents Before and During Widespread Circulation of the SARS-CoV-2 B.1.617.2 (Delta) Variant – National Healthcare Safety Network, March 1-August 1, 2021.* MMWR Morb Mortal Wkly Rep, 2021. **70**(34): p. 1163-1166.

65. Tartof, S.Y.a.s., Jeff M. and Fischer, Heidi and Hong, Vennis and Ackerson, Bradley K. and Ranasinghe, Omesh N. and Frankland, Timothy B. and Ogun, Oluwaseye A. and Zamparo, Joann M. and Gray, Sharon and Valluri, Srinivas R. and Pan, Kaijie and Angulo, Frederick J. and Jodar, Luis and McLaughlin, John M., A, *Six-Month Effectiveness of BNT162B2 mRNA COVID-19 Vaccine in a Large US Integrated Health System: A Retrospective Cohort Study.* Preprints with The Lancet, 2021.

66. Tenforde, M.W., et al., *Sustained Effectiveness of Pfizer-BioNTech and Moderna Vaccines Against COVID-19 Associated Hospitalizations Among Adults – United States, March-July 2021.* MMWR Morb Mortal Wkly Rep, 2021. **70**(34): p. 1156-1162.

67. Rosenberg, E.S., et al., *New COVID-19 Cases and Hospitalizations Among Adults, by Vaccination Status – New York, May 3-July 25, 2021.* MMWR Morb Mortal Wkly Rep, 2021. **70**(34): p. 1150-1155.

68. Chemaitelly, H., et al., *Waning of BNT162b2 Vaccine Protection against SARS-CoV-2 Infection in Qatar.* New England Journal of Medicine, 2021.

69. Harvey, W.T., et al., *SARS-CoV-2 variants, spike mutations and immune escape.* Nature Reviews Microbiology, 2021. **19**(7): p. 409-424.

70. Planas, D., et al., *Reduced sensitivity of SARS-CoV-2 variant Delta to antibody neutralization.* Nature, 2021. **596**(7871): p. 276-280.

71. Souza, W.M., et al., *Neutralisation of SARS-CoV-2 lineage P.1 by antibodies elicited through natural SARS-CoV-2 infection or vaccination with an inactivated SARS-CoV-2 vaccine: an immunological study.* Lancet Microbe, 2021.

72. Haveri, A., et al., *Persistence of neutralizing antibodies a year after SARS-CoV-2 infection.* medRxiv, 2021: p. 2021.07.13.21260426.

73. Tang, J., et al., *Reduced neutralization of SARS-CoV-2 variants by convalescent plasma and hyperimmune intravenous immunoglobulins for treatment of COVID-19.* bioRxiv, 2021: p. 2021.03.19.436183.

74. Sapkal, G.N., et al., *Neutralization of Delta variant with sera of Covishield vaccinees and COVID-19 recovered vaccinated individuals.* bioRxiv, 2021: p. 2021.07.01.450676.

AR-04497

75. Edara, V.-V., et al., *Infection and Vaccine-Induced Neutralizing-Antibody Responses to the SARS-CoV-2 B.1.617 Variants.* New England Journal of Medicine, 2021. **385**(7): p. 664-666.

76. Fowlkes, A., et al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020-August 2021.* MMWR Morb Mortal Wkly Rep, 2021. **70**(34): p. 1167-1169.

77. Tang, P., et al., *BNT162b2 and mRNA-1273 COVID-19 vaccine effectiveness against the Delta (B.1.617.2) variant in Qatar.* medRxiv, 2021: p. 2021.08.11.21261885.

78. Lopez Bernal, J., et al., *Effectiveness of Covid-19 Vaccines against the B.1.617.2 (Delta) Variant.* New England Journal of Medicine, 2021. **385**(7): p. 585-594.

79. Shenai, M.B., R. Rahme, and H. Noorchashm, *Equivalency of Protection from Natural Immunity in COVID-19 Recovered Versus Fully Vaccinated Persons: A Systematic Review and Pooled Analysis.* medRxiv, 2021: p. 2021.09.12.21263461.

80. Bozio CH, G.S., Naleway AL, , *Laboratory-confirmed COVID-19 among adults hospitalized with COVID-19–like illness with infection-induced or mRNA vaccine-induced SARS-CoV-2 immunity—nine states, January–September 2021.* MMWR – Morbidity & Mortality Weekly Report, 2021. **70**.

81. (ONS), O.f.N.S., *Coronavirus (COVID-19) Infection Survey Technical Article: Impact of vaccination of testing positive in the UK: October 2021.* 2021: United Kingdom.

82. Appelman, B., et al., *Time Since SARS-CoV-2 Infection and Humoral Immune Response Following BNT162b2 mRNA Vaccination.* 2021, Social Science Research Network: Rochester, NY.

83. Bousquet, J., *Antibody response after one and two doses of the BNT162b2 vaccine in nursing home residents: The CONsort-19 study.*

84. Camara, C., et al., *Differential effects of the second SARS-CoV-2 mRNA vaccine dose on T cell immunity in naïve and COVID-19 recovered individuals.* bioRxiv, 2021: p. 2021.03.22.436441.

85. Carbonare, L., *Antibody response to BTN162b2 mRNA vaccination in naïve versus SARS-CoV-2 infected subjects with and without waning immunity.* 2021.

86. Ebinger, J.E., et al., *Antibody responses to the BNT162b2 mRNA vaccine in individuals previously infected with SARS-CoV-2.* Nature Medicine, 2021. **27**(6): p. 981-984.

87. Gobbi, F., et al., *Antibody Response to the BNT162b2 mRNA COVID-19 Vaccine in Subjects with Prior SARS-CoV-2 Infection.* Viruses, 2021. **13**(3): p. 422.

88. Krammer, F., et al., *Antibody Responses in Seropositive Persons after a Single Dose of SARS-CoV-2 mRNA Vaccine.* New England Journal of Medicine, 2021. **384**(14): p. 1372-1374.

89. Narowski, T.M., et al., *SARS-CoV-2 mRNA Vaccine Induces Robust Specific and Cross-reactive IgG and Unequal Strain-specific Neutralizing Antibodies in Naïve and Previously Infected Recipients.* bioRxiv, 2021: p. 2021.06.19.449100.

90. Gallais, F., et al., *Anti-SARS-CoV-2 Antibodies Persist for up to 13 Months and Reduce Risk of Reinfection.* medRxiv, 2021: p. 2021.05.07.21256823.

91. Shrestha, N.K., et al., *Necessity of COVID-19 vaccination in previously infected individuals.* medRxiv, 2021: p. 2021.06.01.21258176.

92. Cavanaugh, A.M., et al., *Reduced Risk of Reinfection with SARS-CoV-2 After COVID-19 Vaccination – Kentucky, May-June 2021.* MMWR Morb Mortal Wkly Rep, 2021. **70**(32): p. 1081-1083.

93. Gazit, S., et al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections.* medRxiv, 2021: p. 2021.08.24.21262415.

94. Murugesan, M.a.M., Prasad and Paul, Hema and Karthik, Rajiv and Mammen, Joy John and Rupali, Priscilla, *Protective Effect Conferred by Prior Infection and Vaccination on COVID-19 in a Healthcare Worker Cohort in South India.* . Preprints with The Lancet, 2021.

95. Abu-Raddad, L.J., et al., *SARS-CoV-2 antibody-positivity protects against reinfection for at least seven months with 95% efficacy.* EClinicalMedicine, 2021. **35**: p. 100861.

AR-04498

96. Lumley, S.F., et al., *Antibody Status and Incidence of SARS-CoV-2 Infection in Health Care Workers.* New England Journal of Medicine, 2020. **384**(6): p. 533-540.

Last Updated Oct. 29, 2021
Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases

AR-04499


Centers for Disease
Control and Prevention

# Nursing Home COVID–19 Vaccination Data Dashboard

## Overview

Long-term care facilities (LTCF) report COVID-19 data to CDC's National Healthcare Safety Network (NHSN), including weekly vaccination data for residents and healthcare personnel (HCP). The LTCF COVID-19 Module enables assessment of COVID-19 vaccination coverage through facility-reported information, including **counts of residents and healthcare personnel, or staff, who received any COVID-19 vaccine**.

CDC began collecting weekly vaccination data through the LTCF COVID-19 Module on December 14, 2020, as a voluntary reporting system. The Centers for Medicare & Medicaid Services (CMS) established COVID-19 vaccination reporting requirements for nursing homes effective May 13, 2021 (see: Federal Register ). Detailed information about vaccination reporting requirements, including details about a grace period prior to enforcement, can be found in CMS memo QSO-21-19-NH . The CMS reporting requirement only applies to CMS-certified nursing homes (i.e., skilled nursing facilities and/or nursing facilities).

**This page displays data at the national and state level on COVID-19 vaccination coverage among residents and staff of CMS-certified nursing homes.** These summaries represent data that nursing homes reported to the NHSN LTCF COVID-19 Module using weekly vaccination forms.

CDC updates this data dashboard weekly on Thursday at 8:00 am Eastern. As a result, the figures presented on this page may not exactly match data publicly posted by state health departments, CMS, or other federally coordinated programs.

 IMPORTANT: Data displayed on this page were submitted directly to CDC's National Healthcare Safety Network (NHSN) and do not include data submitted to other entities contracted by or within the local, state, or federal government.

### COVID-19 Vaccination Coverage and Reporting among Residents in Nursing Homes, by Week - United States

AR-04500



## COVID-19 Vaccination Coverage and Reporting among Residents in Nursing Homes, by State and Week - United States

AR-04501

## COVID-19 Vaccination Coverage and Reporting among Staff in Nursing Homes, by Week - United States



## COVID-19 Vaccination Coverage and Reporting among Staff in Nursing Homes, by State and Week - United States

'% Vaccinated, Facilities Reporting and Percent of Facilities Reporting by State and Ca

AR-04502

Page last reviewed: June 23, 2021


Centers for Disease
Control and Prevention

# Dialysis COVID–19 Vaccination Data Dashboard

## Overview

Dialysis facilities report COVID-19 data to CDC's National Healthcare Safety Network (NHSN), including weekly vaccination data for patients and weekly vaccination data for healthcare personnel (HCP).

CDC began collecting weekly vaccination data, reported voluntarily through the Dialysis COVID-19 Module on March 11, 2021. The Centers for Medicare and Medicaid Services' (CMS) End Stage Renal Disease (ESRD) Network program established COVID-19 vaccination reporting requirements beginning March 17, 2021.

**This page displays data at the national and state level on COVID-19 vaccination coverage among patients and staff of dialysis facilities.** These summaries represent data that dialysis facilities reported to the NHSN Dialysis COVID-19 Module using weekly vaccination forms.

CDC updates this data dashboard weekly on Thursday at 8 a.m. Eastern. As a result, the figures presented on this page may not exactly match data publicly posted by state health departments or other federally coordinated programs.

> (i) IMPORTANT: Data displayed on this page were submitted directly to CDC's National Healthcare Safety Network (NHSN) and do not include data submitted to other entities contracted by or within the local, state, or federal government.

### COVID-19 Vaccination Coverage and Reporting among Patients in Dialysis Facilities, by Week - United States

AR-04504

## COVID-19 Vaccination Coverage and Reporting among Patients in Dialysis Facilities, by State and Week - United States

## COVID-19 Vaccination Coverage and Reporting among Staff in Dialysis Facilities, by Week - United States

AR-04505

## COVID-19 Vaccination Coverage and Reporting among Staff in Dialysis Facilities, by State and Week - United States



Page last reviewed: August 12, 2021

AR-04506

CDC Centers for Disease
Control and Prevention



## COVID-19 Data from the National Center for Health Statistics

NCHS collects, analyzes, and disseminates information on the health of the nation. In response to the COVID-19 pandemic, NCHS is providing the most recent data available on deaths, mental health, and access to health care, loss of work due to illness, and telemedicine from the vital statistics system, the NCHS Research and Development Survey, and through a partnership with the U.S. Census Bureau.

For general information including symptoms, testing, and community safety, visit https://www.cdc.gov.

Articles on NCHS Response to Coronavirus Disease 2019 (COVID-19)



### Deaths

Access provisional death counts based on information obtained from death certificates.



### Cause-of-Death Certification

Guidance for certifiers on how to report deaths due to COVID-19 on death certificates.



### Births and Pregnancies

Access provisional data on births and COVID-19 cases among pregnant women and newborns.



### Health Care Access, Telemedicine, and Mental Health

Data from NCHS' partnership with the U.S. Census Bureau on the Household Pulse Survey.



### Health Care Access, Telemedicine, and Loss of Work Due to Illness

Data from NCHS' research survey RANDS during COVID-19.



### Hospital Data

Data from NCHS' National Hospital Care Survey describing patient care in hospital-based settings.

AR-04507

## Long-term Care and COVID-19

COVID-19-related data for residential care communities and adult day services centers

## Physician Experiences

Data from NCHS' National Ambulatory Medical Care Survey describing office-based physician experiences related to COVID-19

# Provisional Death Counts

The following dashboard provides summaries that examine deaths in specific categories and in greater geographic detail. Use the drop-down menus to show data for selected measures or categories. Select the buttons at the bottom of the dashboard to view category-specific provisional death count information.

Access Datasets on Data.CDC.gov                                                    ⌄

Datasets used in this dashboard:

- Provisional COVID-19 Death Counts by Week Ending Date and State

- Provisional COVID-19 Death Counts by Week Ending Date and State
- Provisional COVID-19 Death Counts by Sex, Age, and State
- Provisional COVID-19 Death Counts by Race and Hispanic Origin
- Provisional COVID-19 Death Counts by Place of Death and State
- Conditions contributing to deaths involving coronavirus disease 2019 (COVID-19), by age group, United States
- Provisional COVID-19 Death Counts in the United States by County

Additional data

- Provisional COVID-19 Death Counts by Sex, Age, and Week
- Deaths involving coronavirus disease 2019 (COVID-19) by race and Hispanic origin group and age, by state

The provisional counts for coronavirus disease (COVID-19) are based on a current flow of death data submitted to the National Vital Statistics System. National provisional counts include deaths occurring within the 50 states and the District of Columbia that have been received and coded as of the date specified. It is important to note that it can take several weeks for death records to be submitted to NCHS, processed, coded, and tabulated. Therefore, the data shown on this page may be incomplete, and will likely not include all deaths that occurred during a given time period, especially for the more recent time periods. Death counts for earlier weeks are continually revised and may increase or decrease as new and updated death certificate data are received from the states by NCHS. COVID-19 death counts shown here may differ from other published sources, as data currently are lagged by an average of 1–2 weeks.

For more information, see Understanding the Numbers: Provisional Death Counts and COVID-19



## COVID-19 Data Release Schedule

Calendar of ongoing and upcoming data releases from NCHS surveys and data



## Sign Up for Emails on COVID-19 Data

Includes the latest data releases from NCHS

Page last reviewed: October 8, 2021

AR-04509

Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 190 of 298    PageID 5051

 Centers for Disease
Control and Prevention

# COVID Data Tracker

---

**United States at a Glance**        Collapse   —

**United States**
At a Glance

**Cases** Total     **47,916,623**

Last 30 Days

**Deaths** Total     **773,779**

Last 30 Days

**74.1% of People 5+ with At Least**

One Vaccination

**Community Transmission**    High

 COVID Data Tracker will not update on Thursday, November 25, 2021 and Friday, November 26, 2021. Updates to most data streams will resume on Saturday, November 27, 2021.

Vaccination data will not update on Thursday, November 25, 2021, Friday, November 26, 2021, Saturday, November 27, 2021, and Sunday, November 28, 2021. Updates to vaccination data will resume on Monday November 29, 2021.

Data Tracker Home

COVID Data Tracker Weekly Review

Your Community   +

## COVID Data Tracker

Find maps and charts tracking cases, deaths, and trends of COVID-19 in the United States, updated daily by 8 pm ET

**Community Transmission in the US**

AR-04510

Health Equity Data

Pediatric Data

Pregnancy Data

Vaccination Delivery and Coverage    +

Vaccine Effectiveness and Breakthrough Surveillance    +

Cases, Deaths, and Testing    +

Demographic Trends    +

Health Care Settings    +

Variants and Genomic Surveillance    +

Antibody Seroprevalence    +

People at Increased Risk    +

Multisystem Inflammatory Syndrome in Children (MIS-C)



Territories

| AS | FSM | GU | MP | PW | RMI | VI |

County level community transmission     >

State level community transmission     >

**Recent updates:**

- The Vaccination Demographics tab now shows booster dose data for people 65 years and older by race/ethnicity, age, and sex
- The Vaccination Demographic Trends tab now displays vaccination trends by age and sex, vaccination trends by race/ethnicity (including NIS survey data), and booster trends by age, sex, and race/ethnicity among people 65 years and older
- Vaccination data among nursing home residents and staff and dialysis center patients and staff are now available
- The Vaccine Confidence and Coverage Estimates tab now

Prevention Measures and Social Impact ＋

Additional COVID-related Data ＋

Communications Resources

COVID-19 Home

✉ Get Email Updates

Sign up to receive the COVID Data Tracker Weekly Review.

Email Address:

Email Address

What's this?    Submit

displays vaccination status and intent among children by age, race/ethnicity, sex, and sociodemographic characteristics



### COVID Data Tracker Weekly Review

An interpretive summary of this week's data

 If you havent been vaccinated yet, find a vaccine.

# Your Community

Stay up to date on the latest data in your community at the state and county level.

### County View

Track cases, deaths, hospitalizations, and more for your community





## Forecasting

See expectations for case increases or decreases for your state and across the US



## Vaccinations in the US

View doses delivered, administered, and more for your state and across the US



## Pandemic Vulnerability Index

Visualize risk



profiles of
vulnerability to
COVID-19 by
county



## Health Equity Data

Summary of
available health
equity-related
data



## Pediatric Data

Summary of
available
pediatric data



## Pregnancy Data

Summary of
available
pregnancy-
related data



# Vaccination Delivery and Coverage

Track Progress of COVID-19 vaccination across the United States.

## Vaccinations in the US, States, and Jurisdictions

View doses delivered, administered, and more for your state and across the US



## Vaccination Trends

Trends in Number of COVID-19 Vaccinations in the US



## Vaccines Administered by Race/Ethnicity, Age, and Sex

Examine vaccine demographic data



## Trends in Vaccinations by Race/Ethnicity, Sex, and Age

See demographics trends of people receiving COVID-19 vaccinations in the United States



## Vaccination Equity

See county-level vaccination coverage by social vulnerability and metropolitan status



## Vaccination Among Pregnant People

View data on COVID-19 vaccination during pregnancy



Case 2:21-cv-00229-Z    Document 30-8    Filed 11/29/21    Page 197 of 298    PageID 5058

among pregnant
people

## Vaccine Confidence and Coverage Estimates

Visualize trends in vaccine confidence in the US



## Vaccinations in Dialysis Facilities

View weekly vaccination data for patients and healthcare personnel in dialysis facilities.



## Vaccinations in Nursing Homes

View counts of residents and



AR-04517



healthcare personnel, or staff, who received any COVID-19 vaccine.

## Vaccinations by Disability Status

Explore COVID-19 vaccination rates among people with disabilities by age and race/ethnicity



## Global COVID-19 Vaccinations

Track the progress of vaccination rollout by country



# Vaccine Effectiveness and Breakthrough Surveillance

Explore how effective the COVID-19 vaccine is against infection, hospitalization, and death.

AR-04518

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 199 of 298   PageID 5060

## COVID-19 Vaccine Effectiveness

COVID-19 vaccine effectiveness trends against hospitalization and infection



## Vaccination and Other Outcomes

See county-level vaccination coverage by COVID-19 case rate, percent positivity, and more



## Rates of COVID-19 Cases and Deaths by Vaccination Status

See trends in COVID-19 cases



AR-04519

and deaths

## Hospitalizations by Vaccination Status - COVID-NET

Visualize population-based trends in rates of COVID-19-associated hospitalizations by vaccination status

## Vaccination and Case Trends

Trends in vaccinations and

# Case, Death, & Laboratory Testing Trends by Location and Demographics

cases by age group
Monitor the rise and fall of
group in the US
COVID-19 cases and deaths
nationally and by state.

## Trends in Cases and Deaths by Race/Ethnicity, Age, and Sex

Track how the demographic characteristics of COVID-19 cases and deaths have changed over time



## Compare State and Regional Trends

## Cases, Deaths, and Testing by State

See the latest information on
cases, deaths



Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 202 of 298   PageID 5063

and laboratory
testing

## US and State Trends

View increases and decreases in case and death rates by state



## Total Cases and Deaths by Race/Ethnicity, Age, and Sex

Examine data on demographics



## Cases and Deaths by Urban/Rural

## Global Cases and Deaths

Compare case and death rates in countries across the world



AR-04522

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 203 of 298   PageID 5064

# Health Care Settings

Follow the burden of COVID-19 among healthcare personnel and across multiple health care settings.

## About Health Care Setting Data

Understand the strengths and limitations of the different hospital data sources included on COVID Data Tracker



## New Hospital Admissions

Daily trends in number of new confirmed COVID-19 hospital admissions in the United States



## COVID-19 Hospitalized Patients

Daily trends in number of patients hospitalized with confirmed COVID-19 in the United States



## COVID-19 Hospitalizations and Disease Severity

Trends in Hospitalizations and Disease Severity Among Patients Hospitalized With COVID-19 in a Large Subset of Hospitals Across the U.S.



## Emergency Department Visits

Visualize trends in emergency department visits and hospitalizations



AR-04524

## Hospitalization Rates and Clinical Characteristics - COVID-NET

Visualize population-based trends in rates and clinical characteristics in COVID-19-associated hospitalizations



## Nursing Home Staff

Track cases and deaths among nursing home staff in the US



## Nursing Home Residents

Track cases and deaths among



## Healthcare Personnel

Track cases and deaths among healthcare



AR-04525


Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 206 of 298   PageID 5067

personnel in the
US

# Variants and Genomic Surveillance

Learn more about how CDC is using genomic surveillance to track SARS-CoV-2 Variants

## Variant Proportions in the U.S.

View data on the estimated proportions of SARS-CoV-2 variants circulating nationally, by region, and by state.



## Published SARS-CoV-2 Sequences

View data of SARS-CoV-2 sequences available in public repositories.



AR-04526

## Global Variant Report Map

See countries that have reported variants of SARS-CoV-2.



# Antibody Seroprevalence

Learn more about COVID-19 seroprevalence surveys, which are used to determine how much of the U.S. population has been infected with SARS-COV-2, the virus that causes COVID-19.

## Nationwide Commercial Lab Seroprevalence

View an estimate

of the percent of people with antibodies against SARS-CoV-2 from a study of commercial laboratories across 50 US states



## Nationwide Blood Donor Seroprevalence

View an estimate of the percent of people with antibodies against SARS-CoV-2 from a study of blood donors across 50 US states, Washington, DC, and Puerto Rico



# People Who Are at Increased Risk

See the latest data on some of the groups of people who are put at an increased risk for severe illness with COVID-19.

## Underlying Medical Conditions

AR-04528


View estimates of the
number of people with
certain medical conditions
down to the county level



## Pregnant
## People

View data on
severity of
COVID-19 illness
during
pregnancy, as
well as birth and
infant outcomes
for women with



Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 210 of 298    PageID 5071

COVID-19 during pregnancy

## Correctional Facilities

See cases and deaths in US correctional and detention facilities by state



# Multisystem Inflammatory Syndrome

Health Department-Reported Cases of Multisystem Inflammatory Syndrome in Children (MIS-C) in the United States

## Multisystem Inflammatory Syndrome in Children (MIS-C)

MIS-C cases by

AR-04530


Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 211 of 298    PageID 5072



state. View data on MIS-C, a rare but serious condition associated with COVID-19 in which different body parts become inflamed.

# Prevention Measures and Social Impact

Explore the social impacts of COVID-19 and see how human movement and COVID-19 prevention measures correspond to trends in the pandemic.

