IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS *et al.*,          §
                                  §
        Plaintiffs,               §
                                  §
v.                                §          2:21-CV-229-Z
                                  §
XAVIER BECERRA in his official capacity   §
As Secretary of the               §
United States Department of Health   §
And Human Services *et al.*,      §
                                  §
        Defendants.               §

## MEMORANDUM OPINION AND ORDER

The Court enters this Order pursuant to Rule 65 of the Federal Rules of Civil Procedure

after a preliminary injunction hearing on Plaintiffs'[1] various claims against Defendants.[2] For the

following reasons, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction (ECF No. 6).

BACKGROUND

On November 5, 2021, the Centers for Medicare and Medicaid Services ("CMS") — a

federal agency — published its Interim Final Rule with Comment Period ("IFR") entitled

"Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination." ECF

No. 7 at 9; 86 Fed. Reg. 61,555 ("the CMS Mandate"). The CMS Mandate covers fifteen categories

of Medicare-certified and Medicaid-certified health providers and suppliers. *Id.* at 61,569-70.

---

[1] Plaintiffs are the State of Texas and the Texas Department of Health and Human Services.

[2] Defendants are Xavier Becerra in his official capacity as Secretary of the United States Department of Health and Human Services; the United States Department of Health and Human Services ("DHHS"); Chiquita Brooks-LaSure in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; Meena Seshamani in her official capacity as Deputy Administrator and Director of Center for Medicare; Daniel Tsai in his official capacity as Deputy Administrator and Director of Medicaid and CHIP Services; the Centers for Medicare and Medicaid Services ("CMS"); Joseph R. Biden in his official capacity as President of the United States of America; and the United States of America.

These providers include health clinics, hospitals, long-term care facilities, and home-health agencies. *Id.*

The CMS Mandate requires virtually every employee, contractor, trainee, student, and volunteer working for one of the covered providers or suppliers to be vaccinated against SARS-CoV-2. *Id.* at 61,570; ECF No. 7 at 9. Further, it requires those same workers to receive the first dose of the vaccine prior to December 6, 2021 or the provider will be subject to penalties. *Id.* at 61,573.

On November 15, 2021, Plaintiffs filed a Complaint seeking a permanent injunction of the CMS Mandate. ECF No. 1. The Complaint alleges ten violations by the Biden Administration in enacting the CMS Mandate. *Id.* at 38–66.

On November 16, 2021, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction. ECF No. 6. The following day, Defendants entered an appearance and filed a motion for a scheduling order — labeled as a status report — requesting the Court set extended deadlines for the response and reply to Plaintiffs' motion. ECF No. 11. The Court issued a responsive scheduling order the same day. ECF No. 13. On November 30, 2021, the United States District Court for the Western District of Louisiana issued a "nationwide preliminary injunction" of the CMS Mandate. *Louisiana v. Becerra,* No. 3:21-CV-03970, 2021 WL 5609846 (W.D. La. Nov. 30, 2021).

On December 1, 2021, Defendants filed a Motion to Stay proceedings on the grounds that the nationwide preliminary injunction "obviates any need for a preliminary injunction here, since it provides all of the relief Texas seeks in its motion for temporary restraining order and preliminary injunction." ECF No. 35 at 1-2. On the same day, the Court issued an order to defer ruling on Defendants' Motion to Stay until after the scheduled preliminary injunction hearing on

December 2, 2021. After holding a hearing, the Court granted Defendants' Motion to Stay. ECF No. 35. The Court ordered both parties to immediately notify the Court of an "Intervening Court Action." ECF No. 43.

On December 15, 2021, the Fifth Circuit narrowed the nationwide preliminary injunction to only apply to fourteen states — not including Texas.[3] The Court held an emergency telephonic hearing with both parties to finally adjudicate the pending Motion for Preliminary Injunction.

LEGAL STANDARDS

A federal court sitting in equity has power to issue a preliminary injunction under Federal Rule of Civil Procedure 65. The Court need not address Plaintiffs' Motion for a Temporary Restraining Order under Rule 65(b) because Defendants received notice and made an appearance. ECF No. 10. The local rules of the U.S. District Court for the Northern District of Texas do not alter, subtract from, or add to these requirements. *See* N.D. TEX. L. CIV. R. *passim.*

A preliminary injunction is an extraordinary remedy requiring the applicant to unequivocally show the plaintiff is entitled to such relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013) (internal marks omitted). To obtain a preliminary injunction, a movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest. *Denton v. City of El Paso, Texas*, 861 Fed.Appx. 836, 838 (5th Cir. 2021) (quoting *Moore v. Brown*, 868 F.3d 389, 402-03 (5th Cir. 2017)).   "Likelihood of success and irreparable injury to the movant are the most significant factors." *Louisiana*, No. 21-30734 at 2 (internal marks omitted).

---

[3]   *See Louisiana v. Becerra*, No. 21-30734 (5th Cir. Dec. 15, 2021).

ANALYSIS

In the analysis that follows, the Court concludes that it has jurisdiction over Plaintiffs' claims and that Plaintiffs have standing. Next, the Court concludes Plaintiffs have met their burden under the four factors. Plaintiffs are therefore entitled to injunctive relief.

### A. Jurisdiction

To begin, the Court addresses jurisdiction. Section 1355cc(h) of the Medicare statute funnels most Medicare claims brought by "an institution or agency dissatisfied with a determination by the Secretary," through a special review system. *See* 42 U.S.C. § 1395cc(h)(1). Accordingly, such claims are "entitled to a hearing thereon by the Secretary" under 42 U.S.C. § 405(b) and "to judicial review of the Secretary's final decision after such hearing" as provided by 42 U.S.C. § 405(g). *See* 42 U.S.C. § 1395cc(h)(1).

Defendants argue that this Court lacks jurisdiction because Plaintiffs failed to first present their claim administratively to the agency as required by 42 U.S.C. § 1395ii's incorporation of 42 U.S.C. § 405(h). ECF No. 32 at 22-23. But Plaintiffs are neither "institutions" nor "agencies" entitled to the Medicare statute's vehicle for administrative review. Instead, Plaintiffs are a *State* and a state agency. States have a procedural right to bring claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. ("[T]o vindicate its sovereign, quasi-sovereign, and proprietary interests on behalf of its citizens *parens patriae*." ECF No. 1 at 3.)[4] Because Plaintiffs' claims arise under the Medicaid Act, which is not subject to the Section 405(h) pre-enforcement provision of the Medicare Act, the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331,

---

[4] *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) (holding that Congress has recognized a "concomitant procedural right to challenge the rejection of its rulemaking petition as arbitrary and capricious. § 7607(b)(1)." Considering this procedural right and the state of Massachusetts' "stake in protecting its quasi-sovereign interests," it is entitled to "special solicitude in our standing analysis."); *Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015) ("In enacting the APA, Congress intended those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall within that definition.").