## State-Issued Prevention Measures at the State-Level

Visualize state-

AR-04531



**HAVE QUESTIONS?**

    Visit CDC-INFO

    Call 800-232-4636

    Email CDC-INFO

🕐    Open 24/7

**CDC INFORMATION**

About CDC

Jobs

Funding

Policies

File Viewers & Players

Privacy

FOIA

No Fear Act

OIG

Nondiscrimination

Accessibility

Vulnerability Disclosure Policy

**CONNECT WITH CDC**

         

U.S. Department of Health & Human Services

USA.gov

CDC Website Exit Disclaimer ↗

level COVID-19 prevention measures



## Mobility

Monitor changes in human activity across the US

## State-Issued Prevention Measures at the County-Level

Visualize county-level COVID-19 prevention measures alongside trends in cases and deaths



## Social Impact

See news reports related to the social impacts of COVID-19 in the United States



 **HHS Protect Public Data Hub** · Hospital Utilization · Vacc ·  

 An official website of the United States government · [Here's how you know](#) ⌄

# HHS Protect Public Data Hub

The whole-of-America response to the COVID-19 pandemic demands data sharing in near-real time. At HHS, four principles drive this work: transparency, sharing, privacy, and security.

This site provides information on the current state of the American health care system. HHS recognizes the importance of providing high-quality, accessible, and timely information for entrepreneurs, researchers, and policy makers to help drive insights and better health outcomes for all. On this site, you can explore data visualizations on hospitalizations, testing, therapeutics and more.

## National Metrics

Translate Share



Case 2:21-cv-00229-Z Document 30-8 Filed 11/28/21 Page 214 of 298 PageID 5075



HHS Protect Public Data Hub    Hospital Utilization    Vacc

[View an accessible version](#)

# Understand the Status of your Community




 HHS Protect Public Data Hub          Hospital Utilization       Vacc

[Click here for data disclaimers](#)
[View an accessible version](#)

## Healthcare System Status

Over 6,000 hospitals report data to HHS daily to provide insights into American healthcare system capacity and inform government response systems. Explore the pages below to see visualizations on COVID-19 patient impact, as well as the frequency of hospital reporting.



Translate                                                                    Share

 **HHS Protect Public Data Hub**     Hospital Utilization     Vacc

| Hospital Utilization | Hospital Reporting |
|---|---|
| This page displays visualizations on the utilization and capacity status of hospitals in the United States. | The visualizations on this page track the data reporting compliance of hospitals around the country. |
| Learn More | Learn More |

# Additional COVID-19 Information

As America continues battling the COVID-19 pandemic, HHS is tracking the availability and use of both COVID-19 testing and therapeutics. Explore the pages below to learn more about the national distribution of COVID-19 therapeutics and the status of national lab testing.

### Therapeutics Distribution

This page displays monoclonal antibody therapeutic treatment shipment locations nationwide

Learn More

### Vaccination and Testing

This page displays nationwide data on vaccination and diagnostic laboratory testing.

Learn More

What is HHS Protect?

Translate                                        Share

 **HHS Protect Public Data Hub**      Hospital Utilization      Vacc

responders at federal, state, and local levels and we needed to collect this data as fast as possible. To fulfill this need, HHS built HHS Protect, a secure data ecosystem powered by eight commercial technologies for sharing, parsing, housing, and accessing COVID-19 data and driven by four principles: transparency, sharing, privacy, and security.

The HHS Protect ecosystem is a secure platform for authentication, amalgamation, and sharing of healthcare information, so that the U.S. government can harness the full power of data for the COVID-19 response. U.S. healthcare data has often been fractured and inaccessible. With Protect, more than 200 disparate data sources are brought together into one ecosystem that integrates data across federal, state, and local governments and the healthcare industry. It provides a holistic view of the U.S. healthcare system so decision makers informed by Protect have information to guide action and save lives with a data-driven COVID-19 response.

HHS Protect provides the data and analytics underlying the HHS Protect Public Data Hub.  In accordance with data use agreements and in consideration of privacy and confidentiality, some data at the facility and county level may not be available on the HHS Protect Public Data Hub to prevent the release of PHI, PII, or other sensitive information.

## Data Information and Disclaimers

Data in this report may differ from data on state and local websites. This may be due to differences in how data were reported (e.g., date specimen obtained, or date reported for cases) or how the metrics are calculated. Historical data may be updated over time due to delayed reporting. Data presented here use standard metrics across all geographic levels in the United States. It facilitates the understanding of COVID-19 pandemic trends across the United States by using standardized data. For additional data for any particular locality, visit the relevant health department website.


HHS Headquarters
U.S. Department of Health & Human Services

Translate                                                                              Share



 HHS Protect Public Data Hub      Hospital Utilization      Vacc

Contact HHS

200 Independence Avenue, S.W.
Washington, D.C. 20201

**Built with** ArcGIS Hub                                    Manage Privacy

Translate                                                    Share

AR-04538



Centers for Disease
Control and Prevention

# COVID–19 Vaccination Coverage and Vaccine Confidence

COVIDVaxView

User Quick Guide 🔴 | Download Data Table | Back to COVIDVaxView main page



NOTE    Estimates with a denominator sample size of <30 are suppressed and shown as *** in the table and as gray in the maps.
Following collection of August 2021 survey data, an error in data processing led to incorrect categorization of some survey respondents; some respondents who should have been categorized as MSA Principal City instead were categorized as MSA Non-Principal City. Data downloaded during the period September 12, 2021 through September 30, 2021 may have incorrect estimates by MSA status, 0.8 of county of residence, and political leaning of county of residence.
SOURCE    Estimates produced by NORC at the University of Chicago using CDC's National Immunization Survey-Adult COVID-19 Module (NIS-ACM) https://www.cdc.gov/vaccines/imz-managers/nis/about.html

Page last reviewed: September 23, 2021

CDC Centers for Disease
Control and Prevention

# Reduced Access to Care

## RANDS during COVID-19

The Research and Development Survey (RANDS) is a platform designed for conducting survey question evaluation and statistical research. RANDS is an ongoing series of surveys from probability-sampled commercial survey panels used for methodological research at the National Center for Health Statistics (NCHS). RANDS estimates are generated using an experimental approach that differs from the survey design approaches generally used by NCHS, including possible biases from different response patterns and sampling frames as well as increased variability from lower sample sizes. Use of the RANDS platform allows NCHS to produce more timely data than would be possible using traditional data collection methods. RANDS is not designed to replace NCHS' higher quality, core data collections. Below are experimental estimates of reduced access to healthcare for three rounds of RANDS during COVID-19. Data collection for the three rounds of RANDS during COVID-19 occurred between June 9, 2020 and July 6, 2020, August 3, 2020 and August 20, 2020, and May 17, 2021 and June 30, 2021. Information needed to interpret these estimates can be found in the Technical Notes.

RANDS during COVID-19 included questions about unmet care in the last 2 months during the coronavirus pandemic. Unmet needs for health care are often the result of cost-related barriers. The National Health Interview Survey, conducted by NCHS, is the source for high-quality data to monitor cost-related health care access problems in the United States. For example, in 2018, 7.3% of persons of all ages reported delaying medical care due to cost and 4.8% reported needing medical care but not getting it due to cost in the past year. However, cost is not the only reason someone might delay or not receive needed medical care. As a result of the coronavirus pandemic, people also may not get needed medical care due to cancelled appointments, cutbacks in transportation options, fear of going to the emergency room, or an altruistic desire to not be a burden on the health care system, among other reasons. The Household Pulse Survey, an online survey conducted in response to the COVID-19 pandemic by the Census Bureau in partnership with other federal agencies including NCHS, also reports estimates of reduced access to care during the pandemic (beginning in Phase 1, which started on April 23, 2020). The Household Pulse Survey reports the percentage of adults who delayed medical care in the last 4 weeks or who needed medical care at any time in the last 4 weeks for something other than coronavirus but did not get it because of the pandemic.

The experimental estimates on this page are derived from RANDS during COVID-19 and show the percentage of U.S. adults who were unable to receive medical care (including urgent care, surgery, screening tests, ongoing treatment, regular checkups, prescriptions, dental care, vision care, and hearing care) in the last 2 months.

| RANDS Topics |
| --- |
| Loss of Work Due to Illness |
| Telemedicine Access and Use |
| **Reduced Access to Care** |

Use the drop-down menus to show data for selected reduced access to care indicators by groups (age, race and Hispanic origin, sex, education, urbanization, and chronic conditions).

AR-04540



Microsoft Power BI     ‹ 1 of 2 ›     

[Access Dataset on Data.CDC.gov (Export to CSV, JSON, XLS, XML)↗](#)

# Technical Notes

## Data Source

The National Center for Health Statistics' (NCHS) Division of Research and Methodology (DRM) contracted with NORC at the University of Chicago (NORC) to conduct the Research and Development Survey (RANDS) during COVID-19. RANDS during COVID-19 included three rounds of data collection (Round 1, Round 2, and Round 3). The RANDS survey for each round was conducted in English using web and telephone administration where survey administration mode was determined by the preference of the panelists. The samples for this study were drawn from NORC's AmeriSpeak® Panel ([amerispeak.norc.org ↗](#)) using a stratified sample design to obtain a random, representative sample of U.S. adults aged 18 and over, where sampling strata were defined by race and Hispanic origin (grouped by 1) Hispanic, 2) black non-Hispanic, and 3) white non-Hispanic or other non-Hispanic), age group (18–34 years, 35–49 years, 50–64 years, and 65 years and over), sex (male or female), education (Associate's degree/some college or less and Bachelor's degree or above), and annual household income (less than $75,000 and more than $75,000). NORC performed sampling independently within each of the 96 strata using simple random sampling. Rounds 1 and 2 of RANDS during COVID-19 had a longitudinal design. Sampled panelists were invited to participate in both rounds of the study. For these two rounds, NORC excluded panelists recruited in 2019 from the sampling to improve the cumulative response rate of the study as a nonresponse follow up was not conducted that year. RANDS during COVID-19 Round 3 was designed to evaluate a telephone oversample (see completion rate by mode for each round below) and panelists were sampled independently from Rounds 1 and 2. To meet the target number of completed surveys, Round 3 included panelists recruited to the AmeriSpeak Panel in 2019 and 2020.

In Round 1, NORC invited 8,663 randomly selected panelists to participate in RANDS between June 9, 2020 and July 6, 2020. At the completion of Round 1, 6,800 interviews were completed for an overall completion rate of 78.5%. Of the 6,800 completed

AR-04541

interviews, 5,340 (91.1%) were completed via web administration and 518 (8.9%) were completed via telephone. In Round 2, NORC invited 8,651 of the panelists from Round 1 to participate in Round 2 of RANDS during COVID-19. Responses were collected from August 3, 2020 to August 20, 2020. At the completion of Round 2, 5,981 interviews were completed for an overall completion rate of 69.1%. Of the 5,981 completed interviews, 5,559 (92.9%) were completed via web administration and 422 (7.1%) were completed via telephone. Overall, 5,452 panelists participated in both Rounds 1 and 2. In Round 3, NORC invited 7,852 panelists who were sampled independently from the previous two rounds to participate between May 17, 2021 and June 30, 2021. At the completion of Round 3, 5,458 interviews were completed for an overall completion rate of 69.5%. Of the 5,458 completed interviews, 4,181 (76.6%) were completed via web administration and 1,277 (23.4%) were completed via telephone.

## Survey Questions

The questionnaire included questions to assess U.S. adults' loss of work due to illness with COVID-19, use of telemedicine, and access to healthcare during the COVID-19 pandemic. Questions related to reduced access to care evaluated the ability of U.S. adults to receive selected types of medical care for any reason and due to the Coronavirus pandemic in the past 2 months. Survey questions on RANDS related to this topic included the following:

### Reduced Access to Care

**In the last two months, were you unable to get any of the following types of care for any reason— urgent care for an accident or illness, a surgical procedure, diagnostic or medical screening test, treatment for an ongoing condition, a regular check-up, prescription drugs or medications, dental care, vision care, or hearing care?**

The estimates reported are the percentage unable to receive any of the specified types of care for any reason, including the coronavirus pandemic, in the last 2 months among all adults. The percentages for reduced access to a specific type of care for any reason are compared to all other adults, including those who received the specified care or who did not seek the specified care.

**Were you unable to get this because of the coronavirus pandemic?**

The estimates reported are the percentage unable to receive any of the specified types of care in the last 2 months due to the pandemic among all adults. The percentages for reduced access for a specific type of care due to the pandemic are compared to all other adults, including those who received the specified care, did not seek the specified care, or did not receive the care for a reason other than the pandemic.

## Weighting and Estimation

NORC provided sample weights for each round of RANDS during COVID-19 which account for the sample design and are calibrated to U.S. population counts to account for differential nonresponse and under coverage of some groups on the sample frame. The sample weights developed by NORC were based on the panel weights from the AmeriSpeak® Panel and the RANDS survey-specific sampling weights for each round. The panel weights account for the sampling probability from the AmeriSpeak® Panel, calculated as the inverse probability of selection from the NORC National Sample Frame, which are adjusted for nonresponse and for a subsample of housing units that have a nonresponse follow-up. These panel weights are adjusted using raking to align the panel weights with external population totals obtained from the U.S. Census Bureau Current Population Survey (CPS). From the panel weights, the RANDS survey-specific sampling weights are derived using the probability of selection into RANDS associated with a sampled panel member and an adjustment for nonresponse to the RANDS survey. The RANDS survey-specific sampling weights for each round of RANDS during COVID-19 are raked to adult population totals, trimmed for extreme weights, and raked again to the same population totals to form the final NORC-provided sample weights.

AR-04542

NCHS implemented an additional weighting step to calibrate the NORC-provided weights to the National Health Interview Survey (NHIS), an established core household survey conducted by NCHS. NORC-provided sample weights for each round were adjusted through an additional post-stratification step in which the marginal totals of RANDS from each round were raked to the marginal population totals from the NHIS. RANDS during COVID-19 Rounds 1 and 2 weights were raked using the 2018 NHIS sample adult file ($n = 25,417$) on the following demographic and health characteristics: age, sex, race and Hispanic origin, education, household income, Census region, marital status, ever diagnosed high cholesterol, ever diagnosed asthma, ever diagnosed hypertension, and ever diagnosed diabetes. RANDS during COVID-19 Round 3 weights were raked using the 2019 NHIS sample adult file ($n = 31,997$) on the following demographic and health characteristics: age, sex, race and Hispanic origin, education, household income, Census region, marital status, ever diagnosed high cholesterol, ever diagnosed asthma, ever diagnosed hypertension, ever diagnosed diabetes, metropolitan status, and phone service. Characteristics with missing values in RANDS and in NHIS were included in the raking procedure, while characteristics with missing values in one of the surveys were removed for the raking step with an adjustment on the weights for the non-missing values. The calibrated weights were proportionally adjusted to the total number of RANDS respondents for each round ($n = 6,800$ for Round 1, $n = 5,981$ for Round 2, and $n = 5,458$ for Round 3).

All analyses reported are based on the NCHS calibrated sample weights for the respective round. It is important to note that RANDS during COVID-19 is a probability-sampled panel survey. Although the NORC-provided sample weights are designed to provide nationally representative estimates, the additional calibration further adjusts the RANDS data for differences in health and demographic factors between RANDS and NHIS due to possible differences in response propensities, coverage, and sample variability. The application of sample weights to the data is required to produce results with meaningful population representativeness and to accurately assess the sampling error of statistics based on the survey data.

For each outcome reported, the sample size, percentage estimate, and standard error estimate are shown by round. Standard error estimates were generated using a Taylor series linearization approach. SUDAAN's PROC CROSSTAB was used to calculate all estimates. PROC CROSSTAB accounts for the complex survey design variables, including the sampling strata and sampling weights. The MISSUNIT option in SUDAAN was used to account for singleton primary sampling units in the variance estimation for the reported standard error estimates and statistical testing. Missing values were excluded from the reported estimates. Estimates that did not meet the NCHS Data Presentation Standards for Proportions were suppressed (https://www.cdc.gov/nchs/data/series/sr_02/sr02_175.pdf ).

Each set of estimates is reported for the total overall (at the national level) and by selected factors including demographics and diagnosed chronic conditions. Selected factors included age group (18–44 years, 45–64 years, and 65 years and over), race and Hispanic origin (white non-Hispanic, black non-Hispanic, other non-Hispanic, Hispanic), sex (male or female), education (high school graduate or less, some college, Bachelor's degree or above), urbanization (metropolitan or non-metropolitan), and chronic conditions (one or more chronic conditions, ever diagnosed diabetes, ever diagnosed hypertension, or current diagnosed asthma). For subgroup analyses, sex is identified by the response to the survey item "Please tell us your gender." Urbanization is assigned by zip code, where metropolitan includes metropolitan and micropolitan areas and non-metropolitan includes all other designations. One or more chronic conditions is defined as a diagnosis of one or more of the following: hypertension, also called high blood pressure; high cholesterol; coronary heart disease; current asthma; chronic obstructive pulmonary disease (COPD), emphysema, or chronic bronchitis; cancer or a malignancy of any kind; or diabetes excluding pre-diabetes and borderline diabetes. Estimates are accompanied by bar charts displaying comparisons within the selected factors between the three rounds.

# Comparisons between Rounds

Reported statistical testing results identify statistically significant differences in the experimental estimates between rounds (Rounds 1 and 2, Rounds 1 and 3, Rounds 2 and 3). Since the sampled panelists from Round 1 of RANDS during COVID-19 were also invited to participate in Round 2, the percentage estimates for the selected indicators are not independent. Of the 6,800 respondents to Round 1 and 5,981 respondents to Round 2, 5,452 panelists participated in both rounds. To account for the correlation in the repeated measurements, point estimates provided for Rounds 1 and 2 were statistically compared using an unpaired correlated two-sample $t$-test. The variance of the difference between point estimates was approximated using the variance of the estimates from Rounds 1 and 2 and a correction factor to account for the sample of panelists responding to both rounds. The correction factor incorporated the design effects from both rounds and estimated correlation using the weighted Pearson correlation coefficient. Correction factors were estimated separately for each indicator within subgroups. Correlations between rounds differed by indicator and for categories within subgroups. The resulting test statistic was assumed to be approximately normally distributed.

Statistical testing between Round 1 and 3 estimates and Round 2 and 3 estimates was performed using a survey regression approach. Data from the comparison rounds were parameterized using a reference cell model to estimate the mean difference and the standard error of the difference of the two estimates while accounting for the covariance of the estimates in clustered samples. Note that while the covariance of two estimates for distinct samples is zero under simple random sampling, the covariance of two estimates may be nonzero for clustered samples. The statistical testing for differences between Round 1 and 3 estimates and Round 2 and 3 estimates was also validated to verify that findings of statistically significant differences were not impacted by the change in the reference dataset (2018 NHIS for Rounds 1 and 2, 2019 NHIS for Round 3) for the raking step to produce the NCHS calibrated sample weights.

The reported significance for all three comparisons is based on a two-sided test with a significance level of 0.05 and does not account for multiple comparisons. Significance testing was not reported in cases where either of the estimates in the comparison rounds was suppressed.

## Limitations and Data Use

The information presented here is based on data collected by commercial vendors that maintain groups of respondents, called panels, who agree to participate in surveys, typically in exchange for payment or prizes. Panel surveys can be implemented much quicker and can be less expensive to conduct than typical NCHS surveys that draw new samples from nationally representative frames and collect information by phone, online, or in person. Panel surveys also have more sample bias and less accuracy, than traditional survey methods.

RANDS is an ongoing NCHS research program designed to investigate whether and, if so, how panels with more biases can be used in conjunction with other, higher quality data collections to increase the scope of information collected, the timeliness of data collection and the sample size, and to expand the scope and granularity of NCHS statistical products. The RANDS was not designed to replace NCHS' higher quality, core data collections but to be used in conjunction with those surveys especially during periods when standard data collection methods face challenges.

The COVID-19 pandemic offers an opportunity to further explore the collection of new information more quickly than is possible using the Federal Statistical System's core data collection approaches. Building on past work, NCHS took advantage of the RANDS platform to collect information regarding aspects of the public health emergency not currently being captured in sufficient detail in government or nongovernment surveys. In addition, measurement research that may be instructive for interpreting other federal and non-federal surveys during the pandemic will be conducted and calibration research will continue. Experimental national estimates are only provided for selected variables. The other variables are being collected specifically for research purposes. The experimental national estimates for the inability to work due to illness with COVID-19, telemedicine access before and during the pandemic, telemedicine use during the pandemic, and reduced access to specific types of health care for any reason and due to the pandemic have been calibrated using information from NCHS' NHIS to correct for some portion of the potential bias in the panel relative to the NHIS, as described above. Information on the effect of calibration for past data collections and for this round of data collection will be presented on the RANDS website. As research is underway to both improve the calibration method and understand potential sources of measurement error, estimates may be updated based on the results of that research. These estimates should be considered experimental. On August 28, 2020, NORC provided a revised file for the Round 1 respondents and the calibrated weights were updated accordingly. The reported estimates reflect this update. In the event of future updates to the weights or the calibration approach, the change will be documented and the tables will be updated accordingly.

Statistically significant differences between experimental estimates from Rounds 1 and 2, Rounds 1 and 3, and Rounds 2 and 3 identified using the reported $p$-value approach should be interpreted with caution. Small estimated design effects for subgroups may impact the calculated test statistic and the normality assumption may be violated in the case of small sample sizes. The American Statistical Association (ASA) has released a statement on statistical significance based on $p$-values (https://amstat.tandfonline.com/doi/full/10.1080/00031305.2016.1154108 ⧉ ). The ASA's published guidance indicates that the $p$-value should not be the only factor used when making decisions about scientific findings. NCHS will release a future methodological report with additional details and results from the correlated two-sample $t$-test and the reference cell regression approach used for statistical testing on the RANDS during COVID-19 published indicators.

Note that a statistical test of the difference between the RANDS during COVID-19 estimates using the published estimates and their standard errors and assuming independence between rounds is conservative for positively correlated estimates and may not identify a statistically significant difference that would be identified if the dependence due to repeated

AR-04544

measurements on subjects or due to clustered samples was considered. However, differences between rounds that are identified as statistically significant under the assumption of independence will be significant when accounting for the correlation. Statistical testing results in the published tables accounted for the correlation.

Page last reviewed: August 6, 2021

![American Hospital Association — Advancing Health in America]

800 10th Street, N.W.
Two CityCenter, Suite 400
Washington, DC 20001-4956
(202) 638-1100

September 27, 2021

The Honorable Chiquita Brooks-LaSure
Administrator
Centers for Medicare & Medicaid Services
7500 Security Blvd
Baltimore, MD 21244

**RE: *Forthcoming Interim Final Rule Implementing a Mandatory COVID-19 Vaccination Policy for Hospitals and Other Health Care Providers Participating in Medicare and Medicaid***

Dear Administrator Brooks-LaSure:

On behalf of our nearly 5,000 member hospitals, health systems and other health care organizations and our clinician partners – including more than 270,000 affiliated physicians, 2 million nurses and other caregivers – and the 43,000 health care leaders who belong to our professional membership groups, the American Hospital Association (AHA) writes to offer our recommendations on how the Centers for Medicare & Medicaid Services (CMS) should implement its mandatory COVID-19 vaccination policy.

On Sept. 9, CMS announced it would issue an interim final rule (IFR) in October 2021 requiring COVID-19 vaccinations for workers in most health care settings receiving Medicare or Medicaid reimbursement, likely by using Medicare/Medicaid Conditions of Participation (CoPs). CMS has indicated that a wide range of health care personnel would be subject to the policy, including clinical staff, volunteers, staff not directly involved in patient care and individuals providing services under arrangements.

**The AHA strongly supports the stated goal of CMS' mandatory vaccination policy – that is, to ensure all health care workers are vaccinated for COVID-19 as safely and expeditiously as possible.** The AHA has repeatedly urged the vaccination of all health care workers, and has supported hospitals and health systems that choose to mandate vaccination. In fact, as of the date of this letter, 2,549 hospitals and health systems have publicly announced their own mandatory vaccination policies.

However, these mandate decisions were informed by hospitals' evaluation of the local circumstances in their own facilities and communities. Many hospitals believed it was the right time to implement a vaccine mandate, but others have continued to work diligently with their unvaccinated colleagues to convince them to take the vaccine



voluntarily. In implementing a national regulatory mandate for health care facilities to vaccinate their personnel, CMS should ensure its policy is feasible, transparent and fair for all health care providers that are subject to it.