1361, and 2201. *See Springdale Convalescent Center v. Mathews,* 545 F.2d 943, 949 (5th Cir. 1977). Therefore, Plaintiffs are not subject to Section 405(h)'s jurisdictional bar. Consequently, this Court has jurisdiction over both Plaintiffs' Medicare and Medicaid claims.

### B. Standing

Defendants do not challenge Plaintiffs' standing. Even so, the Court must determine whether this dispute can be "appropriately resolved through the judicial process." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 494 U.S. 155). The United States Constitution limits the judicial power of federal courts to certain "cases" and "controversies." U.S. CONST. art. III, § 2. Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). To have standing, the party invoking federal jurisdiction bears the burden to establish that a plaintiff suffers: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent," (2) an injury that is "fairly…trace[able] to the challenged action of the defendant," and (3) an injury that is "likely" rather than "speculative[ly]" to be "redressed by a favorable decision." *Id*. at 560-61. For the purposes of invoking federal jurisdiction, states are significantly different from normal litigants. *Massachusetts*, 549 U.S. at 518. A state alleging that the defendant violated a congressionally accorded procedural right affecting the state's quasi-sovereign interests in its law-making functions is afforded "special solicitude" standing.[5] *Id*., 549 U.S. at 520–21; *Texas*, 809 F.3d at 151–55.

---

[5] *See Texas v. EEOC*, 933 F.3d 433, 446-47 (5th Cir. 2019) (holding that Texas had standing to sue because there was an "increased regulatory burden," pressure "to change state law," and a "procedural injury jeopardizing its concrete interests.").

   1. *Injury in Fact*

To establish injury in fact, a plaintiff must show that it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citing *Lujan,* 504 U.S. at 560). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id*. at 339. A "concrete" injury must be "de facto," that is, it must "actually exist" and be "real, and not abstract." *Id*. at 340. Although tangible injuries may be easier to recognize, "concrete" is not necessarily synonymous with "tangible." *Id*. Therefore, intangible injuries can also be "concrete." *Id*.

Plaintiffs sue to vindicate their "legally protected" sovereign, quasi-sovereign, and proprietary interests on behalf of their citizens *parens patriae*. ECF No. 1 at 3. As the CMS Mandate expressly preempts state laws regulating COVID-19 vaccine requirements, Plaintiffs have "special solicitude" standing to challenge the federal government's enforcement of a regulation that affects Plaintiffs' quasi-sovereign — and thus its "legally protected" — interests in carrying out its law-making functions. *Massachusetts*, 549 U.S. at 520–21; *Texas*, 809 F.3d at 151–55. Further, Plaintiffs' alleged injuries of: (1) exacerbated healthcare staff shortages, (2) loss of essential healthcare services in vulnerable communities, and (3) its inability to efficiently operate its state-run healthcare institutions are "concrete and particularized."

Plaintiffs' allegations are supported by: (1) affidavits from healthcare workers in Texas who resigned when former hospital-specific COVID-19 vaccine requirements were enforced; (2) affidavits from healthcare executives and state public health officials who reasonably anticipate a reduction in staff, medical services, and resources if the CMS Mandate is enforced; and (3) an affidavit from a Texas healthcare worker who confirms that he will resign if forced to receive the

COVID-19 vaccine. ECF No. 8-1 at 208-253. Thus, the Court finds that Plaintiffs have sufficiently established an injury in fact.

### 2.  Traceability

To establish traceability, Plaintiffs must show a "fairly traceable" link between their alleged injuries and the CMS Mandate. *Lujan,* 504 U.S. at 560. This causal link "requires no more than *de facto* causality," and Plaintiffs need not demonstrate that defendant's actions are "the very last step in the chain of causation." *Dept. of Com. v. New York*, 139 S. Ct. 2551, 2556 (2019) (citing *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.); *Bennett v. Spear*, 520 U.S. 154, 169–70 (1997).

The CMS Mandate requires "providers and suppliers" of Medicare and Medicaid services in the State of Texas to enforce compliance with its COVID-19 vaccine requirement. 86 Fed. Reg. at 61,570; ECF No. 7 at 9. The alleged injuries that Plaintiffs present such as significant medical staff shortages and reductions of healthcare services in vulnerable communities would not occur "but for" the enactment of the CMS Mandate. Accordingly, Plaintiffs' alleged injuries are "fairly traceable" to the CMS Mandate.

### 3.  Redressability

Lastly, Plaintiffs must establish redressability to have standing. Redressability requires that a plaintiff demonstrate a "substantial likelihood that the requested relief will remedy the alleged injury." *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000) (internal marks omitted).

Here, Plaintiffs request injunctive relief to stop implementation of the CMS Mandate. *See* ECF No. 6. Plaintiffs allege enforcement of the mandate will lead to: (1) "a reduction in the availability of healthcare services for those vulnerable individuals who rely on Medicare and Medicaid;" (2) an exacerbation of facility staff shortages; (3) the likelihood that "some rural hospitals may have to discontinue certain services if they cannot replace their staff;" (4) and a worsening of pandemic relief conditions "akin to a regulatory 'bloodletting' of Texas and its healthcare services" if facilities will have to let go of needed healthcare workers at this juncture of the pandemic. ECF No. 7 at 6-7. Redressability is satisfied here because a grant of injunctive relief stops enforcement of the CMS Mandate, thus preventing Plaintiffs' alleged injuries.

### C.  Likelihood of Success on the Merits

#### 1.  *Statutory Authority*

A federal agency has no power to act absent Congressional power conferring it such authority. *La. Pub. Sev. Comm'n v. FCC*, 476 U.S. 355. 374 (1986). The APA requires courts to "hold unlawful and set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Therefore, "to permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant the agency power to override Congress." *La. Pub. Sev. Comm'n*, 476 U.S. at 374. Under the *Chevron* Doctrine, when a Court is reviewing an agency's construction of a statute it must use ordinary tools of statutory construction to determine "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 842-43 (1984). If so, the Court "must give effect to the unambiguously expressed intent of Congress." *Id*.

However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. Further, when presented with an agency decision that relies on an ambiguous statute and has vast "economic and political significance," the "major questions doctrine" applies. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 160 (2000)). The "major questions doctrine" considers "[w]here there are special reasons of doubt…whether it is implausible in light of the statute and subject matter in question that Congress authorized such unusual agency action." *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 959 (D.C. Cir. 2021), *cert. granted* (142 S.Ct. 418 Oct. 29, 2021) (internal marks omitted).