**In addition, it is vital that CMS issue the IFR and associated interpretive guidance as expeditiously as possible to help create stability for the health care field.** While knowing CMS' general intention to implement a mandatory vaccination policy is helpful, the agency's announcement also has introduced some uncertainty and confusion. Those hospitals that do not yet have mandatory vaccination policies are eager to know how CMS will assess and enforce compliance so that they can plan accordingly. Furthermore, those hospitals that already have mandatory vaccination policies want to know to what extent their existing policies may need modification. A few states and municipalities also have implemented or are in the process of implementing vaccination mandates for health care workers. Hospitals in these areas are concerned about ensuring their policies align with all regulatory requirements. Lastly, some unvaccinated health care workers have indicated to our members that they are unwilling to start the process of obtaining the vaccines until there is an official CMS policy in place. At a time when hospitals remained strained by ongoing surges in COVID-19 hospitalizations, issuing the IFR and interpretive guidance quickly will help minimize disruptions to the field, and provide hospitals with the clarity and stability they need to implement the policy.

**The AHA urges CMS to ensure its mandatory vaccination policy includes appropriate safeguards to preserve access to care in all communities.** We believe CMS can achieve a balance between high vaccination rates and access to care by:

- **Ensuring a level playing field across health care** by applying mandatory vaccination policies to all Medicare-regulated health care providers;
- Providing an **adequate amount of time** for hospitals to come into compliance;
- Using a **progressive enforcement approach** that gives hospitals adequate notice if they are not in compliance, as well as multiple opportunities to come into compliance; and
- Providing **enforcement flexibility in the event of vaccine supply shortages.**

**In addition, the AHA urges CMS to provide clear, specific information about how hospitals can demonstrate their compliance and how CMS will conduct enforcement by:**

- Issuing **interpretive guidance** concurrently; and
- Allowing **exceptions from the mandate for medical reasons and sincerely held religious beliefs,** and providing guidance for all providers on how to apply these exceptions consistently.

**Lastly, the AHA urges CMS to minimize the potential for misalignment and duplication with existing federal vaccine-related policies by**:

- Using the reporting of the recently adopted CMS **health care personnel vaccination quality measure** to measure hospital compliance; and
- **Coordinating with other federal agencies** such as the Occupational Safety and Health Administration (OSHA), the Equal Employment Opportunity Commission (EEOC), and others to ensure hospitals are subject to only one consistent mandatory vaccination policy.

Below we provide additional details on each of these recommendations.

## PRESERVING ACCESS TO CARE

Ensuring a Level Playing Field Across Health Care. **The AHA urges CMS to apply its mandatory vaccination policy to all Medicare-regulated health care providers.** CMS' initial public announcement made it clear that the requirement would apply to hospitals, ambulatory surgery centers, end-stage renal disease providers and post-acute care settings like home health agencies and nursing homes. However, it is vital that CMS fosters a consistent vaccination expectation across all types of health care providers. CMS should ensure its mandate applies to other types of entities that may receive Medicare or Medicaid reimbursement, such as federally-qualified health centers (FQHCs), community health centers (CHC) and non-hospital based physician practices.

We recognize that not all of these entities have CoPs or conditions of coverage like hospitals so the precise regulatory mechanism to implement a vaccination mandate could vary. Nevertheless, making the mandate as broad based as possible would ensure that health care providers do not compete for a limited labor pool based on whether particular types of entities are required to have vaccination mandates. A consistent approach applicable to as many health care providers as possible would help minimize this possibility.

Providing Time to Come Into Compliance. **The AHA believes that providing adequate time to come into compliance with CMS' vaccination mandate is vital to maintaining access to care.** This is especially true given that the maximum penalty for non-compliance with a CoP – removal from the Medicare and Medicaid programs – is severe enough to jeopardize most hospitals' financial viability, and threaten their ability to care for their communities. Furthermore, many hospitals are experiencing severe workforce shortages. While the challenges of sustaining the health care workforce predate COVID-19, the pandemic has only served to exacerbate them. Hospitals report that some workers have chosen to leave the health care field altogether due to the emotional toll.

AR-04548

The Honorable Chiquita Brooks-LaSure
September 27, 2021
Page 4 of 7

Among the remaining workforce, the reality is that, as is the case in the general population, some hospital workers remain hesitant to receive the vaccine, and some hospitals have more of such workers than others. To be clear, all hospitals have redoubled their efforts convince the remainder of their workforce to obtain the vaccines. However, these efforts take time, and some hospitals are fearful that a hasty implementation of CMS' policy could prompt abrupt resignations of some staff. Given the national scale of staffing shortages, replacing staff could be extremely challenging for some hospitals. This could force difficult choices about suspending or eliminating services. As has been reported in the media, a hospital in New York state was recently forced to suspend labor and delivery services following the implementation of a vaccination mandate due to a lack of sufficient staffing. Simply put, maintaining adequate staffing is foundational to assuring access to quality care.

In addition, while CMS has announced its intention to write an IFR at least one month before it is issued, many details of how hospitals will be expected to demonstrate their compliance are still unclear. Hospitals will need time to familiarize themselves with CMS' expectations and ensure they are compliant with them. **For these reasons, we urge CMS to ensure there is sufficient time between when the requirement takes effect and when compliance would begin to be enforced.** For example, many hospitals that have implemented their own mandatory vaccination policies announced them at least 60-90 days before employees were to comply. CMS could use a similar timeframe for its policy. By way of illustration, if CMS were to issue the final rule and associated interpretive guidance on or about Oct. 15, its first assessment of whether hospitals were complying with the mandate could take place on Dec. 15. This would allow as yet unvaccinated employees time to get any remaining questions answered, schedule themselves to receive the vaccine doses, and get inoculated.

Progressive Enforcement Approach. Even with the above "grace period," it is possible that some hospitals – even those with high vaccination rates – could have portions of their workforce that are not yet vaccinated by the time they must come into compliance. As noted above, these remaining employees could be among the most challenging to convince to get the vaccine. Yet, we do not believe that a precipitous removal of these hospitals from Medicare and Medicaid participation would serve the interests of CMS, communities or hospitals, especially given the ongoing work to manage COVID-19 patients, as well as an increase in care for non-COVID-19 patients.

**For this reason, the AHA urges CMS to adopt a progressive enforcement approach that gives hospitals opportunities to demonstrate progress in coming into compliance with the mandate.** CMS could consider emulating the multi-step corrective action process it uses to enforce the COVID-19 daily data reporting CoP. This approach gives hospitals time to demonstrate compliance, and only escalates consequences when hospitals fail to engage with CMS to seek guidance and assistance related to actions that can be taken to come into compliance. Furthermore, hospitals have demonstrated extremely high levels of compliance with reporting COVID-19 data

The Honorable Chiquita Brooks-LaSure
September 27, 2021
Page 5 of 7

from the outset. As a result, we believe using a similar approach for the vaccination mandate CoP would be similarly successful.

Flexibility in the Event of Vaccine Supply Shortages. **The AHA urges CMS to include enforcement flexibility in its mandatory vaccination policy in the event of unexpected vaccine supply shortages.** The nation has been fortunate that since May 2021, there has been an adequate supply of vaccines for all who want them. However, as with any vital medical supply, it is possible that disruptions to manufacturing or distribution could cause unexpected shortages in vaccine supply. Furthermore, as the science around vaccination continues to evolve, it is possible that there would be a mismatch between the vaccines that are available and the vaccines needed to complete a regimen. For example, if future booster shot dosages differed from those used in an initial series, a shortage of the booster doses would make it hard to ensure health care workers were fully vaccinated.

To be clear, we anticipate that the supply of vaccine will remain adequate to vaccinate all who need it. However, we urge CMS to include contingencies in its policy (e.g., temporary suspension of requirements, grace periods, etc.) to ensure that hospitals are not considered out of compliance in the event that vaccine supplies are inadequate.

## TRANSPARENT AND CONSISTENT IMPLEMENTATION

Timely Issuance of Interpretive Guidance. **The AHA urges CMS to issue any interpretive guidance associated with its mandatory vaccination policy as close to concurrently with the IFR as possible.** If CMS adheres to its usual process for promulgating CoPs, we would expect that many enforcement details would be specified in sub-regulatory interpretive guidance issued either concurrently with the regulation or shortly after it. Hospitals are eager to have as much detailed information as possible about how they can demonstrate their compliance and how CMS will conduct enforcement. The sooner CMS can issue any associated interpretive guidance, the greater the certainty for hospitals.

In addition, we recommend that there be a sufficient amount of time in between when guidance becomes effective, and when CMS begins to conduct enforcement. We suggest a minimum period of 60-90 days. In the event that the interpretive guidance is not released concurrently, we ask that the agency provide additional flexibility, leniency and judgment in the enforcement of the CoP until such time as the interpretive guidance is released.

Exceptions for Medical and Religious Reasons. **The AHA urges CMS to include in its mandatory vaccination policy exceptions for medical reasons and for sincerely held religious beliefs, practices or observances. Furthermore, we urge CMS to provide interpretive guidance on how to apply these exceptions consistently.** Based on the experience of hospitals that have already implemented their own

The Honorable Chiquita Brooks-LaSure
September 27, 2021
Page 6 of 7

mandatory vaccination policies, we believe the number of individuals who actually require these exceptions is relatively small. However, we anticipate that health care personnel's demand for these exceptions could grow as hospitals work with those staff who remain unvaccinated. Hospitals are eager to ensure that there is a consistent approach to applying such exceptions, one that strikes a balance between rigor and administrative burden to hospitals and health care personnel.

For medical exemptions, it would be important for CMS' guidance to have enough detail to promote standardized approaches among hospitals. We encourage CMS to consult with both the Centers for Disease Control and Prevention (CDC) and Food and Drug Administration (FDA) to provide hospitals with a list of common contraindications for the vaccinations. We appreciate that no list of contraindications is exhaustive, but it would give hospitals a starting point. In addition, CMS could ask that hospitals have a process in place for their workers to attest to having a medical contraindication to the vaccination, along with a policy that permits hospitals to ask employees for substantiation of their medical contraindication. This "proof" could be, for example, a signed letter from a physician, or a hospital-issued form that the hospital produces for physicians to sign.

For religious exemptions, we urge CMS to ensure its approach is consistent with other government guidance from OSHA as well as the EEOC guidance issued on May 28, 2021. The EEOC guidance indicates that employees can ask for accommodations from vaccination requirements based on sincerely held religious beliefs, practices or observances. CMS' interpretive guidance should describe what documentation is required to substantiate a religious exemption.

## ALIGNMENT WITH OTHER FEDERAL VACCINATION-RELATED POLICIES

Measuring Compliance Using CMS Health Care Personnel Vaccination Measure. **To minimize duplicative efforts and promote alignment, CMS should consider measuring hospital compliance with its vaccination mandate by using the recently adopted COVID-19 vaccination coverage among health care personnel (HCP) measure.** Beginning on Oct. 1, CMS will require hospitals and several other provider types to report a measure reflecting the proportion of health care personnel in their facilities that are vaccinated for COVID-19. Hospitals and other providers will report a "snapshot" of their vaccination coverage rates into the CDC's National Healthcare Safety Network (NHSN) portal at least once per month. We believe using this mechanism to measure hospital progress and compliance with the vaccination mandate would ensure a consistent approach to assessing HCP vaccination rates across the agency. In addition, the HCP measure's definition of included personnel types aligns quite closely with what CMS has indicated it intends to include in its mandatory vaccination policy. Lastly, we believe using HCP measure reporting to assess compliance would reduce the amount of administrative burden for hospitals and other health care providers subject to the mandate.

The Honorable Chiquita Brooks-LaSure
September 27, 2021
Page 7 of 7

<u>Coordination with Other Federal Vaccination-Related Policies</u>. As noted above, the AHA strongly supports the vaccination of all HCP for COVID-19. However, CMS' vaccination mandate is not the only vaccination mandate policy that could apply to hospitals and health systems. The Biden Administration's Sept. 9 COVID-19 Action Plan indicates that OSHA soon will issue an emergency temporary standard (ETS) requiring all employers with 100 or more employees to either fully vaccinate their staff or implement weekly COVID-19 testing. Most hospitals in America employ at least 100 people. Furthermore, the Administration announced its intent to require federal contractors to vaccinate their staff. By means of their significant research work, it is possible that some hospitals also could be considered federal contractors.

**The AHA urges CMS to work with other federal agencies to minimize inconsistency and redundancy between these mandates.** For example, we would encourage CMS to engage OSHA to either carve out hospitals from the pending ETS, or to develop an information sharing mechanism with OSHA so that hospitals' Medicare CoP compliance can "count" as meeting the OHSA ETS requirements. Similarly, for those hospitals that may be undertaking research activity as a federal contractor, we would encourage CMS to develop information sharing mechanisms to enable hospitals to count their CoP compliance as meeting the federal contracting vaccination rules**. In short, we believe that hospitals should have a single set of federal rules and regulations to which they are held accountable**. This would ensure that hospitals can spend their finite resources on achieving as high a level of vaccination among their workforce as possible, rather than on deciphering federal rules that could differ from one another.

We appreciate your consideration of these issues, and welcome the opportunity to work with CMS to ensure this new policy is implemented and enforced in a transparent, feasible and fair manner. Please contact me if you have questions or feel free to have a member of your team contact Akin Demehin, AHA's director of policy ademehin@aha.org, or Mark Howell, AHA's senior associate director of policy at mhowell@aha.org.

Sincerely,

/s/


Stacey Hughes
Executive Vice President


Cc*:*   Jonathan Blum, CMS Principal Deputy Administrator
       Lee Fleisher, M.D., CMS Chief Medical Officer



August 24, 2021

Xavier Becerra
Secretary
U.S. Department of Health and Human Services
200 Independence Ave. SW
Washington, DC 20201

Dear Secretary Becerra:

America's Essential Hospitals appreciates the leadership of the Department of Health and Human Services (HHS) in confronting COVID-19 and tackling health inequities brought to the fore by the pandemic. With the highly contagious delta variant becoming the predominant strain of the SARS-CoV-2 virus, essential hospitals nationwide are straining under the overwhelming demand the variant has created and the pressures it has placed on their staff. As providers continue to invest significant resources into COVID-19 prevention and response, and deal with challenges such as critical staff shortages, it is critical that HHS take swift and decisive steps to allocate the remaining funds in the Provider Relief Fund (PRF). We also urge HHS to take other critical steps to bolster the response to the pandemic, including expediting full approval of the COVID-19 vaccine, shoring up the nation's supply chain, and helping direct federal staffing assistance to states and hospitals with workforce shortages. Swift adoption of these recommendations will ensure the stability of the nation's health care safety net as COVID-19 cases continue to spike.

America's Essential Hospitals is the leading champion for hospitals and health systems dedicated to high-quality care for all, including underrepresented people and underserved communities. Our more than 300 member hospitals fill a vital role in their communities. They provide a disproportionate share of the nation's uncompensated care, and three-quarters of their patients are uninsured or covered by Medicare or Medicaid. Essential hospitals provide state-of-the-art, patient-centered care while operating on margins one-third that of other hospitals—2.9 percent on average compared with 8.8 percent for all hospitals nationwide.[1]

Essential hospitals' tight operating margins result in minimal reserves and low cash on hand, with many essential hospitals struggling to make payroll. The difficulties associated with these narrow margins have been compounded by the strain on hospital finances and staff associated with responding to the pandemic, as they experience unsustainable increases in COVID-19 admissions and intensive care units (ICUs) approaching or exceeding full occupancy. Compounding these capacity limitations are the shortage of health care staff, particularly nurses, and the high costs associated with hiring and retaining them. Many essential hospitals

---

[1]  Clark D, Roberson B, Ramiah K. *Essential Data: Our Hospitals, Our Patients—Results of America's Essential Hospitals 2019 Annual Member Characteristics Survey.* America's Essential Hospitals. May 2021. https://essentialdata.info. Accessed August 18, 2021.

essentialhospitals.org      AMERICA'S ESSENTIAL HOSPITALS      t: 202 585 0100
401 Ninth St NW Ste 900      f: 202 585 0101
Washington DC 20004      e: contact@essentialhospitals.org

AR-04553

have hundreds of nursing vacancies at any given time, and, with the high demand, they are competing with other hospitals to recruit nurses even on short-term contracts. Further, the COVID-19 pandemic hit the patients and communities served by essential hospitals particularly hard—especially people of color, who constitute more than half of essential hospitals' discharges.[2] COVID-19 also is detrimental to those with underlying health conditions; our member hospitals serve a disproportionate number of people facing social risk factors and compounding health issues, putting our members' patients most at risk.

Essential hospitals continue to make substantial investments to maintain capacity for treating COVID-19 patients and lead vaccination efforts in their communities. Essential hospitals were some of the first providers to vaccinate health care workers and the general public; their efforts have included procuring adequate supplies of vaccines, setting up appropriate vaccine storage capabilities, establishing mass and drive-through vaccination clinics, and hiring staff to administer vaccines.

However, vaccine acceptance remains inconsistent across the country, with higher rates in some facilities and varied use of mandates by health care employers. Most recently, America's Essential Hospitals called for its member hospitals to require their employees be vaccinated.[3] We have also continued to engage with the Biden administration and its leaders on the White House COVID-19 Task Force, including Bechara Choucair, MD, the COVID-19 vaccination coordinator. Sustained efforts by essential hospitals in vaccination rollout and education campaigns will be critical to ensuring the nation's underserved communities are vaccinated.

Considering the tenuous financial situation of essential hospitals and the difficulty they are having in hiring and recruiting staff from a highly competitive marketplace, it will be critical for HHS to rapidly direct more funds to hospitals most in need. While we appreciate distributions made through the general and targeted PRF distributions to date, many essential hospitals received minimal funds from general distributions tied to Medicare or total revenues, and others were left out of targeted distributions altogether. Today, many essential hospitals continue to struggle with financial challenges related to COVID-19. **We urge HHS to take the steps outlined below to ensure essential hospitals receive much-needed relief and are equipped for their central role in the continued response to the pandemic.**

1. **HHS should swiftly allocate the remaining PRF funds and issue a targeted distribution to hospitals that serve racial and ethnic minorities and low-income populations.**

The year-end COVID-19 relief and appropriations bill allocated an additional $3 billion to the PRF, bringing the total pool to $178 billion. To date, according to the data provided on HRSA's PRF website and by the Government Accountability Office, nearly $44 billion in unallocated funds remain in the PRF.[4] Also, according to the year-end bill, 85 percent of these unallocated funds must be distributed through an application-based process. **We urge HHS to swiftly open the application process to direct these funds to providers in need.**

---

[2] Ibid.
[3] America's Essential Hospitals Urges Members to Require Employee Vaccination. America's Essential Hospitals. July 21, 2021. https://essentialhospitals.org/general/americas-essential-hospitals-urges-members-require-employee-vaccination/. Accessed Aug. 18, 2021.
[4] Government Accountability Office (GAO). *COVID-19: Continued Attention Needed to Enhance Federal Preparedness, Response, Service Delivery, and Program Integrity.* July 19, 2021. https://www.gao.gov/products/gao-21-551. Accessed Aug. 18, 2021.

AR-04554

In addition to opening the application process, HHS should issue a targeted distribution from the remaining funds to hospitals treating racial and ethnic minorities and low-income populations. We appreciate that HHS, in last year's two safety net allocations, recognized the critical role these providers play in the nation's COVID-19 response. However, we remain concerned that, more than a year after these distributions, many essential hospitals serving large numbers of underserved patients and under immense financial pressure still struggle financially. Hospital ICUs, particularly in states with lagging vaccination rates, are approaching or exceeding capacity, with COVID-19 case rates rivaling those during the surge in the winter months. Hospitals in Alabama, for example, have run out of ICU beds, with 29 more patients in need of ICU care than the number of beds available.[5] These providers are in dire need of additional funding, which will go a long way in bolstering their COVID-19 response and allowing them to continue vaccination efforts in underserved communities, which are disproportionately affected by COVID-19. **We urge HHS to distribute funds through an additional targeted distribution to these hospitals filling a safety net role.[6]**

2. **HHS should take steps to ensure essential hospitals are adequately staffed to respond to the pandemic.**

Essential hospitals across the country continue to incur high costs in hiring and maintaining staff to respond to COVID-19. The pressures of the pandemic have led to staff burnout and required essential hospitals to expend significant resources to recruit and retain external medical staff, which is a costly undertaking considering the competitive marketplace for health care workers during the pandemic. As a result of being understaffed, essential hospitals are seeing increased costs associated with hiring bonuses, retention bonuses, and increased salaries to recruit and retain nurses in short supply. Hospitals nationwide have felt the difficulties associated with filling staff vacancies; hospitals in Florida, Arkansas, and Texas are understaffed by hundreds of nurses.[7] The distribution of additional PRF funds will be critical to covering the additional expense of recruiting and retaining these nurses who are assisting in the COVID-19 response.

HHS also can work with other government agencies to approve requests for personnel requests in a timely manner. HHS, in cooperation with the Federal Emergency Management Agency, assists state, tribal, and territorial governments with requests for medical staff. Given the renewed strains of medical personnel due to the increases in COVID-19 cases and emerging variants, **we urge HHS to expedite approval of states' requests for direct federal assistance for additional medical staff.**

3. **To encourage uptake of the COVID-19 vaccine, HHS should expedite full approval of the COVID-19 vaccines and provide recommendations and**

---

[5] Hernandez, Joe. NPR. Alabama Hospitals Have Run Out of ICU Beds as COVID-19 Cases Surge. August 19, 2021. https://www.npr.org/2021/08/19/1029260134/alabama-hospitals-icu-beds. Accessed Aug. 19, 2021.

[6] In previous letters to the agency, America's Essential Hospitals has outlined a methodology that would build on the methodology used in previous safety-net distributions and capture hospitals serving low-income and uninsured patients. See, e.g., letter from Bruce Siegel, America's Essential Hospitals, to HHS Secretary Xavier Becerra. June 15, 2021. https://essentialhospitals.org/wp-content/uploads/2021/06/FINAL-AEH-Letter-to-HHS-PRF-6-14-21-for-archive.pdf. Accessed Aug. 18, 2021.

[7] Goldstein, Amy. *The Washington Post*. Hospitals struggle with staff shortages in coronavirus hotspots. Aug. 12, 2021. https://www.washingtonpost.com/health/staff-shortages-hospitals-covid/2021/08/12/85f636b4-fa97-11eb-8a67-f14cd1d28e47_story.html. Accessed Aug. 20, 2021.

3

**resources to essential hospitals for the administration of additional doses of the COVID-19 vaccines to ensure equity and access.**

Essential hospitals continue to educate staff and their communities about the importance of vaccination in the fight against COVID-19, particularly given the rise of cases tied to the delta variant. However, a subset of the population remains vaccine hesitant. Research tracking the public's attitudes and experiences with COVID-19 vaccinations reveals that full approval from the Food and Drug Administration (FDA) could persuade those in the "wait and see" group to get vaccinated.[8] Additionally, FDA full approval could facilitate the widespread adoption of mandatory vaccination policies by public and private employers, making it easier and more convenient to access the vaccine. We are pleased to see the FDA's full approval August 23 of the Pfizer-BioNTech COVID-19 vaccine for those ages 16 and older. **We encourage HHS to work with the FDA to expedite full approval of the Moderna and Janssen COVID-19 vaccines currently authorized for emergency use.**

Additionally, there is a need for immediate guidance related to the administration of additional COVID-19 vaccine doses. The administration outlined a plan for booster shots of Pfizer and Moderna vaccines for much of the American public beginning September 20.[9] This plan is contingent upon approval of additional doses by the FDA and recommendations from the Centers for Disease Control and Prevention (CDC)'s Advisory Committee on Immunization Practices. **We urge HHS to work with the FDA and CDC to expedite approval and recommendations related to additional vaccine doses for the general public.**

Essential hospitals worked tirelessly during the initial vaccine rollout to deliver doses to front-line workers, the elderly, and the most vulnerable at high risk for severe illness. However, disparities in initial access to the COVID-19 vaccine highlighted the urgent need to address health inequities in the United States. **We urge HHS to work with states and providers to ensure an equity-based national strategy in the planning for and administration of additional doses of COVID-19 vaccines**. This includes directing supply to providers, such as essential hospitals, that can reach into the communities they serve and encourage access for low-income and vulnerable people. Building the infrastructure and processes and providing support needed to administer additional vaccine doses are tasks we must undertake now.