CMS relies upon 42 U.S.C. § 1302 ("Section 1102") and 42 U.S.C.§ 1395hh ("Section 1871") of the Social Security Act ("SSA") to claim "broad statutory authority to establish health and safety regulations," including "the authority to establish vaccination requirements." 86 Fed. Reg. at 61,567. Defendants argue that the CMS Mandate is an action grounded in such "broad statutory authority" because it is "reasonably related to the purposes of the enabling legislation." ECF No. 32 at 27.

The Supreme Court held that Medicare is a program enacted by Congress in 1965 to provide healthcare to the aged and disabled. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993). States may receive the benefits of Medicare by entering into agreements with the Secretary of Health and Human Services ("HHS Secretary") "to which they are reimbursed for certain costs associated with the treatment of Medicare beneficiaries." *Id*. The federal Medicaid program also serves to provide medical assistance to qualifying persons in participating states through providing federal funds. 42 U.S.C.A. § 1396(a). The primary function of the Medicare and Medicaid

programs is to provide access to healthcare services to the most vulnerable in society through *financial* means.

Sections 1102 and 1871 of the SSA give the HHS Secretary authority to make rules to ensure the efficient administration of programs "of the functions with which each is charged" and as "may be necessary to carry out the administration of the insurance programs." 42 U.S.C. § 1302; 42 U.S.C. § 1395hh. However, in neither statutory provision did Congress speak directly to the precise question at issue. *Id*. Defendants rely upon sections that do *not* mention vaccines, let alone health or safety.[6] 86 Fed. Reg. 61,567. As Sections 1102 and 1871 of the SSA are silent as to the authority of CMS to implement and enforce the vaccine mandate at issue. Thus, the Court must determine whether "the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843. In considering both the purpose of the Medicare and Medicaid programs, and the plain meaning of the SSA sections, the Court does *not* find a permissible construction to support the CMS Mandate.

Here, Defendants cite statutory provisions authorizing the HHS Secretary to condition funding on facility maintenance standards. ECF No. 32 at 28[7]; *see also* 86 Fed. Reg. at 61,567 (Table 1). However, CMS itself admits that said statutory provisions have never been invoked or used to implement a vaccine mandate.[8] 86 Fed. Reg. at 61,568.

---

[6] **Section 1102(a)**: Conferring to the HHS Secretary the authority to "make and publish such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of the functions with which each is charged under this chapter." 42 U.S.C. § 1302(a).

**Section 1871(a)(1)**: "The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter. When used in this subchapter, the term "regulations" means, unless the context otherwise requires, regulations prescribed by the Secretary." 42 U.S.C. § 1395hh.

[7] Citing 42 U.S.C. § 1395x(e)(9), 42 U.S.C. § 1395i-3(d)(4)(B), 42 U.S.C. § 1395i-3(f)(1).

[8] "We acknowledge that we have not previously imposed such requirements…."

Mandating facility standards is drastically different from mandating who a healthcare provider hires or fires. In fact, Congress statutorily addressed this issue. In regulating "The Public Health and Welfare," the SSA states that the HHS Secretary may not "exercise any supervision or control … over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services." 42 U.S.C. § 1395. Here, the CMS Mandate far exceeds its statutory authority. It allows the HHS Secretary to make a healthcare worker's employment status dependent on COVID-19 vaccine compliance.[9]

Congress forbids such interference into employment decisions. Further, public health and safety regulation beyond facility standards is emphatically the province of the States through their police powers. *See, e.g.*, *Bond v. U.S.*, 572 U.S. 844, 854 (2014); *see also Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905) (noting that the "safety and the health of the people" are for the State to "guard and protect" and are not matters that "ordinarily concern the national government."). A transfer of responsibility for health and safety laws from States to the federal government necessarily implicates federalism.

The Supreme Court requires Congress to use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1850 (2020); s*ee also Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 236 (5th Cir. 2012) (noting the "presumption that federal statutes do not supersede States' historic police powers, unless Congress clearly and manifestly intended to do so."). Because such "exceedingly clear language" is lacking here, the Court will not apply Defendants' proposed broad interpretation of the Medicare and Medicaid statutes.

---

[9] Plaintiffs aver that the CMS Mandate is quantitatively and categorically broad: "nearly 10.4 million individuals who work for, volunteer at, or contract with healthcare facilities." ECF No. 7 at 19.

Because it will apply to myriad employees and already understaffed employers, the Court finds that the CMS Mandate implicates "vast economic and political consequences."[10] Accordingly, the Court applies the "major questions doctrine" to determine whether CMS's agency action is based on a permissible construction of an ambiguous statute. The Court considers: (1) the purpose behind the implementation of Medicare and Medicaid programs; (2) the plain meaning of the statutory sections wherein Defendants claim broad authority; and (3) the sweeping intrusion into state police powers that the CMS Mandate would allow. The Court finds it is "implausible in light of the statute and subject matter in question that Congress authorized such unusual agency action." *Am. Lung Ass'n*, 985 F.3d at 959.

Defendants argue that the "major questions doctrine" does not apply because "health and safety" are unambiguous words that have a "character of their own" and can encompass "the avoidance of a deadly disease."[11] ECF No. 32 at 29 (citing *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923)). Defendants contend that the "major questions doctrine" is a canon of interpretation that does not apply "unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Coastal Conservation Ass'n v. U.S. Dep't of Com.*, 846 F.3d 99, 106 (5th Cir. 2017) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013)).

The "health and safety" the HHS Secretary may consider in rulemaking does not extend to conditioning employment on vaccine compliance — but is instead limited to "infection prevention and control standards." 86 Fed. Reg. at 61,568. Congress previously considered and answered the issue before the Court when it prohibited the HHS Secretary from construing the SSA provisions

---

[10] *See* Plaintiff affidavits from executive officers of hospitals (ECF No. 8-1 at 208, 219, 248), university health centers (ECF No. 8-1 at 212), the Texas Health and Human Services Commission ("HHSC") (ECF No. 8-1 at 225, 237), and a healthcare worker who will resign if forced to comply with the CMS Mandate (ECF No. 8-1 at 231).