4. **HHS should ensure the nation's supply chain is adequately stocked with crucial supplies such as personal protective equipment and ventilators.**

The Strategic National Stockpile (SNS), within HHS' Office of the Assistant Secretary for Preparedness and Response, has served a role in our country's COVID-19 response by deploying critical supplies, such as personal protective equipment and ventilators. The federal government activated the SNS early in the pandemic to fill states' gaps in COVID-19 medical supplies and materials. This support was not only helpful, but necessary at a time when hospitals were overwhelmed by COVID-19 cases. As essential hospitals again face surge in areas with low vaccination rates and high prevalence of the delta variant, **we urge HHS to ensure**

---

[8] Kaiser Family Foundation COVID-19 Vaccine Monitor: June 2021. https://www.kff.org/coronavirus-covid-19/poll-finding/kff-covid-19-vaccine-monitor-june-2021/. Accessed Aug. 18, 2021.

[9] U.S. Department of Health and Human Services. Joint Statement from HHS Public Health and Medical Experts on COVID-19 Booster Shots. August 18, 2021. https://www.hhs.gov/about/news/2021/08/18/joint-statement-hhs-public-health-and-medical-experts-covid-19-booster-shots.html. Accessed Aug. 23, 2021.

4

**that the SNS can handle not only smaller requests from states experiencing surge, but also the potential for large-scale outbreaks.**

******

We look forward to continued engagement and partnership in responding to COVID-19. If you have questions, please contact Senior Director of Policy Erin O'Malley at 202-585-0127 or eomalley@essentialhospitals.org.

Sincerely,

Bruce Siegel, MD, MPH
President and CEO

5

The Jewish Federations
OF NORTH AMERICA | Strategic Health
Resource Center

**Mark Wilf**
CHAIR, BOARD OF TRUSTEES

**Jodi J. Schwartz**
VICE CHAIR, BOARD OF
TRUSTEES

**Julie B. Platt**
NATIONAL CAMPAIGN CHAIR

**Harold Gernsbacher**
TREASURER

**Neil A. Wallack**
SECRETARY

**Andy Hochberg**
CHAIR, DOMESTIC POLICY &
GOVERNMENT AFFAIRS

**Eric D. Fingerhut**
PRESIDENT & CEO

**Elana Broitman**
SENIOR VICE PRESIDENT,
PUBLIC AFFAIRS

**Jonathan S. Westin**
SENIOR DIRECTOR, HEALTH
INITIATIVES

**Elizabeth A. Cullen**
COUNSEL, HEALTH POLICY

**Aaron Kaufman**
SENIOR MANAGER,
LEGISLATIVE AFFAIRS

September 3, 2021

Administrator Chiquita Brooks-LaSure
The Centers for Medicare & Medicaid Services,
U.S. Department of Health and Human Services
7500 Security Boulevard
Baltimore, MD 21244-1850

**RE: Mandatory Vaccinations for Medicare and Medicaid-Participating Nursing Homes**

**SUBMITTED ELECTRONICALLY**

Dear Administrator Brooks-LaSure:

On behalf of the Jewish Federations of North America (Jewish Federations) and the Association of Jewish Aging Services (AJAS), we are writing in response to CMS' August 18, 2021 announcement of the agency's intention to engage in emergency rulemaking that would require staff vaccinations within the nation's more than 15,000 Medicare and Medicaid-participating nursing homes. Jewish Federations, AJAS, and our provider partners support thoughtful policy measures designed to increase vaccination rates, including broad-based vaccine mandates. We write today to encourage you to ensure that any vaccine mandate is comprehensive and imposed on healthcare personnel working in *all* healthcare settings, not just nursing homes. In conjunction with this policy, we further urge CMS and HHS to lend support to long-term care providers that are bearing an extraordinary burden during this current public health emergency by distributing dedicated funding from the Provider Relief Fund to these providers.

Jewish Federations represent one of the largest philanthropic networks in the United States. Together, we raise and distribute more than $3 billion annually for social welfare, social services, and educational needs. Our local federations support one of the largest networks of social service providers in the country, including 100 nursing homes, 15 leading academic medical centers/health systems, and 125 Jewish family service agencies – that serve people of all denominations, backgrounds, and socioeconomic levels.

800 8th Street NW
Washington, DC 20001

p 202.785.5900
f 202.785.4937
JewishFederations.org

 @jfederations

**The Jewish Federations**
OF NORTH AMERICA

Strategic Health
Resource Center

AJAS is a unique association of not-for-profit community-based organizations, rooted in Jewish values, which promotes and supports the delivery of services to an aging population. AJAS members administer to the needs of the aging through residential health care; skilled nursing; assisted living and group homes; independent and congregate housing; and living-at-home service programs. Together, our aging partners provide care for more than 400,000 clients and employ more than 43,000 staff.

As noted above, Jewish Federations and AJAS are supportive of broad-based public health measures, including vaccine mandates, carefully crafted to maximize their effectiveness. **During the period of the COVID-19 public health emergency, we are therefore in favor of a requirement that <u>all</u> qualifying healthcare personnel across <u>all</u> healthcare settings be fully vaccinated against COVID-19**. A requirement that singles out just nursing homes risks exacerbating existing serious nursing home staffing shortages by encouraging unvaccinated staff to move to other healthcare settings. This unintended consequence will prove even more acute in communities throughout the country where our nursing home providers are already witnessing staffing shortages in excess of 30% and are relying heavily on agency staff to fill gaps in coverage. On a positive note, our providers are reporting that in states with existing mandates on *all* healthcare workers, providers have been successful in retaining staff while boosting vaccination rates, suggesting that a broad-based vaccine mandate policy is both workable and commonsense.

Our nursing home partners have worked arduously, creatively, and persistently for months to vaccinate their staff. As the agency finalizes its plans to address the growing threat of COVID-19 and the delta variant head on, we would urge you to consider some questions and concerns that would help shape a practical and comprehensive approach:

- When will the policy go into effect? How long will nursing homes have to comply given the time needed for staff to receive multiple doses of a vaccine?

- Will there be exceptions or alternatives to vaccination, such as regular and frequent testing, similar to a policy adopted in other jurisdictions (for example, California and Maryland)? What about exceptions where staff have a medical contraindication or condition specified by the FDA labeling authorization, or a sincerely held religious belief?

- Will the policy apply only to nursing homes, or also to other long-term care providers including home and community-based service providers, assisted living facilities, or group homes?

800 8th Street NW
Washington, DC 20001

p 202.785.5900
f 202.785.4937
JewishFederations.org

 @jfederations

AR-04559

# The Jewish Federations
OF NORTH AMERICA | Strategic Health Resource Center

- Will the policy only apply to nursing home employees or to anyone that works inside of a nursing home (for example, workers provided by a staffing agency or janitorial workers provided by a third-party cleaning service)?

- Will the policy apply to the same type of workers in other healthcare settings, including hospitals?

- How will HHS survey and enforce the new vaccine mandate? How will nursing homes demonstrate proof of vaccination for their staff?

- Will HHS provide funding or assistance to nursing homes to help them come into compliance, particularly in the face of workforce shortages?

Importantly, and as part of any future policy or regulatory action, we urge CMS and HHS to support long-term care providers across the country as they battle the spread of COVID-19 by releasing additional Provider Relief Fund dollars. Nursing homes and other long-term care providers are at the epicenter of providing care and support for our nation's most vulnerable individuals and are in dire need of an infusion of resources to assist with these facilities' recovery and stability now and into the future.

Thank you for your time and attention to this critical manner. If you have any questions or concerns on this request, please do not hesitate to reach me directly via email at Jonathan.Westin@jewishfederations.org or cell at 202-255-7994.

Sincerely,

Jonathan S. Westin
Senior Director
The Jewish Federations of North America Strategic Health Resource Center

800 8th Street NW
Washington, DC 20001

p 202.785.5900
f 202.785.4937
JewishFederations.org

 @jfederations

AR-04560





Susan Ratner
Co-Chair, Health & Long-Term Care Committee
The Jewish Federations of North America

Robert Yass
Co-Chair, Health and Long-Term Care Committee
The Jewish Federations of North America

Donald Shulman
President & Chief Executive Officer
Association of Jewish Aging Services

CC: Jonathan Blum, Principal Deputy Administrator & Chief Operating Officer, CMS

800 8th Street NW
Washington, DC 20001

p 202.785.5900
f 202.785.4937
JewishFederations.org

 @jfederations



August 23, 2021

Susan Rice
Director
Domestic Policy Council of the United States
Eisenhower Executive Office Building
Washington, DC 20502

Xavier Becerra
Secretary
U.S. Department of Health and Human Services
1401 Constitution Avenue N.W.
Washington, DC 20230

Chiquita Brooks-LaSure
Administrator
Centers for Medicare and Medicaid Services (CMS)
7500 Security Boulevard
Baltimore, MD 21244-1850

Dear Ambassador Rice, Secretary Becerra, and Administrator Brooks-LaSure:

Thank you for the ongoing commitment of the Administration to beating the pandemic, your continued rapid response to the evolving situation, and your steadfast focus on the people who use and work in aging and long-term care services.

LeadingAge members—providers of services to older people in their own homes and in settings across the continuum of care—continue to work tirelessly to increase vaccination rates among staff. Many life plan communities, nursing homes, assisted living providers, PACE programs, low-income senior housing providers, and others have made the bold decision to mandate that staff be vaccinated. Others are complying with the increasing number of state requirements that health care staff be immunized.

We commend the Administration for its efforts to promote vaccine acceptance in all communities. Your efforts align with ours; LeadingAge has encouraged all members from across the continuum to make COVID-19 vaccination a condition of employment. But we know aging services providers can't do this alone. In addition to a strong statement to LeadingAge members, we joined with more than 50 other health care provider groups to promote the same message for all health care providers.

However, the Administration's announcement this week that employers in only one health care setting—nursing homes—will face loss of Medicare and Medicaid funding if they do not ensure that all staff are vaccinated is far too limited. To achieve the objective of protecting older adults, any mandate must include *all health care providers* participating in those programs—not just nursing homes.

2519 Connecticut Ave., NW | Washington, DC  20008-1520
P  202.783.2242  |  F  202.783.2255  |  LeadingAge.org

*The Trusted Voice for Aging*

AR-04562

Further, mandates should extend to visitors and agency staff across all care settings. Many staff, temporary workers, residents, visitors, and patients move between health care settings, so the only way to protect older Americans and their caregivers is to make vaccination mandates universal for all of health care. In addition, state surveyors and quality assurance staff who enter nursing homes and other health care settings should be required to be vaccinated. There are far too many examples of agency staff and surveyors bringing COVID into nursing homes; this can't continue.

Throughout the pandemic, our nursing home leaders and staff have demonstrated dedication, commitment, and bravery in the face of deadly challenges. It's impossible to view them as separate from the rest of the health care system. We note a recent report from the Census that there are more than 7 million workers in hospitals, close to 2 million in physician offices and a similar number in outpatient care settings, and 1.7 million in nursing homes. Nursing home workers are only a small part of a larger system.

Workforce shortages in nursing homes have been one of the most painful outcomes of the pandemic; and they continue with the Delta surge. It is quite common for our provider members to post positions at all levels and receive no applicants. Recently, as the Delta variant drives case rates higher, we are hearing from members in some states that it is not even possible to hire temporary agency staff. Many are turning away individuals in need of their care because they simply don't have the staff to provide quality care.

Mandates that don't cover the whole health care workforce, are likely to further workforce shortages, driving some nursing home staff to employers not requiring vaccination—which is untenable. Nursing homes that are unable to hire staff or even bring in agency staff face the dire prospect of having to transfer residents and close their doors. This unintended consequence may be even more likely for many nursing homes, particularly small, single site homes, and those in rural areas that are still struggling financially from the mounting costs of the pandemic.

A nursing home staff vaccine mandate in isolation will do more harm than good. We suggest that the Administration take the following steps to ensure a comprehensive vaccine program that protects everyone:

- Level the field to keep ALL of us protected. The vaccine mandate as a condition of employment should apply to all health care providers that participate in Medicare and/or Medicaid.  For this mandate to successfully keep nursing home residents safe, and to do everything possible to protect anyone seeking health care in any setting, it is critical that nursing homes are not the only providers subject to this federal regulation.

- Provide desperately needed assistance to address workforce shortages. The workforce challenges in the long-term care sector have been well documented. Please couple vaccine mandates in nursing homes and other aging services with direct assistance to enable providers to have the staff to keep serving and caring for residents. This could include a targeted assistance fund for providers that reach critical shortage levels; additional strike teams, Public Health Service, and national guard resources to fill staffing gaps during the Public Health Emergency; stringent rules against price gouging by staffing agencies during a public health emergency; freeing up CMP funds for nursing

AR-04563

homes to address staffing challenges; amending the State Department's Immigrant Visa Prioritization update to prioritize the entry of foreign trained nurses and health care workers into the US; and resources to cover training of frontline staff.

- Allocate remaining Provider Relief Funds to long-term care providers as quickly as possible. The PRF funds have helped offset some of the tens of billions of dollars in expenses and losses during the pandemic, and more is critically needed to ensure caregivers can continue to serve residents.

- Increase Administration supports to promote vaccine acceptance in aging services settings. With our partner Community Catalyst, LeadingAge will be engaged in efforts that are part of a CDC initiative to promote vaccine confidence among aging services staff.

I would welcome an opportunity to meet with you as soon as possible on these recommendations.

LeadingAge members appreciate the Administration's efforts to make the nation's health care system as safe as possible. We look forward to continuing to work with you.

Sincerely,

Katie Smith Sloan
President and CEO
LeadingAge

AR-04564

AN ASSOCIATION OF HOSPITALS & HEALTH SYSTEMS



September 29, 2021

The Honorable Chiquita Brooks-LaSure
Administrator
Centers for Medicare & Medicaid Services
7500 Security Blvd
Baltimore, MD 21244

*RE: Forthcoming Interim Final Rule Implementing a Mandatory COVID-19 Vaccination Policy for Hospitals and Other Health Care Providers Participating in Medicare and Medicaid*

Dear Administrator Brooks-LaSure,

The Florida Hospital Association (FHA), on behalf of its more than 200 member hospital and health systems, writes to request certain considerations as you develop an Interim Final Rule related to the health care staff mandatory COVID-19 vaccination policy President Biden announced on September 9.

President Biden's 6-part "Path Out of the Pandemic" included instructions to the Centers for Medicare and Medicaid Services (CMS) "to require COVID-19 vaccinations for workers in most health care settings that receive Medicare or Medicaid reimbursement, including but not limited to hospitals, dialysis facilities, ambulatory surgical settings, and home health agencies."  This mandate, coupled with direction to the Occupational Safety and Health Administration (OSHA) to require employers of 100 or more employees to require employee vaccination or weekly testing, represents an effort to curb COVID-19 death and infection through vaccination.  FHA is a strong proponent of vaccination for all eligible persons, as we have demonstrated through a successful multi-language public awareness campaign, and we support the underlying purpose of the administration's efforts.

However, CMS, and the administration, must make sure that the IFR is developed quickly, clearly, fairly, and in a way that will not incentivize staff turnover. The IFR should create stability for health care employers and reduce confusion related to the various public health mandates that apply to the health care field.  Health care employers have shown incredible leadership adapting to the developing science of COVID-19: they implemented infection control procedures

AR-04565

AN ASSOCIATION OF HOSPITALS & HEALTH SYSTEMS 

independent of federal mandates; managed PPE and staff shortages to treat their communities; and have developed OSHA compliance programs with little time or instruction from the agency. Florida's hospitals are ready to implement CMS's mandatory vaccine policies; however, they are concerned that the IFR could be drafted in a manner that puts hospitals at odds with both their staff and other federal mandates.

As CMS develops the IFR, they should:

- Ensure consistent application of the vaccine mandate to all Medicare-regulated health care providers – requiring vaccines in one health care setting, but not another, could result in labor shortages for vaccine mandated employers.  **Parity among providers is critical to minimize disruption of care delivery**.
- Provide hospitals with adequate time for compliance and make sure enforcement efforts account for a hospital's good faith effort to adopt these requirements.
- Clearly define any exceptions, specifically for medical reasons or sincerely held religious beliefs, and documentation necessary to apply those exceptions.
- Build in flexibility to account for vaccine and testing supply shortages.
- Coordinate with other federal vaccination-related policies to minimize inconsistency and redundancy.  **All hospital requirements should be managed by a single regulation and agency**.

We appreciate your consideration of these issues and welcome the opportunity to work with CMS to ensure this new policy is implemented quickly, clearly and fairly.  Please do not hesitate to contact me if you have any questions or you may reach out to Michael Williams, Senior Vice President Federal Affairs and General Counsel at michaelw@fha.org.

Sincerely,

Mary C. Mayhew

Mary C. Mayhew

President and CEO

AR-04566



August 27, 2021

SEIU

Stronger Together

Chiquita Brooks-LaSure, Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Hubert H. Humphrey Building, Room 445-G
200 Independence Avenue, SW
Washington, DC 20201

Dear Ms. Brooks-LaSure,

In light of the recent announcement that the Centers for Medicare and Medicaid intends to issue an interim final rule mandating COVID-19 vaccination for nursing home workers, we would like to take this opportunity to offer a few policy recommendations. These recommendations are based on our experience leading education and outreach campaigns to increase vaccine uptake among our more than 150,000 thousand nursing home members throughout the country.

According to a poll recently conducted by Hart Research of SEIU members, 81% of all SEIU members have received at least one dose of the covid-19 vaccine. Among nursing home members, the poll found an 82% vaccination rate--well above the national average of 62%.[1] While the higher vaccination rate among unionized members is due in part to geography (our members are more heavily concentrated in the northeast and west, where overall vaccination rates are higher, than in the south and midwest), it is also directly attributable to our robust education and outreach programs and extensive partnerships with employers, government, and medical experts.

As we proceed toward mandatory vaccination in skilled nursing facilities, it will be important to couple mandates with policies that require facilities to improve vaccine education and access in order to reduce the number of workers who leave the nursing home workforce and to avoid exacerbating the already severe staffing crisis in nursing homes. Specifically, CMS's policies implementing vaccine mandates should be accompanied by policies that require and support  robust worker education and outreach and ease remaining barriers to vaccine access, including the barrier created by workers' fear that they will need to use unpaid time or exhaust limited reserves of paid time off to get vaccinated or recover from reactions to the vaccination.

MARY KAY HENRY
International President

GERRY HUDSON
International Secretary-Treasurer

NEAL BISNO
Executive Vice President

HEATHER CONROY
Executive Vice President

LESLIE FRANE
Executive Vice President

VALARIE LONG
Executive Vice President

ROCIO SÁENZ
Executive Vice President

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

1800 Massachusetts Ave., NW
Washington, DC 20036

202.730.7000

www.SEIU.org

[1]Paulin, E., 2021Paulin, E., 2021. *Feds Say Nursing Home Staff Must Get COVID* [online] AARP. Available at: <https://www.aarp.org/caregiving/health/info-2021/nursing-home-staff-covid-vaccine-mandate.html> [Accessed 27 August 2021].

AR-04567

**Our Work on Increasing Vaccination Uptake in Nursing Homes**

The Service Employees International Union (SEIU)'s work on vaccine trust relies on culturally- and linguistically-competent education and outreach to members, with the union as validator and trusted messenger. Our formula for effective member communication utilizes medical experts who engage in a culturally competent manner and the stories of members who have been impacted by the virus and have chosen to be vaccinated.[2] We have improved vaccine access through SEIU-sponsored pop-up clinics, by assisting members in scheduling their appointments, and by working with employers to ease access to vaccination clinics through flexible scheduling and specifically allocated vaccine supply.

1. **Vaccine Education**

Our policy recommendations to increase vaccination rates among long term care workers follow the methodology outlined above and emphasize the importance of education, outreach and access as tools. There remains significant work to reduce distrust and resistance among those unvaccinated workers who are in the "wait and see" category rather than the "no never" category. Our polling shows that the "wait and see" group includes approximately 13% percent of unvaccinated nursing home workers and, importantly, 44 percent of Black unvaccinated workers. Rigorous education among these workers will also have the ripple effect of increasing vaccination rates within their families and in the communities in which they reside.

> **POLICY RECOMMENDATION:**
> Nursing homes should be required to offer vaccine educational sessions during mandatory in-service meetings. Whenever possible, such sessions should include medical experts with the same race/ethnicity and language profile as the workers at the facility. Where there is a union presence in the facility, the union is the trusted messenger that can center the sessions and anchor information resources and provide the medical expert through existing partnerships. Where there is not a union presence, community leaders may be able to play a role.  Holding mandatory educational sessions on work time increases the likelihood that workers who may not voluntarily seek out vaccine information nonetheless gain access to factual medical information from trusted sources.

2. **Vaccine Access**

Many nursing home workers became eligible for vaccination shortly after the FDA cleared the Pfizer-BioNTech and Moderna vaccines for emergency use. The speed of the roll-out for a population of workers heavily mistrustful of government (and sometimes of their employers), who had faced shortages of critical PPE and COVID testing and frequently changing health and safety guidance during much of the pandemic, contributed to initially low vaccine take-up rates for these workers. Further, the Pharmacy Partnership for Long Term Care COVID-19 vaccine efforts featured rigid clinic hours that did not line up with the

---

[2] "To get more long-term healthcare workers the vaccine, we're focused on trust and respect." Dr Alicia Fernandez,  Professor of Medicine at UCSF and Director of the UCSF Latinx Center of Excellence and Leslie Frane, Executive Vice President of the Service Employees International Union (SEIU). 6/14/2021 https://www.seiu.org/blog/2021/6/trusted-messengers

AR-04568

shifts of nursing home workers who often work multiple jobs and have family obligations and transportation challenges that made scheduling difficult.

> **POLICY RECOMMENDATION:**
>
> Going forward, states and employers should  create onsite vaccination opportunities that follow the shift-based structure of nursing home work and the needs of workers and that closely follow vaccine informational sessions. One way to increase the ease of access on site at nursing homes is to make it easier for pharmacies connected to the nursing homes to access the vaccine supply chain. Another is to have mobile vaccine units available onsite at shift change to better facilitate vaccination when workers arrive or depart from work. Onsite vaccination opportunities also address transit and time-off issues for employees.

### 3.  Paid Leave

The Occupational Safety and Health Administration (OSHA) Emergency Temporary Standard(ETS) directs nursing home employers to provide at least 8 hours of paid leave per vaccine dose for workers to recover from any side effects from the vaccine.[3] Under the ETS, the employer must support COVID–19 vaccination for each employee by providing reasonable time and paid leave (e.g., paid sick leave, administrative leave) to each employee for vaccination and any side effects experienced following vaccination.[4]

> **POLICY RECOMMENDATION:**
>
> The OSHA ETS directs employers to draw from existing sick and administrative leave employees may have accrued to cover any lost wages employees experience recovering from vaccine side effects.[5] Requiring use of workers' meager accrued leave can feel punitive and lower morale and acceptance of the vaccine. Instead, employers should be directed to use the paid leave tax credits for time given to employees to receive and recover from the vaccine under the American Rescue Plan.[6] Workers should be afforded as much paid time off to recover as they need, even if it exceeds the amounts prescribed by the ETS. Paid sick leave that is not drawn from workers' banked leave should also be offered for any required booster shots.

### 4.  Vaccine Incentive Payments

Providing small payments to encourage vaccination is an approach that has shown efficacy in other settings.[7] Given the impact of COVID-19 on nursing homes, we believe they are an appropriate setting for a large-scale roll out of this approach. Achieving higher vaccination rates among nursing home workers is an important goal that is well worth the price of providing small incentive payments to workers.

---

[3] ETS Regulatory Text (29 CFR 1910, Subpart U)
[4] CFR 1910.502(m)
[5] Federal Register: https://www.osha.gov/laws-regs/federalregister/2021-06-21
[6] Only 14% of workers have access to paid leave.  Saad-Lessler, Joelle and Kate Bahn. 2017. The Importance of Paid Leave for Caregivers. Washington, DC: Center for American Progress. https://www.americanprogress.org/issues/women/reports/2017/09/27/439684/ importance-paid-leave-caregivers/.