[11] "Nonetheless, the first stay factor requires more than showing a close call. We cannot say that the Secretary has made a strong showing of likely success on the merits." *Louisiana*, No. 21-30734 at 3.

on Public Health and Welfare "to exercise any supervision or control … over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person." 42 U.S.C. § 1395. Therefore, the Court rightfully applies the "major questions doctrine." Congress does not grant the HHS Secretary the broad authority to regulate "health and safety" in a manner that conditions employment of healthcare workers. It rather *limits* the Secretary's authority in this respect. The Court finds Plaintiffs are likely to succeed on the merits of Count I of their Complaint alleging that the CMS Mandate exceeds its asserted statutory authority.[12]

2. *Proper Rule-making Procedures*

a. Notice-and-Comment

First, the Court considers whether CMS had "good cause" to skip the notice-and-comment period normally required in administrative rulemaking. When rule-making, the APA requires administrative agencies to publish notice of a proposed rule and allow a 60-day period for comments before enacting a final rule. 5 U.S.C. § 553. An agency can forgo this notice-and-comment period when it for "good cause" finds that such a procedure would be "impracticable, unnecessary, or contrary to the public interest." *Id*. Further, this "good cause exception" to notice-and-comment rulemaking is to be "narrowly construed and only reluctantly countenanced." *N.J. Dep't of Env't Prot. v. EPA*, 626 F.2d 1038, 1045 (1980).

Defendants contend that "good cause" exists to waive a notice-and-comment period. 86 Fed. Reg. at 61,586. Defendants state that the HHS Secretary "issued his rule on an emergency basis, and waived a comment period in advance of publication, because he foresaw an imminent

---

[12] "[I]t appears that the Secretary will have the most difficulty overcoming the part of the ruling that applied the "major questions doctrine." *Louisiana*, No. 21-30734 at 2.

need to protect patients against a spike in COVID-19 cases in the winter months." ECF No. 32 at 12. Defendants' actions, however, undermine the existence of an emergency established "good cause."

Arguably, COVID-19 cases were of significantly greater public health concern when vaccines first became available nearly one year ago. Yet Defendants fail to explain how the current vaccination rate among healthcare workers creates an emergency justifying a preclusion of a notice-and-comment period. Further, Defendants did not enact the IFR until almost 60 days after President Biden announced that CMS needed to issue a mandate. ECF No. 8-1 at 184.

Defendants aver that in the period between President Biden's announcement and the enactment of the CMS Mandate, the Secretary "completed a 73-page rule, with an analysis of over 200 cited sources" thereby demonstrating "appropriate dispatch in the face of the crisis." ECF No. 32 at 43. As the Fifth Circuit noted when considering OSHA's two-month delay in enacting its vaccine mandate, "[o]ne could query how an 'emergency' could prompt such a 'deliberate' response." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 611 n.11 (5th Cir. 2021); s*ee also Asbestos Info. Ass'n/N. Am. v. OSHA*, 727 F.2d 415, 423 (5th Cir. 1984) (holding that although not conclusive, an agency's failure to act "may be evidence that a situation is not a true emergency.").

Despite issuing this rule on an alleged "emergency basis," Defendants allowed time to review input from stakeholders who support the CMS Mandate, but failed to find time to receive input from stakeholders who do not.[13] 86 Fed. Reg. at 61,565-66. In considering the circumstances surrounding the enactment of the CMS Mandate, the Court finds it was not impracticable for HHS to conduct a notice-and-comment period prior to implementing the CMS Mandate.

---

[13] CMS has received over 1,400 comments in the last month since it announced the mandate. ECF No. 34 at 10 (citing https://www.regulations.gov/document/CMS-2021-0168-0001/comment).

Defendants suggest that the HHS Secretary "reasonably predicted that a renewed surge, the coming flu season, or a combination of the two will further exacerbate the strain on the health care system" thereby making preclusion of the notice-and-comment period necessary. ECF No. 32 at 43. Defendants, however, fail to consider the significant effects of the expansive reach of the CMS Mandate.

For example, the CMS Mandate covers approximately 10.4 million people with an additional 2.7 million individuals who will be covered once hired. 86 Fed. Reg. at 61,603 (Table 5), 61,606 (Table 6). In addition, the first-year costs of implementation will be nearly $1.4 billion — of which $600 million *alone* will be allocated to staffing and service disruptions. *Id*. at 61,609 (Table 7). Moreover, a period for public comment would have likely provided CMS with more reliable data rather than "estimates" and "assumptions" to best predict the CMS Mandate's effects on the provision of healthcare — particularly in rural areas.[14] *Id*. at 61,604-09.

Therefore, Plaintiffs are likely to succeed on Count III of their Complaint because Defendants lack "good cause" to skip the notice-and-comment period. Public comment would not be "unnecessary," but rather in the public interest, because "[t]he more expansive the regulatory reach of these rules, of course, the greater the necessity for public comment." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981); ECF No. 1 at 50.

    b.  State Agency Consultation

CMS failed to consult with state agencies prior to implementing the CMS Mandate. In carrying out statutory functions "relating to determination of conditions of participation by providers of services . . . the Secretary shall consult with appropriate State agencies and recognized

---

[14] And CMS admits "it is possible there may be disruptions in cases where substantial numbers of health care staff refuse vaccinations…and are terminated, with consequences for employers, employees, and patients" — but that it does "not have a cost estimate for those, since there are so many variables and unknowns." 86 Fed. Reg. at 61,608.

national listing or accrediting bodies, and may consult with appropriate local agencies." 42 U.S.C. § 1395z. Consultation is appropriate under Section 1395z because "conditions prescribed under any of such subsections may be varied for different areas or different classes of institutions or agencies." *Id*.

Defendants argue that the HHS Secretary found that, "[a]ny delay in the implementation of this rule would result in additional deaths and serious illnesses among health care staff and consumers, further exacerbating the newly-arising, and ongoing, strain on the capacity of health care facilities to serve the public." ECF No. 32 at 45 (citing 86 Fed. Reg. at 61,567). Based on this finding and the alleged state of emergency, Defendants aver that the HHS Secretary ascertained there were no entities "appropriate to engage in these consultations in advance of issuing" the IFR. *Id*. Defendants stated he would consult with state agencies following issuance of the IFR. *Id*. Defendants argue that the HHS Secretary's determination to not consult with State agencies is "entitled to deference from this Court." ECF No. 32 at 45.[15]

The Court previously determined the HHS Secretary lacked statutory basis in the "broad" language of SSA Sections 1102 and 1871. The "narrower" language of 42 U.S.C. § 1395z provides an even *weaker* justification for Defendants' deference arguments. The text of Section 1395z neither gives the HHS Secretary deference to determine when consultation is "appropriate," nor provides a "good cause" exception. 42 U.S.C. § 1395z. Section 1395z commands that the HHS Secretary "*shall* consult with appropriate State agencies." *Id*. As Plaintiffs argue, "[a]llowing the Secretary to decide when consultation is appropriate would create an exception that swallows the

---

[15] Defendants provide the following decisions as support for their reliance on the deference afforded to the HHS Secretary: *The GEO Grp., Inc. v. Newsom*, 15 F.4th 919, 930 (9th Cir. 2021) (statutory language authorizing agency to take "appropriate" action "is a hallmark of vast discretion"); s*ee also Kisor v. Wilkie*, 139 S. Ct. 2400, 2448 (2019) (Kavanaugh, J., concurring in the judgment) ("broad and open-ended terms" like "appropriate" "afford agencies broad policy discretion"); *Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 655 (D.C. Cir. 2019), *cert. denied sub nom.*, *Valero Energy Corp. v. EPA*, 140 S. Ct. 2792 (2020) ("nor does the phrase 'as appropriate' itself specify a particular temporal dimension"). ECF No. 32 at 45.