[7] Carlos Algara, D. J. S. (2021, August 25). Analysis | as little as $20 in cash might persuade the reluctant to get vaccinated, our research finds. The Washington Post. https://www.washingtonpost.com/politics/2021/08/25/little-20-cash-might-persuade-reluctant-get-vaccinated-our-research-finds/.

**POLICY RECOMMENDATION:**

Incentive payments of $300-$500 dollars should be given to each worker who has already been fully vaccinated or who newly becomes fully vaccinated. Additional incentive payments in the amounts of $150-$250 should be given to nursing home workers after they receive a booster shot. To encourage vaccination as a collective effort, workers and managers in an individual nursing home should receive an incentive payment when the facility vaccination rate among staff exceeds 90%. This payment should be divided into equal amounts and distributed to all staff in a facility in recognition of that facility's progress.

5. **COVID Testing**

   **POLICY RECOMMENDATION:**

   Low-wage nursing home workers should not be responsible for the cost of frequent testing if frequent testing is a component of the upcoming mandate. Testing should also be available at the worksite and on paid work time.

6. **Phased Implementation**

In setting a timeline for imposing full vaccination mandates, CMS should consider a phased in approach. Especially for facilities with very low current vaccination rates, immediate implementation of a full mandate may create a staffing crisis that puts residents at great risk. As a result, CMS should consider establishing a mandate implementation date that gives facilities a limited amount of time to take steps to increase their voluntary compliance rate in advance of the full mandate, potentially with a slightly longer amount of time if they show evidence that they are implementing a robust plan to drive up take-up rates.

   **POLICY RECOMMENDATION:**

   Nursing home operators would be eligible for a limited amount of additional time to meet the goals of universal staff vaccination if they do all of the following:
   1. Meet metrics that demonstrate progress toward universal vaccination, such as sustained increases in vaccination rates week over week;
   2. Require mandatory testing for those who decline vaccination during the interim period;
   3. Provide paid time off for vaccination and recovery from side effects that does not count against the employee's accrued paid leave;
   4. Run mandatory inservice educational sessions for non-vaccinated employees provided by unions or community partners and medical experts not affiliated with the facility; and
   5. Provide incentive programs for vaccination.

**7.  Building Worker Trust**

Additionally, nursing home workers have expressed that vaccine hesitancy is often rooted in distrust of employers and of the government. Employers have also shared that staff vaccination rates are higher in nursing homes where workers have a positive relationship with operators and management. Factors that contribute to distrust of employers and the government include unsafe working conditions, low wages, and short staffing.

Throughout the course of the COVID-19 pandemic, workers in many nursing homes have been unable to secure the resources necessary to support a positive work environment. At times, nursing home workers have been left without adequate personal protective equipment, without adequate wages and hazard pay, and without enough coworkers on their shifts to assist them in providing quality care to residents. As a result of these challenges, which workers perceive to be caused by the government and employers, some workers remain distrustful of government and employer attempts to persuade them to take a COVID-19 vaccine. To build the trust of nursing home workers, it is imperative that deliberate measures are taken to improve overall working conditions in nursing homes. The government and employers should demonstrate to workers that their health and well-being are top priorities. Actions that can be taken to gain worker trust include: raising wages, providing retroactive and current pandemic pay, requiring minimum levels of staffing in nursing homes, providing more training and career advancement opportunities, and strengthening infection control measures.

We hope you will consider our best practices and recommendations on how to best encourage vaccine uptake among nursing home workers as this regulation is crafted. Please contact Elizabeth Royal at elizabeth.royal@seiu.org if you have any questions or comments about our approach to ensuring that nursing home workers become vaccinated against COVID-19.

Sincerely,

Leslie Frane
Executive Vice President



The Honorable Chiquita Brooks-LaSure
Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
7500 Security Blvd.
Baltimore, MD 21244

Dear Administrator Brooks-LaSure:

On behalf of the Nonprofit Kidney Care Alliance (NKCA), we write to offer our input as the agency prepares rulemaking related to vaccination requirements for health care workers. NKCA represents eight nonprofit dialysis providers: Centers for Dialysis Care; Central Florida Kidney Centers; Dialysis Center of Lincoln; Dialysis Clinic, Inc.; Independent Dialysis Foundation, Inc.; Northwest Kidney Centers; Puget Sound Kidney Centers; and The Rogosin Institute. Collectively, we serve more than 22,500 patients at 326 facilities in 32 states. In an effort to keep patients off dialysis, we also serve more than 10,000 patients with chronic kidney disease (CKD), with the goal of avoiding, or at least delaying, the onset of ESRD.

We commend the Administration for its commitment to tackling the pandemic and increasing the vaccination rate among Americans. We share with you the goal of protecting health care workers and their patients through vaccination and have been working even before vaccines became available to share data on safety and efficacy, counsel staff and patients, and lead by example to encourage vaccination. Although we hope for the same outcome, with the recent announcement of a forthcoming vaccine mandate for all health care workers, we are concerned about the risk of unintended consequences posed by any regulatory requirement that does not adequately allow for adaptation by providers.

We want to underscore our strong support for vaccination for staff and patients. At the same time, we stress the importance of mandating it in a way to ensure continued access to dialysis for patients during a time when these individuals are already at increased risk of severe COVID-19. At present we are already facing significant staffing shortages in many markets. Thus far, our experience with state-level vaccine mandates suggests that staff attrition of 5 to 10 percent or more is very likely under a federal standard.  In some markets, this may require facilities to curtail activities, through a reduction of shifts, or worse, to be forced to suspend services entirely.  This could limit dialysis access for beneficiaries in the clinic and shift dialysis care to hospitals during a time when they are dealing with their own staffing shortages and an influx of patients.   Further still, geographic differences in vaccine uptake could lead to disparities in staff attrition between states, leading to inequities in patient access to care.

During a recent CMS-CDC Town Hall Meeting, CMS asked that stakeholders let CMS know of their concerns. In that spirit, as CMS prepares the forthcoming regulation, we urge the agency to:

AR-04572

- Establish a tiered vaccine mandate transition based on vaccine rates in a geographic area or state, in which the target date for ESRD providers in states already in the highest quartile would be sooner, while those in the second, third and bottom quartile would each be given additional time commensurate with the quartile in which they fall.  This could also lend itself to incremental staff vaccination goals which increase over time to show progress.
- Establish measurable, objective, criteria for denying requests for religious and medical exemptions which would not require providers to adjudicate the validity of an exemption request.
- Develop robust educational and public message campaigns targeting health care workers that are tailored to different geographic markets, demographics, and concerns.
- Conduct a dynamic, flexible and transparent regulatory process that can easily adapt as new evidence becomes available including evidence of the consequences of the mandate on staffing shortages, changes in the COVID-19 case rates, emergence of new variants, and new information about the efficacy of the vaccines.

We urge your consideration of the above and would welcome additional discussion based on our experiences in various markets.  If you have any questions, please feel free to contact me at 202-580-7707 or info@nonprofitkidneycare.org.

Sincerely,

Martin Corry
Executive Director

2



**Priority Recommendations Regarding the Federal COVID-19 Vaccination Requirement**

Ascension commends the Biden Administration for announcing a requirement for COVID-19 vaccination for workers in most healthcare settings that receive Medicare or Medicaid reimbursement including clinical staff, individuals providing services under arrangements, volunteers, and staff who are not involved in direct patient, resident, or client care.

As the details on the forthcoming rulemaking are developed, we respectfully offer the following recommendations. In addition, our original proposed vaccination mandate policy is also included below.

**Our recommendations:**

**(1) Require that covered facilities adopt a policy that requires vaccination as a condition of employment and medical staff membership and/or clinical privileges by a date certain.** We strongly recommend that CMS avoid being overly prescriptive on the implementation details to carry out the vaccination requirement while being clear that the adopted policy must be clearly enforceable and enforced.  Each site of care will face different challenges toward reaching full implementation and by leaving the implementation details to the sites of care, the CMS policy can appropriately balance the need for an enforceable policy without being overly prescriptive.  Furthermore, we strongly recommend that CMS's vaccine requirement and the related data collection requirements for facilities be tailored so they are specific to only those groups under the direct control of the facility.

**(2) Require enforcement by the covered facility.** The agency should not dictate or be overly prescriptive about what such enforcement mechanisms(s) should be, beyond the essential required elements outlined here, provided that it should support and promote a provider's policy to enforce appropriate corrective action for noncompliance that includes without limitation termination of employment or privileges to provide services at the facility. It is essential that the covered facility implement and actually enforce its own policy.  However, while the agency could provide examples of effective enforcement mechanisms, CMS's policy should simply require an effective enforcement policy be implemented by a covered provider or facility. The agency should not dictate or be overly prescriptive about what such enforcement mechanisms(s) that policy should include beyond the essential requirements elements outlined here.

**(3) Effective federal enforcement.**   It is important that there is an effective enforcement mechanism that ensures that covered facilities come into compliance with the workforce

AR-04574

vaccination requirement. The federal requirement will only be effective to the extent that enforcement is effective.

**(4) Any testing alternative should be limited only to those who qualify for an exemption.** Testing should not be permitted as a general alternative for any healthcare worker who refuses the vaccine. Such an approach would create a loophole that would be vulnerable to exploitation by those who want to avoid the requirement and will undercut the goal of creating a safe environment. More importantly, the science does not support the use of testing as a valid alternative for keeping patients, associates, and visitors safe. A general testing alternative would also be difficult to implement, hard to track, and very costly. Accordingly, a testing alternative should be permitted only for those limited circumstances where an approved request for a religious or medical accommodation is granted. And in those cases, consideration should be given to providing federal funding to covered facilities to defray the cost of testing.

**(5) Exemptions need to be narrowly tailored.** It is necessary to include appropriate exemptions for cases where covered personnel request an accommodation because they have a documented medical contraindication or a closely held religious belief for which the vaccine is contraindicated. It is crucial, however, for these exceptions to be narrowly tailored, for the covered facility to be allowed to request appropriate documentation to support the request for the accomodation, and for the covered facility to apply the exemptions in a manner such that they do not become "rubber stamp" exemptions that consume the rule. Furthermore, facilities should be afforded the opportunity to refrain from granting exemptions in cases of undue hardship.

**(6) Allow appropriate time for implementation.** While we support a timeline that requires vaccination as soon as possible, the timeline must accommodate the time necessary for health systems and covered facilities to adopt policies, allow associates to apply for exceptions, for those exceptions to be reviewed and decided upon, and then for the associate to complete the course of COVID-19 vaccination dosing post exception decision to become fully vaccinated. The timelines should also anticipate the need to build up infrastructure for compliance and data reporting.

**(7) Consider policies that equitably extend vaccination requirements to all participating providers.** While CMS has robust regulatory authority over most healthcare providers, there may be some independent clinicians not subject to Medicare Conditions of Participation (CoPs) or Conditions for Coverage (CfCs). With respect to clinicians that participate in Medicare and Medicaid by accepting assignment, but who are not otherwise directly regulated under CMS CoPs or CfCs, the agency should evaluate policy options for equitably extending vaccination requirements to these clinicians as well, to provide ample protection to all Medicare beneficiaries and Medicaid enrollees.

**(8) Exempt covered facilities from OSHA vaccination requirements.** To avoid confusion, administrative burden, and potential unintended liability, CMS should work with OSHA to ensure that any healthcare facilities that comply with the Medicare/Medicaid requirements for vaccine

2

mandates are exempted from forthcoming OSHA requirements applicable to employers with 100+ employees.

**Proposed New Condition of Participation (CoP) or Condition for Coverage (CfC) --**

**Introduction**: This proposal would require that within 4 weeks of finalization of rulemaking that hospitals and other providers subject to a Medicare Condition of Participation or Condition for Coverage have a policy in place requiring qualified healthcare personnel as defined to be fully vaccinated [by December 31, 2021].  By requiring such a policy to be in place, CMS would ensure that hospitals and other providers are taking the steps necessary to ensure the full vaccination of their workforce, while not being overly prescriptive and maintaining flexibility for the implementation and operational details to the hospitals and providers.

**Proposal**: During the period of the COVID-19 PHE, the Centers for Medicare & Medicaid Services (CMS) will require as a Medicare CoP/CfC that a participating hospital and other sites of care has a policy adopted requiring all qualifying healthcare personnel to be fully vaccinated against COVID-19 and that such entities require contracted vendors to have a policy requiring their contracted personnel to be fully vaccinated.  Such a policy must be enforceable, and may include appropriate exceptions for cases where qualified personnel have a medical contraindication or condition specified by Food and Drug Administration (FDA) labeling or authorization, CDC or Advisory Committee on Immunization Practices (ACIP) recommendations and where qualified personnel have  a sincerely held religious belief that will not permit them to receive the vaccine.  Facilities have a maximum of 4 weeks before being subject to survey and certification review to confirm that a compliant policy has been adopted, and the policy must require that qualified current personnel as defined be fully vaccinated by December 31, 2021.

Qualified healthcare personnel shall include:

1. Employees: This includes all w-2 employed persons receiving a direct paycheck from the facility (i.e., on the facility's payroll), regardless of clinical responsibility or patient contact.
2. Providers granted clinical privileges and/or  medical staff membership at the facility: This includes, but is not limited to, physicians (MD, DO), advanced practice nurses, and physician assistants who are affiliated with the reporting facility to the extent that they are credentialed or affiliates of the medical staff of the facility, but are not directly employed by it (i.e., they do not receive a paycheck from the facility), and working onsite at the covered facility regardless of clinical responsibility or degree of patient contact. Post-residency fellows are also included in this category if they are not on the facility's payroll.
3. Volunteers: This includes volunteers (eligible for vaccination) who are affiliated with the healthcare facility, but are not directly employed by it (i.e., they do not receive a paycheck from the facility), working onsite at the covered facility regardless of clinical responsibility or degree of patient contact.

3

4. Through a requirement by the hospital [and other sites of care] with contracted entities, other contract personnel onsite at the covered facility: Contract personnel are defined as persons providing care, treatment, or services at the facility through a contract.

Fully vaccinated defined: For purposes of this policy, fully vaccinated refers to an individual in which 2 weeks have passed after their second dose in a 2-dose series, such as the Pfizer or Moderna vaccines, in which 2 weeks have passed after a single-dose vaccine, such as Johnson & Johnson's Janssen vaccine (or as subsequently recommended by CDC as vaccination guidelines are revised).

Survey Procedures:
- Verify that the facility has a policy requiring all qualifying healthcare personnel to be fully vaccinated against COVID-19.
- Verify that the facility's policy is enforceable and may include appropriate exceptions for cases where qualified personnel have a medical contraindication or condition specified by Food and Drug Administration (FDA) labeling or authorization, CDC or Advisory Committee on Immunization Practices (ACIP) recommendations and where qualified personnel have  a sincerely held religious belief that will not permit them to receive the vaccine.
- Verify that the facility has a mechanism for requiring all contracted personnel be fully vaccinated against COVID-19, either through contractual requirements or a facility policy with which contracted personnel are required to comply. Facilities shall not be required to produce evidence of contracted personnel vaccination status in order to demonstrate compliance with this requirement.

This requirement would apply under the following CoPs and CfCs maintained by CMS:
- Ambulatory Surgical Centers (ASCs)
- Community Mental Health Centers (CMHCs)
- Comprehensive Outpatient Rehabilitation Facilities (CORFs)
- Critical Access Hospitals (CAHs)
- End-Stage Renal Disease Facilities
- Federally Qualified Health Centers
- Home Health Agencies
- Hospices
- Hospitals
- Hospital Swing Beds
- Intermediate Care Facilities for Individuals with Intellectual Disabilities (ICF/IID)
- Programs for All-Inclusive Care for the Elderly Organizations (PACE)
- Psychiatric Hospitals
- Rural Health Clinics
- Long Term Care Facilities, including skilled nursing, nursing homes, and assisted living facilities
- Transplant Centers

4

 

1201 L Street, NW, Washington, DC 20005
T: 202-842-4444
F: 202-842-3860
**www.ahcancal.org**

September 13, 2021

The Honorable Chiquita Brooks-LaSure
Administrator Center for Medicare and Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

Re: Mandating COVID-19 Vaccine in Skilled Nursing Facilities

Dear Administrator Brooks-LaSure:

Thank you for your consideration of our request to expand the COVID-19 vaccine staff mandate to all health care settings. We greatly appreciate your willingness to consider the implications a mandate targeted only to skilled nursing facilities would have on the care for our residents. We look forward to working with your and your team as we continue to tackle these twin crises of the pandemic and a broad-based workforce shortage in health care that has reached critical levels.

If I, or members of my team, can be of any assistance to your efforts, please do not hesitate to contact us.

Sincerely,

Mark Parkinson
President & CEO

The American Health Care Association and National Center for Assisted Living (AHCA/NCAL) represent more than 12,000 non-profit and proprietary skilled nursing centers, assisted living communities, sub-acute centers and homes for individuals with intellectual and developmental disabilities. By delivering solutions for quality care, AHCA/NCAL aims to improve the lives of the millions of frail, elderly and individuals with disabilities who receive long term or post-acute care in our member facilities each day.

# The First Church of Christ, Scientist in Boston Massachusetts

July 12, 2021

**FILED ELECTRONICALLY**

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS–3414–IFC
P.O. Box 8010
Baltimore, MD 21244–1850

> **Re:** *[CMS–3414–IFC; RIN 0938–AU57] Medicare and Medicaid Programs; COVID–19 Vaccine Requirements for Long-Term Care (LTC) Facilities and Intermediate Care Facilities for Individuals With Intellectual Disabilities (ICFs–IID) Residents, Clients, and Staff*

To Whom It May Concern:

The First Church of Christ, Scientist (Church)[1] appreciates the opportunity to provide comments on the Centers for Medicare & Medicaid Services' (CMS) interim final rule titled, "Medicare and Medicaid Programs; COVID–19 Vaccine Requirements for Long-Term Care (LTC) Facilities and Intermediate Care Facilities for Individuals With Intellectual Disabilities (ICFs–IID) Residents, Clients, and Staff."

The Church files this comment in support of its members who are patients of, or Christian Science nurses working in, Christian Science nursing facilities certified to participate in Medicare as religious nonmedical health care institutions (RNHCIs). Although the provisions of this interim final rule do not apply to RNHCIs, CMS has requested comment on whether the policies regarding COVID-19 vaccination reflected in the rule should be extended to other Medicare provider types.

As explained in detail below, the Church suggests that the existing public health measures in place during the current public health emergency (PHE) and facilities' responsiveness to those measures have been sufficient to protect patients from COVID-19. Therefore, there is no need to extend the policies reflected in this rule to RNHCIs. However, should CMS decide to undertake similar rulemaking applicable to RNHCIs in the future, we are grateful for the opportunity to offer suggestions for how these policies might be implemented appropriately.

---

[1] The Church is a 501(c)(3) organization with branches in the United States and approximately 70 other countries. It is the world headquarters of the Christian Science religion. Christian Science was founded during the latter part of the 19th century by Mary Baker Eddy. It is based on the Bible and the teachings of Jesus, and has at its core the belief that people can find healing of problems of all kinds (including health problems) through prayer, scriptural study, and gaining a better understanding of one's relationship to God.

Christian Science Committee on Publication – U.S. Federal Office – 603 2nd Street NE
Washington, D.C. 20002 – federal@christianscience.com – (202) 296-2190

AR-04579

The First Church of Christ, Scientist *in Boston Massachusetts*

## I. Background

### A. Christian Science Nursing Facilities

Christian Science nursing facilities provide care to individuals who have elected to rely on the teachings of Christian Science rather than medical treatment for health problems and require care in an inpatient setting. At the present time, there are 13 such facilities around the country that are Medicare-certified as RNHCIs. All of these facilities are small (typically less than 20 beds) and operated by not-for-profit organizations.[2] Some have been providing skilled nonmedical care to Christian Scientists since the early part of the twentieth century.

### B. The RNHCI Benefit under Medicare

The RNHCI benefit is a required benefit under Medicare Part A available to individuals for whom "the acceptance of [voluntary] medical treatment would be inconsistent with their sincere religious beliefs."[3] For care to be covered, an individual must sign a notarized form electing the RNHCI benefit and have a health condition that requires inpatient care in a hospital or a skilled nursing facility.[4] The Medicare Act recognizes the need to ensure that payments for RNHCI services are made correctly and only for covered services.[5] It also respects beneficiary choice of care, providing in relevant part that:

> (A)(i) In administering this subsection and section 1395i-5 of this title, **the Secretary shall not require any patient of a religious nonmedical health care institution to undergo medical screening, examination, diagnosis, prognosis, or treatment or to accept any other medical health care service**, if such patient (or legal representative of the patient) objects thereto on religious grounds.
>
> * * *
>
> (B)(i) In administering this subsection and section 1395i-5 of this title, **the Secretary shall not subject a religious nonmedical health care institution or its personnel to any medical supervision, regulation, or control, insofar as such supervision, regulation, or control would be contrary to the religious beliefs observed by the institution or such personnel.**

---

[2] These providers are 501(c)(3) organizations independent of the Church. However, they maintain a cooperative relationship with the Church, and provided input concerning the issues discussed in this comment.

[3] 42 U.S.C. § 1395i-5(b)(2)(A)(ii).

[4] *See* 42 U.S.C. § 1395i-5(a)(2). This provision of the Medicare Act also refers to qualification for home health services. Although at one point a pilot project authorized Medicare payment for RNHCI services provided in the home, authorization for that pilot project was not renewed and ended on December 31, 2006. *See generally*, § 706, Medicare Prescription Drug Improvement and Modernization Act of 2003, P.L. 106-173 (December 8, 2003).

[5] 42 U.S.C. §§ 1395x(ss)(3)(A)(ii) and 1395x(ss)(3)(B)(ii).

Christian Science Committee on Publication – U.S. Federal Office – 603 2nd Street NE
Washington, D.C. 20002 – federal@christianscience.com – (202) 296-2190

2

AR-04580

The First Church of Christ, Scientist in Boston Massachusetts

The statutory definition of a RNHCI also prohibits these facilities from employing or having relationships with medical personnel.[6] Among other things, the definition provides that a RNHCI "on the basis of its religious beliefs, **does not provide** through its personnel or otherwise medical items and services (including **any medical screening**, examination, diagnosis, prognosis, treatment, **or the administration of drugs**) for its patients"[7] The conditions of participation for RNHCIs are located in 42 C.F.R. 403, Subpart G, and guidance regarding those regulations is found in Appendix U of the State Operations Manual.

## II. Comments on the Interim Final Rule

### A. General Comments

As an initial matter, the Church commends CMS for its responsiveness to the ongoing COVID-19 PHE and the degree to which it has considered the interests of patients, Medicare providers, and the community in crafting its policies during this time of need. This same responsiveness is reflected in the provisions of the interim final rule. In particular, we appreciate the provisions of the rule that support informed consent by patients and staff, and allow individuals to make their own decisions about COVID-19 vaccination.

In this regard, it is worth stressing that the Church does not dictate the decisions of its members in any respect, whether about health care, vaccination, or any other matter. Individuals who practice Christian Science thus typically turn to prayer as taught in Christian Science to meet their health needs because they have found it to be effective in their lived experience. It is also relevant to know that the founder of Christian Science counseled following the Golden Rule in our actions with one another and our communities, as well as conscientious compliance with law, including directives for the handling of contagious disease.

Throughout the PHE, Christian Science nursing facilities have been actively monitoring and complying with federal, State, and local public health measures, including those regarding isolation and quarantine, COVID-19 testing, and the appropriate use of personal protective equipment. It is our understanding that this has resulted in a notably low number of positive COVID-19 test results in these facilities throughout the PHE and no significant outbreaks.

In consulting with Christian Science nursing facilities to prepare this comment, we learned that the overwhelming majority of these facilities already inform their staff and patients of the availability of the COVID-19 vaccine, leaving the decision of whether to vaccinate to each individual. It is our understanding that some staff and patients have chosen to accept the vaccine while others have declined, and that the facilities are taking this information into account in determining how best to respond to the evolving public health guidelines in their communities.