16

rule." ECF No. 34 at 10. Thus, Plaintiffs are likely to succeed on Count IV of their Complaint alleging a Violation of 42 U.S.C. § 1395z.

        c.  RIA Report

      CMS did not follow proper rulemaking procedures because the HHS Secretary did not prepare a Regulatory Impact Analysis ("RIA"). When the HHS Secretary proposes a rule that "may have a significant impact on the operations of a substantial number of small rural hospitals, the Secretary shall prepare and make available for public comment an initial regulatory impact analysis." 42 U.S.C. § 1302(b)(1).

      Defendants argue that the text of Section 1302(b)(1) applies to a "notice of proposed rulemaking." Under Defendants' reasoning, the statute therefore does *not* apply to the CMS Mandate because it was promulgated as an "Interim Final Rule." ECF No. 32 at 45. (citing 86 Fed. Reg. at 61,613; *see Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) (courts are not free to impose additional procedural requirements on rulemakings beyond those expressed in statute)); *Abushagif v. Garland*, 15 F.4th 323, 332 (5th Cir. 2021).

      But the Supreme Court recently rejected Defendants' IFR construction — albeit in a different case with a different HHS Mandate. *See Little Sisters of the Poor v. Pennsylvania*, 140 S.Ct. 2367, 2384 (2020). In *Little Sisters*, the Supreme Court put aside "formal labels" and instead reasoned that the relevant IFRs were the equivalent of the "notice of proposed rule-making" ("NPR"). Specifically, the Supreme Court was persuaded that an IFR is equivalent to an NPR when it states a: (1) "reference to the legal authority under which the rule is proposed" and (2) "description of the subjects and issues involved." *Id*. (citing Sections 553(b)(2)-(3)). The IFR in *Little Sisters* is similarly situated to the IFR at issue here. For these reasons, this Court rejects Defendants' reading of Section 1302(b)(1).

Even if the IFR at issue is not the equivalent of an NPR, Defendants did not have "good cause" to skip notice-and-comment. Consequently, Plaintiffs are likely to succeed on Count V of their Complaint alleging that Defendants violated 42 U.S.C. § 1302.

### 3. Arbitrary and Capricious

Courts must "hold unlawful and set aside agency action" that is "arbitrary and capricious." 5 U.S.C. § 706(2)(A). An agency action is "arbitrary or capricious" when it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The arbitrary and capricious standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely fails to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. In reviewing an agency's action, the Court considers only reasoning "'articulated by the agency itself' at the time of the agency action and cannot consider *post hoc* rationalizations." *Id.* at 50 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1908 (2020).

Therefore, the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). In reviewing the record, the Court does not "defer to the agency's conclusory or unsupported

suppositions." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (citing *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,* 375 F.3d 1182, 1187 (D.C. Cir. 2004)).

Here, Plaintiffs are likely to succeed on Count VI of its Complaint and prove that the CMS Mandate is an "Arbitrary and Capricious Agency Action." The Court finds Plaintiffs' arguments persuasive. Plaintiffs argue that the CMS Mandate's overbreadth creates a blanket regulation that relies on "conclusory and unsupported suppositions." ECF No. 7 at 32.  Plaintiffs further argue that CMS failed to consider the extent of the CMS Mandate's impact and inflexibility. *Id*. at 34.

Plaintiffs are likely to prove the CMS Mandate is overbroad in at least three respects. First, the HHS Secretary extrapolated data from one provider and applied it to other fundamentally different settings. Second, the CMS Mandate fails to consider the disruptions to staff shortages and healthcare resources especially in rural areas from its enforcement. Third, the CMS Mandate lacks exemptions for those who: (1) have natural immunity to COVID-19; (2) would prefer a testing option as an alternative; or (3) have little or no patient contact.

     a.   Irrelevant Data to Support Conclusory Suppositions

CMS relies on comprehensive data elicited from just one *type* of facility: long-term-care ("LTC") facilities.[16] 86 Fed. Reg. at 61,558. CMS assumes that the LTC data "may generally be extrapolated to other settings." *Id*. But this is a fallacy of composition. Data reflecting COVID-19

---

[16] CMS states, "Data from CDC's National Healthcare Safety Network (NHSN) have shown that case rates among LTC facility residents are higher in facilities with lower vaccination coverage among staff; specifically, residents of LTC facilities in which vaccination coverage of staff is 75 percent or lower experience higher rates of preventable COVID–19.38 Several articles published in CDC's Morbidity and Mortality Weekly Reports (MMWRs) regarding nursing home outbreaks have also linked the spread of COVID–19 infection to unvaccinated health care workers and stressed that maintaining a high vaccination rate is important for reducing transmission…While similarly comprehensive data are not available for all Medicare- and Medicaid-certified provider types, the available evidence for ongoing healthcare-associated COVID–19 transmission risk is sufficiently alarming in and of itself to compel CMS to take action." 86 Fed. Reg. at 61,558.

vulnerabilities at LTC facilities is not necessarily extrapolative to the remaining fourteen categories of Medicare- and Medicaid-certified facilities.

CMS concluded the available evidence in LTC facilities "is sufficiently alarming in and of itself to compel CMS to take action." *Id.* at 61,558. Defendants were not required to consider *all* possible data in reaching their decision. *See State v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021). But the Court will "not defer to the agency's conclusory or unsupported suppositions." *Id.* (citing *United Techs. Corp. v. U.S. Dep't of Def.* 601 F.3d 557, 562 (D.C. Cir. 2010)). The Court finds Defendants' failure to consider any other data is unreasonable.

In making this finding, the Court notes that LTC facilities treat patients that are older and more vulnerable to COVID-19.[17] Other certified facilities — like psychiatric residential treatment facilities ("PRTF")[18] and community-care oriented health centers — serve patients in younger age brackets that are less vulnerable to COVID-19.[19] Defendant's own data shows that deaths from COVID-19 are overrepresented in LTC facilities.[20] *Id.* at 61,601.

---

[17] "The population of older adults, and LTC facility residents in particular, have been hard hit by the impacts of the pandemic. Among those infected, the death rate for older adults age 65 or higher was hundreds of time higher than for those in their 20s during 2020." 86 Fed. Reg. at 61,601.