---

[6] 42 U.S.C. § 1395x(ss)(1).
[7] 42 U.S.C. § 1395x(ss)(1)(F) (emphasis added).

Christian Science Committee on Publication – U.S. Federal Office – 603 2nd Street NE
Washington, D.C. 20002 – federal@christianscience.com – (202) 296-2190

3

AR-04581

**The First Church of Christ, Scientist** in Boston Massachusetts

For this reason, the Church respectfully requests that the policies reflected in the interim final rule not be extended to RNHCIs. The public health measures already in place have proven to be effective at protecting staff and patients while supporting individual decision-making about vaccination, which is consistent with the overarching goals of the rule. Additionally, given what is already being done by these facilities, extending the interim final rule policies to them would place an unnecessary burden on these small providers without yielding significantly different results.

Should CMS decide to extend the rule's policies to RNHCIs in the future, however, the Church would like to offer suggestions and observations about how they might be applied in a manner that is consistent with the Medicare Act and the sincerely held religious beliefs of patients and staff.

As a threshold matter, we offer no comments regarding the requirement that facilities offer patients and staff the opportunity to accept or decline the COVID-19 vaccine.[8] This is already being done by Christian Science nursing facilities across the country. Instead, our comments primarily relate to the educational requirement for staff and residents, specifically regarding the risks and benefits of the COVID-19 vaccine.

   *B. Education for Patients and Staff Regarding COVID-19 Vaccination*

The Church supports the right of each individual to make an informed decision about whether to receive the COVID-19 vaccine. However, the ability of RNHCI staff to provide specific information about the risks and benefits of vaccination is limited by the fact that, under the Medicare Act, RNHCIs are not permitted to employ or have relationships with medical personnel or to perform any type of medical intervention or treatment. RNHCI staff are not qualified to discuss the particulars of an individual's medical situation as it relates to vaccination, nor are they qualified to identify situations where vaccination is contraindicated or to respond to adverse side effects.

Credible public information regarding the risks and benefits of COVID-19 vaccination is widely available,[9] however, and recipients receive vaccine-specific information at the time of administration. Should CMS decide to extend the provisions of the interim final rule to RNHCIs, this type of information should be considered to satisfy the educational requirement in the RNHCI context. Staff receiving the vaccine will be able to receive more specific, medically appropriate information about vaccination from medical professionals qualified to administer it. RNHCI patients will likely be unable to access the vaccine independently.[10] Accordingly, we

---

[8] CMS is not requiring long-term care facilities to provide the vaccine directly. 86 Fed.Reg. 26306, 26312 (May 13, 2021). For obvious reasons, this same policy should apply to RNHCIs.

[9] *See, e.g.*, CDC, COVID-19 Vaccine Emergency Use Authorization (EUA) Fact Sheets for Recipients and Caregivers (last reviewed January 21, 2021).

[10] *See,* 86 Fed.Reg. at 26310. (Noting challenges of most long-term care facility residents in accessing vaccination).

Christian Science Committee on Publication – U.S. Federal Office – 603 2nd Street NE
Washington, D.C. 20002 – federal@christianscience.com – (202) 296-2190

4

AR-04582

The First Church of Christ, Scientist  in Boston Massachusetts

suggest that facilities be required to assist patients who desire vaccination to obtain the vaccine in a manner that is safe and meets their individual needs.

The Church agrees that, in offering the opportunity to be vaccinated, facilities should inform patients that they may receive the vaccine at no cost during the PHE. However, there are potential financial consequences to acceptance of the vaccine that are unique to RNHCI patients under the provisions of the Medicare Act. These should be addressed in developing any potential rule.

Under the Medicare Act, individuals must sign an election form to receive the RNHCI benefit. The voluntary receipt of medical care paid for by Medicare causes a revocation of the election unless such care is "excepted medical care."[11] Beneficiaries who have revoked their election more than once are required to wait specified periods of time before they are again permitted to access the RNHCI benefit.[12] 42 C.F.R.§ 403.702 defines "medical care" as "health care furnished by or under the direction of a licensed physician that can involve diagnosing, treating, or preventing disease . . . It may involve the use of pharmaceuticals, . . . and technical procedures."  The same regulation defines "excepted medical care" as "medical care that is **received involuntarily or required under Federal, State, or local laws**"[13] (emphasis added).

Vaccinations are typically covered under Medicare Part B.[14] COVID-19 vaccination is not currently required by law, although CMS, and State and local public health officials alike, is actively encouraging it. While this development is perfectly understandable in the context of the PHE, it creates a revocation-related dilemma for RNHCI patients. These patients are at risk of incurring a penalty (in the form of a year-long waiting period for benefit access) if they receive a vaccination that is paid for by Medicare. The penalty period may extend even longer if they have already revoked the benefit once and then receive a two dose vaccine. This runs contrary to the existing public health goal of encouraging as many people as possible to accept COVID-19 vaccination.

Accordingly, we request that CMS consider waiving the revocation rules for RNHCI patients who receive the COVID-19 vaccine. Alternatively, CMS should require RNHCIs to educate Medicare patients about the possibility of causing a revocation of election and the consequences of revocation if they accept the COVID-19 vaccine and it is paid for by Medicare.

   *C. Reporting of COVID-19 Vaccination Data*

The Church requests that the reporting requirements in the interim final rule not be applied to RNHCIs. Notably, CMS has declined to extend the reporting requirement to intermediate care

---

[11] 42 U.S.C. § 1395i-5(b)(3).
[12] 42 U.S.C. § 1395i-5(b)(4).
[13] *See also*, 42 U.S.C. § 1395i-5(b)(5)(A)(ii)
[14] We have heard anecdotally that individuals are requested to provide their Medicare information at the time of vaccine administration, and assume that this information would be used to bill Medicare.

Christian Science Committee on Publication – U.S. Federal Office – 603 2nd Street NE
Washington, D.C. 20002 – federal@christianscience.com – (202) 296-2190

5
AR-04583

The First Church of Christ, Scientist in Boston Massachusetts

facilities for individuals with intellectual disabilities (ICF-IID), largely because those facilities have not historically participated in national reporting programs and are typically small providers with fewer resources to dedicate to reporting. We suggest that similar reasoning applies to RNHCIs.

The 13 Christian Science nursing facilities that are certified as RNHCIs nationwide are small in size and operated by not-for-profit organizations. Staff in these facilities often fill multiple roles. Like ICF-IIDs, RNHCIs have not historically been part of national reporting initiatives. Accordingly, the reporting requirements would impose a considerable administrative burden on these providers, including potential equipment acquisition and training costs related to enrollment in the NHSN. In addition, RNHCIs are not long-term residential care facilities, but are instead intended for short term stays for those with serious health conditions. Patient turnover could make vaccination rates among patients more difficult to monitor. Finally, and based upon feedback that the Church received from Christian Science nursing facilities that participate as RNHCIs, we expect that some staff and patients would have significant privacy and security concerns about the sharing of individually identifiable information in connection with their vaccination status.

## III. Conclusion

Thank you for your consideration of the comments set forth above. The interim final rule serves the laudable goal of preventing additional COVID-19 outbreaks in LTC facilities while respecting the autonomy of residents and staff. The Church feels it is unnecessary to extend the rule to RNHCIs for the reasons stated above, and we hope that CMS finds the information in this comment helpful in considering how these issues could reasonably be addressed in the context of patients and staff that hold sincere religious beliefs that are inconsistent with the receipt of medications and medical treatment.

The Church looks forward to continuing to work with CMS as it considers these important issues moving forward. Please do not hesitate to let us know if we can provide any additional information, or if you would like to meet with us to learn more about the comments above.

Sincerely,

Tessa E. B. Frost
Director of Federal Government Affairs
Committee on Publication, U.S. Federal Office
The First Church of Christ, Scientist in Boston, MA

*Address:* 603 2nd St NE        *Email:*  frostt@csps.com        *Phone:*  (202) 591-3960
WDC, 20002

Christian Science Committee on Publication – U.S. Federal Office – 603 2nd Street NE
Washington, D.C. 20002 – federal@christianscience.com – (202) 296-2190

6

AR-04584



Charles N. Kahn III
President and CEO

October 1, 2021

The Honorable Chiquita Brooks-LaSure
Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201

The Honorable James Frederick
Acting Assistant Secretary of Labor
Occupational Safety and Health Administration
200 Constitution Ave NW
Washington, DC 20210

     Re:  Federal COVID-19 Vaccine Mandate

Dear Administrator Brooks-LaSure and Acting Assistant Secretary Frederick:

     The Federation of American Hospitals (FAH) is the national representative of more than 1,000 leading tax-paying hospitals and health systems throughout the United States.  FAH members provide patients and communities with access to high-quality, affordable care in both urban and rural areas across 46 states, plus Washington, D.C and Puerto Rico.  Our members include teaching, acute, inpatient rehabilitation, behavioral health, and long-term care hospitals and provide a wide range of inpatient, ambulatory, post-acute, emergency, children's, and cancer services.

     We understand that the Centers for Medicare & Medicaid Services (CMS) and the Occupational Safety & Health Administration (OSHA) are developing policy regarding implementation of the recent federally mandated COVID-19 vaccine requirement.  As such, we wanted to provide you with key recommendations and considerations, as discussed below, based on our hospital and health system member experience in serving patients and their communities during the COVID-19 public health emergency (PHE).

AR-04585

Hospitals' and health systems' primary responsibility is to treat patients while at the same time ensuring the safety of their employees. This requires ensuring there are sufficient health care workers (HCWs) available to serve patients and the community, as well as sufficient non-HCW employees to support hospital and health system operations. To achieve this goal, there are a number of factors that we urge you to consider to ensure that hospitals have the resources, including availability of sufficient staffing, to continue to treat their patients, while also ensuring that the regulations do not present obstacles for hospitals in serving their patients.

As an overall matter, the FAH urges CMS and OSHA to minimize operational burdens and promote efficiency by exempting those hospitals that are already subject to state or locally ordered COVID-19 vaccine mandates from the corresponding federal requirement. Our members' hospitals and health systems operate nationally, and many are already subject to state and local vaccination requirements for HCWs. Such an exemption would avoid an unnecessary patchwork of competing vaccination requirements, definitions, and compliance burdens that risk hindering operations and patient care. In addition, the FAH offers the following critical recommendations for facilitating hospitals' and health systems' compliance efforts with the mandate.

## IMPLEMENTING THE FEDERAL VACCINE MANDATE: KEY RECOMMENDATIONS

### Time/Flexibility

Implementing the mandate successfully will require providing hospitals with a reasonable timeframe within which to operationalize the implementing regulations consistent with hospital workflow, and **we urge CMS and OSHA to allow hospitals at least 90 days to achieve compliance once the vaccine mandate requirement becomes effective.**

### Impact of Vaccine Mandate on Testing Capacity

As our members ramp up efforts to vaccinate and periodically test their unvaccinated HCWs and other employees, this will significantly increase the number of COVID-19 test kits that will need to be available, especially as other covered employers begin regular testing of non-vaccinated employees. In addition to a shortage of test kits, this influx of new testing likely will result in delays in processing and receiving test results, and these dynamics will be intensified in geographic areas across the country that currently have limited access to testing facilities and/or experience longer waits for testing results.

Our members report that hospitals' ability to test actual symptomatic patients is already being impacted by testing shortages. For example, some states require increased testing in areas of high transmission of COVID-19, e.g., require testing twice a week, with a rapid test prior to the beginning of each shift for HCWs. These requirements, while important to contain the spread of COVID-19, have a material impact on, and limit, the testing supply chain. If this trend continues, symptomatic patients will be considered Patient Under Investigation (PUI) positive until tests and results are available. This will increase use of personal protective equipment (PPE) and hospital staffing ratios – two other areas where shortages currently exist.

2

AR-4586

**CMS and OSHA implementing regulations should be developed in a manner that averts a national shortage of COVID-19 test kits and prolonged wait times for test results. For example, the regulations should:**

- **Allow flexibility in the frequency of testing of non-vaccinated employees;**
- **Allow staggered testing of non-vaccinated employees;**
- **Provide an exemption or a pause from testing for asymptomatic HCWs (who have an approved religious or medical exemption) when certain criteria are met (e.g., HCWs wear safe and appropriate PPE, including a fitted respirator), particularly when testing shortages arise; and**
- **Direct federal resources toward increased test kit and lab processing availability, including establishing and funding state testing facilities.**

Further, the FAH urges that diagnostic testing be prioritized over surveillance testing in order to minimize the risk that patients who actually are symptomatic for COVID-19 experience testing and result delays due to testing of asymptomatic, non-vaccinated employees, who must test weekly as part of the federal strategy. Regulations should ensure that symptomatic patients are prioritized so that these individuals can rapidly know their test results and take appropriate action so as not to spread the disease further.

<u>Sufficiency/Availability of Health Care Workers</u>

**The success of the vaccine mandate will be amplified if the regulations allow compliance time and flexibility to address HCW shortages, including nursing and other staff shortages.** The regulations should anticipate that a number of caregivers may choose to leave their employment rather than receive a vaccine. This will exacerbate the existing HCW shortages that hospitals currently face. For example, our members are experiencing shortages of medical technicians and laboratory assistants, and in some instances, hospitals do not have enough staff to be able to operate at full capacity. In addition, they also are experiencing nursing shortages, which certainly will increase the already substantial cost of travel nurses.

Further, the regulations should recognize and provide hospitals with the flexibility to address the fact that some HCWs will experience short-term side effects of the vaccine and may miss a day or two of work while waiting for these effects to subside. **Staggering implementation of the vaccine mandate could help avoid significant loss of staff at the same time.**

<u>Minimum and Flexible Reporting Requirements</u>

While hospitals understand the need to ensure reporting compliance with the vaccine mandate regulatory requirements, many hospitals continue to be at or beyond maximum capacity due to the current surge of COVID-19 patients as the country experiences another phase of the multiple surges that have occurred since the beginning of the PHE in 2020. Also, as discussed above, hospitals are experiencing shortages in HCWs and other employees, many of whom would be responsible for documentation efforts. In this environment, hospital workers' time and

AR-04587

resources should be focused as much as possible on helping patients fight for their lives and sustaining hospital operations.

**Therefore, we urge that the implementing regulations minimize any reporting requirements related to the vaccine mandate.**  Some states require hospitals to report to the state twice monthly regarding the total number of vaccinated individuals, exemptions granted, and other related factors.  This is unduly burdensome.

**Hospitals should be able to attest that they are implementing the mandate.**  In this case, hospitals would internally document, monitor, and ensure that staff are vaccinated, rather than being required to affirmatively report to federal agencies.

## Definitions

We also urge that the implementing regulations reasonably define the scope of the vaccine mandate.

### *Fully vaccinated*

**"Fully vaccinated" should be defined as when an individual completes the full course of the vaccine dosing (whether two shots or one), rather than the full course of the vaccine dosing plus 14 days.**  Some states, define "fully vaccinated" as the moment the full course of the dosing occurs, which provides flexibility to meet deadlines and ensure availability of HCWs.

Further, the implementing regulations should address which international COVID-19 vaccines for foreign HCWs are permissible even though they may be vaccinated with a non-US/FDA approved vaccine.  In addition, the regulations should address booster shots and how they factor into the definition of "fully vaccinated," with flexible timelines for compliance to assure availability of HCWs.  These timelines should recognize that:

- Booster shots can have greater short-term side effects and thus HCWs may need extra time for the side effects to subside; and
- Some HCWs may need a booster shot while others are getting their initial vaccine dosing, which will affect availability of HCWs.

Finally, the regulations should allow flexibility for HCWs who have had COVID-19 within the previous 90 days, as early data indicates that these individuals often have greater immunity than vaccinated individuals.  This is particularly important for those treated with monoclonal antibodies, as they often are medically advised not to be immunized for at least 90 days due to residual effects of the treatment.

4

AR-04588

*Health Care Worker*

**Further, flexibility also should apply in defining an HCW, which should exclude individuals who are:**

- Not directly employed by the hospital, but verifiably employed by another entity subject to the vaccine mandate;
- Employed by the hospital, but work remotely; and
- Only transiently on the hospital campus, such as contractors and vendors.

*COVID-19 Approved Tests*

**The determination of what constitutes an approved COVID-19 test should be flexible and should include all tests with a high level of reliability, including molecular tests, as well as rapid antigen tests.**

*Proof of Vaccination*

**Hospitals should be permitted to attest that their employees have provided proof of vaccination and should have flexibility in determining how their HCWs and employees demonstrate proof of their vaccination.** States have varying standards for hospitals to demonstrate that their HCWs are vaccinated and a specific federal standard on top of the state standards would be unduly burdensome.

Further, hospitals and employers should not be put in a position to confirm the authenticity of proof of vaccination – which may vary depending on the state or, in the case of foreign workers, the country in which the individual was vaccinated – and should not be liable if and when an individual defrauds a hospital or other employer with a fake proof of vaccination.

## Exemptions from Vaccination

Existing law and standards for required medical and religious exemptions from the vaccine mandate should continue. However, there is little guidance for hospitals and employers to determine whether the standard for an exemption – particularly an exemption for religious reasons – is met, and states have varying standards as well. **Thus, we urge development of federal criteria with clear and actionable standards on whether an exemption can be approved.** These standards should be minimally burdensome on hospitals and employers, who should not be put in the position of assessing employees' religious beliefs.

With respect to HCWs who remain unvaccinated due to an approved health or religious exemption, hospitals should have flexibility to determine whether these HCWs should be required to be tested on a regular basis and/or wear a certain type of mask while at the hospital.

AR-04589

**Consistency of Federal Regulatory Requirements**

We are concerned about the complexity of varying requirements applicable to hospital employees and **urge CMS and OSHA to coordinate to ensure that the agencies' respective regulations are consistent with each other and do not overlay conflicting requirements on hospitals.**

Some hospital employees who are not HCWs may be covered by OSHA requirements while certain hospital clinical staff would be covered under CMS' conditions of participation (COPs), or both.  Consistency among these appliable regulations will be critical for ensuring seamless compliance.

**Cost of Testing**

The federal vaccine mandate will require a great amount of testing – whether for HCWs who receive an approved exemption or employees of businesses who opt not to receive a vaccine.  Testing may not be covered (or fully covered) by an individual's insurance, and even if insurance covers the cost of testing, this places a significant cost on businesses, especially those that are self-insured, and individuals, including the cost of increased premiums due to the mandate.  **Due to these substantial costs, we urge that the costs of testing due to the vaccine mandate be covered by the federal government.**

**Enforcement**

**The FAH urges CMS and OSHA to provide hospitals with as much flexibility as possible in the implementing regulations regarding enforcement.**  Hospitals currently are experiencing unprecedented times and need to be able to direct all of their resources, which already are limited due to the length and ongoing surge of the COVID-19 PHE, toward patient care.

**In addition, we urge a progressive enforcement approach that allows hospitals adequate notice of any non-compliance issues with multiple opportunities to develop an action plan to come into compliance**, as well as enforcement flexibility if limitations in the vaccine supply develop.

***************************

The FAH commends CMS and OSHA for your leadership and dedication toward ending the COVID-19 PHE and appreciates your consideration of these comments.  If you have any questions, please contact me at 202-624-1534, or any member of my staff at 202-624-1500.

Sincerely,

6

https://www.cdc.gov/nhsn/covid19/ltc-vaccination-dashboard.html

The above website is being produced in native form (as a hyperlink) in addition to as a PDF because it allows the user to customize parameters for accessing a dataset.

https://www.cdc.gov/nhsn/covid19/dial-vaccination-dashboard.html

The above website is being produced in native form (as a hyperlink) in addition to as a PDF because it allows the user to customize parameters for accessing a dataset.

AR-04592

https://www.cdc.gov/nchs/covid19/index.htm

The above website is being produced in native form (as a hyperlink) in addition to as a PDF because it allows the user to customize parameters for accessing a dataset.

AR-04593

https://covid.cdc.gov/covid-data-tracker/#datatracker-home

The above website is being produced in native form (as a hyperlink) in addition to as a PDF because it allows the user to customize parameters for accessing a dataset.

https://protect-public.hhs.gov/

The above website is being produced in native form (as a hyperlink) in addition to as a PDF because it allows the user to customize parameters for accessing a dataset.

https://www.cdc.gov/vaccines/imz-managers/coverage/covidvaxview/interactive.html

The above website is being produced in native form (as a hyperlink) in addition to as a PDF because it allows the user to customize parameters for accessing a dataset.

https://www.cdc.gov/nchs/covid19/rands/reduced-access-to-care.htm

The above website is being produced in native form (as a hyperlink) in addition to as a PDF because it allows the user to customize parameters for accessing a dataset.


Original Investigation | Health Policy

# Reports of Forgone Medical Care Among US Adults During the Initial Phase of the COVID-19 Pandemic

Kelly E. Anderson, MPP; Emma E. McGinty, PhD, MS; Rachel Presskreischer, MS; Colleen L. Barry, PhD, MPP

## Abstract

**IMPORTANCE**  The coronavirus disease 2019 (COVID-19) pandemic has caused major disruptions in the US health care system.

**OBJECTIVE**  To estimate frequency of and reasons for reported forgone medical care from March to mid-July 2020 and examine characteristics of US adults who reported forgoing care.

**DESIGN, SETTING, AND PARTICIPANTS**  This survey study used data from the second wave of the Johns Hopkins COVID-19 Civic Life and Public Health Survey, fielded from July 7 to July 22, 2020. Respondents included a national sample of 1337 individuals aged 18 years or older in the US who were part of National Opinion Research Center's AmeriSpeak Panel.

**EXPOSURES**  The initial period of the COVID-19 pandemic in the US, defined as from March to mid-July 2020.

**MAIN OUTCOMES AND MEASURES**  The primary outcomes were missed doses of prescription medications; forgone preventive and other general medical care, mental health care, and elective surgeries; forgone care for new severe health issues; and reasons for forgoing care.

**RESULTS**  Of 1468 individuals who completed wave 1 of the Johns Hopkins COVID-19 Civic Life and Public Health Survey (70.4% completion rate), 1337 completed wave 2 (91.1% completion rate). The sample of respondents included 691 (52%) women, 840 non-Hispanic White individuals (63%), 160 non-Hispanic Black individuals (12%), and 223 Hispanic individuals (17%). The mean (SE) age of respondents was 48 (0.78) years. A total of 544 respondents (41%) forwent medical care from March through mid-July 2020. Among 1055 individuals (79%) who reported needing care, 544 (52%) reported forgoing care for any reason, 307 (29%) forwent care owing to fear of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) transmission, and 75 (7%) forwent care owing to financial concerns associated with the COVID-19 pandemic. Respondents who were unemployed, compared with those who were employed, forwent care more often (121 of 186 respondents [65%] vs 251 of 503 respondents [50%]; $P$ = .01) and were more likely to attribute forgone care to fear of SARS-CoV-2 transmission (78 of 186 respondents [42%] vs 120 of 503 respondents [24%]; $P$ = .002) and financial concerns (36 of 186 respondents [20%] vs 28 of 503 respondents [6%]; $P$ = .001). Respondents lacking health insurance were more likely to attribute forgone care to financial concerns than respondents with Medicare or commercial coverage (19 of 88 respondents [22%] vs 32 of 768 respondents [4%]; $P$ < .001). Frequency of and reasons for forgone care differed in some instances by race/ethnicity, socioeconomic status, age, and health status.

*(continued)*

## Key Points

**Question**  What are the frequency of and reasons for reported forgone medical care from March to mid-July 2020, the initial phase of the coronavirus disease 2019 (COVID-19) pandemic in the US?

**Findings**  In this national survey of 1337 participants, 41% of respondents reported forgoing medical care from March through mid-July 2020. Among adults who reported needing care during this period, more than half reported forgoing care for any reason, more than one-quarter reported forgoing care owing to fear of severe acute respiratory syndrome coronavirus 2 transmission, and 7% reported forgoing care owing to financial concerns.

**Meaning**  This survey study found that there was a high frequency of forgone care from March to mid-July 2020, with respondents commonly attributing the causes of forgone care to repercussions of the COVID-19 pandemic.

**+ Supplemental content**

Author affiliations and article information are listed at the end of this article.

---

🔓 **Open Access.** This is an open access article distributed under the terms of the CC-BY License.