[18] "PRTFs are non-hospital facilities that provide inpatient psychiatric services to Medicaid-eligible individuals under the age of 21 (also called the 'psych under 21 benefit')." 86 Fed. Reg. at 61,576.

[19] "LTC facility and home health care patients are on average both the oldest and most health-impaired of those in settings covered by this rule. At the other extreme, rural and other community-care oriented health centers serve the full age spectrum and a lower fraction of severely health-impaired." 86 Fed. Reg. at 61,612.

[20] In expressing the "Populations of Higher Risk for Severe Covid-19 Outcomes", CMS states that "approximately 54.1 million people aged 65 years or older reside in the U.S.; this age group accounts for more than 80 percent of U.S. COVID–19 related deaths. Residents of LTC facilities make up less than 1 percent of the U.S. population but accounted for more than 35 percent of all COVID–19 deaths in the first 12 months of the pandemic." 86 Fed. Reg. at 61,566.

CMS presents no evidence to support why the other fourteen categories of certified facilities should be treated like LTC facilities. *See State Farm*, 463 U.S. at 43 (holding that in reviewing an agency's explanation for its rule the court considers, "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."). The Court finds that Defendants' failure to consider data from any of the other fourteen categories of Medicare- and Medicaid- certified facilities resulted in conclusory and unsupported supposition during the rule making process. *See Biden*, 10 F.4th at 555.

      b.  Staff and Resource Shortages

The CMS Mandate has "near-universal applicability". Even so, CMS conducted a weak and underwhelming analysis of the effects it would have on healthcare staff shortages and patient care. CMS acknowledges the disruptions the CMS Mandate could create in a healthcare environment already plagued with "endemic staff shortages." *Id*. at 61,607. CMS absurdly concludes that the vaccine requirement "will result in nearly all health care workers being vaccinated, thereby benefiting all individuals in health care settings." CMS admitted there was "insufficient evidence to quantify and compare adverse impacts on patient and resident care associated with temporary staffing losses due to mandates." *Id*. at 61,569.

CMS admits vaccination rates are disproportionately lower in rural locations where healthcare workers are more likely to be members of racial and ethnic minorities. CMS dismissively and derisively argues that such workers could simply find jobs in "physician and dental offices" not covered by the CMS Mandate. *Id*. at 61,566, 61,607. CMS's callous response ignores the harsh reality of rural healthcare, where (1) patients have fewer options and (2) the loss of a provider disproportionately affects minority and low-income individuals. *See* ECF No. 7 at 35.

Defendants claim the CMS Mandate is designed to achieve a universally vaccinated healthcare force. 86 Fed. Reg. 61,569. As evidenced by Plaintiffs' affidavits, the CMS Mandate will likely cause significant job loss due to resignation or termination. Plaintiffs offer evidence of healthcare workers in Texas who have not complied with internal COVID-19 vaccine mandates and who will not comply with the CMS Mandate. ECF No. 8-1 at 214-217, 222-223, 231, 233-235, 241-243.

Many executive officers of Medicare- and Medicaid-certified providers and suppliers in Texas express concerns that the exacerbated staffing shortage would likely worsen should the CMS Mandate be enforced. *Id.* at 208, 219, 248, 212, 225, 237, and 231. If they choose not to comply, these executive officers will lose Medicare and Medicaid revenue in an already resource-drained healthcare setting. *Id.*

Such concerns are particularly prevalent in rural areas like the Hansford County Hospital District. At Hansford County Hospital, where COVID-19 has already inflicted a "devastating impact," approximately 56% of medical staff are fully vaccinated as many refuse the vaccine on personal, religious, and medical grounds. *Id.* at 209. The hospital cannot afford to lose more employees because healthcare workers are difficult to recruit in rural areas. *Id.* If enforced, the CMS Mandate would likely create a greater strain on limited resources and prevent residents of rural communities from receiving vital medical services. Further, Plaintiffs argue the CMS Mandate deadlines are impractical. Plaintiffs explain,

> Those receiving the Pfizer vaccine must wait 21 days between their first and second shots, and those receiving the Moderna vaccine must wait 28 days between their first and second shots. App.203. So, hypothetically if a person receives their first shot of the Moderna vaccine on November 30, 2021, they cannot get the second shot any earlier than December 28, 2021, but must get it before January 4, 2022. Taking this example further, if a person is suffering from COVID-19 at this time, they would not be able to take any shots until they recovered, did not have any symptoms and tested negative — even though this person is attempting to comply.

22

ECF No. 7 at 37.

In sum, CMS created a "one-size-fits-all" solution without articulating "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *See State Farm*, 463 U.S. at 43. Therefore, Plaintiffs are likely to prove that the CMS Mandate is arbitrary and capricious because CMS relied on a perfunctory analysis of the possible effects to healthcare staff shortages — particularly in rural areas — and applied an inflexible deadline period for vaccine compliance.

      c.  Lack of Exemptions

Plaintiffs aver that the CMS Mandate lacks exceptions for healthcare workers who: (1) have natural immunity to COVID-19; (2) who would prefer a testing option as an alternative to a compulsory vaccine; or (3) whose jobs consist of little to no patient contact. ECF No. 7 at 33, 36.

Although CMS acknowledges the effectiveness of natural immunity, it rejects natural immunity as a viable alternative to the CMS Mandate's vaccination requirement.[21] 86 Fed. Reg. at 61,614. CMS recognizes the effectiveness of natural immunity yet dismisses it as an illegitimate measure of infection control. Thus, CMS acts in an arbitrary and capricious manner by offering "an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

Also, Defendants allowed regular testing as an alternative to vaccination in the OSHA mandate but provide no explanation why that exception cannot apply here. *See* 86 Fed. Reg. 61,402. CMS simply dismisses testing as a viable alternative to vaccination based on a conclusory supposition that a "vaccination is a more effective infection control measure." *Id.* at 61,614.

---

[21] CMS states that those who have "recovered from infection" are "no longer sources of future infections," which "reduce[s] the risk to both health care staff and patients substantially." 86 Fed. Reg. at 61,604.

Lacking a "satisfactory explanation" for its inflexibility or a "rational connection between the facts found and the choices made," CMS again acts in an arbitrary and capricious manner. *See State Farm*, 463 U.S. at 43.