*JAMA Network Open.* 2021;4(1):e2034882. doi:10.1001/jamanetworkopen.2020.34882

January 21, 2021    1/11

Downloaded From: https://jamanetwork.com/ on 11/25/2021

AR-04598

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 279 of 298   PageID 5140

*Abstract (continued)*

**CONCLUSIONS AND RELEVANCE**  This survey study found a high frequency of forgone care among US adults from March to mid-July 2020. Policies to improve health care affordability and to reassure individuals that they can safely seek care may be necessary with surging COVID-19 case rates.

*JAMA Network Open.* 2021;4(1):e2034882. doi:10.1001/jamanetworkopen.2020.34882

## Introduction

During the initial months of the coronavirus disease 2019 (COVID-19) pandemic, the US health care system experienced major disruptions, with temporary closures of medical practices, cancellation of elective procedures, and the shift of many services to telehealth delivery.[1] These disruptions may have led individuals to forgo medical care. Forgoing care for chronic and emergent conditions can lead to increased complications and costs. Additionally, missing preventive care, such as cancer screenings, can result in a delayed diagnosis. Since the pandemic onset, hospitals have reported substantial declines in emergency department (ED) visits for severe health issues, including heart attacks and strokes.[2]

Several factors may have influenced individuals' decisions to forgo medical care during the COVID-19 pandemic. In March 2020, many state and local governments issued emergency public health orders, such as stay-at-home orders and bans on elective procedures, which either discouraged or prohibited certain types of medical care.[1] These suspensions were not lifted until late spring or early summer 2020. Furthermore, many medical practices voluntarily closed in the early weeks of the pandemic, either to redirect their personnel to COVID-19 response or to reduce risk of transmission of the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), the virus that causes COVID-19. Many individuals feared that seeking in-person medical care could expose them to SARS-CoV-2.

In addition, the financial downturn caused by the COVID-19 pandemic increased unemployment rates and reduced employee working hours. In the first 4 months of the pandemic, more than 48 million individuals filed for unemployment benefits.[3] Because health insurance is tied to employment for many US adults, layoffs have also resulted in more than 12 million individuals losing coverage since March 2020.[4] Resulting financial concerns may have influenced individuals' decisions to obtain or forgo care.

Several studies have sought to quantify changes in medical care during the pandemic using electronic health record (EHR) or insurance claims data. A study by Westgard et al[5] found a 49% decline in ED visits comparing visits in the 28 days before and 28 days after the state emergency declaration using EHR data from an urban trauma center.[5] Using data from 9 cardiac catheterization laboratories, a study by Garcia et al[6] estimated a 38% decline in cardiac catheterizations, comparing data from March 2020 with data from 2019 and earlier in 2020. Similarly, a study by Bhatt et al[7] estimated a 43% reduction in hospitalizations for cardiovascular conditions in March 2020 compared with March 2019, using data from a large health system. While these studies provide a useful snapshot of changes in health care utilization, they do not provide a nationally representative picture of forgone care or assess the mechanisms behind reductions in care. Understanding reasons individuals forgo care is particularly important for designing clinical and policy interventions targeted to barriers to obtaining care. Furthermore, these prior studies focused on care for severe health issues and did not examine preventive care, mental health care, or prescription medication continuity.

To our knowledge, no published research has quantified the frequency of and factors associated with forgone medical care during the initial phase of the COVID-19 pandemic in a representative sample of US adults. We fielded a nationally representative survey to determine the frequency and types of forgone medical care among adults and the reasons identified for cancelling or not seeking care from March through mid-July 2020. We examined the sociodemographic characteristics of

Downloaded From: https://jamanetwork.com/ on 11/25/2021

AR-04599

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 280 of 298   PageID 5141

JAMA Network Open | Health Policy                    Reports of Forgone Medical Care Among US Adults During the Initial Phase of the COVID-19 Pandemic

respondents forgoing medical care and assessed whether prevalence differed for certain at-risk groups, including individuals who were unemployed, lacked health insurance, or had chronic health conditions. Finally, we examined 2 specific reasons respondents may have forgone medical care: fear of exposure to SARS-CoV-2 and the financial repercussions of the COVID-19 pandemic.

## Methods

All data reported in this survey study come from wave 2 of the Johns Hopkins COVID-19 Civic Life and Public Health Survey, fielded July 7 to 22, 2020, using the National Opinion Research Center's (NORC) AmeriSpeak Panel. Prior to enrolling individuals in the AmeriSpeak Panel, NORC obtained written informed consent. This study was approved by the Johns Hopkins Bloomberg School of Public Health institutional review board. This study is reported following the American Association for Public Opinion Research (AAPOR) reporting guideline.

The AmeriSpeak Panel is a probability-based panel designed to be representative of the US adult population. The panel is drawn from NORC's area probability sample and US Postal Service addresses and covers 97% of US households.[8] The AmeriSpeak panel's recruitment rate is 34% and includes approximately 35 000 individuals. Our sample was drawn from this panel, and respondents completed the survey online.

We developed a 16-item module to assess health status and forgone medical care from March to the time of survey data collection in July 2020 (eAppendix in the Supplement). Possible types of forgone medical care included missed prescription medications, missed scheduled preventive care visits, missed scheduled general medical outpatient visits (ie, physical health care, other than preventive care, delivered in an office setting), missed scheduled mental health outpatient visits, missed elective surgical procedures, or emergent health issues warranting general medical or mental health care for which the respondent did not receive care. In the survey, we asked respondents to distinguish between care received through telehealth (not classified as forgone care) and missed or forgone care. We defined a new health issue as severe if a respondent reported a severity score of 4 or 5 on a 5-point Likert scale. In addition to the aggregate measure that included all of the categories of forgone care, we also developed a measure of forgone planned medical care that included prescription medications, scheduled preventive care visits, scheduled general medical outpatient visits, scheduled mental health outpatient visits, and elective surgical procedures but did not include new health issues.

We calculated prevalence of forgone medical care overall and by type of care among all respondents and among the subset who reported needing care. Then, among individuals who reported needing care, we calculated prevalence of forgone medical care by sociodemographic and clinical characteristics and tested whether group differences were statistically significant. We also analyzed group differences based on race/ethnicity, as the COVID-19 pandemic has disproportionately affected Black, Hispanic, and Indigenous communities.[9-11] We classified individual race/ethnicity based on self-reported race/ethnicity using response options defined by NORC. Finally, we tested whether frequency of forgone medical care differed by employment and health insurance status.

### Statistical Analysis

All counts and percentages reported in this study are survey weighted To test whether frequency of forgone medical care differed between subgroups, we used Pearson $\chi^2$ tests. We considered a difference to be statistically significant if the 2-sided $P$ value was less than .05. We conducted analyses in Stata statistical software version 16 (StataCorp), applying survey weights to calculate nationally representative estimates. Data were analyzed from July 30 to September 3, 2020.

JAMA Network Open. 2021;4(1):e2034882. doi:10.1001/jamanetworkopen.2020.34882                    January 21, 2021    3/11

Downloaded From: https://jamanetwork.com/ on 11/25/2021

AR-04600

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 281 of 298   PageID 5142

JAMA Network Open | Health Policy                    Reports of Forgone Medical Care Among US Adults During the Initial Phase of the COVID-19 Pandemic

## Results

Of 1468 individuals who completed wave 1 of the survey (70.4% completion rate), 1337 completed wave 2 (91.1% completion rate). Among 1337 wave 2 respondents, 691 (52%) were women, and the mean (SE) age was 48 (0.78) years. A total of 840 respondents (63%) reported their race/ethnicity as non-Hispanic White, 160 respondents (12%) reported their race/ethnicity as non-Hispanic Black, 223 respondents (17%) reported their race/ethnicity as Hispanic, and the remaining 115 respondents (9%) reported another race and non-Hispanic ethnicity (eTable in the Supplement).

A total of 544 respondents, representing an estimated 41% of US adults , reported forgoing medical care during the initial phase of the COVID-19 pandemic in the US from March through mid-July 2020 (**Figure 1**), including 108 respondents (8%) who reported missing 1 or more doses of a prescription medicine typically picked up from a retail pharmacy, 387 respondents (29%) who reported missing a preventive care visit, 343 respondents (26%) who reported missing an outpatient general medical appointment, 105 respondents (8%) who reported missing an outpatient mental health appointment, 77 respondents (6%) who reported missing an elective surgery, and 38 respondents (3%) who reported not receiving health care for a new severe mental or physical health issue.

Among 1055 respondents (79%) who reported needing care from March to mid-July 2020, 544 (52%) reported forgoing care, including 108 of 725 respondents (15%) who typically picked up prescription medication and who missed 1 or more doses, 387 of 664 respondents (58%) with scheduled preventive care, 343 of 688 respondents (50%) with scheduled general medical care, and 105 of 227 respondents (46%) with scheduled mental health care reporting missing visits. Among 127 respondents who had scheduled an elective surgical procedure in the initial phase of the pandemic, 77 respondents (60%) reported forgoing their surgical procedure. Finally, 38 of 74 respondents (51%) with a severe mental or physical health issue that emerged after the start of the pandemic reported forgoing care.

Among 535 respondents who reported missing any planned medical care, including missed prescription medications or missed scheduled appointments or procedures, 337 (63%) attributed missed care to a medical practice being closed (either temporarily or permanently), 307 (57%) attributed missed care to fear of SARS-CoV-2 exposure, and 75 (7%) attributed missed care to financial repercussions of the COVID-19 pandemic (**Figure 2**). While medical practice closure was the most common reason for missing care, 174 respondents (56%) who reported missing care owing to



**Figure 1. Share of Respondents Forgoing Medical Care From March Through Mid-July 2020**



Forgone medical care includes missing 1 or more doses of a medicine the respondent typically picked-up or had someone else pick-up from a retail pharmacy; missing a scheduled health care visit, including a preventive care visit, general medical outpatient visit, mental health outpatient visit, or elective surgical procedure; or not receiving care for a new severe (defined based on self-report as severity 4-5 on a scale of 1-5) physical or mental health issue. Individuals could report multiple types of forgone care during the period of March through mid-July 2020.

Downloaded From: https://jamanetwork.com/ on 11/25/2021

AR-04601

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 282 of 298   PageID 5143

JAMA Network Open | Health Policy          Reports of Forgone Medical Care Among US Adults During the Initial Phase of the COVID-19 Pandemic

fear of SARS-CoV-2 exposure and 39 respondents (52%) who reported missing planned care owing to the financial repercussions of the COVID-19 pandemic did not report medical practice closure as a reason for forgoing care.

Among 108 respondents reporting a missed dose of medication, 44 respondents (41%) attributed it to fear of COVID-19 and 23 respondents (21%) cited financial repercussions of the COVID-19 pandemic. Among 387 respondents who reported missing scheduled preventive care, scheduled general medical care, or scheduled mental health care, more than half of respondents attributed the missed care to practice closure and fear of COVID-19 exposure, and less than 10% of respondents attributed the forgone care to financial concerns owing to COVID-19 (Figure 2). Practice closure and fear of SARS-CoV-2 transmission were also the most common reasons reported for missing a scheduled elective surgery; more than one-quarter of respondents reported the financial repercussions of the COVID-19 pandemic as a reason for forgoing elective surgery (Figure 2).

While the proportion of respondents reporting forgone medical care did not vary by sex, differences were found by race/ethnicity, age, household income, employment status, and health insurance status (**Table 1**). A larger share of Hispanic respondents reported missed prescription medications compared with non-Hispanic White respondents (33 of 109 respondents [30%] vs 50 of 482 respondents [10%]; $P$ = .004). Compared with adults aged 65 years or older, higher proportions of respondents reported missed medication in age groups 18 to 34 years (45 of 204 respondents [22%] vs 10 of 160 respondents [6%]; $P$ = .004) and 35 to 49 years (29 of 182 respondents [16%]; $P$ = .01). Respondents in households with lower incomes (ie, <\$35 000/year) more often reported missing medication compared with respondents in households with an income of \$35 000 to \$74 999 per year (66 of 244 respondents [27%] vs 26 of 226 respondents [12%]; $P$ = .01).

Respondents who were unemployed or not working owing to disability, compared with individuals who were employed, reported higher frequency of any forgone medical care (121 of 186

Figure 2. Reasons Reported for Forgoing Care Among Respondents Who Missed Planned Care From March Through Mid-July 2020



Respondents were prompted to select the reasons that best described why they missed taking a dose(s) of medication or missed a previously scheduled health care appointment. Respondents were allowed to select more than 1 reason. Practitioner practice being closed was not a response option for individuals who reported missing a dose of prescription medication. COVID-19 indicates coronavirus disease 2019; SARS-CoV-2, severe acute respiratory syndrome coronavirus 2.

Downloaded From: https://jamanetwork.com/ on 11/25/2021

AR-04602

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 283 of 298   PageID 5144

JAMA Network Open | Health Policy                    Reports of Forgone Medical Care Among US Adults During the Initial Phase of the COVID-19 Pandemic

respondents [65%] vs 251 of 503 respondents [50%]; *P* = .01), missed doses of prescription medication (46 of 117 respondents [39%] vs 46 of 367 respondents [13%]; *P* < .001), and missed scheduled medical care (111 of 159 respondents [70%] vs 225 of 405 respondents [56%]; *P* = .02). Compared with individuals with commercial health insurance or Medicare, those insured through Medicaid reported higher frequency of missed prescription medications (41 of 114 respondents [36%] vs 52 of 517 respondents [10%]; *P* < .001).

Frequency of forgone medical care varied by self-reported health status, number of prescription medications taken, and presence of a mental health condition (**Table 2**). Respondents who rated their health as fair or poor more often reported missing prescription medication compared with individuals who rated their health as excellent (35 of 149 respondents [24%] vs 5 of 41 respondents [11%]; *P* = .03), and those with 1 or more prescriptions reported forgoing any medical care less often than those with no prescription medication use (443 of 902 respondents [49%] vs 99 of 149 respondents [66%]; *P* = .005). Similarly, individuals with a mental health condition more often reported missing medication than individuals without a mental health condition (49 of 184 respondents [26%] vs 59 of 541 respondents [11%]; *P* = .004). No differences were detected in

Table 1. Respondents Who Reported Needing Care Reporting Forgone Medical Care From March Through Mid-July 2020, by Sociodemographic Characteristics

| Characteristic | Any forgone medical care (N = 1055)[a] | | | Missed dose of medicine (n = 725) | | | Missed scheduled medical care (n = 873)[b] | | |
|---|---|---|---|---|---|---|---|---|---|
| | No./total No. (%) | 95% CI, % | P value | No./total No. (%) | 95% CI, % | P value | No./total No. (%) | 95% CI, % | P value |
| **Sex** | | | | | | | | | |
| Men | 234/458 (51) | 44.9-57.1 | [Reference] | 41/299 (14) | 9.0-20.4 | [Reference] | 211/384 (55) | 48.5-61.5 | [Reference] |
| Women | 310/597 (52) | 46.3-57.7 | .81 | 66/426 (16) | 10.3-22.9 | .66 | 290/490 (59) | 52.8-65.2 | .38 |
| **Race/ethnicity** | | | | | | | | | |
| White, non-Hispanic | 356/697 (51) | 46.1-56.0 | [Reference] | 50/482 (10) | 7.0-15.2 | [Reference] | 337/600 (56) | 50.8-61.4 | [Reference] |
| Black, non-Hispanic | 58/121 (48) | 36.1-60.1 | .65 | 18/81 (22) | 11.3-37.7 | .06 | 48/85 (56) | 43.7-68.3 | .98 |
| Other, non-Hispanic | 48/94 (51) | 35.9-66.3 | .99 | 7/52 (13) | 2.8-43.0 | .78 | 39/70 (57) | 38.9-72.9 | .96 |
| Hispanic | 82/143 (57) | 45.1-69.0 | .34 | 33/109 (30) | 16.7-48.6 | .004 | 77/119 (64) | 50.7-76.0 | .27 |
| **Age group** | | | | | | | | | |
| ≥65 | 125/262 (48) | 41.4-54.2 | [Reference] | 10/160 (6) | 3.4-11.4 | [Reference] | 119/231 (51) | 44.5-58.1 | [Reference] |
| 50-64 | 155/276 (56) | 48.9-62.6 | .09 | 23/179 (13) | 7.7-20.5 | .08 | 146/242 (61) | 52.9-67.6 | .07 |
| 35-49 | 125/241 (52) | 44.6-59.4 | .39 | 29/182 (16) | 10.3-24.5 | .01 | 116/199 (58) | 50.1-66.2 | .19 |
| 18-34 | 139/276 (50) | 39.3-61.6 | .68 | 45/204 (22) | 12.2-36.6 | .004 | 120/202 (59) | 45.8-71.7 | .29 |
| **Household income, per y** | | | | | | | | | |
| <$35 000 | 167/327 (51) | 42.6-59.6 | .94 | 66/244 (27) | 18.0-38.3 | .01 | 149/264 (56) | 46.4-65.7 | .96 |
| $35 000-$74 999 | 177/344 (52) | 44.1-58.9 | [Reference] | 26/226 (12) | 6.6-19.6 | [Reference] | 163/288 (57) | 49.1-63.8 | [Reference] |
| ≥$75 000 | 200/384 (52) | 46.1-57.7 | .93 | 16/255 (6) | 3.7-9.9 | .09 | 189/321 (59) | 52.3-65.1 | .65 |
| **Employment status** | | | | | | | | | |
| Currently employed | 251/503 (50) | 43.9-55.9 | [Reference] | 46/367 (13) | 8.4-18.7 | [Reference] | 225/405 (56) | 49.0-61.9 | [Reference] |
| Unemployed or not working owing to disability | 121/186 (65) | 55.2-73.7 | .01 | 46/117 (39) | 25.1-55.2 | <.001 | 111/159 (70) | 60.0-78.3 | .02 |
| Retired or providing unpaid family caregiving | 129/271 (48) | 41.3-54.2 | .63 | 8/161 (5) | 2.3-11.4 | .05 | 125/239 (52) | 45.3-59.1 | .50 |
| **Insurance coverage** | | | | | | | | | |
| Commercial or Medicare | 387/768 (50) | 46.1-54.8 | [Reference] | 52/517 (10) | 7.0-14.0 | [Reference] | 360/645 (56) | 51.1-60.3 | [Reference] |
| Medicaid | 86/142 (61) | 44.4-75.4 | .23 | 41/114 (36) | 20.0-55.7 | <.001 | 75/116 (65) | 45.1-80.4 | .37 |
| Uninsured | 45/88 (50) | 35.4-65.5 | .99 | 12/56 (21) | 9.5-40.9 | .09 | 40/61 (65) | 48.3-79.3 | .28 |

[a] Forgone medical care includes missing 1 or more doses of a medicine the respondent typically picked-up or had someone else pick up from a retail pharmacy; missing a scheduled health care visit, including a preventive care visit, general medical outpatient visit, mental health outpatient visit, or elective surgical procedure; or not receiving care for a new severe (defined based on self report as severity 4-5 on a scale of 1-5) physical or mental health issue. Individuals could report multiple types of forgone care.

[b] Scheduled medical care includes scheduled preventive care visits, scheduled general medical outpatient visits, scheduled mental health outpatient visits, and elective surgical procedures.

Downloaded From: https://jamanetwork.com/ on 11/25/2021

AR-04603

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 284 of 298   PageID 5145

JAMA Network Open | Health Policy
Reports of Forgone Medical Care Among US Adults During the Initial Phase of the COVID-19 Pandemic

reported frequency of forgone medical care by other chronic health conditions examined, including heart disease, lung disease, or high blood pressure, diabetes, or high cholesterol.

We identified differences in the reasons stated for forgoing medical care by employment and health insurance status (**Figure 3**). Compared with adults who were employed, adults who were unemployed more often attributed forgone medical care to fear of SARS-CoV-2 exposure (78 of 186 respondents [42%] vs 120 of 503 respondents [24%]; $P$ = .002) and to financial repercussions of the pandemic (36 of 186 respondents [20%] vs 28 of 503 respondents [6%]; $P$ = .001). Respondents without insurance reported forgoing medical care owing to financial concerns more often than respondents with commercial or Medicare health care coverage (19 of 88 respondents [22%] vs 32 of 768 respondents [4%]; $P$ < .001). Respondents with Medicaid coverage, compared with respondents with commercial or Medicare coverage, more often reported forgoing care owing to concerns about SARS-CoV-2 exposure (70 of 142 respondents [50%] vs 203 of 768 respondents [26%]; $P$ = .003) and financial concerns (21 of 142 respondents [15%] vs 32 of 768 respondents [4%]; $P$ = .03). We also examined whether there were differences in reporting forgoing care owing to practice closures, but did not find statistically significant differences based on employment status or insurance coverage.

Table 2. Share of Respondents Who Reported Needing Care Who Reported Forgone Medical Care From March Through Mid-July 2020, by Clinical Characteristics

| Characteristic | Any forgone medical care (N = 1055)[a] | | | Missed dose of medicine (n = 725) | | | Missed scheduled medical care (n = 873)[b] | | |
|---|---|---|---|---|---|---|---|---|---|
| | No./total No. (%) | 95% CI, % | $P$ value | No./total No. (%) | 95% CI, % | $P$ value | No./total No. (%) | 95% CI, % | $P$ value |
| Self-reported health | | | | | | | | | |
| Excellent | 56/92 (61) | 46.0-74.7 | [Reference] | 5/41 (11) | 2.8-3.4 | [Reference] | 56/82 (69) | 53.4-81.0 | [Reference] |
| Very good | 173/363 (48) | 41.8-53.8 | .11 | 25/254 (10) | 5.7-16.3 | .88 | 167/298 (56) | 49.3-62.5 | .13 |
| Good | 198/391 (51) | 43.7-57.7 | .21 | 43/281 (15) | 9.6-23.1 | .21 | 174/322 (54) | 45.9-61.7 | .09 |
| Fair or poor | 116/210 (56) | 45.1-65.5 | .54 | 35/149 (24) | 13.0-39.4 | .03 | 104/172 (61) | 50.7-69.9 | .36 |
| Uses ≥1 prescription medications | | | | | | | | | |
| No | 99/149 (66) | 55.4-75.7 | [Reference] | NA | NA | NA | 95/145 (65) | 54.1-75.0 | [Reference] |
| Yes | 443/902 (49) | 44.7-53.6 | .005 | 108/725 (15) | 11.0-19.7 | NA | 404/725 (56) | 50.8-60.6 | .12 |
| Has high blood pressure, diabetes, or high cholesterol | | | | | | | | | |
| No | 337/650 (52) | 46.1-57.6 | [Reference] | 71/433 (16) | 10.8-23.8 | [Reference] | 309/519 (60) | 53.1-65.7 | [Reference] |
| Yes | 207/405 (51) | 45.4-56.7 | .85 | 37/292 (13) | 8.5-18.4 | .37 | 192/354 (54) | 48.0-60.1 | .23 |
| Has heart disease, such as a heart attack, coronary heart disease, angina, congestive heart failure, or other heart problems | | | | | | | | | |
| No | 500/979 (51) | 46.7-55.5 | [Reference] | 94/675 (14) | 10.0-19.0 | [Reference] | 463/803 (58) | 52.8-62.2 | [Reference] |
| Yes | 44/76 (58) | 44.9-70.1 | .33 | 13/50 (27) | 13.0-47.4 | .10 | 38/70 (55) | 41.2-67.5 | .69 |
| Has lung disease, such as chronic bronchitis or emphysema | | | | | | | | | |
| No | 515/1003 (51) | 47.0-55.7 | [Reference] | 103/695 (15) | 10.9-20.0 | [Reference] | 475/829 (57) | 52.5-61.9 | [Reference] |
| Yes | 29/52 (56) | 39.7-71.0 | .59 | 4/30 (14) | 5.8-29.4 | .86 | 26/44 (59) | 43.0-73.1 | .85 |
| ≥1 Mental health conditions | | | | | | | | | |
| No | 402/809 (50) | 45.1-54.3 | [Reference] | 59/541 (11) | 7.6-15.4 | [Reference] | 373/669 (56) | 50.6-60.8 | [Reference] |
| Yes | 142/246 (58) | 48.2-66.7 | .13 | 49/184 (26) | 16.3-39.9 | .004 | 128/204 (63) | 53.0-71.1 | .22 |

[a] Forgone medical care includes missing 1 or more doses of a medicine the respondent typically picked-up or had someone else pick up from a retail pharmacy; missing a scheduled health care visit, including a preventive care visit, general medical outpatient visit, mental health outpatient visit, or elective surgical procedure; or not receiving care for a new severe (defined based on self report as severity 4-5 on a scale of 1-5) physical or mental health issue. Individuals could report multiple types of forgone care.