Finally, the overbreadth of the CMS Mandate is reflected in in its applicability to employees and contractors "who provide any care, treatment, or *other services* for the facility . . . *regardless* of patient contact." 86 Fed. Reg. at 61,570 (emphasis added). In practice, the CMS Mandate applies to telework and administrative employees who have little to no patient contact. It also applies to contracted workers whose interaction with hospital staff and patients is limited to common areas such as restrooms and cafeterias. *Id*. at 61,571. Plaintiffs are likely to win on the merits that the CMS Mandate is arbitrary and capricious because CMS cannot justify such a sweeping application of the rule, sans exceptions.

### D.  Substantial Threat of Irreparable Harm

To warrant a grant of a preliminary injunction, a plaintiff must demonstrate that it is likely to "suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Such likelihood need not be based on a "certainty" but cannot rely upon a mere "possibility" of irreparable harm. *Id*. at 22. Plaintiffs proved they will suffer irreparable harm in at least the two ways discussed next.

1.  *Sovereign and Proprietary Interests.*

a.  Sovereign Interests

Plaintiffs have a sovereign interest in exercising their police powers to protect the health and welfare of its citizens. *Jacobson*, 197 U.S. at 25-26. The CMS Mandate expressly "preempts inconsistent State and local laws as applied to Medicare- and Medicaid-certified providers and suppliers." 86 Fed. Reg. at 61,568. Plaintiffs argue that enforcement of the CMS Mandate harms

Plaintiffs by preventing them from enforcing Texas statutes which currently prohibit mandatory vaccination requirements. *See* ECF No. 8-1 at 253.[22]

Irreparable harm exists when a federal regulation prevents a state from enforcing its duly enacted laws. *See*, *e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) ("[T]he inability to enforce its duly enacted plan clearly inflicts irreparable harm on the State."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time [a State is blocked] from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, C.J., in chambers) ("It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020).

Healthcare facilities covered by the CMS Mandate have a tremendous reliance interest in Medicare and Medicaid funds. Therefore, Defendants unconstitutionally use Congress's spending powers to "commandeer[] a State's . . . administrative apparatus for federal purposes" by conditioning Medicare and Medicaid funds on state surveyor compliance with the mandate. *See NFIB v. Sebelius*, 567 U.S. 519, 577 (2012). As a result, not only would the CMS Mandate prohibit Plaintiffs from enforcing its duly enacted COVID-19 vaccination regulations, but it would likely force Plaintiffs to administer a federal mandate that has a dubious statutory basis.[23] It is a "gun to the head" and an unconstitutional use of Congress's spending powers to compel Plaintiffs through

---

[22] **Executive Order GA-40:** "No entity in Texas can compel receipt of a COVID-19 vaccine by any individual, including an employee or a consumer, who objects to such vaccination for any reason of personal conscience, based on a religious belief, or for medical reasons, including prior recovery from COVID-19. I hereby suspend all relevant statutes to the extent necessary to enforce this prohibition." ECF No. 8-1 at 253.

[23] Even when an expressed statutory basis has been created by Congress, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *NFIB*, 567 U.S. at 577 (citing *New York v. United States*, 505 U.S. 144, 162 (1992)).

"financial inducement" to forgo exercising their police powers to enforce a federal statute. *See NFIB*, 567 U.S. at 577, 581.[24] Therefore, enforcement of the CMS Mandate poses a threat of irreparable harm to Plaintiffs' sovereign interests.

      b.  Proprietary Interests

      Plaintiffs has a proprietary interest in the operation of its healthcare facilities covered by the CMS Mandate. *See* ECF No. 7 at 13. Through the Texas Health and Human Services' Health and Specialty Care System ("HSCS"), Plaintiffs operates various state-run healthcare institutions including thirteen State Supported Living Centers ("SSLCs"), nine State Hospitals ("SHs"), and one residential youth center for individuals with mental health issues. ECF No. 7 at 13. Plaintiffs assert that while HSCS has historically experienced staffing shortages, the COVID-19 pandemic worsened this issue. ("Fill rates for the HSCS have steadily dropped from 86% in March 2020 to 73% in September 2021…State Hospitals currently have 8,508 FTEs, of which only 6,351 positions are filled…SSLCs have 13,863 FTEs, of which only 9,945 are filled.") ECF No. 7 at 13. Plaintiffs submit an affidavit by state HSCS Deputy Executive Commissioner Scott Schalchlin ("Commissioner Schalchlin") who expressed how staffing shortages will be exacerbated by the CMS Mandate:

> Staffing levels in Health and Specialty Care facilities will be impacted by this federal requirement. Many staff have expressed their opposition to mandatory vaccines and I anticipate that some staff will resign in lieu of compliance with this requirement. Decreased staffing will increase the likelihood of injury or incident, could require halting of admissions to HSCS facilities, lead to closure of beds or units in the state hospitals, expand the civil and forensic inpatient care waitlists for state hospitals, and increase the likelihood of regulatory citation due to sub-minimal staffing levels. The downstream impacts of these events will likely lead to increased pressure on local mental health systems, county jails, and the court system as well.

> ECF No. 8-1 at 239.

---

[24] Plaintiff is therefore likely to succeed on Count VII and Count VIII of its Complaint alleging an "Unconstitutional Exercise of Spending Power" and a "Violation of Anti-Commandeering Doctrine." ECF No. 1 at 62-64.

Plaintiffs predict that decreased staffing due to the CMS Mandate will "further strain the already-struggling HSCS and prevent Texans from receiving the care they need." ECF No. 7 at 14. Specifically, Plaintiffs contend that decreased staffing will: (1) "increase the risk of injury or incident; (2) require halting admission to HSCS facilities; (3) overwork nurses; (4) lead to closure of beds or units in the State Hospitals; (5) expand the civil and forensic inpatient care waitlists for State Hospitals; and (6) increase the likelihood of regulatory citation due to sub-minimal staffing levels." *Id.* (additions) Plaintiffs assert that a staffing shortage will also require "additional resources and an increased workload to comply with the onerous regulatory requirements imposed by the CMS Vaccine Mandate." *Id*. citing ECF No. 8-1 at 240.

Such threat of harm to Plaintiffs' proprietary interests is akin to the "irreparable harm" of "the business and financial effects of a lost or suspended employee, compliance and monitoring costs associated with the Mandate, [and] the diversion of resources necessitated by the Mandate" faced by businesses in the recent Fifth Circuit OSHA Mandate Case. *BST Holdings*, 17 F.4th at 618. The CMS Mandate poses a threat of irreparable harm to Plaintiffs' proprietary interests by increasing the likelihood of staffing shortages, thereby creating business and financial effects that can drain state resources and disrupt the state's ability to efficiently operate its various healthcare programs.