[b] Scheduled medical care includes scheduled preventive care visits, scheduled general medical outpatient visits, scheduled mental health outpatient visits, and elective surgical procedures.

Downloaded From: https://jamanetwork.com/ on 11/25/2021

AR-04604

## Discussion

This survey study found that in a population representative of the overall US adult population, 41% of adults reported forgone care from March through mid-July 2020. Previous studies have found that individuals sometimes chose to forgo care prior to the COVID-19 pandemic; for example, the Kaiser Family Foundation estimated that in 2018, 13% of White individuals, 17% of Black individuals, and 21% of Hispanic individuals forwent care owing to cost.[12] However, our results suggest that the COVID-19 pandemic exacerbated the problem, with individuals reporting closed practitioner offices, fear of exposure to SARS-CoV-2, and the financial repercussions of the pandemic as common reasons for forgoing care during this period.

These national survey results are consistent with research using insurance claims and EHR data that documented declines in the use of health care services to treat severe health issues during the first several months of the COVID-19 pandemic within specific health systems.[5-7] Our results extend existing research on forgone medical care by quantifying changes at the national level, considering a larger set of health care services, and examining the underlying reasons reported for forgoing care during the initial phase of the pandemic.

The most common reason respondents reported for missing scheduled care was owing to office closure. The Coronavirus Aid, Relief, and Economic Security (CARES) Act[13] included $175 billion to provide financial relief to medical practices and hospitals during the COVID-19 pandemic, and such funding may have helped practices that initially closed to reopen after putting additional safety precautions in place to prevent the spread of COVID-19. Proactive outreach from health care practitioner offices to reschedule cancelled appointments through in-person care or telehealth may help limit the long-term consequences of this forgone medical care. Telehealth can also help individuals continue to receive health care when they are concerned about exposure to SARS-CoV-2.[14] States and the federal government have supported telehealth by temporarily loosening licensing, electronic prescribing, and written consent laws.[15-17] Additionally, many payers have temporarily increased the types of services that can be delivered via telehealth and reimbursement for telehealth services.[18] Continuing to provide financial and regulatory support for telehealth is important to ensure that practitioners offer this service for the duration of the pandemic. However, older adults who are uncomfortable with technology and individuals with limited internet connectivity may struggle to access or may be hesitant to use telehealth.[19] It is important for practitioners and insurers to support patient use of telehealth and to ensure that



Figure 3. Reasons Reported for Forgoing Planned Care Among Respondents Who Reported Needing Care by Employment and Health Insurance Status

Responses are based on the time period of March through mid-July 2020, during the initial phase of the coronavirus disease 2019 (COVID-19) pandemic in the United States. SARS-CoV-2 indicates severe acute respiratory syndrome coronavirus 2.

Downloaded From: https://jamanetwork.com/ on 11/25/2021

AR-04605

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 286 of 298   PageID 5147

JAMA Network Open | Health Policy                     Reports of Forgone Medical Care Among US Adults During the Initial Phase of the COVID-19 Pandemic

telehealth can be accessed using a variety of internet speeds and devices, for example by offering audio-only (telephone) services.[20,21]

Among respondents who reported missing planned care, 14% reported the financial repercussions of the COVID-19 pandemic as a reason for forgoing care, and among the subset who reported missing prescription medication, nearly 1 in 4 respondents reported financial reasons for missing medications. Several policies can offer better financial protection to patients experiencing financial distress owing to the pandemic. Within the 38 states plus Washington, District of Columbia, that have expanded Medicaid, enrollment in Medicaid can improve health care affordability for individuals who have lost health insurance or were uninsured when the pandemic began. The $600 boost to weekly unemployment benefits during the first 4.5 months of the pandemic may have also mitigated some of the potentially harmful financial outcomes of the COVID-19 pandemic on people with health care needs. More individuals who are unemployed may forgo medical care as their unemployment benefits expire. Our results suggest that Medicare had a protective association, with older adults reporting much lower frequency of missed medication compared with other age groups. Conditioning businesses' relief payments on keeping furloughed employees enrolled in their health insurance is another strategy that may prevent forgone care owing to cost concerns. Employers receiving federal assistance, such as the employee retention tax credit, are currently allowed, but not required, to pay for health insurance for furloughed employees.[22]

## Limitations

This study has several limitations. First, our sample size may have inhibited our ability to detect statistically significant differences in the frequency and reasons of forgone medical care, particularly when analyzing certain subgroups. Second, there may have been heterogeneity in responses to the COVID-19 pandemic owing to differences in timing and extent of the pandemic and public health responses in different locales not captured in our survey. Third, our survey items on forgone medical care were generated for this study, preventing us from directly comparing our findings with frequency of forgone medical care before the COVID-19 pandemic. Fourth, the AmeriSpeak panel used probability-based recruitment aligning with best-practice survey research standards, but results may be susceptible to sampling biases. Fifth, we did not have information on the employment or health insurance status of a respondent's entire household. If a family member lost employment or health insurance owing to the pandemic, it could financially affect decision-making within the entire household about whether to seek or forgo care. Sixth, our analysis did not capture all types of forgone medical care; for example, we did not consider missed doses of mail-order drugs.

## Conclusions

The findings of this survey study suggest that as the United States is experiencing another wave of surging SARS-CoV-2 infections, it will be important to track whether interventions to enhance health system safety provide the public with sufficient confidence to seek medical care. As emergency financial measures enacted by the US Congress and unemployment benefits expire, ensuring the affordability of needed health care services for individuals financially impacted by COVID-19 is critical.

**ARTICLE INFORMATION**

**Accepted for Publication:** December 4, 2020.

**Published:** January 21, 2021. doi:10.1001/jamanetworkopen.2020.34882

**Open Access:** This is an open access article distributed under the terms of the CC-BY License. © 2021 Anderson KE et al. *JAMA Network Open*.

Downloaded From: https://jamanetwork.com/ on 11/25/2021

AR-04606

**Corresponding Author:** Kelly E. Anderson, MPP, Department of Health Policy and Management, Johns Hopkins Bloomberg School of Public Health, 624 N Broadway, Room 428, Baltimore, MD 21205 (kelly.anderson@jhu.edu).

**Author Affiliations:** Department of Health Policy and Management, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland.

**Author Contributions:** Ms Anderson had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.

*Concept and design:* All authors.

*Acquisition, analysis, or interpretation of data:* Anderson, McGinty, Barry.

*Drafting of the manuscript:* Anderson.

*Critical revision of the manuscript for important intellectual content:* All authors.

*Statistical analysis:* Anderson.

*Obtained funding:* McGinty, Barry.

*Administrative, technical, or material support:* McGinty, Barry.

*Supervision:* McGinty, Barry.

**Conflict of Interest Disclosures:** Ms Anderson previous employment from The Lewin Group outside the submitted work. No other disclosures were reported.

**Funding/Support:** The Johns Hopkins Bloomberg School of Public Health and the Johns Hopkins University Alliance for a Healthier World's 2020 COVID-19 Launchpad Grant funded data collection. The Agency for Healthcare Research and Quality provides tuition and stipend support for Ms Anderson (grant No. T32HS000029). The National Institute of Mental Health provides tuition and stipend support for Ms Presskreischer (grant No. T32MH109436).

**Role of the Funder/Sponsor:** The funders had no role in the design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

## REFERENCES

**1**. Sarac NJ, Sarac BA, Schoenbrunner AR, et al. A review of state guidelines for elective orthopaedic procedures during the COVID-19 outbreak. *J Bone Joint Surg Am*. 2020;102(11):942-945. doi:10.2106/JBJS.20.00510

**2**. Hartnett KP, Kite-Powell A, DeVies J, et al; National Syndromic Surveillance Program Community of Practice. Impact of the COVID-19 pandemic on emergency department visits—United States, January 1, 2019-May 30, 2020. *MMWR Morb Mortal Wkly Rep*. 2020;69(23):699-704. doi:10.15585/mmwr.mm6923e1

**3**. US Department of Labor. Unemployment insurance weekly claims data. Accessed October 2, 2020. https://oui.doleta.gov/unemploy/claims.asp

**4**. Bivens J, Zipperer B. Health insurance and the COVID-19 shock. *Economic Policy Institute*. August 26, 2020. Accessed October 2, 2020. https://www.epi.org/publication/health-insurance-and-the-covid-19-shock/

**5**. Westgard BC, Morgan MW, Vazquez-Benitez G, Erickson LO, Zwank MD. An analysis of changes in emergency department visits after a state declaration during the time of COVID-19. *Ann Emerg Med*. 2020;76(5):595-601. doi:10.1016/j.annemergmed.2020.06.019

**6**. Garcia S, Albaghdadi MS, Meraj PM, et al. Reduction in ST-segment elevation cardiac catheterization laboratory activations in the United States during COVID-19 pandemic. *J Am Coll Cardiol*. 2020;75(22):2871-2872. doi:10.1016/j.jacc.2020.04.011

**7**. Bhatt AS, Moscone A, McElrath EE, et al. Fewer hospitalizations for acute cardiovascular conditions during the COVID-19 pandemic. *J Am Coll Cardiol*. 2020;76(3):280-288. doi:10.1016/j.jacc.2020.05.038

**8**. Dennis JM; NORC at the University of Chicago. Technical overview of the AmeriSpeak panel NORC's probability-based household panel. Updated June 2020. Accessed October 2, 2020. https://amerispeak.norc.org/Documents/Research/AmeriSpeak%20Technical%20Overview%202019%202018.pdf

**9**. Yancy CW. COVID-19 and African Americans. *JAMA*. 2020;323(19):1891-1892. doi:10.1001/jama.2020.6548

**10**. Webb Hooper M, Nápoles AM, Pérez-Stable EJ. COVID-19 and racial/ethnic disparities. *JAMA*. 2020;323(24):2466-2467. doi:10.1001/jama.2020.8598

**11**. Centers for Disease Control and Prevention. COVID-19 hospitalization and death by race/ethnicity. Updated August 18, 2020. Accessed November 24, 2020. https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html

Downloaded From: https://jamanetwork.com/ on 11/25/2021

AR-04607

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 288 of 298   PageID 5149

**JAMA Network Open | Health Policy**                    Reports of Forgone Medical Care Among US Adults During the Initial Phase of the COVID-19 Pandemic

**12**. Artiga S, Garfield R, Orgera K. Communities of color at higher risk for health and economic challenges due to COVID-19. *Kaiser Family Foundation*. April 7, 2020. Accessed August 21, 2020. https://www.kff.org/disparities-policy/issue-brief/communities-of-color-at-higher-risk-for-health-and-economic-challenges-due-to-covid-19/

**13**. Department of Health and Human Services. CARES Act Provider Relief Fund. Accessed October 3, 2020. https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/index.html

**14**. Mehrotra A, Ray K, Brockmeyer DM, Barnett ML, Bender JA. Rapidly converting to "virtual practices": outpatient care in the era of COVID-19. *NEJM Catalyst*. Published online April 1, 2020. doi:10.1056/CAT.20.0091

**15**. Hoffman DA. Increasing access to care: telehealth during COVID-19. *J Law Biosci*. 2020;7(1):a043. doi:10.1093/jlb/lsaa043

**16**. Trump administration issues second round of sweeping changes to support US healthcare system during COVID-19 pandemic. News release. Centers for Medicare & Medicaid Services. April 30, 2020. Accessed June 5, 2020. https://www.cms.gov/newsroom/press-releases/trump-administration-issues-second-round-sweeping-changes-support-us-healthcare-system-during-covid

**17**. Weigel G, Ramaswamy A, Sobel L, Salganicoff A, Cubanski J, Freed M. Opportunities and barriers for telemedicine in the US during the COVID-19 emergency and beyond. *Kaiser Family Foundation*. May 11, 2020. Accessed June 5, 2020. https://www.kff.org/womens-health-policy/issue-brief/opportunities-and-barriers-for-telemedicine-in-the-u-s-during-the-covid-19-emergency-and-beyond/

**18**. America's Health Insurance Plans. Health insurance providers respond to coronavirus (COVID-19). Accessed June 5, 2020. https://www.ahip.org/health-insurance-providers-respond-to-covid-19/

**19**. Lam K, Lu AD, Shi Y, Covinsky KE. Assessing telemedicine unreadiness among older adults in the United States during the COVID-19 pandemic. *JAMA Intern Med*. 2020;180(10):1389-1391. doi:10.1001/jamainternmed.2020.2671

**20**. Uscher-Pines L, Sousa J, Raja P, Mehrotra A, Barnett ML, Huskamp HA. Suddenly becoming a "virtual doctor": experiences of psychiatrists transitioning to telemedicine during the COVID-19 pandemic. *Psychiatr Serv*. 2020;71(11):1143-1150. doi:10.1176/appi.ps.202000250

**21**. Nouri S, Khoong EC, Lyles CR, Karliner L. Addressing equity in telemedicine for chronic disease management during the COVID-19 pandemic. *NEJM Catalyst*. Published online May 4, 2020. doi:10.1056/CAT.20.0123

**22**. Internal Revenue Service. COVID-19–related employee retention credits: amount of allocable qualified health plan expenses FAQs. Accessed August 30, 2020. https://www.irs.gov/newsroom/covid-19-related-employee-retention-credits-amount-of-allocable-qualified-health-plan-expenses-faqs#65

**SUPPLEMENT.**
**eAppendix.** Question Wording for Forgone Medical Care, Health Insurance, and Employment Survey Questions
**eTable.** Characteristics of Study Sample

Downloaded From: https://jamanetwork.com/ on 11/25/2021

AR-04608

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 289 of 298   PageID 5150

# The Washington Post
*Democracy Dies in Darkness*

# The evidence is building: Vaccine mandates work — and well

By Aaron Blake
Senior reporter

September 29, 2021 at 11:03 a.m. EDT

A union representing Massachusetts state troopers sought to make a splash this week in its fight against the state's coronavirus vaccine mandate. Dozens of troopers had submitted resignation paperwork over the mandate, the State Police Association of Massachusetts announced Monday after an adverse court ruling. It suggested that the mandate-linked resignations would deplete an agency that is "already critically short staffed."

What if such mandates mean our crime-fighters can't fight crime? That's a scary prospect.

The reality, though, is far from as dire as it might have seemed. And the totality of the anecdotal data we have so far on coronavirus vaccine mandates points to one conclusion: They work — quite well, in fact.

Two bits of context were often lost in the coverage of the Massachusetts news. One was that the troopers come from a force of about 2,000. The news release did not specify a number, but the "dozens" could be as little as about 1 percent of troopers.

The other is that, as we've since found out, it's not clear how many troopers actually will leave the force. As of later Monday, the Massachusetts State Police said only one trooper actually had retired over the mandate. Others could follow, but even the union said some might go to other departments with less-stringent requirements.

And even as that news landed Monday, we were receiving plenty of data pointing to the effectiveness of vaccine mandates for state employees and businesses. Many of these mandates were announced this summer and are reaching deadlines, meaning they provide a good barometer for how effective the mandates are.

United Airlines was one of the first big companies to adopt a mandate, and it announced this week that 98.5 percent of employees have been vaccinated. Just 593 out of 67,000 employees face being fired for refusing the vaccine.

AR-04609

The success of the mandate approach is even more evident when you compare it with another big carrier, Delta Air Lines. Delta, too, has sought to apply pressure on employees; it will charge a $200-per-month health insurance surcharge for unvaccinated employees starting Nov. 1. And it, too, has seen compliance grow, but only to 82 percent. It is possible that could still grow ahead of Nov. 1, when it starts hitting the unvaccinated employees' pocketbooks. But United is clearly way ahead of the game when it comes to employee vaccinations, which is difficult to attach to anything but its mandate.

Most of the news on this front comes from hospital systems, where there has been strong compliance. Here are the numbers in New York, as reported by the New York Times on Tuesday:

- The entire system, an early indicator for vaccine mandates, has gone from about three-fourths of hospital employees and nursing-home workers being vaccinated when the policy was announced a month and a half ago to 92 percent today.

- Strong Memorial Hospital in Rochester, N.Y., announced a 95.5 percent vaccination rate.

- Albany Medical Center said only 200 of its 11,000 employees either did not get shots or did not seek exemptions — around 2 percent. Those employees were suspended and given a week to comply.

- St. Barnabas Hospital in the Bronx went from 20 percent unvaccinated as recently as last week to just 3 percent.

- Bassett Healthcare Network in central New York said 97 percent of employees are vaccinated.

- Rome Health in Upstate New York said 98.2 percent are vaccinated after a late surge.

- The Mohawk Valley Health System went up from 70 percent over the summer to 95.6 percent today.


And the evidence elsewhere:

- Tyson Foods announced a vaccine mandate in early August. Since then, its vaccination rate has gone from 50 percent to 80 percent, with the deadline still more than a month away.

- Truman Medical Centers/University Health in Kansas City, Mo., was the first in the region to require vaccinations. Just 39 of 5,000 employees — below 1 percent — lost their jobs after the deadline passed last week.

- Houston Methodist's hospital system, one of the earliest case studies this summer, lost 153 employees out of 26,000 — a rate of about half a percent. Approximately 2 percent received exemptions.

AR-04610

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 291 of 298   PageID 5152

- North Carolina's hospital system announced Tuesday that about 175 of its 35,000 employees — again, about half of one percent — were fired for refusing the vaccines.

That last one is a key example. Last week, the system had announced the suspensions of 375 employees for refusing the vaccines — about 1 percent of its workforce. But about 200 of them ultimately complied. Over and over, the examples suggest that as deadlines approach, compliance increases substantially in ways that suggest that the vast majority of these people wouldn't have gotten vaccinated without the mandates.

There are, however, examples of the mandates not working as well; certain hospitals in New York are struggling more than others. The Erie County Medical Center in Buffalo has said 20 percent of nursing-home staffers were placed on unpaid leave Monday for refusing the vaccines, and it is scrambling to fill the gaps. Oneida Health lost about 12 percent of its workforce.

And in the San Francisco Bay area, about 10 percent of police, hospital and school employees have yet to comply, with deadlines approaching.

None of it means these departures do not and will not test these organizations. In many cases, they do, in small hospital systems already dealing with a pandemic. It's also possible that those with strong compliance numbers are more likely to publicize that.

But when such vaccine mandates were considered and announced — and even up through today after President Biden announced a vaccine-or-testing mandate for large employers — much of the pushback from the anti-mandate crowd has been an argument that these measures would "harden" opposition to vaccines.

"It is contrary to getting the vaccines out," Arkansas Gov. Asa Hutchinson (R) said this month of Biden's announcement. "It will harden the hesitancy out there, and it's not the right time. It's not the right message."

"Vaccine hesitancy is complicated, and overreaching government mandates can make people even more hesitant to get the vaccine," a spokeswoman for Florida Gov. Ron DeSantis (R) said last week.

That might indeed be true! It might make people resent being forced to do something they don't want to or hadn't yet decided to do. But the evidence also increasingly suggests that it spurs that vast majority of the resistant ultimately to comply, hard feelings or not.

## Coronavirus: What you need to read

**Coronavirus maps:** Cases and deaths in the U.S. | Cases and deaths worldwide

**Vaccines:** Tracker by state | Booster shots | For kids 5 to 11 | Guidance for vaccinated people | How long does immunity last? | County-level vaccine data

AR-04611

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 292 of 298   PageID 5153

**Do you think you're experiencing long-haul covid symptoms?** Share your experience with The Post.

**What you need to know:** Masks FAQ | Delta variant | Other variants | Symptoms guide | Follow all of our coverage and sign up for our free newsletter

**Impact of the pandemic:** Supply chain | Education | Housing

**Got a pandemic question?** We answer one every day in our coronavirus newsletter

AR-04612

ΛXIOS                          Sections      Local news      About Axios      Sign up

Sep 12, 2021 - Politics & Policy

# New York hospital to "pause" delivering babies af

Yacob Reyes

Photo: Jill Connelly/Bloomberg via Getty Images

A hospital in upstate New York says it will "pause" its maternity services this month after several employees chose to resign rather than get a mandatory COVID-19 vaccine.

**Driving the news:** At least six unvaccinated maternity staffers at Lewis County General Hospital have quit. In all, 165 staffers, or about 27% of the hospital's workforce, is unvaccinated, CEO Gerald Cayer said at a news briefing.

The Sept. 25 pause will take place two days before the state's deadline for health care workers to get the shot.

**What they're saying: "**We are unable to safely staff the service after Sept. 24," Cayer told reporters Friday.

- "The number of resignations received leaves us no choice but to pause delivering babies at Lewis County General Hospital."

AR-04613

Case 2:21-cv-00229-Z    Document 30-8    Filed 11/28/21    Page 294 of 298    PageID 5155

- "It is my hope that the [New York] Department of Health will work with us in pausing the service rather than closing the maternity department."

AXIOS             Sections     Local news     About Axios     Sign up          🔍

Go deeper

Axios
Updated 3 hours ago · Politics & Policy

# Coronavirus dashboard

AR-04614

Case 2:21-cv-00229-Z   Document 30-8   Filed 11/28/21   Page 295 of 298   PageID 5156

**AXIOS**

Sections     Local news     About Axios     Sign up

Illustration: Aïda Amer/Axios

1. **Vaccines:** U.S. to mandate vaccines for anyone who crosses borders starting in January — Shots lagged data by months — The next big bottleneck in the global vaccination effort.

2. **Health:** The Thanksgiving bouncers — Axios-Ipsos poll: Thanksgiving roulette — Experts criticize CDC's language on vaccine boosters — America's Thanksgiving gamble.

3. **Politics:** Biden administration asks appeals court to reinstate vaccine mandate — Michigan recommends face masks for all residents amid surge.

4. **Education:** A COVID strategy backfires at schools — Schools across the U.S. offer vaccine drives — Benefits of in-person school outweigh risks, study finds.

5. **World:** EU drug regulator recommends Pfizer COVID vaccine for kids — Italy announces new COVID restrictions for unvaccinated people — European health agency urges expanding booster shot access.

6. **Variant tracker:** Where different strains are spreading.

Go deeper (1 min. read) ⟶

AR-04615

AXIOS

Sections      Local news      About Axios      Sign up

Noah Garfinkel
Nov 24, 2021 - Health

# European health agency urges expanding COVID booster shot access

A woman in Slovakia recieving the Sputnik V vaccine against COVID-19. Photo: VLADIMIR SIMICEK/AFP via Getty Images

The European Centre for Disease Prevention and Control (ECDC) recommended booster shots for all adults in a statement on Wednesday, as COVID-19 reaches new daily highs throughout the continent.

**The big picture:** Slovakia, the Czech Republic, the Netherlands and Hungary all reported new daily highs in infections on Wednesday, Reuters reports.

Go deeper (<1 min. read) ⟶

AR-04616

**∧XIOS**

Sections      Local news      About Axios      Sign up

Shawna Chen
Nov 25, 2021 - Health

# U.S. to mandate COVID vaccines for all border crossers in January

President Biden speaks during an event at the South Court Auditorium at Eisenhower Executive Office Building in Washington, D.C. Photo: Alex Wong via Getty Images

The Biden administration will begin requiring essential travelers crossing U.S. borders to be fully vaccinated starting Jan. 22, a White House spokesperson told Axios Wednesday.

**Why it matters:** The move comes after the U.S. opened land borders with Canada and Mexico to non-essential travel in November, but only to those fully vaccinated against the coronavirus.

Go deeper (<1 min. read)  ⟶

**∧XIOS**

Axios gets you smarter, faster with news & information that matters.

Copyright Axios Media 2021

About

About Axios

Advertise with us

Careers

Events

Axios on HBO

Axios HQ

AR-04617

**AXIOS**

Privacy and terms

Online tracking choices

Contact us

Sections        Local news        About Axios        Sign up

Subscribe

Axios newsletters

Axios app

Axios podcasts

Courses

Earn Axios rewards

AR-04618