## 2. *Staff and Supply Shortages in Rural Areas.*

Like other States, Plaintiffs have endured "endemic staff shortages." 86 Fed. Reg. at 61,607. Texas Health and Human Services issued a report finding that Plaintiffs suffer a shortage of physicians that is projected to increase. ECF No. 8-1 at 103. Further, the pandemic has exacerbated the *nursing* shortage in Texas as State health data projects a deficit of 59,970 nurses in Texas by 2030. *Id*. at 12. Plaintiffs provide numerous affidavits of healthcare professionals in

Texas who lost their jobs due to non-compliance with internal COVID-19 vaccine requirements enforced prior to Governor Abbott's Executive Order prohibiting such mandates. *Id.* at 214-17, 222-23, 233-35, 241-43.

Plaintiffs also submit affidavits from executive officers of hospitals (ECF No. 8-1 at 208, 219, 248), university health centers (ECF No. 8-1 at 212), the HHSC (ECF No. 8-1 at 225, 237), and a healthcare worker who will resign if forced to comply with the CMS Mandate (ECF No. 8-1 at 231). As a composite, these declarants express *both* a grave concern in an exacerbated staffing shortage *and* a substantial reliance on Medicare and Medicaid revenue to fund operations in an already resource-drained healthcare system.

Defendants cite the HHS Secretary's reliance on "real-world experience with COVID-19 vaccination requirements in a variety of settings" to support the prediction that "the vast majority of non-exempt individuals would obtain vaccination, even in cases where individuals earlier had expressed an initial unwillingness to do so." ECF No. 32 at 47. But the affidavits submitted by Texas healthcare workers and leaders suggest otherwise — and predict that even a small amount of staff loss is detrimental.

Healthcare staff who refused the COVID-19 vaccine have cited various reasons: personal, religious, and medical. *Id*. at 209. Such convictions are likely to persist even in the presence of a mandate. The CEO of Goodall-Witcher Healthcare states that "multiple employees" informed him that they will resign if forced to get the COVID-19 vaccine. ECF No. 8-1 at 248. In addition, there are affidavits from healthcare workers in Texas who have not complied with internal COVID-19 vaccine mandates and who will not comply if the CMS Mandate is enforced. *Id.* at 214-17, 222-

23, 231, 233-35, 241-43. Plaintiffs argue that rural healthcare providers like Hansford County Hospital can ill afford to lose *any* more staff.[25]

Plaintiffs aver that rural hospitals are likely to experience the greatest threat of irreparable harm. Plaintiffs submit an affidavit by Jeff R. Turner ("Mr. Turner"), the Chief Executive Officer of Moore County Hospital District ("MCHD"), located in one of the "earliest and hardest hit rural communities in Texas" due to "its geographic isolation and presence of a meat-packing plant with a sizable refugee population." ECF No. 8-1 at 245. Mr. Turner explains that despite Moore County's "dubious distinction" of having the "highest per capita covid-infection rate in Texas," 99 of MCHD's 372 full-time equivalent employees remain unvaccinated. *Id*. at 245-46. Mr. Turner predicts that MCHD will have to choose between forgoing 45% of its "total payor mix" that rely on Medicare and Medicaid program funding or lose up to 50% of its employees who remain unvaccinated if the mandate is enforced, thereby putting MCHD in a "no-win situation." *Id*. Either "penalty" will likely cripple MCHD's ability to provide essential healthcare services. *Id*. at 246.[26]

Plaintiffs have proven through affidavits that the CMS Mandate poses a substantial threat of irreparable harm by compromising the ability of "providers and suppliers" to offer essential healthcare services and full range of care for vulnerable communities across Texas.

---

[25] Declarant Jonathan Bailey, CEO for Hansford County Hospital District: "I cannot afford to lose more staff . . . Everyone in our community will suffer if we lose staff and services." ECF No. 8-1 at 209-10.

[26] Defendants argue that immediate termination from Medicare and Medicaid programs will not occur. Instead, facilities will be given an opportunity "to make corrections and come into compliance." ECF No. 32 at 48. Lack of *immediacy* does not change the fact that healthcare providers in rural areas such as MCHD will have to choose between (1) complying with the CMS Mandate and losing a significant amount of much needed medical staff, or (2) forego a substantial amount of Medicare and Medicaid funding.

### E.  Public Interest

Federal courts may consider the third and fourth requirements for an issuance of a preliminary injunction together as they overlap considerably and "merge when the Government is the opposing party." *Texas*, 809 F.3d at 187; *Nken v. Holder*, 556 U.S. 418, 435 (2009). In determining the balance of equities and public interest factors affected by a grant of injunctive relief, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citing *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)). Further, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312 (1982); *see also Railroad Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 500 (1941)).

Defendants allege a more generalized, nebulous, and speculative harm,[27] while Plaintiffs provided particular and tangible evidence that they will endure irreparable harm to their Plaintiffs' economic, healthcare, and liberty interests should the injunction be denied. In addition, the Court finds it is in the public interest for Plaintiffs to maintain the status quo of encouraging, but not mandating the vaccine in light of the staffing crisis. The Fifth Circuit recently held in the OSHA Vaccine Mandate case, "[T]he public interest is also served by maintaining our constitutional structure and . . . the liberty of individuals to make intensely personal decisions according to their own convictions." *BST Holdings*, 17 F.4th at 618. Accordingly, the Court finds that the balance of equities and the public interest in the status quo weigh in favor of granting Plaintiffs' Motion for Preliminary Injunction.

---

[27] Defendants' public-interest argument relies on "slowing the spread of COVID-19 among millions of healthcare workers and patients at federally-funded health care facilities." ECF No. 32 at 49. This is undermined by CMS's own admission within its rule that "the effectiveness of the vaccine to prevent disease transmission by those vaccinated [is] not currently known." 86 Fed. Reg. at 61,615.

CONCLUSION

For the reasons set forth above, the Court **GRANTS** Plaintiffs' Motion for a Preliminary Injunction. The Court **ORDERS** that Defendants are preliminarily enjoined from the implementation and enforcement of 86 Fed. Reg. 61,555 (Nov. 5, 2021), the Interim Final Rule with Comment Period entitled "Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination," against any and all Medicare- and Medicaid-certified providers and suppliers within the State of Texas pending a trial on the merits of this action or until further order of this Court. Defendants shall immediately cease all implementation or enforcement of the Interim Final Rule with Comment Period as to any Medicare- and Medicaid-certified providers and suppliers within the State of Texas. Using the same methodology set forth in the Court's previous Preliminary Injunction Hearing and Order, Defendants shall provide "notice" to all Medicare- and Medicaid-certified providers and suppliers located in Texas that the CMS Mandate will *not* be implemented or enforced. *See* ECF No. 42, 43.

The Court further **ORDERS** that no security bond shall be required under Federal Rule of Civil Procedure 65(c).

**SO ORDERED.**

December 15, 2021.

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

31